## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| NORTHWESTERN CORPORATION, | Case No. 03-12872 (JLP) |
| Debtor. | |
| MAGTEN ASSET MANAGEMENT CORPORATION AND TALTON R. EMBRY, | Adv. Pro. No 04-55051 (JLP) |
| Appellants, | |
| v. | Civil Action No. |
| NORTHWESTERN CORPORATION, | 05-00548 (JJF) |
| Appellee. | |

## OPENING BRIEF OF APPELLANTS

**FRIED, FRANK, HARRIS, SHRIVER**
  **& JACOBSON LLP**
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:   (212) 859-4000

Counsel for Magten Asset Management
Corporation and Talton R. Embry

**BLANK ROME LLP**
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6400
Facsimile:   (302) 425-6464

Counsel for Magten Asset Management
Corporation and Talton R. Embry

Dated: December 21, 2006
Wilmington. Delaware

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

BASIS OF APPELLATE JURISDICTION ............................................................... 4

ISSUES PRESENTED ............................................................................................... 4

STANDARD OF APPELLATE REVIEW ................................................................. 5

STATEMENT OF THE CASE ................................................................................... 6

      I.      PARTIES ..................................................................................... 6

               A.      NorthWestern ..................................................................... 6

               B.      Magten ............................................................................... 6

               C.      Talton R. Embry ............................................................... 7

      II.     THE EVENTS LEADING UP TO THE ADVERSARY PROCEEDING ................... 7

      III.    THE ADVERSARY PROCEEDING ......................................... 9

      IV.    NORTHWESTERN'S FAILURE TO PURSUE DISCOVERY ............................... 10

      V.     THE SETTLEMENT NEGOTIATIONS. .................................. 11

      VI.    THE WITHDRAWAL OF THE ADVERSARY PROCEEDING
               COMPLAINT ......................................................................... 11

      VII.   THE DENIAL OF THE FEES AND EXPENSES MOTION .................................. 12

ARGUMENT ............................................................................................................ 13

I.       THE BANKRUPTCY COURT ERRED IN HOLDING THAT APPELLANTS
        WERE NOT THE PREVAILING PARTIES WHEN NORTHWESTERN
        VOLUNTARILY DISMISSED THE COMPLAINT WITH PREJUDICE ..................... 13

II.      THE BANKRUPTCY COURT ERRED IN REFUSING TO AWARD APPELLANTS'
        FEES AND COSTS IN DEFENDING AGAINST THE COMPLAINT ......................... 17

      A.     Appellants should be awarded fees pursuant to Bankruptcy Rule 7041 and
          the exception to the American Rule for bringing or maintaining an action "in
          bad faith, vexatiously, wantonly, or for oppressive reasons." ..................... 17

               1.      Fees under bankruptcy Rule 7041 ................................................... 17

i

2.    Fees under the exception to the American Rule for bringing or
maintiaining an action "in bad faith, vexatiously, wantonly, or
for oppressive reqasons." ............................................................................... 19

3.    NorthWestern's extreme misconduct demonstrates exceptional
circumstances and bad faith meriting an award of fees .................................. 21

(i)    *NorthWestern's knowledge that the allegations in the
Complaint were false* ........................................................................ 22

(ii)    *NorthWestern's failure to conduct even a minimal
preliminary investigation* .................................................................. 24

(iii)    *NorthWestern's behavior during the discovery process* .................... 26

B.    Appellants should be awarded costs pursuant to Bankruptcy Rules 7041
and 7054(b) and the exception to the American Rule for bringing or
maintaining an action "in bad faith, vexatiously, wantonly, or for
oppressive reasons. ................................................................................................... 27

III.    THE BANKRUPTCY COURT ERRED IN FINDING THAT THE ORDER
PERMITTING SECURITIES TRADING UPON THE ESTABLISHMENT
OF AN ETHICAL WALL PROHIBITED TRADING IN NORTHWESTERN'S
SECURITIES ......................................................................................................................... 28

IV.    THE BANKRUPTCY COURT ERRED IN FINDING THAT APPELLANTS'
FEES AND COSTS INCURRED IN DEFENDING AGAINST CLAIMS OF
BREACH OF FIDUCIARY DUTY AND INSIDER TRADING WERE
UNREASONABLE ............................................................................................................... 32

A.    The Bankruptcy Court committed reversible error when it determined
that Appellants' fees were unreasonable and impermissible .......................... 32

B.    The Bankruptcy Court committed reversible error when it determined
that Appellants' costs were unreasonable and impermissible. ....................... 34

C.    The Bankruptcy Court committed reversible error in concluding
that Appellants' fees and costs were unreasonable in their
entirety................................................................................................................ 39

CONCLUSION ....................................................................................................................................... 40

## TABLE OF AUTHORITIES

### CASES

*Aerotech, Inc. v. Estes*,
   110 F.3d 1523 (10th Cir. 1997).........................................................................................18

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
   421 U.S. 240 (1975)...............................................................................................15, 19

*Anthony v. Marion County Gen. Hosp.*,
   617 F.2d 1164 (5th Cir. 1980).........................................................................................14

*Beer v. John Hancock Life Ins. Co.*,
   211 F.R.D. 67 (N.D.N.Y. 2002).................................................................................14, 15

*Behrle v. Olshansky*,
   139 F.R.D. 370 (W.D. Ark. 1991) ...............................................................................37, 38

*Burger v. Level End Dairy Investors, Inc. (In re Burger)*,
   125 B.R. 894 (Bankr. D. Del. 1991) ................................................................................20

*Callaway Golf Co. v. Dunlop Slazenger*,
   384 F. Supp. 2d 735 (D. Del. 2005)...........................................................................14, 17

*Cantrell v. Int'l Brotherhood of Elec. Workers, Local 2021*,
   69 F.3d 456 (10th Cir. 1995).....................................................................................14, 15

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) .........................................................19, 20, 21

*Christianburg Garment Co. v. EEOC*,
   434 U.S. 412 (1978)...................................................................................................16

*Christina A. v. Bloomberg*,
   315 F.3d 990 (8th Cir. 2003).........................................................................................13

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,
   and Comm. of Creditors Holding Unsecured Claims as Estate Representative of
   Papercraft Corp.*,
   160 F.3d 982 (3d Cir. 1998)..........................................................................................24

*Claiborne v. Wisdom*,
   414 F.3d 715 (7th Cir. 2005).........................................................................................15

*Colombrito v. Kelly*,
   764 F.2d 122 (2d Cir. 1985).....................................................................................18, 21

*Crawford Fitting Co. v. J.T. Gibbons, Inc.*,
   482 U.S. 437 (1987)...............................................................................................37, 38

iii

*D'Auria v. Minniti (In re Minniti)*,
   242 B.R. 843 (Bankr. E.D. Pa. 2000)................................................................................ 20

*DeKalb Genetics Corp. v. Pioneer Hi-Bred Int'l*,
   2002 U.S. Dist. LEXIS 10628 (N.D. Ill. June 13, 2002) ................................................... 14

*Doering v. Union County Bd. of Chosen Freeholders*,
   857 F.2d 191 (3d Cir. 1988)............................................................................................. 19

*Dorfsman v. Law Sch. Admission Council, Inc.*,
   2001 U.S. Dist. LEXIS 24044 (E.D. Pa. Nov. 28, 2001)........................................... 17, 18

*Esquivel v. Arau*,
   913 F. Supp. 1382 (C.D. Cal. 1996)................................................................................ 38

*Fellheimer Eichen & Braverman, P.C. v. Charter Techs., Inc.*,
   57 F.3d 1215 (3d Cir. 1995)....................................................................................... 19, 20

*Fink v. Gomez*,
   239 F.3d 989 (9th Cir. 2001)........................................................................................... 20

*Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs.)*,
   153 F.3d 61 (2d Cir. 1998)............................................................................................. 31

*J.T. Gibbons, Inc. v. Crawford Fitting Co.*,
   102 F.R.D. 73 (E.D. La. 1984)........................................................................................ 36

*John Evans Sons, Inc. v. Majik-Ironers, Inc.*,
   95 F.R.D. 186 (E.D. Pa. 1982)....................................................................................... 18

*Kiester v. Mizrahi (In re Mizrahi)*,
   179 B.R. 322 (Bankr. M.D. Fla. 1995) ........................................................................... 15

*Kona Enterprises v. Estate of Bishop*,
   229 F.3d 877 (9th Cir. 2000)........................................................................................... 14

*Lawrence v. Fuld*,
   32 F.R.D. 329 (D. Md. 1963).......................................................................................... 18

*Leonard v. Univ. of Del.*,
   204 F. Supp. 2d 784 (D. Del. 2002)................................................................................ 20

*Manus Corp. v. NRG Energy, Inc. (In re O'Brian Envtl. Energy Inc.)*,
   188 F.3d 116 (3d Cir. 1999)............................................................................................. 6

*Meder v. Everest & Jennings, Inc.*,
   553 F. Supp. 150 (E.D. Mo. 1982).................................................................................. 36

*Miller v. Cardinale (In re Deville)*,
361 F.3d 539 (9th Cir. 2004)............................................................................................. 19

*Mobile Power Enters., Inc. v. Power Vac, Inc.*,
496 F.2d 1311 (10th Cir. 1974)................................................................................... 15, 18

*Murdock v. Prudential Ins. Co. of Am.*,
154 F.R.D. 271 (M.D. Fla. 1994).................................................................................... 18

*In re Paoli R.R. Yard PCB Litig.*,
221 F.3d 449 (3d Cir. 2000)............................................................................................ 36

*Peek-a-boo Lounge, Inc. v. Manatee County*,
2006 U.S. Dist. LEXIS 24567 (M.D. Fla. Apr. 28, 2006) ................................................ 15

*Primus Auto. Fin. Servs., Inc. v. Batarse*,
115 F.3d 644 (9th Cir. 1997)........................................................................................... 20

*Pro-Tec Servs., LLC v. Inacom Corp. (In re Inacom Corp.)*,
2004 U.S. Dist. LEXIS 20822 (D. Del. Oct. 4, 2004)......................................................... 6

*Quincy Johnson, Jones, Myott, Williams, Acevedo, Vaugh Architects, Inc. v. Pringle Dev., Inc.*,
2006 U.S. Dist. LEXIS 53103 (M.D. Fla. Aug. 1, 2006).................................................. 15

*Safety Nat'l Cas. Corp. v. Kaiser Aluminum & Chem. Corp. (In re Kaiser Aluminum Corp.)*,
303 B.R. 299 (D. Del. 2003) .............................................................................................. 6

*Samsung Elecs. Co., v. Rambus Inc.*,
440 F. Supp. 2d 495 (E.D. Va. 2006).............................................................................. 15

*Sassower v. Field*,
973 F.2d 75 (2d Cir. 1992).............................................................................................. 20

*Schwarz v. Folloder*,
767 F.2d 125 (5th Cir. 1985)........................................................................................... 14

*SecuraComm Consulting, Inc. v. Securacom Inc.*,
224 F.3d 273 (3d Cir. 2000)............................................................................................ 19

*Sheets v. Yamaha Motors Corp., U.S.A.*,
891 F.2d 533 (5th Cir. 1990)........................................................................................... 14

*Shields v. Zuccarini*,
254 F.3d 476 (3d Cir. 2001)............................................................................................ 19

v

*Smoot v. Fox*,
  340 F.2d 301 (6th Cir. 1964)..........................................................................14, 15

*Smoot v. Fox*,
  353 F.2d 830 (6th Cir. 1965)................................................................................18

*Steinert v. Winn Group, Inc.*,
  440 F.3d 1214 (10th Cir. 2006)......................................................................17, 18

*United States v. Admin. Enters., Inc.*,
  46 F.3d 670 (7th Cir. 1995)..................................................................................31

*United States v. Estate of Rogers*,
  2003 U.S. Dist. LEXIS 20171 (E.D. Tenn. Apr. 11, 2003) ...........................14, 16

*United States v. Spallone*,
  399 F.3d 415 (2d Cir. 2005)...........................................................................31, 32

*Valley Nat'l Bank v. Abdnor*,
  918 F.2d 128 (10th Cir. 1990)..............................................................................31

*Viking Associates v. Drewes (In re Olson)*,
  120 F.3d 98 (8th Cir. 1997)..................................................................................24

*Wainwright Secs., Inc. v. Wall St. Transcript Corp.*,
  80 F.R.D. 103 (S.D.N.Y. 1978) ............................................................................15

*Willner v. Budig*,
  1988 U.S. Dist. LEXIS 12107 (D. Kan. Oct. 14, 1988)......................................27

*York v. Ferris State Univ.*,
  36 F. Supp. 2d 976 (W.D. Mich. 1998)...........................................................16, 17

*Zenith Ins. Co. v. Breslaw*,
  108 F.3d 205 (9th Cir. 1997)................................................................................14

*Zucker v. Katz*,
  1990 U.S. Dist. LEXIS 1748 (S.D.N.Y. Feb. 21, 1990) .....................................38

## STATUTES

15 U.S.C. § 78t-1 .....................................................................................................29

28 U.S.C. § 158(a)......................................................................................................4

28 U.S.C. § 1920 ...................................................................................35, 36, 37, 38

42 U.S.C. § 1988 .....................................................................................................16

17 C.F.R. § 240.10b-5-1 ............................................................................................... 29

Del. Local Bankr. R. 2016-2 ...................................................................................... 33

Fed. R. Bankr. P. 7041 .......................................................................................... *passim*

Fed. R. Bankr. P. 7054(b) ..................................................................................... *passim*

Fed. R. Bankr. P. 8001(a) ............................................................................................ 4

Fed. R. Bankr. P. 8002 ................................................................................................. 4

Fed. R. Civ. P. 30(b)(6) .............................................................................................. 24

Fed. R. Civ. P. 41(a) ............................................................................................. *passim*

Fed. R. Civ. P. 41(d) ................................................................................................... 38

Fed. R. Civ. P. 54(d) ....................................................................................... 35, 37, 38

## MISCELLANEOUS

*Herbert S. Wander, Chinese Walls for Creditors' Committees,*
   48 Bus. Law. 747 (1993) ........................................................................................ 29

*1-5 Collier Business Workout Guide,* P 5.04 ............................................................ 29

## PRELIMINARY STATEMENT

This appeal by Magten Asset Management Corporation ("Magten") and Talton R. Embry ("Embry" and together with Magten, "Appellants") arises from the Order dated June 6, 2005 (the "Fees and Expenses Order") of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") denying Appellants' motion (the "Fees and Expenses Motion") for fees and expenses incurred in connection with the adversary proceeding (the "Adversary Proceeding") filed by NorthWestern Corporation ("NorthWestern") against Appellants and ultimately abandoned and voluntarily dismissed by NorthWestern with prejudice.

NorthWestern brought the Adversary Proceeding in August 2004, alleging that Appellants traded in certain of its securities, known as QUIPS, while in possession of material, non-public information Appellants obtained while Magten was serving on NorthWestern's Official Committee of Unsecured Creditors (the "Committee"). See App. Exh. 1.[1]

As discussed herein, NorthWestern's allegations of insider trading and securities law violations were intended not only to have a financial impact on Appellants, but more importantly to tarnish Embry's reputation and impede Magten's ability to participate in other bankruptcy cases or out-of-court restructurings in the future. As such, NorthWestern brought the Adversary Proceeding knowing that the allegations in its complaint (the "Complaint") had no basis in fact or law and only dismissed the Complaint after costing Appellants significant delay and expense.

Prior to filing the Complaint, through discovery in an unrelated matter, NorthWestern had obtained a copy of Magten's trading records for the QUIPS, which showed that Magten (i) had ceased trading the QUIPS before attending its first Committee meeting and receiving confidential information and (ii) did not resume trading until Magten was no longer a member of the Committee and NorthWestern had already filed its chapter 11 plan, disclosure statement and its 10-K and 10-Q,

---

[1]     References to items identified in Appellants' Designation of Items to Be Included in the Record on Appeal and Statement of the Issues to be Presented on Appeal of Magten Asset Management Corporation and Talton R. Embry [Docket No. 2] are referred to as "App. Exh. __."

1

which disclosed all material information concerning NorthWestern. Moreover, the Complaint was predicated on an allegation that the Committee may have provided confidential information to Magten. However, prior to filing the Complaint, NorthWestern could easily have ascertained what, if any, confidential information the Committee provided to Appellants. Yet, NorthWestern chose not to make any inquiries whatsoever and instead simply filed the Complaint "upon information and belief." See App. Exh. 1, Cplt. at ¶ 15, 16, 25, 29, 35, 49, 50, 51, 52.

Moreover, after alleging that the Committee and its advisors provided material non-public information to Appellants, NorthWestern never sought any documentary or testimonial discovery from the Committee or its professionals because it knew its allegations were false. Thus Appellants had to seek discovery from NorthWestern and the Committee in order to disprove the damaging allegations. Adding insult to injury, when Appellants sought discovery from NorthWestern and the Committee, both parties resisted the discovery demands and NorthWestern, once again, failed to take any steps to support the allegations it had made on "information and belief." Likewise, when the members of the Committee and the Committee's professionals refused to provide documents responsive to Appellants' subpoenas, NorthWestern made no effort to challenge the assertion of privilege, but rather Appellants sought the Bankruptcy Court's intervention to obtain the necessary information. It was only through Appellants' discovery efforts to subpoena and depose the Committee's professionals and the individual Committee members that the facts concerning what information the Committee provided to Appellants were made known.

On January 27, 2005, when discovery had been substantially completed, when Appellants had already completed the pre-trial brief due that day, when trial preparation was well under way, and with only ten days before the start of the trial, the parties reached an agreement on the settlement of all outstanding claims and causes of actions. NorthWestern subsequently disavowed the settlement, and knowing that it had filed a frivolous Complaint and had no evidence to substantiate its allegations, filed a motion to withdraw the Complaint with prejudice on February 25, 2005. See

2

App. Exh. 63. NorthWestern's withdrawal of the Complaint, however, was long overdue as Appellants had already incurred $710,524.00[2] in fees and $73,596.30 in costs as a result of NorthWestern's Complaint and dilatory tactics. See App. Exh. 69, Fees and Expenses Motion at ¶ 4.

On March 9, 2005, the Bankruptcy Court entered an order dismissing the Complaint with prejudice and preserving Appellants' rights to seek fees and costs as compensation for Appellants' time and efforts spent defending against the allegations in the Complaint. See App. Exh. 67. Accordingly, on March 22, 2005, Appellants filed the Fees and Expenses Motion with the Bankruptcy Court seeking as award of fees in the amount of $710,524.00 and costs in the amount of $73,596.30, incurred in connection with the Adversary Proceeding. See App. Exh. 69.

By a memorandum decision entered on June 6, 2005, the Bankruptcy Court denied the Fees and Expenses Motion based on no less than four reversible errors. First, the Bankruptcy Court erroneously found that its dismissal of the Complaint with prejudice did not confer prevailing party status on Appellants, despite precedent to the contrary and despite NorthWestern's admission that Appellants were entitled to seek fees and costs as the prevailing party in the Adversary Proceeding. See App. Exh. 79, Opinion at ¶ 14.

Second, the Bankruptcy Court erred in finding that it lacked the authority under Bankruptcy Rule 7041 to grant the Fees and Expenses Motion and that, even if it did have the requisite authority, the facts of this case did not merit an award of fees and costs. See App. Exh. 79, Opinion at ¶ 14. The record before the Bankruptcy Court clearly established that NorthWestern prosecuted the Adversary Proceeding in bad faith, as evidenced by its numerous instances of harassment and other misconduct, and that exceptional circumstances existed to warrant an award of fees and costs.

Although not directly related to the issues before it, the Bankruptcy Court also committed reversible error in misconstruing the Order Permitting Securities Trading Upon the Establishment of

---

[2]     Counsels' fees include the total time incurred by Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") and the time incurred by Blank Rome LLP ("Blank Rome") in connection with the Adversary Proceeding. Moreover, this amount has been voluntary reduced by counsel.

an Ethical Wall (the "Trading Order").[3] The Trading Order provided a safe harbor for Committee members to continue to trade in NorthWestern's securities. However, the Bankruptcy Court apparently interpreted the Order to forever prohibit an entity that served on the Committee from trading in NorthWestern's securities, even after previously confidential information had been publicly disclosed. See App. Exh. 79, Opinion at ¶ 10. Furthermore, the Bankruptcy Court erroneously ignored the Committee's bylaws and the confidentiality agreement (the "Confidentiality Agreement") executed by members of the Committee and NorthWestern, both of which stated that trading in NorthWestern's securities was permitted in accordance with securities laws.

Finally, the Bankruptcy Court erred in finding that Appellants fees' and costs were unreasonable, despite the fact that NorthWestern did not object to the reasonableness of the fees and costs requested, and despite the fact that the Bankruptcy Court did not give Appellants the opportunity to address the Court's questions regarding the reasonableness of the fees and costs. See App. Exh. 79, Opinion at ¶ 16. As a result, the Bankruptcy Court's decision denying the Fees and Expenses Motion should be reversed.

## BASIS OF APPELLATE JURISDICTION

This is an appeal of the Fees and Expenses Order. In accordance with Fed R. Bankr. P. 8001(a) and 8002, on June 13, 2005, Appellants timely filed the Notice of Appeal of the Fees and Expenses Order. This Court, therefore, has jurisdiction over this case pursuant to 28 U.S.C. § 158(a)(1) and Fed. R. Bankr. P. 8001(a).

## ISSUES PRESENTED

1.     Whether the Bankruptcy Court erred in determining, contrary to overwhelming authority, that Appellants were not the prevailing parties, when NorthWestern voluntarily dismissed the Complaint with prejudice.

---

3     The Trading Order was entered by Bankruptcy Judge Charles G. Case, on November 6, 2003, before NorthWestern's Chapter 11 Case was reassigned to Bankruptcy Judge John L. Peterson.

4

2.    Whether the Bankruptcy Court erred in refusing to award Appellants' fees and costs
      in defending against the Complaint where (i) NorthWestern voluntarily dismissed the
      Complaint with prejudice on the eve of trial, (ii) the undisputed documentary
      evidence establishes that NorthWestern knew that the allegations underlying the
      Complaint were meritless at the time Complaint was filed, (iii) NorthWestern
      undertook no investigation prior to the filing of the Complaint and no discovery after
      the filing of the Complaint to attempt to prove the allegations asserted therein, and
      (iv) the Complaint was filed solely to harass Appellants.

3.    Whether the Bankruptcy Court erred in determining that the Trading Order prohibited
      trading in NorthWestern's securities despite the fact that by its own terms, the Order
      provided a safe harbor and despite the fact that the Committee's bylaws and the
      Confidentiality Agreement affirmatively stated that trading in NorthWestern's
      securities was permitted in accordance with securities laws.

4.    Whether the Bankruptcy Court erred in determining that Appellants' legal fees and
      costs for defending against claims of breach of fiduciary duty and insider trading
      were unreasonable where Appellants' counsel was required to undertake significant
      discovery, draft multiple dispositive motions, and prepare for trial on an expedited
      basis and where opposing counsel did not object to the reasonableness of the fees and
      costs, where no requests for follow up information regarding Appellants' legal fees
      and costs were made by the Bankruptcy Court or any party and where Appellants'
      counsel was available at the hearing on Appellants' motion for its legal fees and costs
      to testify and be cross-examined regarding such fees and costs.

## STANDARD OF APPELLATE REVIEW

When considering an appeal from a ruling by the United States Bankruptcy Court, a "district
court reviews the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear

5

error, and its exercise of discretion for abuse." Pro-Tec Servs., LLC v. Inacom Corp. (In re Inacom Corp.), 2004 U.S. Dist. LEXIS 20822, at *3 (D. Del. Oct. 4, 2004) (citing Manus Corp. v. NRG Energy, Inc. (In re O'Brian Envtl. Energy Inc.), 188 F.3d 116, 122 (3d Cir. 1999); Safety Nat'l Cas. Corp. v. Kaiser Aluminum & Chem. Corp. (In re Kaiser Aluminum Corp.), 303 B.R. 299, 302 (D. Del. 2003) ("In undertaking a review of the issues on appeal, the Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions.").

## STATEMENT OF THE CASE

### I.    PARTIES

#### A.    NorthWestern

NorthWestern is a publicly traded Delaware corporation that was incorporated in 1923. NorthWestern, together with its direct and indirect non-debtor subsidiaries, comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota, and Nebraska. On September 14, 2003 (the "Petition Date"), NorthWestern filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On October 19, 2004, the Bankruptcy Court entered the order confirming NorthWestern's Plan. On November 1, 2004, the Plan became effective and NorthWestern ceased to operate as a debtor in possession.

#### B.    Magten

Magten holds in excess of 40% of NorthWestern's Series A 8.45% Quarterly Income Preferred Securities ("QUIPS") issued by Montana Capital I (the "Trust"). The Trust is a business trust established pursuant to the Delaware Business Trust Act. The Trust was established by The Montana Power Company ("Montana Power"), predecessor in interest to Clark Fork (f/k/a NorthWestern Energy, LLC), as a financing vehicle. The sole assets of the Trust are the 8.45% Junior Subordinated Debentures due 2036 issued by Montana Power.

6

C.    Talton R. Embry

Embry is the principal and managing director of Magten. Embry is 100% owner of Magten and chairman of the company board of directors. See App. Exh. 1, Cplt. at ⁋ 6.

II.    THE EVENTS LEADING UP TO THE ADVERSARY PROCEEDING

On account of Magten's holdings in NorthWestern's QUIPS, on the Petition Date, Appellants had an unliquidated claim (the "Magten Claim") for (i) the face amount of approximately 40% of the QUIPS held by Magten and (ii) damages resulting from an alleged fraudulent transfer of assets to NorthWestern in 2002.

On November 6, 2003, at the request of the Committee and prior to Magten being appointed to the Committee, the Bankruptcy Court entered the Trading Order, which provided a safe harbor to Committee members to continue trading in NorthWestern's securities through the establishment an ethical wall. See App. Exh. 85.

On November 25, 3005, the Office of the United States Trustee appointed Magten to the Committee. See App. Exh. 1, Cplt. at ⁋ 14. The first meeting of the Committee that Appellants attended occurred on December 18, 2003. See App. Exh. 3, Embry Decl. at ⁋ 7. At that time, Embry, on behalf of Magten, executed the Confidentiality Agreement, agreeing to maintain the confidentiality of all non-public information provided to the Committee. See App. Exh. 3, Embry Decl. at ⁋ 9. From that point forward, Appellants refrained from either buying or selling QUIPS until after NorthWestern had disclosed all material information and after Magten was removed from the Committee due to prosecution of the Magten Claim through a separate adversary proceeding brought by Appellants against NorthWestern (the "Fraudulent Conveyance Proceeding"). The Fraudulent Conveyance Proceeding contended that NorthWestern wrongfully appropriated certain assets of a subsidiary and that the holders of the QUIPS (as direct creditors of that subsidiary as well

7

as NorthWestern) had the right to have their claims paid in full before those assets could be made available to satisfy the claims of NorthWestern's other creditors.

Prior to attending its first Committee meeting, between December 1, 2003 and December 17, 2003, Appellants acquired 27,540 shares of QUIPS and sold 1,900 shares of QUIPS (collectively, the "December Transactions"). See App. Exh. 3, Embry Decl. at ¶ 4, 5. Appellants made additional purchases of QUIPS (the "Post-Committee Transactions") after Magten was no longer a member of the Committee and after NorthWestern had issued its plan and disclosure statement and filed a 10-K and 10-Q with the SEC – all public documents in which NorthWestern was required by law to disclose all information which could be material to the purchase or sale of QUIPS. See App. Exh. 70, Kaplan Decl. at ¶ 4. The Post-Committee Transactions consisted of purchases of 95,000 shares of QUIPS. See App. Exh. 3, Embry Decl. at ¶ 11. Appellants' investment decision to acquire additional QUIPS through the Post-Committee Transactions was based on Embry's independent assessment of the claims being advanced against NorthWestern on behalf of the holders of the QUIPS in the Fraudulent Conveyance Proceeding.

On March 11, 2004, NorthWestern filed its plan of reorganization (as amended, the "Plan"). The Plan provided that holders of the QUIPS would receive 2% of the equity of reorganized NorthWestern if their class accepted the Plan and nothing if the class rejected the Plan. See App. Exh. 88, Plan at pp. 37-39. Consequently, the Plan and valuations underlying the Plan showed the QUIPS to be out of the money. NorthWestern's Plan also required QUIPS holders accepting the Plan to abandon the litigation claims being prosecuted in the Fraudulent Conveyance Proceeding. See App. Exh. 89, Disclosure Statement at pp. 55-57. Because Appellants believed that the amount Magten was entitled to recover on account of those claims was dramatically higher than the distribution being offered under the Plan, Magten did not accept the Plan. Magten objected to

8

confirmation of the Plan but was overruled and received no distribution due to its failure to vote in favor of the Plan.[4]

## III.    THE ADVERSARY PROCEEDING

On August 20, 2004, NorthWestern commenced the Adversary Proceeding against Appellants, seeking damages, subordination of the Magten Claim, and equitable relief based on Appellants' allegedly improper trading activities regarding the QUIPS. The primary allegations in the Complaint were that Appellants traded QUIPS while Magten was a member of the Committee and that Appellants had material, non-public information when they made the trades in question. These allegations were based "upon information and belief." See App. Exh. 1, Cplt. at ¶ 15, 16, 25, 29, 35, 49, 50, 51, 52.

On September 28, 2004, Appellants filed their motion to dismiss the Adversary Proceeding (the "Motion to Dismiss") in which they noted, among other things, that there was no factual basis to the allegations in the Complaint. See App. Exh. 2. With the Motion to Dismiss, Appellants included a declaration (the "Declaration") of Embry in which Embry declared that he had no material, non-public information prior to attending Magten's first Committee meeting and resumed trading only after Magten was no longer a member of the Committee and NorthWestern had disclosed all material information. See App. Exh. 3. On November 8, 2004, the Court entered an order denying the Motion to Dismiss on the grounds that NorthWestern should have an opportunity to offer evidence in support of its claims. See App. Exh. 9. Thereafter, on November 29, 2004, Appellants filed their answer and affirmative defenses to the Complaint, denying the allegations set forth in the Complaint. See App. Exh. 15.

---

4       The Plan required holders of QUIPS to chose to (i) receive twelve cents on the dollar on account of their QUIPS holdings and forego any right with respect to the Fraudulent Conveyance Proceeding or (ii) pursue the Fraudulent Conveyance Proceeding, receive no distribution on account of their QUIPS holdings, and receive sixty-three cents on the dollar on any judgment obtained in the Fraudulent Conveyance Proceeding.

## IV.    NORTHWESTERN'S FAILURE TO PURSUE DISCOVERY

Despite NorthWestern's assertion in its opposition to the Motion to Dismiss that discovery
was necessary to prove its allegations in the Complaint and support its identification of the
Committee and the Committee's professionals as having knowledge concerning the information
allegedly provided to Appellants, the only discovery conducted by NorthWestern in connection with
the Adversary Proceeding was the service of a document request and deposition notice on
Appellants, the service of a subpoena on Magten's counsel, and the service of subpoenas on certain
of Appellants' brokers that handled various purchases of QUIPS made by Appellants. See App. Exh.
70, Kaplan Decl. at ¶ 11. In that regard, the only information sought from Appellants' brokers were
documents reflecting when Appellants had purchased and sold securities – information NorthWestern
had in its possession before it even filed the Complaint. See App. Exh. 70, Kaplan Decl. at ¶ 11.

In contrast, Appellants vigorously pursued discovery on behalf of both themselves and
NorthWestern, including seeking documentary and testimonial evidence from (i) NorthWestern's
counsel, Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings"), (ii) NorthWestern's financial
advisor, (iii) counsel to the Committee, (iv) financial advisor to the Committee, and (vi) eight
individual members of the Committee who served on the Committee during Magten's membership.
See App. Exh. 70, Kaplan Decl. at ¶ 12. Each of these persons and entities were identified by
NorthWestern in its interrogatory responses (the "Interrogatory Responses") as persons and entities
having knowledge regarding the allegations made by NorthWestern in the Complaint. See App. Exh.
70, Kaplan Decl. at ¶ 12.

Instead of complying with the discovery requests, NorthWestern filed a motion for a
protective order and NorthWestern's counsel, Paul Hastings, filed a motion to quash the subpoenas
and for a protective order with the Bankruptcy Court. See App. Exh. 70, Kaplan Decl. at ¶ 14. Paul

10

Hastings later withdrew its motion to quash only to refile it with the District Court for the Southern District of New York. See App. Exh. 70, Kaplan Decl. at ¶ 14.

Thereafter, the Bankruptcy Court ordered the Committee, the Committee's professionals, NorthWestern and Paul Hastings to provide the documents and testimony required by Appellants. See App. Exh. 70, Kaplan Decl. at ¶ 17. However, the Committee continued its refusal to provide responsive documents by asserting claims of privilege and NorthWestern did not challenge these claims. See App. Exh. 70, Kaplan Decl. at ¶ 18. Appellants pressed for a resolution of this matter and, via a teleconference on January 20, 2005, the Court ordered the Committee to produce all responsive documents. See App. Exh. 70, Kaplan Decl. at ¶ 19-20. Even after resolution of the discovery issues, Appellants (not NorthWestern), took depositions of the Committee's professionals and dealt with the Committee in order to obtain discovery information from its members. See App. Exh. 70, Kaplan Decl. at ¶ 20.

## V.    THE SETTLEMENT NEGOTIATIONS

During the course of conducting discovery for the trial, NorthWestern solicited Appellants to make an offer to settle all pending claims and causes of action. Ultimately, after two weeks of extensive settlement discussions, on January 27, 2005, the parties reached an agreement in principle. Notably, this agreement was reached with less than ten days before the trial date, when discovery had been substantially completed, when Appellants had already completed the pre-trial brief due that day, and when trial preparation was well under way. After both the trial date was cancelled and the settlement agreement was presented to the Bankruptcy Court and made public, NorthWestern advised Appellants that it would not honor the terms of the settlement agreement.

## VI.    THE WITHDRAWAL OF THE ADVERSARY PROCEEDING COMPLAINT

On February 25, 2005, NorthWestern filed a motion seeking to withdraw the Complaint with prejudice pursuant to Bankruptcy Rule 7041 ("Motion to Withdraw") and requested that each party

11

bear its own fees and costs. See App. Exh. 63. In its Motion to Withdraw, NorthWestern admitted that it could not substantiate any of the allegations set forth in its Complaint. See App. Exh. 63, Motion to Withdraw at ¶ 19, 27 and 30.

In light of NorthWestern's bad faith filing, on March 7, 2005, Appellants filed a limited objection to the Motion to Withdraw, requesting that the Bankruptcy Court preserve their right to seek fees and costs incurred in connection with the Adversary Proceeding. See App. Exh. 66. On March 9, 2005, the Court entered an order dismissing the Complaint with prejudice and preserving Appellants' rights to seek fees and costs. See App. Exh. 67.

## VII. THE DENIAL OF THE FEES AND EXPENSES MOTION

On March 22, 2005, Appellants filed the Fees and Expenses Motion requesting the entry of an order awarding Appellants' fees in the amount of $710,524.00 and costs in the amount of $73,596.30 that Appellants were forced to incur in connection with the frivolous and baseless Adversary Proceeding. See App. Exh. 69.

On April 20, 2005, NorthWestern filed its objection to the Fees and Expenses Motion, contending that each party should bear its own fees and costs because Appellants did not provide any evidence of bad faith or vexatious, wanton, or oppressive conduct on the part of NorthWestern in bringing and prosecuting the Adversary Proceeding. See App. Exh. 72, Objection to Fees and Expenses Motion at ¶ 31, 37. On June 6, 2005, the Bankruptcy Court, Honorable John L. Peterson, entered the Fees and Expenses Order and its corresponding opinion (the "Opinion") denying Appellants' request for fees and costs incurred in defending against the Adversary Proceeding. See App. Exh. 79 and 80.

12

## ARGUMENT

### I. THE BANKRUPTCY COURT ERRED IN HOLDING THAT APPELLANTS WERE NOT THE PREVAILING PARTIES WHEN NORTHWESTERN VOLUNTARILY DISMISSED THE COMPLAINT WITH PREJUDICE

NorthWestern's Complaint was voluntarily dismissed with prejudice pursuant to an Order of the Bankruptcy Court under Rule 7041 of the Federal Rules of Bankruptcy Procedure and Rule 41(a) of the Federal Rules of Civil Procedure. Rule 41(a)(2), made applicable to adversary proceedings pursuant to Bankruptcy Rule 7041, provides that once a defendant has filed an answer to a plaintiff's complaint, the action "shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper."

As a condition for dismissal under Bankruptcy Rule 7041, the Bankruptcy Court specifically reserved Appellants' right to seek fees and costs incurred in defending against the Adversary Proceeding. Despite this express reservation of rights, however, the Bankuptcy Court concluded that Appellants improperly brought the Fees and Expenses Motion because they were not a prevailing party when the Complaint was dismissed with prejudice. See App. Exh. 79, Opinion at 14. As discussed below, voluntary dismissal of a complaint with prejudice confers prevailing party status on a defendant in the same way that a judgment on the merits confers such status and may therefore serve as the basis for an award of attorney's fees and costs. Accordingly, and as admitted by NorthWestern's counsel at oral argument, Appellants were well within their right to seek fees and costs as the prevailing party in the Adversary Proceeding. See App. Exh. 119, Transcript at p. 36 ll. 18-20 ("you have the situation that we have here with a clear admission that [Appellants] are the prevailing party").

An appellate court applies *de novo* review to the threshold question of prevailing party status. Christina A. v. Bloomberg, 315 F.3d 990, 992 (8th Cir. 2003) ("We review de novo the legal question of whether a litigant is a prevailing party."). With regard to prevailing party status pursuant to Rule 41(a)(2), this Court has held that "[a] defendant, who has obtained from a claimant a

13

voluntary dismissal with prejudice can be classified as a prevailing party" for the purpose of awarding fees and costs. Callaway Golf Co. v. Dunlop Slazenger, 384 F.Supp.2d 735, 746 (D. Del. 2005) (quotations omitted); see also Beer v. John Hancock Life Ins. Co., 211 F.R.D. 67, 70 (N.D.N.Y. 2002) ("All circuit courts to have directly addressed this issue have concluded that a defendant ... is a prevailing party [when the plaintiff voluntarily dismisses the action with prejudice]."); Cantrell v. Int'l Bhd. of Elec. Workers, Local 2021, 69 F.3d 456, 458 (10th Cir. 1995); Sheets v. Yamaha Motors Corp., U.S.A., 891 F.2d 533, 539 (5th Cir. 1990) (" ... the dismissal of the plaintiff's suit with prejudice is tantamount to a judgment on the merits for the defendants, thereby rendering them the prevailing parties"); Schwarz v. Folloder, 767 F.2d 125, 130 (5th Cir. 1985) ("Having already held that a dismissal with prejudice may be granted at any time in a lawsuit because it does not prejudice the defendant, we would be inconsistent to deny the defendant 'prevailing party' status, since such a denial would be precisely the type of prejudice to the defendant that we claimed would not occur."); Kona Enters. v. Estate of Bishop, 229 F.3d 877, 889 (9th Cir. 2000); Zenith Ins. Co. v. Breslaw, 108 F.3d 205, 207 (9th Cir. 1997); DeKalb Genetics Corp. v. Pioneer Hi-Bred Int'l, 2002 U.S. Dist. LEXIS 10628, at *3 (N.D. Ill. June 13, 2002).

The rationale for conferring prevailing party status upon a voluntary dismissal with prejudice is that any future litigation is barred by the doctrine of *res judicata*. See United States v. Estate of Rogers, 2003 U.S. Dist. LEXIS 20171, at *12 (E.D. Tenn. Apr. 11, 2003). Specifically, a plaintiff's voluntary dismissal of an action with prejudice is a complete adjudication of the issues presented by the pleadings and prohibits further action between the same parties. See Smoot v. Fox, 340 F.2d 301, 303 (6th Cir. 1964). Thus, a voluntary dismissal with prejudice has been held to constitute a final adjudication in the defendant's favor, and hence a judicially sanctioned material alteration in the parties' legal relationship, the functional equivalent to a judgment on the merits and enough to convey prevailing party status on the defendant. See Rogers, 2003 U.S. Dist. LEXIS 20171, at *14; Schwarz, 767 F.2d at 130; Anthony v. Marion County Gen. Hosp., 617 F.2d 1164, 1169-70 (5th Cir.

14

1980); Samsung Elecs. Co. v. Rambus Inc., 440 F.Supp.2d 495, 511 (E.D. Va. 2006) ("A Rule
41(a)(2) dismissal is a court order that materially alters the legal relationship between the parties. It
is only granted after the court exercises its discretion, and thus bears the necessary judicial
imprimatur."); Claiborne v. Wisdom, 414 F.3d 715, 719 (7th Cir. 2005) (a voluntary dismissal with
prejudice is equivalent to a material alteration of the parties legal relationship); Smoot, 340 F.2d at
303; Wainwright Secs., Inc. v. Wall St. Transcript Corp., 80 F.R.D. 103, 108 (S.D.N.Y. 1978);
Quincy Johnson, Jones, Myott, Williams, Acevedo, Vaugh Architects, Inc. v. Pringle Dev., Inc.,
2006 U.S. Dist. LEXIS 53103, at *10 (M.D. Fla. Aug. 1, 2006); Peek-a-boo Lounge, Inc. v. Manatee
County, 2006 U.S. Dist. LEXIS 24567, at *1 (M.D. Fla. Apr. 28, 2006).[5]

Upon being adjudged a prevailing party, such party has the right to seek fees and costs
pursuant to statute, rule or a court's equitable authority. See Kiester v. Mizrahi (In re Mizrahi), 179
B.R. 322 (Bankr. M.D. Fla. 1995) (prevailing party may seek fees and costs as a condition to
dismissal under Rule 41(a)(2) and Bankruptcy Rule 7041); Alyeska Pipeline Serv. Co. v. Wilderness
Soc'y., 421 U.S. 240, 258-60 (1975)) (prevailing party may seek fees and costs under an exception to
the "American Rule"). Thus, as the prevailing party, Appellants properly sought fees and costs
pursuant to the following sources of authority discussed in Section II, *infra*: (i) fees and costs under
Rule 41(a)(2) and its bankruptcy equivalent Bankruptcy Rule 7041; (ii) fees and costs under the bad
faith exception to the American Rule; and (iii) costs under Bankruptcy Rule 7054(b).

In light of the foregoing authority, the Bankruptcy Court erroneously determined that
Appellants "were not the prevailing party in this action because this case was dismissed with

---

5        In fact, cases holding to the contrary have been expressly overruled. See Cantrell, 69 F.3d at 458 (holding
that Mobile Power Enterprises, Inc. v. Power Vac, Inc., 496 F.2d 1311 (10th Cir. 1974) was overruled to
the extent that it distinguished between voluntary dismissals with and without prejudice, thus allowing a
defendant in a case dismissed with prejudice to seek costs as a prevailing party under Rule 54(d)); see also
Beer, 211 F.R.D. at 70 (concluding that cases stating that "the defendant is not considered the prevailing
party when ... there is a voluntary dismissal of the action by the plaintiff with prejudice" have been clearly
overruled as "illogical, inconsistent with prior cases, contrary to the weight of authority, and based on
misreading[s] of the case[s] upon which [they] were based").

15

prejudice upon joint motion of each party, thereby terminating the litigation once and for all without trial on the merits." See App. Exh. 79, Opinion at 14. In reaching this determination, the Bankruptcy Court relied on York v. Ferris State Univ., 36 F.Supp.2d 976 (W.D. Mich. 1998), in which the plaintiff voluntarily dismissed its case with prejudice pursuant to Rule 41(a)(2) and the defendants moved for attorney's fees under 42 U.S.C. § 1988. Although the York Court ultimately denied the defendants' request for fees, the Bankruptcy Court misconstrued the holding of York in stating:

> *York* further held that sanctions in the form of attorney's fees under *42 U.S.C. section 1988* where plaintiff's claim "was frivolous, unreasonable or without foundation, even though not brought in subjective bad faith" was not warranted because the defendant was not a prevailing party since it had not obtained a favorable judicial decision on the merits or filed an [sic] dispositive motion.

App. Exh. 79, Opinion at 5 (quoting York, 36 F.Supp.2d at 980). In fact, the Court in York found that the defendants had a reasonable basis for seeking an award of attorney fees and only denied the defendants' fee request because the Court "[could] *not* conclude that [the plaintiff's] claims were frivolous, unreasonable, or groundless." Id. at 982 (emphasis added). The Bankruptcy Court apparently confused the holding in York with the standard the York Court applied in reaching its holding: "Attorney fees may be awarded to prevailing defendants under § 1988 only when the plaintiff's claim was 'frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'" Id. at 980 (quoting Christianburg Garment Co. v. EEOC, 434 U.S. 412, 421 (1978)).

It is obvious from the Bankruptcy Court's misreading of York that the Bankruptcy Court improperly conflated the inquiry of prevailing party status with the inquiry of when a prevailing party is entitled to fees and costs. See Rogers, 2003 U.S. Dist. LEXIS 20171, at *14, *15 (finding that defendant was a prevailing party upon voluntary dismissal of plaintiff's complaint with prejudice but declining to grant an award of fees and costs because defendant failed to meet the relevant statutory

16

tests); see also Callaway, 384 F.Supp.2d at 747 (same). While Appellants are indeed entitled to fees and costs as discussed in Section II, *infra*, there is no question that Appellants are the prevailing party by virtue of NorthWestern's dismissal of the Complaint with prejudice. The Bankruptcy Court's determination to the contrary is a reversible error of law, and the Fees and Expenses Order should be vacated on this basis alone.

## II. THE BANKRUPTCY COURT ERRED IN REFUSING TO AWARD APPELLANTS' FEES AND COSTS IN DEFENDING AGAINST THE COMPLAINT

The Bankruptcy Court also erred in refusing to exercise its authority to award Appellants' fees and costs incurred in defending against the Complaint. This error is subject to *de novo* review as it is based on the Bankruptcy Court's misinterpretation of the applicable standards for an award of fees or costs where a case has been voluntarily dismissed with prejudice and the Bankruptcy Court's misapplication of these standards to the factual record of this case.

A. Appellants should be awarded fees pursuant to Bankruptcy Rule 7041 and the exception to the American Rule for bringing or maintaining an action "in bad faith, vexatiously, wantonly, or for oppressive reasons."

1. Fees under Bankruptcy Rule 7041

Bankruptcy Rule 7041 permits a court to award attorney's fees upon the voluntary dismissal of a case with prejudice (i) under exceptional circumstances or (ii) when there is independent statutory authority for such award. See Steinert v. Winn Group, Inc., 440 F.3d 1214, 1222 (10th Cir. 2006); Dorfsman v. Law Sch. Admission Council, Inc., 2001 U.S. Dist. LEXIS 24044, at \*9-10 (E.D. Pa. Nov. 28, 2001). The Bankruptcy Court recognized these bases for a fee award in stating, "when a plaintiff voluntarily moves to dismiss with prejudice, attorney's fees can be granted only when exceptional circumstances call for their allowance in order to do justice or when authorized by statute or when agreed to between the parties." See App. Exh. 79, Opinion at 5 (citing York, 36 F.Supp.2d at 980). However, the Bankruptcy Court subsequently made an inconsistent, much narrower statement that "... where a lawsuit is voluntarily dismissed with prejudice an award of attorney's fees

17

is appropriate only where there is independent statutory authority for such award …." App. Exh. 79, Opinion at 7.

The Bankruptcy Court ultimately adopted this latter position, concluding that exceptional circumstances cannot serve as a basis for an award of fees under Rule 41(a)(2) or Bankruptcy Rule 7041. However, a number of courts in this and other Circuits have recognized the applicability of the exceptional circumstances test for granting attorney's fees where an action is dismissed pursuant to Rule 41(a)(2). See Dorfsman, 2001 U.S. Dist. LEXIS 24044, at *9-10; John Evans Sons, Inc. v. Majik-Ironers, Inc., 95 F.R.D. 186, 191 (E.D. Pa. 1982); Steinert v. Winn Group, Inc., 440 F.3d 1214, 1222 (10th Cir. 2006); Aerotech, Inc. v. Estes, 110 F.3d 1523, 1528 (10th Cir. 1997); Murdock v. Prudential Ins. Co. of Am., 154 F.R.D. 271, 272 (M.D. Fla. 1994); see also Mobile Power Enters., Inc. v. Power Vac, Inc., 496 F.2d 1311, 1312 (10th Cir. 1974); Smoot v. Fox, 353 F.2d 830, 832-33 (6th Cir. 1965); Lawrence v. Fuld, 32 F.R.D. 329, 331 (D. Md. 1963).

Rather than taking direction from these courts, the Bankruptcy Court relied instead on Colombrito v. Kelly, 764 F.2d 122, 134-35 (2d Cir. 1985). In Colombrito, the Second Circuit examined the defendants' request for attorney's fees on a number of grounds, including as a condition to dismissal under Rule 41(a)(2). The Court ultimately declined to adopt exceptional circumstances as part of the inquiry under Rule 41(a)(2), reasoning that the possibility of a fee award would discourage a plaintiff from seeking to voluntarily dismiss its case with prejudice. Id. at 135. This rationale carries little weight, however, as it completely ignores the policy of punishing bad faith conduct as well as the right of a prevailing party to seek fees and costs. More importantly, Colombrito is inconsistent with cases in this jurisdiction that, as discussed above, have recognized the applicability of the exceptional circumstances test under Rule 41(a)(2).

Although courts have not defined what constitutes exceptional circumstances under Rule 41(a)(2), the Third Circuit has given the following interpretations of exceptional circumstances under other sources of authority for awarding fees: (i) "culpable conduct on the part of the losing party,

18

such as bad faith, fraud, malice, or knowing infringement," Shields v. Zuccarini, 254 F.3d 476, 487 (3d Cir. 2001) (quotations omitted) (§1117(a) of the Lanham Trademark Act); (ii) "vexatious litigation conduct on the part of the defendant," SecuraComm Consulting, Inc. v. Securacom Inc., 224 F.3d 273, 281 (3d Cir. 2000) (§285 of the Patent Act); and (iii) "where a claim or motion is patently unmeritorious or frivolous," Doering v. Union County Bd. of Chosen Freeholders, 857 F.2d 191, 194 (3d Cir. 1988) (Rule 11 of the Federal Rules of Civil Procedure).

This Court is free to apply any of the foregoing standards in defining "exceptional circumstances" under Bankruptcy Rule 7041, and, as discussed below, NorthWestern's filing of the Complaint and dilatory tactics throughout the Adversary Proceeding meet them all, calling for an award of Appellants' fees in this case.

2.    Fees under the exception to the American Rule for bringing or maintaining an action "in bad faith, vexatiously, wantonly, or for oppressive reasons."

In addition to a Court's authority to grant Appellants an award of fees under Bankruptcy Rule 7041, a Court may also grant fees pursuant to its inherent authority derived from common law. See Fellheimer Eichen & Braverman, P.C. v. Charter Techs., Inc., 57 F.3d 1215, 1228 (3d Cir. 1995) (holding that the bankruptcy court did not abuse its discretion in using its inherent power to sanction debtor's counsel); Miller v. Cardinale (In re Deville), 361 F.3d 539, 551 (9th Cir. 2004) (concluding that the bankruptcy court can rely on its inherent authority to impose sanctions when other rules and statutes to sanction misconduct are inadequate). Although this authority is limited by the American Rule, which provides that generally each party must bear its own fees incurred in litigation, there are a number of established exceptions to this rule, including the commencement or prosecution of an action "in bad faith, vexatiously, wantonly, or for oppressive reasons." Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991) (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y., 421 U.S. 240, 258-59 (1975)). This bad faith exception to the American Rule has been held to apply in a number of contexts, including, among others:

19

- where an attorney "knowingly or recklessly raises a frivolous argument . . . for the purpose of harassing an opponent." Primus Auto. Fin. Servs., Inc. v. Batarse, 115 F.3d 644, 648 (9th Cir. 1997) (quotations omitted);

- where a party fails to honor obligations under a settlement agreement. See Leonard v. Univ. of Del., 204 F. Supp. 2d 784 (D. Del. 2002);

- "where a party hinders the orderly administration of a bankruptcy estate," Burger v. Level End Dairy Investors, Inc. (In re Burger), 125 B.R. 894, 908 (Bankr. D. Del. 1991);

- where, a party files a complaint to intimidate defendant in negotiations. See Charter Techs., 57 F.3d at 1228; and

- where a party practices fraud upon the court or delays or disrupts the litigation or hampers the enforcement of a court order. See Chambers, 501 U.S. at 46.

Despite the broad application of the bad faith exception, the Bankruptcy Court improperly found that the bad faith exception was not applicable in this case because NorthWestern did not practice "fraud on the Court or Defendants," as was the case in Chambers. App. Exh. 79, Opinion at 8. However, fraud on a court or an opposing party is only one form of conduct subject to the bad faith exception. The Chambers Court did not limit the applicability of the bad faith exception but merely pointed to examples of bad faith conduct that can merit an award of fees. See Chambers, 501 U.S. at 46 ("the inherent power [of the court] extends to a full range of litigation abuses"). Indeed, cases relying on Chambers have applied the bad faith exception in a variety of other instances. See D'Auria v. Minniti (In re Minniti), 242 B.R. 843, (Bankr. E.D. Pa. 2000) (awarding sanctions where debtor's attorney obstructed plaintiff's discovery through false statements and implied threats); Sassower v. Field, 973 F.2d 75, 78-80 (2d Cir. 1992) (imposing sanctions against *pro se* litigants for harassing conduct during the course of a litigation); see also Fink v. Gomez, 239 F.3d 989, 994 (9th Cir. 2001) ("an attorney's reckless misstatements of law and fact, when coupled with an improper purpose, such as an attempt to influence or manipulate proceedings in one case in order to gain tactical advantage in another case, are sanctionable under a court's inherent power"). In light of this authority, the Bankruptcy Court clearly drew an erroneous legal theory from its misreading of

20

Chambers and misunderstanding of the bad faith exception, which resulted in reversible error in this case.

Moreover, the Bankruptcy Court compounded this error by confusing its inherent authority to award fees under the bad faith exception with its authority to award fees under Bankruptcy Rule 7041. Specifically, the Bankruptcy Court found the bad faith exception set forth in Chambers to be inapplicable not only because it misconstrued the exception, as stated above, but also because "Chambers had absolutely nothing to do with Rule 7041(a)(2)." See App. Exh. 79, Opinion at 8. While this statement is entirely true, it is also entirely beside the point. As explained above, a court may grant an award of fees under Bankruptcy Rule 7041 pursuant to a finding of exceptional circumstances. As a factual matter, in this case the issue of exceptional circumstances under Bankruptcy Rule 7041 converges with the issue of bad faith and vexatious litigation under the bad faith exception to the American Rule. However, Appellants may be awarded fees under either source of authority, and denial under one does not necessitate denial under the other. See Colombrito, 764 F.2d at 133 (recognizing a court's common law authority to grant an award of fees under an exception to the American Rule separate and apart from any request for fees pursuant to Rule 41(a)(2)); see also Chambers, 501 U.S. at 46 (distinguishing between a court's inherent authority to impose sanctions for bad faith conduct and its authority to impose sanctions pursuant to statute or rule).

3.    NorthWestern's extreme misconduct demonstrates exceptional circumstances and bad faith meriting an award of fees.

Regardless of whether this Court chooses to act pursuant to its authority under Bankruptcy Rule 7041 or its inherent powers, it is clear that the Bankruptcy Court erred in denying Appellants attorney's fees when a review of the record overwhelmingly demonstrates that the Complaint was filed and litigated in bad faith. As discussed below, (i) the undisputed documentary evidence establishes that NorthWestern knew the allegations underlying the Complaint were meritless at the

21

time the Complaint was filed; (ii) even if NorthWestern was not aware of the falsity of its allegations, which it was, it did not undertake even a minimal investigation prior to filing the Complaint; and (iii) NorthWestern and its counsel continued to act outrageously throughout the course of discovery by fighting Appellants on discovery matters and deliberately neglecting to seek information from the Committee or its professionals which it knew would contradict the allegations in the Complaint.

    *(i)    NorthWestern's knowledge that the allegations in the Complaint were false*

As an initial matter, NorthWestern knew that Appellants had incurred no liability with respect to the December Transactions because the information that NorthWestern obtained prior to filing the Complaint made clear that these transactions all consisted of trades made before Appellants received any confidential information. Magten engaged in purchases and a single sale of QUIPS from December 1 through 17, 2003. Embry on behalf of Magten attended a meeting of the Committee on December 18, 2003, at which financial projections and other potentially material information were disclosed to the Committee. See App. Exh. 3, Embry Decl. at ¶ 7. It is undisputed that prior to that meeting, Appellants had been provided by the Committee's counsel, Paul Weiss, only with information that was either non-substantive or was otherwise public. See App. Exh. 3, Embry Decl. at ¶ 6, 7 (As an example, prior to attending Magten's first Committee meeting, Appellants received a copy of the Committee's bylaws). Since any other information known by Paul Weiss or other Committee representatives at that time could not be imputed to Appellants, NorthWestern had full knowledge that Appellants were not in possession of material non-public information at the time of the December Transactions.

NorthWestern also knew that Appellants incurred no liability with respect to the Post-Committee Transactions. Based on Magten's trading records NorthWestern received prior to filing the Complaint, it was clear to NorthWestern that Appellants did not resume trading until May 14, 2004, after Magten was no longer on the Committee and NorthWestern had filed its plan and

Viking Assocs. v. Drewes (In re Olson), 120 F.3d 98 (8th Cir. 1997) (trustee lacked standing to seek relief related to transfer of claims when transferors had not objected); Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims, and Comm. of Creditors Holding Unsecured Claims as Estate Representative of Papercraft Corp., 160 F.3d 982, 986 (3d Cir. 1998) (noting that claims alleging misuse of inside information to purchase claims had been brought by creditors committee).

Clearly, NorthWestern's purpose in filing the Complaint was not to recover damages but to punish Appellants for attempting to vindicate their rights in the Fraudulent Conveyance Proceeding. Above and beyond any claim for monetary relief, NorthWestern brought the Adversary Proceeding as a form of harassment and an attempt to damage Appellants' reputations. Appellants have frequently been major investors in securities of distressed companies and often participate in restructurings both in and out of court. Appellants have served on official and unofficial creditors committees and intend to pursue such opportunities in the future. NorthWestern's allegations could have and were intended to have a negative effect on Appellants' reputation in the market of distressed debt, further evidencing NorthWestern's bad faith in filing the Complaint. Based on the foregoing, there is ample support for concluding that the commencement of this litigation was vexatious, wanton, and oppressive, and that exceptional circumstances exist to warrant an award of Appellants' fees.

*(ii)    NorthWestern's failure to conduct even a minimal preliminary investigation*

Even if NorthWestern was not aware of the falsity of its allegations and the Complaint's complete lack of merit, it failed to undertake even a minimal investigation prior to filing the Complaint to verify its allegations. Michael Hanson, NorthWestern's Chief Operating Officer and Rule 30(b)(6) representative testified that prior to filing the Complaint, neither he, nor anyone at NorthWestern made any efforts to determine what, if any, material, non-public information

24

disclosure statement with the Bankruptcy Court and its quarterly report with the Securities and Exchange Commission.[6] The Bankruptcy Court suggested Appellants may have possessed material confidential information not disclosed in these documents. See App. Exh. 119, Transcript at p. 39 ll. 5-7. However, the Bankruptcy Court had no basis to draw such a conclusion in light of NorthWestern's voluntary dismissal of the Complaint. Moreover, NorthWestern's Chief Executive Officer certified, under penalty of perjury, that NorthWestern's 10-K and 10-Q contained all material financial information, and NorthWestern was bound by law to disclose all information which could be material to the purchase or sale of QUIPS in its plan, disclosure statement and 10-Q and 10-K. As such, NorthWestern knew that any confidential information Appellants had at that time of the Post-Committee Transactions could not have been material to these transactions.

Furthermore, NorthWestern ignored relevant information in connection with the unsubstantiated allegations in the Complaint. Although Embry provided a sworn statement in his Declaration that Appellants had no material, non-public information when it purchased the QUIPS, NorthWestern did nothing with this information and instead went so far as to name Embry personally in the Complaint. In fact, Embry personally never had any claims against NorthWestern and, therefore, outrageously, NorthWestern's Complaint was seeking equitable subordination of claims that did not exist.

As further evidence of NorthWestern's bad faith, NorthWestern took the position that it had suffered damages attributable to the challenged transactions. There is no conceivable basis for this contention. Similarly, NorthWestern could not claim that individual creditors were harmed by the challenged transactions, as NorthWestern lacked standing to assert such third parties' rights. See

---

6    In April 2004, NorthWestern and counsel for the Committee submitted letters to the U.S. Trustee contending that Appellants' prosecution of the Fraudulent Conveyance Proceeding was inconsistent with Magten's continuing membership on the Committee. See App. Exh. 3, Embry Decl. at ¶ 10. As a result, the U.S. Trustee removed both Appellants and Law Debenture from the Committee on May 6, 2004. There are certainly no allegations in the Complaint that Appellants engaged in any trading activity during this period of review by the U.S. Trustee.

Appellants had at the time the QUIPS were traded. See App. Exh. 70, Kaplan Decl., Exh. A at 1-19. This is especially shocking with regard to the Post-Committee Transactions given that NorthWestern's Chief Executive Officer certified that NorthWestern's 10-K and 10-Q contained all material financial information.

NorthWestern's failure to conduct a preliminary investigation is even more egregious considering that NorthWestern had multiple opportunities to seek discovery from the Committee throughout its chapter 11 case or through the Bankruptcy Rule 2004 process in order to verify its allegations. This neglect to investigate its allegations against Appellants prior to filing the Complaint demonstrates the harassing purpose of the lawsuit.

The Bankruptcy Court excused NorthWestern's failure to investigate because Appellants had already commenced the Fraudulent Conveyance Proceeding by the time the Complaint was filed: "The challenge by Magten that [NorthWestern] never undertook pre-trial investigation ... ignores the adversary position which [NorthWestern] faced due to Magten's fraud action." App. Exh. 79, Opinion at 9. The Bankruptcy Court even went so far as to conclude, without citing any authority whatsoever, that Northwestern was "*prohibited* from interviewing or contacting Embry as to why he made the purchases and sales, whether it was or was not based upon non-public information supplied to the Committee advisers by [NorthWestern]." Id. (emphasis added). There is no reason why the Fraudulent Conveyance Proceeding would have prohibited NorthWestern from seeking information from Appellants or their counsel, and there is certainly no excuse for NorthWestern's failure to seek information from Paul Weiss or individual Committee members. Nor is there any authority to suggest that actions, such as the Adversary Proceeding, are subject to a different standard when brought in response to a pre-existing lawsuit. This is particularly true where the Adversary Proceeding was vexatiously filed to punish Appellants for initiating the Fraudulent Conveyance Proceeding.

25

*(iii)    NorthWestern's behavior during the discovery process*

NorthWestern continued its bad faith conduct during the discovery process by fighting Appellants on discovery matters and making a conscious effort not to obtain information it knew would disprove the allegations in the Complaint. While NorthWestern stated in its opposition to the Motion to Dismiss that it needed to conduct discovery to prove its allegations, the only information it sought through discovery concerned Appellants' trades of QUIPS – information NorthWestern already had prior to filing the Complaint. Moreover, despite the fact that Northwestern identified in its Interrogatory Responses a number of persons and entities that it alleged had provided confidential information to Appellants, NorthWestern never sought to obtain any information from those persons or entities to prove the truth of its allegations because it knew the allegations were entirely without merit.

Not only did NorthWestern fail to seek any discovery to verify the allegations of wrongdoing asserted in the Complaint, it also attempted to thwart Appellants' discovery efforts. NorthWestern and Paul Hastings moved to quash subpoenas issued by Appellants in spite of the fact than those subpoenas sought the information precisely identified in NorthWestern's Interrogatory Responses. Then, in an attempt to further frustrate the discovery process, Paul Hastings attempted to remove its motion to quash from this Court's jurisdiction (to the District Court for the Southern District of New York) without reason. It therefore became necessary for Appellants to incur increased legal fees and expenses to meet the demands of NorthWestern's obstructive discovery tactics.

NorthWestern's pattern of vexatious behavior and failure to assume accountability for its improper actions is rampant in this case and has resulted in wasted time and expense for all parties involved. Appellants maintain that NorthWestern's bad faith began on day one, when NorthWestern

filed the Complaint "upon information and belief" rather than attempting to conduct a preliminary

investigation to clarify what information had been provided to Appellants while Magten was a

member of the Committee. Alternately, NorthWestern's bad faith began during the discovery

process when it demonstrated an utter lack of diligence in pursuing discovery to prove its allegations

and resisted the discovery efforts of Appellants. Once the discovery process was substantially

complete, NorthWestern still did not file its Motion to Withdraw until after Appellants had already

incurred attorney's fees at an increased rate in connection with trial preparations. Had NorthWestern

withdrawn the Complaint at any time before this stage in the proceedings, Appellants' total fees

would have been substantially less. The record shows that NorthWestern never should have brought

the Adversary Proceeding in the first place. But at a minimum, this Court should vacate the Fees and

Expenses Order and remand for further proceedings to determine at what point NorthWestern's bad

faith in connection with prosecution of the Adversary Proceeding became indisputable.

B.    Appellants should be awarded costs pursuant to Bankruptcy Rules 7041 and 7054(b) and the
      exception to the American Rule for bringing or maintaining an action "in bad faith,
      vexatiously, wantonly, or for oppressive reasons."

The Bankruptcy Court should be reversed on the issue of costs for the same reasons it should

be reversed on the issue of fees – namely, because NorthWestern's misconduct amounts to

exceptional circumstances under Bankruptcy Rule 7041 and a showing of bad faith under the

applicable exception to the American Rule. See Willner v. Budig, 1988 U.S. Dist. LEXIS 12107, at

*2 (D. Kan. Oct. 14, 1988) (upon dismissing plaintiff's complaint with prejudice, the court found

exceptional circumstances warranting the imposition of costs due to "evidence of plaintiff's constant

dilatory tactics.").

27

Additionally, Appellants should be awarded costs under Bankruptcy Rule 7054(b), which

provides in pertinent part: "The court may allow costs to the prevailing party except when a statute of

the United States or these rules otherwise provides." While the Bankruptcy Court recognized its

authority to award costs pursuant to Rule 7054(b), it refused to exercise this authority upon

determining that (i) Appellants were not a prevailing party and (ii) NorthWestern was justified in

filing and maintaining the Adversary Proceeding. For the reasons set forth above in Section I, *supra*,

Appellants do qualify as the prevailing party in this case. Moreover, an award of costs under

Bankruptcy Rule 7054(b) is appropriate because NorthWestern's ill motives and harassing tactics

throughout the Adversary Proceeding demonstrate that the litigation was frivolous and conducted in

bad faith. As stated above, NorthWestern failed to even conduct a preliminary investigation to verify

its allegations because it knew they were false and that its claims for breach of duty and securities

law violations were unsupported by law. The Bankruptcy Court's blind eye to NorthWestern's

outrageous behavior, coupled with its erroneous conclusion that the Appellants were not a prevailing

party, resulted in an improper denial of Appellants' request for costs, and the Bankruptcy Court

should be reversed.

III.    THE BANKRUPTCY COURT ERRED IN FINDING THAT THE ORDER PERMITTING
        SECURITIES TRADING UPON THE ESTABLISHMENT OF AN ETHICAL WALL
        PROHIBITED TRADING IN NORTHWESTERN'S SECURITIES

As discussed above, the Bankruptcy Court found that NorthWestern was justified in making

allegations that Appellants were in possession of material confidential information at the time of the

Post-Committee Transactions, despite the fact that these transactions all took place after

NorthWestern had filed its plan, disclosure statement, 10-K and 10-Q. Nevertheless, the Bankruptcy

Court took the position that even if Appellants were not in possession of material nonpublic

information when they made the Post-Committee Transactions, such transactions were somehow a

technical violation of the Trading Order. While the issues surrounding the Trading Order are not

28

germane to the allegations in the Complaint, which allege insider trading and securities law violations, the Bankruptcy Court improperly and erroneously determined that the Post-Committee Transactions were prohibited by the Trading Order. As discussed below, because the Trading Order did not subject Appellants or any other members of the Committee to greater restrictions that those imposed by the securities laws, it did not prohibit Appellants from trading in QUIPS after they were no longer in possession of material confidential information. Thus the Bankruptcy Court's unnecessary ruling on this subject was reversible error.

It is undisputed that securities laws restrict the purchasing or selling of securities while in possession of material nonpublic information. See, e.g., 15 U.S.C. § 78t-1; 17 C.F.R. § 240.10b-5-1. Because members of creditors committees in chapter 11 cases generally receive material nonpublic information about the debtor, they ordinarily cannot trade in the debtor's securities until such information becomes public and/or immaterial. In order to encourage participation on creditors committees, bankruptcy courts often enter trading orders. These orders provide a safe harbor for trading by institutional committee members who are able, as a practical matter, to avail themselves of the order's protections and take affirmative steps to establish an "ethical wall" – a screening system designed to insure that a committee member's employees engaged in trading activities do not have access to any of the information provided to the individuals serving on the committee member's behalf. See 1-5 Collier Business Workout Guide P 5.04 (noting the effect of ethical walls is to give an investor the means of effectively balancing its need to continue trading while allowing the investor to serve on a creditors' committee); Herbert S. Wander, Chinese Walls for Creditors' Committees, 48 Bus. Law. 747 (1993) (concluding that, in order to encourage service on a creditors' committee, bondholders should be allowed to continuing trading pursuant to an ethical wall).

The Trading Order in this case served that very function, giving those Committee members with the ability to establish an ethical wall the concurrent ability to trade in NorthWestern's securities by complying with the terms of the Order. Similarly, any Committee member that had already

established an ethical wall could file an "Unbound-by-Order Notice" and thereafter trade in NorthWestern's securities without any need to comply with the Trading Order's provisions. However, those Committee members without the ability to take advantage of an ethical wall – like Magten because Embry is its sole employee – had no ability to comply with the Trading Order and take advantage of the Order's protections as a means to trade while in the possession of material confidential information.

The Bankruptcy Court clearly misinterpreted the function of the Trading Order when it found that Magten was "bound by the Ethical Wall" and prohibited from trading in QUIPS by the terms of the Trading Order. App. Exh. 79, Opinion at 9. As explained above, the Trading Order did not impose any additional limitations on the right of a Committee member (much less a former Committee member) to trade beyond the obligations already imposed by the securities laws, but rather established a safe harbor for members of the Committee that had the capacity to create an ethical wall and elect to be subject to the protections of the Trading Order. Indeed, none of the members of the Committee intended to be subject to any greater restrictions on trading as a result of serving on the Committee, nor would they have agreed to serve had they been exposed to greater restrictions. The confusion of the Bankruptcy Court with respect to the interpretation of the Trading Order is further highlighted by the fact that, on its theory, Appellants would have been permitted to trade in QUIPS had they filed an Unbound-by-Order Notice – an absurd act since they had not been trading at all rather than trading with an ethical wall in place, and an outcome clearly not contemplated by the Trading Order.

NorthWestern recognized the Trading Order's limited function of providing a safe harbor when it gave the Committee members the Confidentiality Agreement six weeks after the Trading Order was entered by the Bankruptcy Court. The Confidentiality Agreement states, "It [is] understood that nothing herein shall prevent Receiving Parties who have established an Ethical Wall pursuant to the [Trading Order] entered by the Bankruptcy Court on November 6, 2003 from trading

30

NorthWestern's securities in accordance with the procedures set forth in such order or from otherwise trading such securities in accordance with applicable securities law." App. Exh. 3, Embry Decl. Exh. C., p. 3. Likewise, the Committee's bylaws also demonstrate that the Trading Order was not a prohibition against trading: "Each member shall have the ability to trade, purchase, sell, or otherwise dispose of its claims against or interest in [NorthWestern] in accordance with applicable law including any orders entered or to be entered by the Bankruptcy Court." App. Exh. 3, Embry Decl. Exh. A, ¶ 1.7.

The express language of the Trading Order, the Confidentiality Agreement and the Committee's bylaws makes clear that the Trading Order did not impose any limitations on trading beyond those imposed by the securities laws. The Trading Order, by its own terms, simply provided a safe harbor, of which Appellants could not take advantage given their inability to establish an ethical wall. Because Appellants could not establish an ethical wall, they did not qualify for the protections of the Trading Order. Accordingly, the Bankruptcy Court improperly found that the Trading Order prohibited the Post-Committee Transactions.

Moreover, the Bankruptcy Court's finding concerning the Trading Order should be afforded no deference by this Court. "The interpretation of the text of a court order or judgment is considered a conclusion of law subject to *de novo* review." United States v. Spallone, 399 F.3d 415 (2d Cir. 2005); see also Harvis Trein & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs.), 153 F.3d 61, 66 (2d Cir. 1998) (no deference to bankruptcy judge's interpretation of stipulation); United States v. Administrative Enterprises, Inc., 46 F.3d 670, 674 (7th Cir. 1995) ("the interpretation of a single document or part thereof, whether it is a statute, a consent decree, an arbitration clause, or an ordinary contract clause, is reviewed de novo, that is, without giving any deference to the interpretation by the first-line decider, here the district judge"); Valley Nat'l Bank v. Abdnor, 918 F.2d 128, 130 (10th Cir. 1990) ("the appellate court is in as good a position as the trial court to interpret a written document"). While courts sometimes give deference to a judge's

31

interpretation of his or her own order, no deference is due in this case because the Trading Order was entered by Judge Case before NorthWestern's bankruptcy case was reassigned to Judge Peterson. See Spallone, 399 at 423 (applying *de novo* review to lower court judge's interpretation of an order where the order was drafted by a preceding judge in the case). As such, Judge Peterson was in no better position to interpret the Trading Order than this Court, and the meaning of the Trading Order is subject to *de novo* review consistent with the foregoing authority.

IV.     THE BANKRUPTCY COURT ERRED IN FINDING THAT APPELLANTS' FEES AND
        COSTS INCURRED IN DEFENDING AGAINST CLAIMS OF BREACH OF FIDUCIARY
        DUTY AND INSIDER TRADING WERE UNREASONABLE

        After determining that Appellants were not entitled to fees and costs as a matter of law, the Bankruptcy Court went on to find Appellants' fees and costs impermissible and unreasonable under the circumstances. In light of the Bankruptcy Court's prior error in holding that Appellants were not a prevailing party and that NorthWestern was justified in prosecuting the Adversary Proceeding, the Bankruptcy Court's determinations in this regard amounts to dicta. However, the Bankruptcy Court's remarks as to reasonableness also reveal basic legal errors, calling for a remand of this case to determine the reasonableness of Appellants' fees and costs should this Court find that NorthWestern was not justified in prosecuting the Adversary Proceeding.

A.      The Bankruptcy Court committed reversible error when it determined that Appellants' fees
        were unreasonable and impermissible.

        Appellants' request for fees includes $698,602.00 incurred by Fried Frank and $11,922.00 incurred by Blank Rome. Although NorthWestern did not object to the amount of Appellants' fee request, the Bankruptcy Court determined that these fees were unreasonably high because it found Fried Frank's legal work to be duplicative and poorly documented, while it found Blank Rome's legal work to be ministerial and therefore unnecessary. With regard to Fried Frank's fees, the Court specifically took issue with such tasks as four lawyers reviewing the Complaint, multiple hours billed to research and discovery over a condensed period of time, one lawyer working on Christmas Day,

32

and one lawyer drafting a motion for summary judgment that was never filed because NorthWestern dismissed the Complaint. The Bankruptcy Court also found fault with Fried Frank's time activity descriptions in its billing statements in light of Delaware Local Bankruptcy Rule 2016-2, which provides guidelines for fee applications filed with the Bankruptcy Court. Strangely, the Bankruptcy Court stated that Fried Frank "totally ignored" Delaware Local Bankruptcy Rule 2016-2 in drafting its billing statements, yet also noted that these billing statements were not even subject to this Local Bankruptcy Rule, as Fried Frank was not required to submit fee applications in NorthWestern's bankruptcy case. See App. Exh. 79, Opinion at 11.

In any event, the Bankruptcy Court's finding the Appellants' fees were unreasonable clearly ignores the circumstances surrounding this case. Although NorthWestern's Complaint was completely baseless, the gravity of its allegations against Appellants required the attention of multiple attorneys with different areas of expertise. As discussed above, the Complaint's allegations of insider trading and securities laws violations could have and were intended to have a negative effect on Embry's reputation above and beyond the financial stakes of the action. Any party wrongfully accused of insider trading whose financial liability may only involve disgorgement of a modest amount in alleged wrongful profits would nonetheless be fully justified in spending hundreds of thousands of dollars to disprove the allegations and clear its good name. The amount of fees incurred in defending against the wrongful allegations in the Complaint is entirely appropriate.

Additionally, Appellants were effectively forced to both define and defend this action because NorthWestern neglected to pursue its claims while attempting to thwart Appellants' discovery efforts. For example, instead of complying with Appellants' discovery requests, both NorthWestern and Paul Hastings filed motions for protective orders and Paul Hastings filed a motion to quash the subpoenas. In light of this posturing, Appellants' counsel was compelled to spend many hours researching the issues raised, discussing them internally, and responding accordingly. This is but one example of many dilatory tactics that forced Appellants' counsel to spend substantial time

33

addressing and responding to issues in this litigation. As a consequence of NorthWestern's misconduct, Appellants had to perform an increased amount of work over a brief period of time, including taking significant discovery, drafting multiple motions, and preparing for trial on an expedited basis in order to vindicate Appellants from NorthWestern's baseless and unnecessary lawsuit. NorthWestern also filed its Motion to Withdraw after Appellants had already incurred fees at an increased rate in connection with trial preparations. As counsel stated at oral argument, Fried Frank attorneys were working around the clock in order to effectively represent Appellants in the Adversary Proceeding. See App. Exh. 119, Transcript at p. 43 ll. 8-9.

Likewise, Fried Frank's efforts are not unusual or unreasonable from an industry perspective. It is not uncommon for firms similarly situated to Fried Frank to have multiple lawyers and paralegals staffed on a single case with a demanding workload and strict time constraints. Nor is it uncommon for a number of lawyers to review the same document or for a lawyer to prepare motion papers that ultimately do not get filed in litigation. Bankruptcy Courts routinely approve fee applications detailing such work, and Fried Frank's hours billed are simply the result of zealous representation, not over-lawyering. The fact that NorthWestern did not object to the amount of Fried Frank's fees is a further testament to their reasonableness from an industry wide as well as fact-specific standard.[7] Accordingly, the fees incurred were appropriate and necessary to the effective representation of Appellants, and the Bankruptcy Court's determination of unreasonableness should be reversed.

B.    The Bankruptcy Court committed reversible error when it determined that Appellants' costs were unreasonable and impermissible.

In addition to fees, Appellants sought $73,596.30 in costs as follows:

Duplicating:                $43,124.29

---

[7]    Blank Rome's fees are appropriate for similar reasons. As local counsel, Blank Rome assured that all filings complied with local procedural rules and provided additional necessary legal services at industry rates.

34

| | |
|---|---|
| Court reporting: | $ 8,256.93 |
| Telecommunications: | $   669.10 |
| Courier service: | $   165.65 |
| Computerized research: | $10,776.74 |
| Word processing: | $ 1,994.74 |
| Late night transportation: | $ 4,154.49 |
| Working meals: | $ 2,649.73 |
| Secretarial and paralegal overtime: | $ 1,546.25 |
| Temporary paralegals: | $   258.38 |

The Bankruptcy Court addressed these costs in two categories: those that fall under the ambit

of 28 U.S.C. § 1920 and those that do not. Section 1920 sets forth the costs that a court may award

pursuant to Rule 54(d), or its bankruptcy equivalent Bankruptcy Rule 7054(b):

(1) Fees of the clerk and marshal;
(2) Fees of the court reporter for all or any part of the stenographic transcript
necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and copies of papers necessarily obtained for use
in the case;
(5) Docket fees under section 1923 of this title;
(6) Compensation of court appointed experts, compensation of interpreters,
and salaries, fees, expenses, and costs of special interpretation services under
section 1828 of this title.

As noted by the Bankruptcy Court, court reporting and duplicating costs fall under sub-

sections (2) and (4) of this itemized list, which both provide for an award of such costs to the extent

they are "necessarily obtained for use in the case." The Bankruptcy Court held that Appellants' court

reporting and duplicating costs were not allowable under section 1920 because it did not have

sufficient documentation to conclude that such costs were reasonable. See App. Exh. 79, Opinion at

15. As discussed below, however, Appellants' billing records meet the statutory standard, and

NorthWestern's bad faith conduct, coupled with its failure to object to the amount of Appellants'

costs, demonstrates that such costs should be awarded under the circumstances of this case.

With respect to Appellants' court reporting (or deposition) costs, the Bankruptcy Court specifically found fault with Appellants' lack of evidence regarding Judicial Conference rates for deposition transcripts. While Appellants would have been more than happy to provide the Bankruptcy Court with this and any other information had the Court requested it, there is no authority to suggest that such evidence is required for a determination that court reporting costs were necessary within the meaning of section 1920. Additionally, the Bankruptcy Court concluded that it could not make a determination as to reasonableness because Appellants did not indicate which parts of the deposition transcripts were obtained for use in the case. However, it is undisputed that the depositions at issue were taken solely for use in connection with the Adversary Proceeding and not for any other purpose, making it entirely unnecessary for Appellants to parse through the deposition transcripts in an effort to weed out irrelevant testimony.

More importantly, NorthWestern's failure to object to the costs of the depositions should have led the Bankruptcy Court to find Appellants' court reporting costs reasonable. The burden is on the losing party to demonstrate the impropriety of a request for costs, including costs for depositions. See In re Paoli R.R. Yard PCB Litig., 221 F.3d 449, 462-63 (3d Cir. 2000) (citations omitted). In fact, "unless the opposing party interposes a specific objection that a deposition was improperly taken or unduly prolonged, deposition costs will be taxed as having been 'necessarily obtained for use in the case' within the meaning of 28 U.S.C. § 1920." J.T. Gibbons, Inc. v. Crawford Fitting Co., 102 F.R.D. 73, 80 (E.D. La. 1984), quoting Meder v. Everest & Jennings, Inc., 553 F.Supp. 150 (E.D. Mo. 1982). As discussed herein, Appellants had to perform a disproportionate amount of discovery in this case, including taking a number of depositions to disprove NorthWestern's allegations in the Complaint. These depositions were obtained specifically for use in the Adversary Proceeding, and absent any objection from NorthWestern, it was presumptively reasonable for Appellants to incur the costs in connection therewith.

With respect to duplicating costs, the Court found these costs exorbitant and not clearly necessary for Appellants's use in the case or preparation of the defense. However, as explained on the record at oral argument and in Appellants' motion papers, Appellants had several document productions and depositions, which necessitated duplicating in order to allow multiple attorneys to review documents simultaneously and on a time sensitive basis. In addition, due to the sheer number of documents exchanged in this litigation, Appellants' counsel utilized duplicating facilities to compile necessary binders and other materials in preparation for hearings, meetings, etc. Moreover, because Appellants' were forced to both define and defend the Adversary Proceeding, Appellants incurred duplicating changes that otherwise would have been incurred by NorthWestern had it taken steps to properly prosecute its case. Accordingly, Appellants believe that each of the duplicating charges it incurred were necessary for effective representation and should be awarded.

With regard to Appellants' remaining costs – namely, for telecommunications, courier services, computerized research, word processing, transportation for late night and other exigencies, working meals, secretary and paralegal overtime, and temporary paralegals – the Bankruptcy Court concluded that that these costs were not permissible because they do not fall on the list of itemized costs set forth in section 1920. See App. Exh. 79, Opinion at 15. However, while costs awarded under Rule 54(d) or Bankruptcy Rule 7054(b) are generally limited to those listed in section 1920, Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 441-42 (1987), courts have held that section 1920 does not limit the type of costs available under Rule 41. In Behrle v. Olshansky, 139 F.R.D. 370 (W.D. Ark. 1991), for example, the District Court determined that section 1920 is not applicable to an award of costs under Rule 41(d), which authorizes a federal court to award costs where a plaintiff voluntarily dismisses a case in one jurisdiction and then refiles the same or similar case in another jurisdiction. See Fed. R. Civ. P. 41(d). In granting an award for costs under Rule 41(d), the Behrle Court held that attorney's fees could properly be included as costs, irrespective of section 1920:

37

> Does "costs" mean only those items that are traditionally considered
> to be costs in the American legal system or is the court, in its
> discretion, authorized to include in "costs" attorney's fees reasonably
> incurred? If it is not, and if the court may impose only "costs" which
> a winning party would be entitled to recover under Rule 54(d) and 28
> U.S.C. § 1920 as interpreted by the United States Supreme Court in
> Crawford Fitting Co. v. J. T. Gibbons, Inc., 482 U.S. 437, 96 L. Ed.
> 2d 385 , 107 S. Ct. 2494 (1987), then the provision has no "teeth" and
> is useless.

Behrle, 139 F.R.D. at 373. The Behrle Court went on to compare Rule 41(d) with Rule 41(a), stating

that a court's authorization to impose such terms and conditions as the court deems proper under

subsection (a) is "arguably much broader" than its authority under subsection (d). Id. at 374. Given

the Behrle Court's expansive notion of costs under Rule 41(d), it logically follows that a court should

not be limited by section 1920 when making an award of costs under Rule 41(a) or Bankruptcy Rule

7041.

Other courts have also granted costs under Rule 41(d) beyond those listed in section 1920,

including disbursements for computerized legal research, telephone and telecopy charges, postage,

external messengers, express delivery, and public transportation. See, e.g., Zucker v. Katz, 1990

U.S. Dist. LEXIS 1748, at *8-10 (S.D.N.Y. Feb. 21, 1990); see also Esquivel v. Arau, 913 F. Supp.

1382, 1393 (C.D. Cal. 1996).

Based on the foregoing authority and in light of the broad discretion afforded to courts under

Rule 41(a)(2), it is clear that the Bankruptcy Court erred in concluding that it did not have authority

to grant Appellants' costs outside of section 1920. Moreover, it is clear that these costs were

necessary and appropriate in light of NorthWestern's bad faith conduct and the disproportionate

amount of legal work Appellants had to perform in a condensed time frame. Given the complex,

time-pressured and harassing nature of this case, Appellants' counsel was compelled to work late into

the night on a frequent basis. For example, Appellants' counsel incurred expenses for dinner and

after hours transportation home in the evening in connection with late night discovery efforts and

other legal services required to effectively represent the Appellants. In addition, there were a

38

significant number of issues in this case that necessitated considerable computerized research and assistance from dedicated secretaries and paralegals. Because costs incurred in this regard were a direct result of NorthWestern's dilatory tactics, Appellant's request for costs is entirely reasonable and appropriate.

C.    The Bankruptcy Court committed reversible error in concluding that Appellants' fees and costs were unreasonable in their entirety.

As discussed above, Appellants believe their fees and costs were reasonably incurred and reasonable in amount given the amount and type of work required to effectively defend against the Adversary Proceeding. However, to the extent the Bankruptcy Court found Appellants' fees and costs exorbitant, it erred in determining that these fees and costs were unreasonable in their entirety. Once the Bankruptcy Court determined those fee entries or cost components it found objectionable, it could have reduced the total amount of fees and costs accordingly or requested a revised submission and computation from Appellants. Alternately, the Bankruptcy Court could have proposed a percentage reduction to account for any finding of unreasonableness. The Bankruptcy Court's blanket rejection of all fees and costs as unreasonable was an abuse of discretion, and this Court should remand this case for further proceedings to determine to what extent Appellants' fees and costs should be reasonably allowed.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request this Court vacate the Fees and

Expenses Order and grant such other relief at it deems appropriate.

### BLANK ROME LLP

Dated:  Wilmington, Delaware
        December 21, 2006

/s/ Dale R. Dubé
Dale R. Dubé (DE No. 2863)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6400
Facsimile:  (302) 425-6464

- and -

### FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

Bonnie Steingart
Gary Kaplan
John W. Brewer
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:  (212) 859-4000

Counsel for Magten Asset Management
Corporation and Talton R. Embry

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of December, 2006, I served by hand delivery and

filed electronically the OPENING BRIEF OF APPELLANTS using CM/ECF which will send

notification of such filing(s) to the following:

Denise Seastone Kraft, Esquire
EDWARDS ANGELL PALMER & DODGE
LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801
dkraft@edwardsangell.com

Neil B. Glassman, Esquire
Charlene D. Davis, Esquire
Eric M. Sutty, Esquire
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
nglassman@bayardfirm.com
cdavis@bayardfirm.com
esutty@bayardfirm.com
Phone: 302 655-5000
nglassman@bayardfirm.com
cdavis@bayardfirm.com
esutty@bayardfirm.com

Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
Rebecca L. Butcher, Esquire
LANDIS RATH & COBB LLP
919 Market Street, Suite 600
Wilmington, DE 19801
landis@lrclaw.com
mumford@lrclaw.com
butcher@lrclaw.com

Robert J. Dehney, Esquire
Curtis S. Miller, Esquire
MORRIS NICHOLS ARSHT & TUNNELL
1201 Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
rdehney@mnat.com
cmiller@mnat.com

David A. Jenkins, Esquire
SMITH KATZENSTEIN & FURLOW LLP
800 Delaware Avenue
P. O. Box 410
Wilmington, DE 19899
daj@skfdelaware.com

Victoria Watson Counihan, Esquire
Dennis A. Meloro, Esquire
GREENBERG TRAURIG LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
counihanv@gtlaw.com
melorod@gtlaw.com

Kathleen M. Miller, Esquire
SMITH KATZENSTEIN & FURLOW LLP
800 Delaware Avenue
P. O. Box 410
Wilmington, DE 19899
kmm@skfdelaware.com

I also certify that, on this 21st day of December, 2006, I served the aforementioned

document, by e-mail and Federal Express, upon the following non-registered participants:

Steven J. Reisman, Esquire
Joseph D. Pizzurro, Esquire
Nancy E. Delaney, Esquire
Miriam K. Harwood, Esquire
CURTIS, MALLET-PREVOST,
  COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178-0061
sreisman@cm-p.com
jpizzurro@cm-p.com
ndelaney@cm-p.com
mharwood@cm-p.com

Alan W. Kornberg, Esquire
Margaret A. Phillips, Esquire
Ephraim I. Diamond, Esquire
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
akornberg@paulweiss.com
mphillips@paulweiss.com
ediamond@paulweiss.com

Stanley T. Kaleczyc, Esquire
Kimberly A. Beatty, Esquire
BROWNING, KALECZYC, BERRY
  & HOVEN, P.C.
139 North Last Chance Gulch
P.O. Box 1697
Helena, Mt 59624
stan@bkbh.com
kim@bkbh.com

John V. Snellings, Esquire
Amanda D. Darwin, Esquire
NIXON PEABODY LLP
100 Summer Street
Boston, Massachusetts 02110-1832
jsnellings@nixonpeabody.com
adarwin@nixonpeabody.com

Bijan Amini, Esquire
Avery Samet, Esquire
STORCH AMINI & MUNVES PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
bamini@samlegal.com
asamet@samlegal.com

Dennis E. Glazer, Esquire
Paul Spagnoletti, Esquire
DAVIS POLK & WARDWELL
450 Lexington Avenue, Room 3004
New York, NY 10017
dennis.glazer@dpw.com
paul.spagnoletti@dpw.com

Jesse H. Austin, III, Esq.
Karol K. Denniston, Esq.
PAUL, HASTINGS, JANOFSKY &
  WALKER LLP
600 Peachtree Street, Suite 2400
Atlanta, GA 30308
jessaustin@paulhastings.com
karoldenniston@paulhastings.com

Philip Bentley, Esquire
Matthew J. Williams, Esquire
KRAMER LEVIN NAFTALIS &
  FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
pbentley@kramerlevin.com
mwilliams@kramerlevin.com


Dale R. Dubé  (I.D. No. 2863)