# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

NORTHWESTERN CORPORATION,

                  Debtor.

Chapter 11

Case No. 03-12872
(KJC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MAGTEN ASSET MANAGEMENT CORPORATION
AND TALTON R. EMBRY,

                  Appellants,

      v.

NORTHWESTERN CORPORATION,

                  Appellee.

Adv. Pro. No.
04-55051 (KJC)

Civil Action No.
05-00548 (JJF)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ANSWERING BRIEF OF APPELLEE NORTHWESTERN CORPORATION

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**
101 Park Avenue
New York, NY 10178
(212) 696-6000 (telephone)
(212) 697-1559 (fax)

Counsel for Appellee,
NorthWestern Corporation

Dated: February 16, 2007

**GREENBERG TRAURIG, LLP**
The Nemours Building
1007 N. Orange Street, Suite 1200
Wilmington, DE 19801
(302) 661-7000 (telephone)
(302) 661-7360 (fax)

Table of Contents

Page #

Table of Authorities ............................................................................................ iii

Preliminary Statement .......................................................................................... 1

Introduction .......................................................................................................... 1

Standard of Review on Appeal ............................................................................ 2

Summary of Argument ......................................................................................... 3

Statement of The Case ......................................................................................... 3

    A.   The Parties ................................................................................................ 3

    B.   The Securities Trading Order ................................................................... 4

    C.   Magten Is Placed on the Committee and Serves for Nearly Six Months ............ 4

    D.   NorthWestern Becomes Concerned About Apparent Insider Trading ................ 5

    E.   The Adversary Proceeding ........................................................................ 7

    F.   NorthWestern and Magten Undertake Discovery ....................................... 8

    G.   NorthWestern Decides Not to Pursue the Adversary Proceeding ................. 9

    H.   NorthWestern Moves to Dismiss With Prejudice ....................................... 9

    I.   Magten and Embry File a Motion for Fees, Expenses and Costs ................ 10

    J.   The Bankruptcy Court's Opinion and Order Denying the Motion ............... 11

        1.   The Bankruptcy Court's Findings of Fact ........................................ 11

        2.   The Bankruptcy Court's Conclusions of Law ................................... 12

        3.   The Bankruptcy Court's Determinations as to the
            Reasonableness and Necessity of the Fees, Expenses and Costs ................ 13

ARGUMENT ...................................................................................................... 15

POINT ONE
APPELLANTS HAVE FAILED TO MEET THEIR BURDEN OF
SHOWING THAT THE BANKRUPTCY COURT'S FACTUAL
FINDINGS THAT, INTER ALIA, NORTHWESTERN ACTED IN
"GOOD FAITH" AND "UNDER A VERY STRONG COLORABLE
RIGHT" WERE CLEARLY ERRONEOUS ................................................. 15

    A.   The Evidence In Support of the Factual Findings of "Good Faith" and
        "Very Strong Colorable Right" Is More Than Sufficient to Affirm Those Findings ........ 17

    B.   Appellants' Allegations In Support of Bad Faith Are Unsubstantiated, Incorrect,
        And Inadequate to Overturn the Contrary Factual Findings of the Bankruptcy Court ...... 22

POINT TWO

THE BANKRUPTCY COURT PROPERLY FOUND THAT
APPELLANTS WERE NOT ENTITLED TO AN AWARD OF ATTORNEYS' FEES.............26

    A.   The Bankruptcy Court Correctly Found That An Award of Fees Is Not
        Appropriate Under the Bad Faith Exception to the "American Rule" ..............................26

    B.   The Bankruptcy Court Correctly Found That An Award of Fees Is Not
        Appropriate Under Fed. R. Bankr. P. 7041(a) ................................27

    C.   The Bankruptcy Court Found That Appellants Were Not the Prevailing
        Party, But Analyzed the Issues As If Appellants Were the Prevailing Party
        And Correctly Concluded That An Award of Fees Was Not Warranted ..........................30

    D.   The Bankruptcy Court's Factual Findings As To The Nature And Magnitude
        of the Claimed Fees Were Not "Clearly Erroneous" ........................................31

POINT THREE
THE BANKRUPTCY COURT ACTED WITHIN ITS DISCRETION
IN DECLINING TO AWARD COSTS UNDER FED. R. BANKR. P. 7054(b).........................34

    A.   The Bankruptcy Court Correctly Found That Not All Expenses Are "Costs" .................35

    B.   The Bankruptcy Court Properly Exercised Its Discretion In Refusing to
        Award Costs................................................36

CONCLUSION................................................38

ADDENDUM ......................................................... A-1

<u>**Table of Authorities**</u>

**Page #**

## Cases

<u>Aerotech, Inc. v. Estes</u>,
   110 F.3d 1523 (10th Cir. 1997) ..............................................................28

<u>Anders v. FPA Corp.</u>,
   164 F.R.D. 383 (D.N.J. 1995)...........................................................................36

<u>Anderson v. City of Bessemer</u>,
   470 U.S. 564 (1985)..............................................................................15, 16, 18

<u>Behrle v. Olshansky</u>,
   139 F.R.D. 370 (W.D. Ark. 1991) .....................................................................36

<u>Bell Atl. Corp. Sec. Litig.</u>,
   1997 U.S. Dist. LEXIS 4938
   (E.D. Pa. Apr. 16, 1997)....................................................................................21

<u>Bensalem Township v. International Surplus Lines Ins. Co.</u>,
   38 F.3d 1303 (3d Cir. 1994) ..............................................................................24

<u>Callaway Golf Co. v. Dunlop Slazenger</u>,
   384 F. Supp. 2d 735 (D. Del. 2005)........................................................17, 25, 31

<u>Chambers v. NASCO</u>,
   501 U.S. 32 (1991)..............................................................................................26

<u>Citicorp Venture Capital v. Committee of Creditors Holding Unsecured Claims</u>
   <u>(In re Papercraft Corp.)</u>,
   211 B.R. 813 (W.D. Pa. 1997)...........................................................................20

<u>Citicorp Venture Capital v. Committee of Creditors Holding Unsecured Claims</u>,
   160 F.3d 982 (3d Cir. 1998) ........................................................................7, 25

<u>Colombrito v. Kelly</u>,
   764 F.2d 122 (2d Cir. 1985) ......................................................................28, 29

<u>Crawford Fitting Co. v. J. T. Gibbons, Inc.</u>,
   482 U.S. 437 (1987)......................................................................................35, 36

<u>Ford Motor Co. v. Summit Motor Products, Inc.</u>,
   930 F.2d 277 (3d Cir.), <i>cert. denied</i>, 502 U.S. 939 (1991)................................24

<u>Gillette Foods, Inc. v. Bayernwald-Fruchteverwertung, GmbH</u>,
   977 F.2d 809 (3d Cir. 1992) ..............................................................................26

<u>Grendel's Den, Inc. v. Larkin</u>,
   749 F.2d 945 (1st Cir. 1984)..............................................................................33

<u>Gross v. Summa Four</u>,
   93 F.3d 987 (1st Cir. 1996).................................................................................21

<u>Hoffman La Roche, Inc. v. Invamed Inc.</u>,
   213 F.3d 1359 (Fed. Cir. 2000) .........................................................................25

<u>In re A. C. Williams Co.</u>,
   25 B.R. 173 (Bankr. N.D. Ohio 1982)...............................................................21

<u>In re Federated Dep't Stores, Inc.</u>,
   1991 Bankr. LEXIS 288
   (Bankr. S.D. Ohio Mar. 7, 1991) .......................................................................18

In re General Motors Class E Stock Buyout Sec. Litigation,
  694 F. Supp. 1119 (D. Del. 1988)...................................................................21

In re Healthco Int'l Inc. Sec. Litig.,
  777 F. Supp. 109 (D. Mass. 1991) ................................................................21

In re Northwestern Corp.,
  2005 Bankr. LEXIS 367 (Bankr. D. Del. Mar. 10, 2005),
  aff'd, 352 B.R. 32 (D. Del. 2006) ...................................................................8

In re Orthopedic Bone Screw Prods. Liab. Litig.,
  193 F.3d 781 (3d Cir. 1999) .............................................................2, 34, 38

In re Refco Inc.,
  336 B.R. 187 (Bankr. S.D.N.Y. 2006).........................................................18

In re Spiegel,
  292 B.R. 748 (Bankr. S.D.N.Y. 2003) .........................................................18

Kastar, Inc. v. K Mart Enterprises, Inc.,
  1976 U.S. Dist. LEXIS 14839 (E.D.N.Y. May 19, 1976) ............................18

Kirk v. Texaco, Inc.,
  82 B.R. 678 (S.D.N.Y. 1988)........................................................................21

Knop v. Johnson,
  712 F. Supp. 571 (W.D. Mich. 1989) ...........................................................33

Krouse v. American Sterilizer Co.,
  928 F. Supp. 543 (W.D. Pa. 1996)................................................................37

Landon v. Hunt,
  938 F.2d 450 (3d Cir. 1991) .........................................................................26

Magten Asset Mgmt. Corp. v. Paul Hastings
  Janofsky & Walker LLP (In re Northwestern Corp.),
  346 B.R. 84 (D. Del. 2006)..............................................................................2

Mellon Bank, N.A. v. Metro Communications, Inc.,
  945 F.2d 635 (3d Cir. 1991),
  cert. denied, 503 U.S. 937 (1992)...................................................................2

Napier v. Thirty or More Unidentified Federal Agents,
  855 F.2d 1080 (3d Cir. 1988) .......................................................................32

Northwestern Corp. v. Magten Asset Mgmt. (In re Northwestern Corp.),
  326 B.R. 519 (Bankr. D. Del. 2005) .............................................................11

Philadelphia Mortg. Trust v. Touche Ross & Co.,
  930 F.2d 306 (3d Cir. 1991) .........................................................................36

Roeder v. Alpha Industries, Inc.,
  814 F.2d 22 (1st Cir. 1987).........................................................................21

Rousseau v. Echosphere Corp.,
  2005 U.S. Dist. LEXIS 22587 (W.D. Pa. Aug. 30, 2005) ...........................31

White v. General Motors Corp.,
  908 F.2d 675 (10th Cir. 1990),
  cert. denied, 498 U.S. 1069 (1991)...............................................................33

Williams v. Giant Eagle Markets, Inc.,
  883 F.2d 1184 (3d Cir. 1989) ..............................................................2, 15, 16

York v. Ferris State Univ.,
  36 F. Supp. 2d 976 (W.D. Mich. 1998) ........................................................30

## Statutes

11 U.S.C. § 1125..................................................................................................................21
11 U.S.C. § 1125(d).............................................................................................................21
28 U.S.C. § 1920......................................................................................................... passim

## Rules

Delaware Local Bankruptcy Rule 2016-2 ...........................................................................13
Fed. R. Bankr. P. 7041(a) ............................................................................................ passim
Fed. R. Bankr. P. 7054(b) ........................................................................................... passim
Fed. R. Bankr. P. 9019........................................................................................................8
Fed. R. Civ. P. 12(b)(6) .....................................................................................................7
Fed. R. Civ. P. 41(a) ..............................................................................................9, 28, 29
Fed. R. Civ. P. 41(d)........................................................................................................36
Fed. R. Civ. P. 54(d)..............................................................................................13, 34, 35

## Other Authorities

Greg M. Zipes and Lisa M. Lambert, Creditors' Committee
    Formation Dynamics:  Issues in the Real World, 77 Am. Bank. L.J. 229 (2003) .......................19

## Preliminary Statement

Appellee NorthWestern Corporation ("NorthWestern") respectfully submits this Brief in opposition to the appeal filed by Appellants Magten Asset Management Corporation ("Magten") and Talton R. Embry ("Embry").

## Introduction

Appellants Magten and Embry appeal from an Order of the United States Bankruptcy Court (Peterson, J.) dated June 6, 2005, denying their Motion for an award of attorneys' fees, expenses, and costs.

At certain relevant times, Magten, through its principal Embry, was a member of the Official Committee of Unsecured Creditors of NorthWestern (the "Committee"). During its Chapter 11 case, NorthWestern provided the Committee's advisers with material non-public information. In 2004, NorthWestern became aware that Magten, through Embry, had purchased and sold NorthWestern securities while serving on the Committee, and again immediately after being terminated from the Committee. NorthWestern reasonably believed that Magten and Embry had traded NorthWestern securities while in the possession of material, non-public information obtained while serving on the Committee. NorthWestern commenced an adversary proceeding against Magten and Embry, seeking equitable subordination of Magten's claim, and other relief.

Discovery in the adversary proceeding revealed that Committee records failed to document what information provided by NorthWestern to the Committee's advisors was relayed by the Committee's advisers to individual Committee members, and on what dates. Accordingly, NorthWestern decided that further litigation would not be cost-effective. NorthWestern moved to dismiss its adversary proceeding with prejudice.

Magten and Embry filed a motion for attorneys' fees, expenses, and costs (the "Motion"), claiming that NorthWestern had commenced and pursued the adversary proceeding in bad faith and for purposes of harassment.

In its June 6, 2005 Order, accompanied by a 17-page Memorandum Opinion, the Bankruptcy Court denied the Motion in its entirety.

The Bankruptcy Court specifically found that NorthWestern had a "colorable right to infer" that Magten's trades "were based on non-public, confidential information supplied to the Committee advisers by the Plaintiff, and which it could rightly assume was passed on to the Defendants." The Court also found that the adversary proceeding had been filed in "good faith" and "under a very strong colorable right, which is completely divorced from fraud, vexatious, wanton or oppressive conduct." As a result, the Court concluded there was no basis for an award of attorneys' fees. The Court also declined to exercise its discretion under Fed. R. Bankr. P. 7054(b), and did not award costs to Magten and Embry.

### Standard of Review on Appeal

Findings of fact are reviewed under the "clearly erroneous" standard, while legal conclusions are review *de novo*. *See* Williams v. Giant Eagle Markets, Inc., 883 F.2d 1184, 1190 (3d Cir. 1989). As for mixed questions of law and fact, "the Court accepts the Bankruptcy Court's findings of 'historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" Magten Asset Mgmt. Corp. v. Paul Hastings Janofsky & Walker LLP (In re Northwestern Corp.), 346 B.R. 84, 87 (D. Del. 2006) (quoting Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991), *cert. denied*, 503 U.S. 937 (1992)). Discretionary determinations are reviewed for abuse, which occurs "when the court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." In re Orthopedic Bone Screw Prods. Liab. Litig., 193 F.3d 781, 795 (3d Cir. 1999).

**Summary of Argument**

1.     Appellants effectively seek *de novo* determination of the facts already determined by the Bankruptcy Court, including the findings that NorthWestern acted in "good faith" and "under a very strong colorable right[.]" However, findings of fact can only be disturbed on appeal if they are "clearly erroneous." The Bankruptcy Court's findings of fact are not "clearly erroneous." (Point One)

2.     The Bankruptcy Court applied the correct legal standards to its findings of fact, including, in the alternative, the legal standards proposed by Appellants, and properly found that Appellants were not entitled to an award of attorneys' fees, neither under the "bad faith" exception to the American Rule, nor under Fed. R. Bankr. P. 7041(a). (Point Two)

3.     The Bankruptcy Court acted within its discretion under Fed. R. Bankr. P. 7054(b) in declining to award costs. Appellants sought "costs" far beyond those allowed under 28 U.S.C. § 1920, and failed to establish the reasonableness or necessity of the amounts claimed. (Point Three)

The Order of the Bankruptcy Court should be affirmed.

**Statement of The Case**

**A.    The Parties**

NorthWestern is a publicly-held Delaware corporation. On September 14, 2003, NorthWestern filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code.

On or about September 30, 2003, the U.S. Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors of NorthWestern.

Magten, a closely-held Delaware corporation, is a holder of approximately 40% of NorthWestern's Series A 8.45% Quarterly Income Preferred Securities ("QUIPS") issued by Montana Power Capital I Trust (the "Trust"). The sole assets of the Trust are 8.45% Junior Subordinated Debentures due 2036. Magten, a major investor in the securities of distressed

companies, first acquired the QUIPS in 2003, shortly before NorthWestern filed for Chapter 11 bankruptcy protection, and continued to acquire QUIPS after NorthWestern's bankruptcy case commenced.

Magten is owned 100% by Embry. Apart from a secretary, Embry is Magten's sole employee. (Ex. 5, Embry Decl. ¶ 8)[1]

On or about January 14, 2004, Magten filed a Proof of Claim (No. 842) against NorthWestern's bankruptcy estate, asserting claims based upon Magten's ownership of the QUIPS.

## B.     The Securities Trading Order

By Notice of Motion dated October 17, 2003, the Committee moved for an Order permitting the trading of NorthWestern securities by Committee members, conditioned upon establishment of an "Ethical Wall." (Ex. 1)

On November 6, 2003, the Bankruptcy Court entered an Order Permitting Securities Trading Upon the Establishment of an Ethical Wall (the "Securities Trading Order"). (Ex. 2) The Securities Trading Order created a mechanism whereby members of the Committee would be permitted to trade in NorthWestern securities, but only under specified conditions. By the terms of the Securities Trading Order, a Committee member "choosing to participate in a Transaction *must* effectively implement and strictly adhere to policies and procedures to erect and maintain an Ethical Wall to prevent . . . [its] trading personnel from misusing any material non-public information obtained by such [member's] designated representative(s) involved in Committee-related or reorganization-related activities . . . ." (Ex. 2 at pp. 1-2) (Emphasis added).

## C.     Magten Is Placed on the Committee and Serves for Nearly Six Months

Because of Magten's ownership of the QUIPS, Magten requested to be placed on the Committee, and was placed on the Committee by the Office of the U.S. Trustee on November 25, 2003. Magten served on the Committee through its principal, Embry. (Ex. 5, Embry Decl. ¶ 10)

---

[1]     References in the form "Ex. ___" are to NorthWestern's Appendix of Exhibits.

Embry, on behalf of Magten, executed a Confidentiality Agreement dated December 18, 2003, agreeing to maintain as confidential all non-public and proprietary information provided by NorthWestern to the Committee. (Sub-Ex. C to Ex. 5, Embry Decl.)

Magten, through Embry, served on the Committee between November 25, 2003 and May 6, 2004. On or about May 6, 2004, the U.S. Trustee dismissed Magten from the Committee due to the conflict of interest resulting from Magten's commencement of an adversary proceeding against NorthWestern on April 16, 2004, asserting claims arising out of its interests in the QUIPS (the "QUIPS Litigation").[2] (Ex. 5, Embry Decl. ¶ 10)

## D.    NorthWestern Becomes Concerned About Apparent Insider Trading

Based upon information and documents to which it had access at the time, NorthWestern became concerned that, during their service on the Committee, Magten and Embry had traded QUIPS while in possession of material, non-public information, and that they had continued to do so following their dismissal from the Committee. Magten had not established, and, as a one-person operation could not establish, an Ethical Wall.

Nevertheless, after its appointment to the Committee on November 25, 2003, Magten increased its QUIPS holdings. Magten executed three transactions in QUIPS between December 1, 2003 and December 5, 2003, acquiring at least 27,540 QUIPS. (Ex. 5, Embry Decl. ¶ 4) On December 17, 2003, Magten sold at least 1,900 QUIPS. (Ex. 5, Embry Decl. ¶ 5)

In January 2004, Magten and Embry unsuccessfully sought permission to trade in NorthWestern securities under a requested modification of the Securities Trading Order. (Ex. 5, Embry Decl. ¶ 8) Magten proposed that "if Magten uses the services of an independent third-party broker (the 'Broker') who does not receive any confidential information regarding the Debtor and that has autonomy in making buy/sell decisions in executing trades in the securities of the Debtor

---

[2]    The QUIPS Litigation is currently pending before this Court, which withdrew the reference from the Bankruptcy Court on September 22, 2005 (Civ. Action No. 04-1494-JJF).

and its affiliates, Magten will receive the protections afforded by the [Securities Trading] Order."
(Ex. 3 at ¶ 21)  Magten's proposal was not acceptable to the U.S. Trustee, and Magten did not
submit its proposal to the Bankruptcy Court.  (Ex. 5, Embry Decl. ¶ 8)

On May 14, 2004 – eight days after the U.S. Trustee removed Magten from the
Committee – Magten began aggressively purchasing QUIPS, acquiring 95,000 in total.  (Ex. 5,
Embry Decl. ¶ 11)  It was reasonable (especially given Magten's inability to establish an Ethical
Wall) for NorthWestern to believe that while serving on the Committee, Magten and Embry had
received material non-public information, and that trades made on and after May 14, 2004 had been
based on that information.

Further concerns arose on July 27, 2004, when NorthWestern deposed Embry in
connection with Magten's objection to confirmation of Debtor's First Amended Plan of
Reorganization.  (Ex. 5, Embry Decl. ¶ 12)  At his deposition, Embry testified that in January 2004,
*after* he had attended his first Committee meeting, and while still serving on the Committee,
Magten had purchased 1,000 QUIPS.  (Ex. 5, Embry Decl. ¶ 12)

In sum, from the perspective of NorthWestern as of August 2004, the following had
occurred, or reasonably appeared to have occurred:

- Magten and Embry had joined the Committee on November 25, 2003.

- There was no apparent way in which Magten or Embry could lawfully trade in
  NorthWestern securities, as there was no way for Magten and Embry to establish
  an Ethical Wall and comply with the Securities Trading Order.

- NorthWestern had provided the Committee's advisers with material non-public
  information.

- While serving on the Committee, in early December 2003 and again in January
  2004, Magten had purchased and sold QUIPS.  One such transaction had

-6-

occurred, according to Embry's sworn testimony, in January 2004, after he had
attended his first Committee meeting.

- Starting May 14, 2004, just eight days after their termination from the
  Committee on May 6, 2004, Magten and Embry began aggressively purchasing
  QUIPS.

**E.      The Adversary Proceeding**

Faced with these facts (as reasonably believed by NorthWestern), and concerned
about the integrity of the reorganization process, on August 24, 2004, NorthWestern commenced an
adversary proceeding (the "Adversary Proceeding") against Magten and Embry, alleging, upon
information and belief, that Magten and Embry had traded QUIPS on the basis of material, non-
public information acquired while serving on the Committee, to the detriment of NorthWestern and
its bankruptcy estate. NorthWestern sought to hold Magten and Embry accountable for their
inequitable conduct by seeking equitable subordination of Magten's claim against NorthWestern's
bankruptcy estate relating to the QUIPS, and damages and other relief. (Ex. 3)

The Bankruptcy Court set an expedited discovery schedule. Trial was scheduled to
begin February 7, 2005. (Ex. 9 at ¶ 14)

Magten and Embry filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6).
(Ex. 4) By Order dated November 8, 2004, the Bankruptcy Court denied the Motion to Dismiss,
and ruled that "the Plaintiff should be allowed the opportunity to pursue its remedies." (Ex. 6 at p.
2) Citing Citicorp Venture Capital v. Committee of Creditors Holding Unsecured Claims, 160 F.3d
982, 986-87 [3d Cir. 1998), the Court held that "[e]quitable subordination may provide a basis for
relief where the defendants engaged in some type of inequitable conduct resulting in injury to
creditors or conferring an unfair advantage on the claimant." (Ex. 6 at p. 2)

Thereafter, the parties attempted to resolve their differences on a global basis. Appellants admit that NorthWestern repeatedly proposed to Magten and Embry that they consent to adjourn the trial date in the Adversary Proceeding so that settlement negotiations could be pursued, but Magten and Embry refused to agree to adjourn the trial date. (Ex. 14, Kaplan Decl. ¶ 21)

On or about January 27, 2005, the parties reached an agreement, subject to Bankruptcy Court approval, on the terms of a proposed settlement, which would have encompassed the QUIPS Litigation, the Adversary Proceeding, and numerous actions and appeals which Magten had brought against NorthWestern and other parties. (Ex. 14, Kaplan Decl. ¶ 22) However, certain creditors of NorthWestern's bankruptcy estate objected to the settlement, and NorthWestern concluded that it could not go forward with the proposed settlement.

Despite NorthWestern's decision not to proceed with the proposed settlement, on February 22, 2005, Magten and the indenture trustee filed a Joint Motion, pursuant to Fed. R. Bankr. P. 9019, seeking approval of the proposed settlement. (Ex. 8) By Order dated March 10, 2005, the Bankruptcy Court declined to approve the settlement. (Ex. 12) In an accompanying Memorandum Opinion, the Court found that the various parties had acted in good faith, but that the objections of creditors were fatal to the proposed settlement. This Court affirmed. *See* In re Northwestern Corp., 2005 Bankr. LEXIS 367, at *11-12 (Bankr. D. Del. Mar. 10, 2005), *aff'd*, 352 B.R. 32 (D. Del. 2006).

**F.     NorthWestern and Magten Undertake Discovery**

During the course of the Adversary Proceeding, both parties undertook substantial discovery. An Addendum attached to this Memorandum lists the discovery notices served by each side. (A-1, 2)

On November 23 and December 6, 2004, NorthWestern served discovery demands on Magten and Embry. (A-1) On December 8 and 13, 2004, NorthWestern served subpoenas on

various broker-dealers, seeking to ascertain the full extent of Magten's trading in NorthWestern securities.  (A-1, 2)  Also on December 13, 2004, Magten served subpoenas on various Committee members and advisers, thereby obviating the need for NorthWestern to do the same.  (A-2)

**G.    NorthWestern Decides Not to Pursue the Adversary Proceeding**

The discovery led NorthWestern to conclude that, while it could prove it had provided material non-public information to the Committee's advisors, the Committee's records were insufficient to establish what information had been conveyed to which Committee members, or when it had been conveyed.  As explained by NorthWestern's counsel at the hearing in the Bankruptcy Court:

> [T]here were over thirty boxes of material non-public information which included projections, confirmation scenarios, analysis evaluation [sic] for the plan that were provided to the advisors for the Plan Committee [sic], but yet, when we got to discovery we couldn't get that very critical link to show that in fact that information had been given to Talley [sic] Embry. . . . [B]y the time we got through the discovery and began to prepare for trial it was clear to the debtor that the better course was to dismiss with prejudice because we couldn't link up the very pieces we needed to establish that as to those trades that he [Embry] made after he left the Committee were made on the basis of material non-public information that he was provided while sitting as a member of the Committee.

(Ex. 16, Tr. May 3, 2005, at pp. 35-36)  Thus, NorthWestern prudently decided that further litigation would not be cost-effective and would therefore not be in the best interests of the bankruptcy estate.  (Ex. 16, Tr. May 3, 2005, at pp. 35-36)

**H.    NorthWestern Moves to Dismiss With Prejudice**

On February 24, 2005, NorthWestern filed a Joint Motion to Dismiss the Adversary Proceeding with prejudice, pursuant to Fed. R. Bankr. P. 7041(a) and Fed. R. Civ. P. 41(a).  (Ex. 9) Magten and Embry filed a Limited Objection, asking the Bankruptcy Court to preserve whatever rights they might have to seek attorneys' fees and expenses incurred in the defense of the Adversary Proceeding.  (Ex. 10)

By Order dated March 9, 2005, the Bankruptcy Court granted the Joint Motion to Dismiss the Adversary Proceeding with prejudice, but, as requested by Magten and Embry, indicated that "nothing shall prejudice Defendants' rights to pursue an award of for [sic] attorney's fees and costs incurred in connection with the above-captioned adversary proceeding[.]" (Ex. 11)

I.     **Magten and Embry File a Motion for Fees, Expenses and Costs**

On March 22, 2005, Magten and Embry filed a Motion for payment of fees, expenses and costs incurred in connection with the Adversary Proceeding. (Ex. 13)   Magten and Embry asserted – without proof, and contrary to the record – that NorthWestern had deliberately commenced frivolous and harassing litigation in order to retaliate against Magten and Embry for litigation they had commenced, and that this supposed misconduct warranted an award of attorneys' fees, expenses and costs.

In their Motion, Magten and Embry made two arguments for an award of fees: (i) that the Bankruptcy Court has the authority to award fees to Appellants under Fed. R. Bankr. P. 7041(a) if there are "exceptional circumstances," and that the Bankruptcy Court should exercise that authority and award fees because "exceptional circumstances" were present, namely, bad faith, harassment and vexatious conduct; and (ii) that, while the established "American Rule" ordinarily requires each litigant to bear its own fees, an exception allows an award of fees when there has been bad faith, vexatious, oppressive and wanton conduct. (Ex. 13 at ¶¶ 32-35)

In opposition to the Motion, NorthWestern explained that, based upon the information it had at the time it commenced the Adversary Proceeding (including the uncontested facts that Magten and Embry had purchased and sold QUIPS while serving on the Committee, and immediately after being removed from the Committee) it had reasonably believed that Magten and Embry had engaged in trading on the basis of material non-public information.  However, when discovery indicated that it would not be possible to establish what information the individual

-10-

Committee members had received, or when, NorthWestern had concluded that it was not cost-effective to continue to litigate, and had moved to dismiss with prejudice. There was, therefore, no basis for awarding fees, expenses and costs to Magten and Embry. (Ex. 15)

On May 3, 2005, the Bankruptcy Court conducted a hearing on the Motion, and reserved decision. (Ex. 16, Tr. May 3, 2005, at pp. 21-44)

## J.    The Bankruptcy Court's Opinion and Order Denying the Motion

By Order dated June 6, 2005, accompanied by a detailed 17-page Memorandum Opinion (the "Opinion" or "Op."), the Bankruptcy Court denied the Motion in its entirety. (Exs. 17, 18) *See* Northwestern Corp. v. Magten Asset Mgmt. (In re Northwestern Corp.), 326 B.R. 519 (Bankr. D. Del. 2005).

### 1.    The Bankruptcy Court's Findings of Fact

In its Opinion (Ex. 18), the Bankruptcy Court made, inter alia, the following findings of fact pertaining to NorthWestern's institution and conduct of the Adversary Proceeding:

- "the litigation was filed in a *good faith* attempt to preserve the integrity of the operations of the Committee, the confidentiality agreements and the fiduciary obligations undertaken by Magten/Embry as members of the Committee." (Op. p. 6) (Emphasis added).

- "The Plaintiff had *colorable right* to infer that Magten's QUIPS trades were based on non-public, confidential information supplied to the Committee advisers by the Plaintiff, and which it could *rightly* assume was passed on to the Defendants." (Op. p. 9) (Emphasis added).

- "Plaintiff's desire to keep the reorganization process clean by filing a lawsuit against Magten was done under a *very strong colorable right*, which is *completely divorced from fraud, vexatious, wanton or oppressive conduct.* I find

-11-

the contentions of the Defendants to the contrary are without merit." (Op. p. 10)

(Emphasis added).

In a concluding paragraph, the Bankruptcy Court summarized its findings of fact:

> I determine the complaint filed by the Plaintiff against Magten and
> Embry *was under colorable facts and rights* in light of
> Magten/Embry membership on the Committee, which was, through
> the Committee advisers, supplied non-public, confidential
> information that the *Plaintiff had the right* to assume was supplied to
> the Members. . . . Therefore, *the complaint was not filed in bad
> faith, nor for vexatious or harassment purpose,* but rather to
> preserve the integrity of the reorganization process. . . ."

(Op. pp. 16-17) (emphasis added).

### 2.    *The Bankruptcy Court's Conclusions of Law*

Turning to the two legal bases for relief asserted by Magten and Embry, the

Bankruptcy Court carefully analyzed, and rejected, both such bases, on the law and on the facts.

The Court *assumed* that Magten and Embry were the prevailing parties in the

Adversary Proceeding, and noted the well-established "American Rule," under which "the

*prevailing party* in litigation is not entitled to attorney's fees unless certain stringent exceptions

apply." (Op. at p. 5) (Emphasis added).  The Court acknowledged its inherent power to override

the American Rule where a party has "acted in bad faith, vexatiously, wantonly or for oppressive

reasons," such as by engaging in fraud on the court. (Op. at p. 8)  The Court, however, found

"nothing in this record which suggests or even comes close to suggesting, that the plaintiff

practiced fraud on the Court or Defendants," and found that the allegations in the Complaint "do

not at all involve bad faith, vexatious or wanton misconduct." (Op. pp. 8, 10)  The Court

specifically found that, to the contrary, "the litigation was filed in a *good faith* attempt to preserve

the integrity of the operations of the Committee, the confidentiality agreements and the fiduciary

obligations undertaken by Magten/Embry as members of the Committee." (Op. p. 6) (Emphasis

added).  The Court concluded there was no basis for deviating from the American Rule.

-12-

The Court also considered the movants' contention that Fed. R. Bankr. P. 7041(a) not only authorized but warranted an award of attorney's fees to Magten and Embry, because of "exceptional circumstances," namely bad faith, harassment, and vexatious conduct. Although the Court's findings of fact precluded any relief even if Fed. R. Bankr. P. 7041(a) was subject to such an "exceptional circumstances" test, the Court ruled that Fed. R. Bankr. P. 7041(a) would not in any event authorize an award of attorneys' fees because, as a matter of law, it was not subject to an "exceptional circumstances" test. (Op. p. 7)

> 3.    *The Bankruptcy Court's Determinations as to the Reasonableness and Necessity of the Fees, Expenses and Costs*

Despite having "concluded the award of fees and costs are not warranted [for] the reasons set forth," the Bankruptcy Court nevertheless "deem[ed] it necessary to comment on the applications," which totaled the "grand and exorbitant amount of $710,524.00" in attorneys' fees, plus $73,596.30 in purported "costs." (Op. pp. 10-11)

Acknowledging that Delaware Local Bankruptcy Rule 2016-2 was not technically controlling, the Bankruptcy Court observed that that rule nevertheless provides "guidance" for assessing the "reasonableness" of the application as well as the "necessity" of various services and expenses. (Op. p. 11) The Court found that the "billing statements show extensive duplication of legal work on the same subject matter, predominant lumping and vague activity descriptions to the point of being meaningless." (Op. pp. 11-12) The Court found that the fees were "exorbitant," full of "duplication" and "over-lawyering," and that the supporting documentation was "totally insufficient[.]" (Op. pp. 12-13) The Court summed it up by saying, "I only can conclude here that Defendants['] counsel indeed incurred exceptionally exorbitant fees and costs." (Op. p. 8)

Turning to the issue of costs, the Bankruptcy Court drew a critical distinction between Fed. R. Civ. P. 54(d) and Fed. R. Bankr. P. 7054(b). While an award of costs to the "prevailing party" under Fed. R. Civ. P. 54(d) is presumed "unless the court otherwise directs,"

Fed. R. Bankr. P. 7054(b) provides that the "court *may* allow costs to the prevailing party except when a statute . . . or these rules" otherwise provide. (Emphasis added). The standards, therefore are significantly different under the two rules. In particular, an award of costs under Fed. R. Bankr. P. 7054(b) is not presumed, and the prevailing party bears the burden of convincing the court to exercise its "discretion." (Op. pp. 14, 16)

The Bankruptcy Court determined, for purposes of Fed. R. Bankr. P. 7054(b), that "the Defendants were not the prevailing party in this action because this case was dismissed with prejudice upon joint motion of each party, thereby terminating the litigation once and for all without trial on the merits." (Op. p. 14)

However, the Bankruptcy Court provided an alternative holding "if I were to hold that costs are allowable to the Defendants[.]" (Op. p. 14) Under the assumption that Defendants were the prevailing party, thereby triggering Fed. R. Bankr. P. 7054(b), the Court found that the expenses claimed under the rubric of "costs" are "not allowable costs under 28 U.S.C. Section 1920," for a combination of reasons. (Op. p. 14) Those costs that are potentially allowable under 28 U.S.C. § 1920 (such as transcript fees and necessary copies) were insufficiently documented as to necessity and reasonableness. (Op. pp. 14-15) The remaining charges (including telephone, courier service, computerized research, word processing, transportation, meals, and overtime) were simply not encompassed by 28 U.S.C. § 1920. (Op. pp. 14-16) The Court summarized its findings as to the claimed "costs" as follows: "the expense items are unreasonably high, not documented, and most fall beyond the express provisions of 28 U.S.C. Section 1920." (Op. p. 16)

By Order dated June 6, 2005, the Bankruptcy Court denied the Motion "in toto," for "the reasons set forth in the Court's Memorandum Opinion[.]" (Ex. 17)

Magten and Embry appeal from the June 6, 2005 Order.

## ARGUMENT

## POINT ONE

**APPELLANTS HAVE FAILED TO MEET THEIR BURDEN OF SHOWING THAT THE BANKRUPTCY COURT'S FACTUAL FINDINGS THAT, INTER ALIA, NORTHWESTERN ACTED IN "GOOD FAITH" AND "UNDER A VERY STRONG COLORABLE RIGHT" WERE CLEARLY ERRONEOUS**

In its detailed Opinion, the Bankruptcy Court made numerous factual findings. Inter alia, the Court found that NorthWestern "had a *colorable right* to infer that Magten's QUIPS trades were based on non-public, confidential information supplied to the Committee advisers by the Plaintiff, and which it could *rightly* assume was passed on to the Defendants," and that "the litigation was filed in a *good faith* attempt to preserve the integrity of the operations of the Committee, the confidentiality agreements and the fiduciary obligations undertaken by Magten/Embry as members of the Committee." (Op. pp. 6, 9) (Emphasis added)  The Court specifically found that "Plaintiff's desire to keep the reorganization process clean by filing a lawsuit against Magten was done *under a very strong colorable right*, which is completely divorced from fraud, vexatious, wanton or oppressive conduct." (Op. p. 10) (Emphasis added).

These factual findings, in and of themselves, are sufficient to affirm the Order.  To disturb these findings of fact, Appellants bear the heavy burden of establishing that the Bankruptcy Court's factual findings were "clearly erroneous." Williams v. Giant Eagle Markets, Inc., 883 F.2d 1184, 1190 (3d Cir. 1989) (determination of party's "bad faith" conduct in litigation for purpose of awarding fees is subject to review under "clearly erroneous" standard).

Factual findings may not be disturbed by the reviewing court if the original court's "account of the evidence is plausible in light of the record viewed in its entirety[.]" Anderson v. City of Bessemer, 470 U.S. 564, 574 (1985).  That is the governing standard of review even where the "findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." Id.

-15-

Appellants cannot meet their burden. They cannot establish that the Bankruptcy Court's factual findings were erroneous, much less "clearly erroneous."

In their Opening Brief, Appellants acknowledge that findings of fact must be reviewed under the "clearly erroneous" standard. (Appellants' Opening Brief at pp. 5-6) However, nowhere in their Opening Brief do Appellants acknowledge that *any* of the Bankruptcy Court's findings actually fall within this category. To the contrary, Appellants repeatedly strain to categorize the Court's findings of fact as something other than that, and effectively demand *de novo* review of each and every determination made below. (*See* Appellants' Opening Brief at pp. 17, 21, 24, 28, 32, 34, 35, 39)

For example, Appellants make statements such as, "*should this Court find* that NorthWestern was not justified in prosecuting the Adversary Proceeding...." (Appellants' Opening Brief at p. 32) (Emphasis added). That misstates the standard of review. *See* Anderson, 470 U.S. at 574 (reversal of factual determinations by reviewing court inappropriate "even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.")

As another example, Appellants argue that "there is *ample support for concluding* that the commencement of this litigation was vexatious, wanton, and oppressive[.]" (Appellants' Opening Brief at p. 24) (Emphasis added). Whether or not there is "ample support" for such factual findings likewise misstates the standard of review. The Supreme Court has held that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574.

The standard of review of the Bankruptcy Court's factual findings is whether they were "clearly erroneous." Williams, 883 F.2d at 1190. As shown below, they were not.

A.    **The Evidence In Support of the Factual Findings of "Good Faith" and "Very Strong Colorable Right" Is More Than Sufficient to Affirm Those Findings**

At the time it commenced the Adversary Proceeding, NorthWestern had trading records which established that Magten and Embry had traded QUIPS while they were serving on the Committee, and that they had also done so immediately after being terminated from the Committee. By their own acknowledgement, Magten and Embry could not establish an Ethical Wall, and therefore could not comply with the Securities Trading Order. Moreover, Embry himself had testified at deposition on July 27, 2004 (prior to the institution of the Adversary Proceeding) that in January 2004, while he was serving on the Committee and after he had attended his first Committee meeting, Magten had purchased 1,000 QUIPS.[3]  (Ex. 5, Embry Decl. ¶ 12)  This provided NorthWestern with more than ample basis to commence the Adversary Proceeding.

The Bankruptcy Court properly found that NorthWestern had acted in good faith, and that NorthWestern had a good faith basis for believing that Magten and Embry had traded on material, non-public information.  (Op. pp. 6, 8-10, 16-17)  Moreover, the Court properly found that NorthWestern had moved to dismiss the Adversary Proceeding with prejudice because it ultimately became apparent, through discovery, that NorthWestern could not pin down which material non-public information had been imparted to Magten and Embry, and when, so that it would not be cost-effective to continue litigating.  (Op. pp. 3-4, 10)  This voluntary dismissal is itself an indication of NorthWestern's good faith. *See* Callaway Golf Co. v. Dunlop Slazenger, 384 F. Supp. 2d 735, 747 (D. Del. 2005) ("voluntary dismissal is generally deemed 'an indication of good faith'"; denying defendant's motion for attorneys' fees where plaintiff had voluntarily dismissed claim for reasons that "include[d] a belief that it was not in [plaintiff's] best interest to

---

[3]    Although Embry would later explain that the January 2004 transaction was simply a "rebooking" of one of the December 2003 transactions that had not gone through, Embry admits that this explanation, and the corresponding supporting documentation, was not provided to NorthWestern until some time after NorthWestern had commenced the Adversary Proceeding. (Ex. 5, Embry Aff. ¶ 13) Moreover, Embry's convoluted explanation raised more questions than it answered. (*See* Ex. 5, Embry Aff. ¶¶ 12-14) Appellants' argument that Embry's explanations should have put the matter to rest is baseless. (*See* Appellants' Opening Brief at p. 23)

pursue [the] claim," and "that the litigation would not be worth the expense it would likely entail") (quoting Kastar, Inc. v. K Mart Enterprises, Inc., 1976 U.S. Dist. LEXIS 14839, at *16 (E.D.N.Y. May 19, 1976)).

None of these findings of fact are erroneous at all, let alone "clearly erroneous." At the very least, the Bankruptcy Court's "account of the evidence is plausible in light of the record viewed in its entirety," and therefore may not be disturbed on appeal. Anderson, 470 U.S. at 574.

It is important to understand why Magten's trading activity while a member of the Committee, in and of itself, was of such concern. In the typical bankruptcy case, creditors' committee members often "receive commercially sensitive or proprietary information from the debtor and other parties[.]" In re Refco Inc., 336 B.R. 187, 196 (Bankr. S.D.N.Y. 2006). Appellants admit that "[b]ecause members of creditors committees in chapter 11 cases generally receive material nonpublic information about the debtor, they ordinarily cannot trade in the debtor's securities until such information becomes public and/or immaterial." (Appellants' Opening Brief at p. 29) There is, therefore, significant cause for concern whenever a member of a creditors' committee trades in the debtor's securities. Cf. In re Spiegel, 292 B.R. 748, 751 (Bankr. S.D.N.Y. 2003) (trading by members of creditors' committee in debtor's securities creates, at a minimum, "an appearance of impropriety"). It is for this reason that, ordinarily, creditors' committees request permission for, and courts sometimes authorize, trading in the debtor's securities, *conditioned upon establishment of an appropriate ethical wall. See, e.g.*, In re Federated Dep't Stores, Inc., 1991 Bankr. LEXIS 288 (Bankr. S.D. Ohio Mar. 7, 1991) (granting motion to allow trading by committee members upon establishment of ethical wall).

Establishment of, and compliance with, an ethical wall pursuant to court order (known as a "blocking order") is a *sine qua non* for trading by a member of a creditors' committee. *See* Greg M. Zipes and Lisa M. Lambert, Creditors' Committee Formation Dynamics: Issues in the

Real World, 77 Am. Bank. L.J. 229, 248 (2003) ("A blocking order should be viewed as establishing the *minimum steps a creditor must take* if it wishes to trade in a debtor's securities.") (emphasis added).

Where – as here – the court has issued a blocking order, and a member of a creditors' committee does not or cannot establish an ethical wall, any trading by such member in the debtor's securities raises extremely serious concerns

Appellants argue that the Bankruptcy Court misconstrued the Securities Trading Order when it found that it "prohibited trading" in NorthWestern's securities. (Appellants' Opening Brief at pp. 28-32) Appellants claim that the Securities Trading Order merely created one option via which Committee members could trade in NorthWestern securities. Appellants take the position that, notwithstanding the Securities Trading Order, they were entirely free to trade in NorthWestern securities while sitting on the Committee even without creating an Ethical Wall, so long as they did not trade on the basis of material non-public information.

Appellants are wrong. By the express terms of the Securities Trading Order, a Committee member "choosing to participate in a Transaction ***must*** effectively implement and strictly adhere to policies and procedures to erect and maintain an Ethical Wall to prevent . . . [its] trading personnel from misusing any material non-public information obtained by such [Member's] designated representative(s) involved in Committee-related or reorganization-related activities . . . ." (Ex. 2 at pp. 1-2) (Emphasis added).

The word "must" is not ambiguous. It does not mean "may." Under the Securities Trading Order, for a Committee member to trade NorthWestern securities, the Member "must" have first established an "Ethical Wall" (as defined in the Securities Trading Order). It is undisputed that Magten and Embry did not and could not establish an Ethical Wall. (Ex. 5, Embry Decl. ¶ 8)

-19-

Trading NorthWestern securities without first establishing an Ethical Wall is a *per se* violation of the Securities Trading Order – whether or not the Committee member actually possessed material non-public information at the time of the trades. Magten and Embry traded in derogation of the Securities Trading Order, thus giving NorthWestern even more justification for commencing the Adversary Proceeding.

Magten and Embry are experienced and sophisticated. By their own admission, they "have frequently been major investors in securities of distressed companies and often participate in restructurings both in and out of court. Appellants have served on official and unofficial creditors committees[.]" (Appellants' Opening Brief at p. 24) Magten and Embry understood full well that their trading activity while sitting on the Committee, given their known inability to establish an Ethical Wall, would cause alarm bells to sound.

Nor was this the first time Magten had traded a debtor's securities while sitting on a creditors' committee, under suspicious circumstances. *See* Citicorp Venture Capital v. Committee of Creditors Holding Unsecured Claims (In re Papercraft Corp.), 211 B.R. 813, 817 (W.D. Pa. 1997) (Magten traded debtor's securities while serving on creditors' committee, and settled claims that arose out of that trading). Magten's suspect history further justified NorthWestern's commencing the Adversary Proceeding.

On these facts, the Bankruptcy Court's finding that NorthWestern acted within its rights in commencing the Adversary Proceeding was, at the very least, not "clearly erroneous."

Appellants argue that the trades made *after* Magten was removed from the Committee could not possibly have been based upon material non-public information, because by then NorthWestern had already filed its 2003 10-K, first quarter 2004 10-Q, Plan of Reorganization, and Disclosure Statement, so that, according to Appellants, no material information

about NorthWestern could possibly have remained undisclosed to the public. (Appellants' Brief at pp. 8, 23, 25, 28)

Again, Appellants are wrong. There is no duty on the part of a public corporation to disclose all material non-public information in its possession. *See, e.g.,* Gross v. Summa Four, 93 F.3d 987, 992 (1st Cir. 1996); Roeder v. Alpha Industries, Inc., 814 F.2d 22, 26 (1st Cir. 1987); Bell Atl. Corp. Sec. Litig., 1997 U.S. Dist. LEXIS 4938, at *93 (E.D. Pa. Apr. 16, 1997); In re General Motors Class E Stock Buyout Sec. Litigation, 694 F. Supp. 1119, 1128-29 (D. Del. 1988). That is so even in the context of a 10-K or 10-Q filing. *See, e.g.,* In re Healthco Int'l Inc. Sec. Litig., 777 F. Supp. 109, 113-14 (D. Mass. 1991). Appellants cite no authority for their novel position that in its 10-K and 10-Q filings, a company must reveal *all* material non-public information. There is no such requirement.

Appellants fare no better with the Plan and Disclosure Statement. The Disclosure Statement is governed by 11 U.S.C. § 1125, which requires disclosure of "adequate information" to enable a hypothetical investor "to make an informed judgment about the plan," a standard *less broad* than the disclosure required under federal securities laws. *See* Kirk v. Texaco, Inc., 82 B.R. 678, 681 (S.D.N.Y. 1988) ("under normal circumstances, a disclosure statement need *not* comply with the disclosure standards of the federal securities laws.") (emphasis in original); In re A. C. Williams Co., 25 B.R. 173, 176 (Bankr. N.D. Ohio 1982) ("the fact that this disclosure statement may not meet the requirements for a prospectus under state or federal securities law is irrelevant."); 11 U.S.C. § 1125(d) ("Whether a disclosure statement . . . contains adequate information is not governed by any otherwise applicable nonbankruptcy law, rule, or regulation"). Thus, the issuance of the Plan and Disclosure Statement does not support Appellants' argument.

Accordingly, it was not unreasonable for NorthWestern to have believed that Appellants had traded on the basis of material non-public information even after the Plan, Disclosure Statement, 10-K and 10-Q were issued.

In sum, there is ample evidence to support the factual findings of the Bankruptcy Court that NorthWestern acted in "good faith" and under a "very strong colorable right." Those findings were not "clearly erroneous" and should be affirmed.

**B.      Appellants' Allegations In Support of Bad Faith Are Unsubstantiated, Incorrect, And Inadequate to Overturn the Contrary Factual Findings of the Bankruptcy Court**

As putative circumstantial evidence that NorthWestern acted in bad faith, Appellants claim – incorrectly – that NorthWestern failed to take any meaningful discovery, then speculate that NorthWestern deliberately avoided doing so because it knew that such discovery would expose the baseless nature of the case. (Appellants' Opening Brief at pp. 1, 10-11, 26-27)

Appellants are entirely wrong. NorthWestern took substantial discovery in the Adversary Proceeding. (A-1, 2). That NorthWestern chose not to serve additional discovery notices that would have precisely duplicated those served by Appellants was prudent and economical. NorthWestern participated actively and vigorously in the depositions of the Committee's advisors noticed by Appellants, and asked the questions one would expect a responsible plaintiff to ask. There is no evidence that NorthWestern avoided taking discovery, let alone that it avoided taking discovery because of a nefarious motive.

Straining to find anything that might support their claim of bad faith, Appellants complain that, during the course of the Adversary Proceeding, NorthWestern battled over, and sought to block, Appellants' discovery demands, and also that NorthWestern was unduly deferential to the Committee's assertion of privilege as a basis for its objection to providing discovery. (Appellants' Opening Brief at pp. 2, 26-27) But the Bankruptcy Court, which ruled on these discovery disputes, never found NorthWestern to have acted in bad faith. (Ex. 7) There is no

evidence whatsoever that NorthWestern's objections to Appellants' discovery demands were out of bounds or sanctionable. They were not. They were well within the range of permissible discovery objections. Similarly, there is no evidence that NorthWestern acted improperly in reacting to the Committee's assertions of privilege.

Appellants also try to create the false impression that before commencing the Adversary Proceeding, NorthWestern did not undertake *any* preliminary investigation to determine whether its allegations were well-founded. (Appellants' Opening Brief at pp. 2, 5, 22, 24-25) Appellants baldly assert that "NorthWestern did not undertake *even a minimal investigation* prior to filing the Complaint[.]" (Appellants' Opening Brief at p. 22) (Emphasis added).

Appellants ignore the trading records that showed activity while Magten and Embry were serving on the Committee and immediately after being terminated, and likewise ignore Embry's deposition testimony that Magten had purchased 1,000 QUIPS in January 2004, while Magten was serving on the Committee and *after* Embry had attended his first Committee meeting. (Ex. 5, Embry Decl. ¶¶ 4-5, 7, 11-12)

Appellants mischaracterize the deposition testimony of Michael J. Hanson, COO of NorthWestern, supposedly to the effect that "prior to filing the Complaint, neither he, nor anyone at NorthWestern made any efforts to determine what, if any, material non-public information Appellants had at the time the QUIPS were traded." (Appellants' Opening Brief at pp. 24-25) Mr. Hanson actually testified that "We did not ask, to my knowledge, the representatives of the creditor committee to confirm that they distributed each piece of information to the individual members. They represented to us on occasions that we talked about earlier today, that they had shared information with, 'The creditor committee.' I have no reason to believe that it did not include all of its members, but we didn't ask them." (Hanson Dep. p. 121, Sub-Ex. A to Ex. 14, Kaplan Decl.)

Appellants complain that NorthWestern did not do more to investigate before commencing the Adversary Proceeding. But given the information it had at the time, NorthWestern had no obligation to conduct additional inquiries before commencing the Adversary Proceeding. There is no obligation to try to unearth every fact before commencing litigation. What is required is a "reasonable inquiry" into the facts. *See* <u>Bensalem Township v. International Surplus Lines Ins. Co.</u>, 38 F.3d 1303, 1314 (3d Cir. 1994). An inquiry is reasonable "if it provides the party with an objective knowledge or belief at the time of the filing . . . that the claim was well-grounded in law and fact." <u>Id</u>. (quoting <u>Ford Motor Co. v. Summit Motor Products, Inc.</u>, 930 F.2d 277, 289 (3d Cir.), *cert. denied*, 502 U.S. 939 (1991)). NorthWestern had such an objective belief when it commenced the Adversary Proceeding.

Appellants complain that NorthWestern did not obtain the Committee's records prior to commencing the Adversary Proceeding. (Appellants' Opening Brief at p. 25) But Appellants offer no explanation as to how NorthWestern could have persuaded the Committee's advisers to provide such records, much less how NorthWestern could have overcome the Committee's assertions of privilege. It is unrealistic to believe that the very same Committee advisers who strenuously resisted providing formal discovery in the Adversary Proceeding would somehow have provided information and documents to NorthWestern on a voluntary basis. At a minimum, it is not bad faith for NorthWestern to have anticipated such resistance – which materialized. (Appellants' Opening Brief at pp. 2, 11, 26)

The Bankruptcy Court properly found that NorthWestern had the right to assume that Committee members had access to material non-public information provided to the Committee's advisers. (Op. p. 9) That finding was not "clearly erroneous," especially in light of professional norms (cited earlier) that establish that members of creditors' committees may trade, if

at all, only in compliance with blocking orders, such as the Securities Trading Order, precisely because of concerns that arise out of presumed access to material non-public information.

Furthermore, while NorthWestern's pre-filing investigation was reasonable under the circumstances, it has been held in this district that "[e]ven if plaintiffs' pre-suit investigation was unreasonable, an unreasonable investigation alone does not demonstrate that the ensuing litigation was vexatious, unjustified, or brought in bad faith." Callaway Golf Co. v. Dunlop Slazenger, 384 F. Supp. 2d 735, 747 (D. Del. 2005) (quoting Hoffman La Roche, Inc. v. Invamed Inc., 213 F.3d 1359, 1363 (Fed. Cir. 2000)).

Finally, Appellants make the outrageous allegation – without a shred of proof, and contrary to the evidence – that NorthWestern *knew* the Adversary Proceeding was baseless at the time it filed it. (Appellants' Opening Brief at pp. 1, 5, 22-24) That contention, which is utterly false, flies in the face of the undisputed trading activity by Magten, and Embry's testimony at his July 27, 2004 deposition, admitting he had traded QUIPS shortly after attending his first Committee meeting. (Ex. 5, Embry Decl. ¶ 12) Acting on the reasonable belief that Magten and Embry had traded on the basis of material non-public information, NorthWestern was entitled to protect the integrity of the reorganization process by seeking to hold Magten and Embry accountable for their inequitable conduct. *See* Citicorp Venture Capital v. Committee of Creditors Holding Unsecured Claims, 160 F.3d 982, 986-87 (3d Cir. 1998).

In short, not only did NorthWestern *believe* it had a bona fide basis for suing Magten and Embry, it *had* a bona fide basis. NorthWestern acted under a strong colorable right and in good faith. The Bankruptcy Court's findings to that effect are not "clearly erroneous." (Op. pp. 6, 9-10)

On this basis alone, the Order of the Bankruptcy Court should be affirmed.

## POINT TWO

### THE BANKRUPTCY COURT PROPERLY FOUND THAT
### APPELLANTS WERE NOT ENTITLED TO AN AWARD OF ATTORNEYS' FEES

Having found, as a factual matter, that NorthWestern had acted in "good faith" and "under a very strong colorable right, which is completely divorced from fraud, vexatious, wanton or oppressive conduct" (Op. pp. 6, 10), the Bankruptcy Court proceeded to apply the appropriate legal standards to those findings of fact.

**A.    The Bankruptcy Court Correctly Found That An Award of Fees Is Not
Appropriate Under the Bad Faith Exception to the "American Rule"**

The Bankruptcy Court correctly cited the longstanding "American Rule," pursuant to which the *"prevailing party* in litigation is not entitled to attorney's fees unless certain stringent exceptions apply." (Op. p. 5) (Emphasis added). Treating Appellants *arguendo* as if they were the "prevailing party," the Bankruptcy Court analyzed the circumstances under which a prevailing party would be entitled to attorneys' fees. While the Bankruptcy Court ultimately concluded that Appellants were not the "prevailing party" (Op. p. 14), the Court analyzed the claims for attorneys' fees, expenses and costs *as if* Appellants were the prevailing party.

A court has the inherent power to deviate from the American Rule if there has been bad faith, vexatious, oppressive or wanton behavior. *See* Chambers v. NASCO, 501 U.S. 32, 45-47 (1991); Gillette Foods, Inc. v. Bayernwald-Fruchteverwertung, GmbH, 977 F.2d 809, 813-14 (3d Cir. 1992) ("[A] prerequisite for the exercise of the district court's inherent power to sanction is a finding of bad faith conduct.") (quoting Landon v. Hunt, 938 F.2d 450, 454 (3d Cir. 1991)).

Appellants contend that the Bankruptcy Court misunderstood and misapplied the bad faith exception, because it specifically found that NorthWestern did not practice "fraud on the Court or Defendants[.]" (Op. p. 8) Appellants argue that such fraud "is only one form of conduct subject to the bad faith exception." (Appellants' Opening Brief at pp. 20-21) But the Court did not limit itself to finding that there was no fraud. The Court also found that there was no bad faith, and

-26-

no vexatious, oppressive or wanton behavior, but, to the contrary, "good faith" conduct by
NorthWestern.  (Op. pp. 6, 17)  As a result of all of these factual findings, which are not "clearly
erroneous" (*see* Point One) there is no basis to deviate from the American Rule.  The Bankruptcy
Court's determination to that effect was correct and should be affirmed.

**B.    The Bankruptcy Court Correctly Found That An Award
of Fees Is Not Appropriate Under Fed. R. Bankr. P. 7041(a)**

The Bankruptcy Court also considered, and properly rejected, Appellants' argument
that Fed. R. Bankr. P. 7041(a) authorizes an award of attorneys' fees, and that the facts of this case
warrant such an award.  (Op. pp. 4-5, 7-8)

Despite its findings of fact favorable to NorthWestern (which negates Appellants'
entitlement to fees even under their view of the law), the Bankruptcy Court still considered
Appellants' legal argument, but concluded that Fed. R. Bankr. P. 7041(a) would not allow an award
of attorneys' fees based upon "exceptional circumstances" even under different facts.  (Op. p. 7)

Appellants contend that Fed. R. Bankr. P. 7041(a) authorizes an award of attorneys'
fees in one of two situations:  (a) if there is independent statutory authorization for such an award
(not present here); or (b) under "exceptional circumstances."  (Appellants' Opening Brief at p. 17)
Appellants acknowledge that "courts have not defined what constitutes exceptional circumstances
under Rule 41(a)(2)[.]"  (Appellants' Opening Brief at p. 18)  Appellants provide illustrations of
what they maintain should be deemed "exceptional circumstances":  "culpable conduct . . . such as
bad faith, fraud, malice, or knowing infringement" of a trademark; "vexatious litigation conduct";
or "where a claim or motion is patently unmeritorious or frivolous."  (Appellants' Opening Brief at
pp. 18-19)  Appellants urge this Court "to apply any of the foregoing standards in defining
'exceptional circumstances' under Bankruptcy Rule 7041[.]"  (Appellants' Opening Brief at p. 19)

Even if the Court were to accept Appellants' legal position – that Fed. R. Bankr. P.
7041(a) *can* authorize an award of attorneys' fees under "exceptional circumstances," as that term

is delineated by the examples provided by Appellants – the Bankruptcy Court's factual findings of NorthWestern's "good faith" and "very strong colorable right, which is completely divorced from fraud, vexatious, wanton or oppressive conduct," necessarily preclude any of the factual findings which Appellants urge constitute "exceptional circumstances." (Op. pp. 6, 9-10)

Appellants even concede that "[a]s a factual matter, in this case the issue of exceptional circumstances under Bankruptcy Rule 7041 converges with the issue of bad faith and vexatious litigation under the bad faith exception to the American Rule." (Appellants' Opening Brief at p. 21) Thus, even if Appellants were correct, and that Fed. R. Bankr. P. 7041(a) *could* authorize an award of attorneys' fees based upon "exceptional circumstances," the Bankruptcy Court's factual findings, which are not "clearly erroneous" (*see* Point One), are fatal to Appellants' claim under Fed. R. Bankr. P. 7041(a) just as they are fatal to Appellants' claim under the bad faith exception to the American Rule.

Although the analysis could end here, we note that the federal circuits are split on the issue of whether or not Fed. R. Civ. P. 41(a)(2) can authorize an award of attorneys' fees under "exceptional circumstances." *Compare* Colombrito v. Kelly, 764 F.2d 122, 134-35 (2d Cir. 1985) (declining to adopt "exceptional circumstances" as basis for fee award under Fed. R. Civ. P. 41(a)(2)), *with* Aerotech, Inc. v. Estes, 110 F.3d 1523, 1528 (10th Cir. 1997) (recognizing that pattern of filing lawsuits and dismissing them with prejudice could constitute "exceptional circumstances" warranting award of attorneys' fees under Fed. R. Civ. P. 41(a)(2)).

While arguments exist for both points of view, the Bankruptcy Court found the Second Circuit's holding in Colombrito persuasive. (Op. at p. 7) In Colombrito, the court addressed whether Fed. R. Civ. P. 41(a)(2) authorized an award of attorney's fees under "exceptional circumstances" and concluded it did not:

> [w]hen a lawsuit is voluntarily dismissed *with prejudice* under Fed.
> R. Civ. P. 41(a)(2), attorney's fees have almost never been awarded. .

. . Some courts have assumed or held that fees can be awarded under exceptional circumstances but have failed to find such circumstances on the facts before them. . . .

The reason for denying a fee award upon dismissal of claims with prejudice is simply that the defendant, unlike a defendant against whom a claim has been dismissed without prejudice, has been freed of the risk of relitigation of the issues just as if the case had been adjudicated in his favor after a trial, in which event (absent statutory authorization) the American Rule would preclude such an award. . . . We would not want to discourage such a salutary disposition of litigation by threatening to award attorneys' fees if a plaintiff did not complete a trial. . . . **In view of the questionable origins and rationale of the "exceptional circumstances" test, we decline to adopt it** as the standard for a fee award under Rule 41(a)(2).

Colombrito, 764 F.2d at 134 (italics in original) (bold added) (citations and footnote omitted).[4]

The Third Circuit has not spoken on the issue of whether Fed. R. Bankr. P. 7041(a)(2) (or Fed. R. Civ. P. 41(a)(2)) authorizes an award of attorneys' fees under "exceptional circumstances." (*See* Appellants' Opening Brief at p. 18)

NorthWestern submits that the holding in Colombrito is well-founded. However, this Court would only need to reach the legal issue of whether Fed. R. Bankr. P. 41(a)(2) is subject to an "exceptional circumstances" test if this Court were to find that the Bankruptcy Court's factual findings were "clearly erroneous," for those factual findings negate any of the "exceptional circumstances" suggested by Appellants. (*See* Appellants' Opening Brief at pp. 18-19) Inasmuch as those findings were not "clearly erroneous" (*see* Point One) this Court should affirm on that basis, and need not reach the issue of whether or not to follow the holding of the Second Circuit.

In sum, the Bankruptcy Court's conclusion that Appellants were not entitled to attorneys' fees under Fed. R. Bankr. P. 7041(a) was correct and should be affirmed.

---

[4]    The Second Circuit amplified its comment about the "questionable origins and rationale" of the "exceptional circumstances" test, noting that the test appears to have arisen in patent cases, which are governed by statute, and in "inherent authority" cases. Neither situation supports "exceptional circumstances" as a more general basis for a fee award under Fed. R. Civ. P. 41(a)(2). Colombrito, 764 F.2d at 134 n.7.

**C.    The Bankruptcy Court Found That Appellants Were Not the Prevailing Party, But Analyzed the Issues As If Appellants Were the Prevailing Party And Correctly Concluded That An Award of Fees Was Not Warranted**

In their Opening Brief, Appellants take the position that the lynchpin of the Bankruptcy Court's decision not to award attorneys' fees was not its factual findings of "good faith" and "very strong colorable right," but rather its *legal* determination that Appellants were not the "prevailing party" and therefore, irrespective of the facts, have no legal entitlement to fees, expenses or costs. (Appellants' Opening Brief at pp. 13-17)

Appellants argue that this "error" contaminated the entire reasoning of the Bankruptcy Court. Thus, Appellants take the position that "the Bankruptcy Court concluded that Appellants improperly brought the Fees and Expenses Motion *because* they were not a prevailing party when the Complaint was dismissed with prejudice." (Appellants' Opening Brief at p. 13) (Emphasis added.) Appellants go on to argue that the Bankruptcy Court's determination "is a reversible error of law, and the Fees and Expenses Order should be vacated on this basis alone." (Appellants' Opening Brief at p. 17)

Appellants misstate the record. The Bankruptcy Court, citing <u>York v. Ferris State Univ.</u>, 36 F. Supp. 2d 976, 981 (W.D. Mich. 1998), concluded that Appellants were not the prevailing party "because this case was dismissed with prejudice upon joint motion of each party, thereby terminating the litigation once and for all without trial on the merits." (Op. pp. 5, 14) The Court nevertheless analyzed Appellants' claim *as if* they were the prevailing party. (Op. p. 5) ("under the 'American Rule,' the *prevailing party* in litigation is not entitled to attorneys' fees unless certain stringent exceptions apply.") (Emphasis added). The Court conducted a thorough

analysis of the American Rule and its exceptions, as well as Fed. R. Bankr. P. 7041(a), as if Appellants were the prevailing party. (Op. pp. 5-8)[5]

While there does not appear to be any controlling Third Circuit opinion on this issue (*see* Appellants' Opening Brief at p. 14), subsequent to the Bankruptcy Court's decision, a court in this district determined, in a patent infringement case, that "A defendant who has obtained from a claimant a voluntary dismissal with prejudice can be classified as a 'prevailing party.'" Callaway Golf Co. v. Dunlop Slazenger, 384 F. Supp. 2d 735, 746 (D. Del. 2005). Whether that is now the standard in this circuit has yet to be determined. *See* Rousseau v. Echosphere Corp., 2005 U.S. Dist. LEXIS 22587, at *13, 15 (W.D. Pa. Aug. 30, 2005) ("The issue of whether a defendant is a prevailing party when a plaintiff has voluntarily dismissed the case with prejudice has produced at least three different responses from federal courts. . . . the law in this area is unsettled") (citations omitted). However, it is not necessary for this Court to reach the issue, as the Bankruptcy Court analyzed Appellants' claims under the assumption *arguendo* that Appellants were the prevailing party, and properly concluded that an award of fees was not warranted.

**D.    The Bankruptcy Court's Factual Findings As To The Nature And Magnitude of the Claimed Fees Were Not "Clearly Erroneous"**

Finally, while the Bankruptcy Court's decision not to award fees should be affirmed for all of the factual and legal reasons already set forth, and while it is not necessary to address the issue of the reasonableness of fees to which Appellants are not entitled, in the interest of completeness NorthWestern notes that the Bankruptcy Court's factual findings with respect to the nature and magnitude of the fees claimed by Appellants were not "clearly erroneous."[6]

---

[5]    Although not especially significant because the Bankruptcy Court treated Appellants *arguendo* as if they were the prevailing party, Appellants mischaracterize the record when they claim that NorthWestern's counsel "admitted" at oral argument that Appellants were the "prevailing party." (Appellants' Opening Brief at p. 13) As reflected in the transcript, counsel for NorthWestern was referring to the parties in various reported decisions, not to Appellants. (Ex. 16, Tr. May 3, 2005, p. 36)

[6]    Appellants argue that because NorthWestern did not specifically take issue with the magnitude of the fees and expenses incurred, that was an admission that the fees were reasonable. (Appellants' Opening Brief at pp. 5, 34) It was not. In the Bankruptcy Court, NorthWestern objected to *any* award of fees. It was therefore not necessary to challenge the reasonableness of the amount claimed.

In an effort to justify their expenditure of nearly $800,000 in fees and expenses, Appellants claim they had no choice but to gear up for trial and expend these immense resources due to the expedited schedule imposed by the Bankruptcy Court. (Appellants' Opening Brief at pp. 2, 5, 11, 27, 34, 38-39) But Appellants have also conceded that on more than one occasion, NorthWestern proposed adjourning the trial date to see if a settlement could be reached, and that Appellants refused the proposed adjournments. (Ex. 14, Kaplan Decl. ¶ 21) Appellants cannot have it both ways – on the one hand, insisting on an expedited trial, and on the other hand, complaining that they were forced by the expedited schedule to expend enormous sums which NorthWestern must now reimburse.

Appellants also seek to justify their massive expenditures by arguing that there were considerations beyond winning or losing the Adversary Proceeding: "Any party wrongfully accused of insider trading whose financial liability may only involve disgorgement of a modest amount in alleged wrongful profits would nonetheless be fully justified in spending hundreds of thousands of dollars to disprove the allegations and clear its good name." (Appellants' Opening Brief at p. 33) Even though Appellants bore no burden of proof in the Adversary Proceeding, they nevertheless maintain that they "*had* to perform a disproportionate amount of discovery in this case, including taking a number of depositions to *disprove* NorthWestern's allegations in the Complaint." (Appellants' Opening Brief at p. 36) (Emphasis added).

Appellants' decision to overspend in order to "disprove" the allegations and to "clear [their] good name," does not mean NorthWestern now has to bear that expense. A party seeking to recover attorneys' fees has a "duty to mitigate," which includes defending the litigation using reasonable means, and preventing the fees from becoming excessive. *See* Napier v. Thirty or More Unidentified Federal Agents, 855 F.2d 1080, 1092 (3d Cir. 1988). The duty to mitigate precludes recovery of fees resulting from "overstaffing, overresearching or overdiscovering[.]"

White v. General Motors Corp., 908 F.2d 675, 684 (10th Cir. 1990), *cert. denied*, 498 U.S. 1069 (1991). Or, as some courts have put it, a party is "not entitled to compensation for hours attributable to 'overkill' or to the assumption that 'the standard of service to be rendered and compensated is one of perfection, the best that illimitable expenditures of time can achieve.'" Knop v. Johnson, 712 F. Supp. 571, 578 (W.D. Mich. 1989) (quoting Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 953 (1st Cir. 1984)).

Furthermore, were courts prepared to award fees based upon considerations such as whether a litigant was justified in expending disproportionate resources in order to protect reputation, fee applications would degenerate into libel trials, as the movant would try to prove he or she had a good reputation prior to being sued, while the respondent would try to prove the opposite. Surely that is not contemplated by any exception to the American Rule, and Appellants cite no case that would support such an approach.

In sum, the Bankruptcy Court properly found that Appellants were not entitled to an award of attorneys' fees. That decision should be affirmed.

## POINT THREE

### THE BANKRUPTCY COURT ACTED WITHIN ITS DISCRETION IN DECLINING TO AWARD COSTS UNDER FED. R. BANKR. P. 7054(b)

Under Fed. R. Bankr. P. 7054(b), the Bankruptcy Court had discretion whether to award costs to the prevailing party. (Op. p. 16)  Treating Appellants *arguendo* as if they were the prevailing party, the Court declined to exercise its discretion for their benefit.  The Court concluded that "the expense items are unreasonably high, not documented, and most fall beyond the express provisions of 28 U.S.C. section 1920. *I exercise my discretion to deny all costs to Magten*[.]"  (Op. p. 16) (Emphasis added).  That was not an abuse of discretion.  Abuse of discretion in denying costs occurs "when the court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact."  In re Orthopedic Bone Screw Prods. Liab. Litig., 193 F.3d 781, 795 (3d Cir. 1999).  No such circumstance is present here.

While concluding that, for purposes of 28 U.S.C. § 1920, Appellants were not the "prevailing party," the Bankruptcy Court assumed *arguendo* that Appellants were the "prevailing party," and analyzed Appellants' claim for costs as if they were the "prevailing party."  (Op. p. 16)

The Bankruptcy Court noted the key distinction between Fed. R. Civ. P. 54(d) and Fed. R. Bankr. P. 7054(b).  Under Fed. R. Civ. P. 54(d) there is a presumption that the prevailing party is entitled to costs.  By contrast, under Fed. R. Bankr. P. 7054(b), "such prevailing party must make a sufficient record to move the Court's *discretion* as the burden for entitlement for costs and expenses falls on the applicant."  (Op. p. 16) (Emphasis added).

The Bankruptcy Court properly found that Appellants had failed to meet their burden of persuading the Court to exercise its discretion for their benefit.  The Bankruptcy Court's decision was not an abuse of discretion and should be affirmed.

-34-

**A.**    **The Bankruptcy Court Correctly Found That Not All Expenses Are "Costs"**

As a preliminary matter, Appellants have completely ignored, and continue to ignore, the distinction between "expenses" and "costs." Unlike "expense," which has an accounting as well as an everyday meaning, "cost" has a precise statutory meaning under 28 U.S.C. § 1920. Not every "expense" is a "cost." Section 1920 only authorizes taxation of the following as "costs":

> "(1) Fees of the clerk and marshal;
>
> (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
>
> (3) Fees and disbursements for printing and witnesses;
>
> (4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
>
> (5) Docket fees under section 1923 of [Title 28];
>
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of [Title 28]."

28 U.S.C. § 1920.

In Crawford Fitting Co. v. J. T. Gibbons, Inc., 482 U.S. 437 (1987), the Supreme Court limited the expenses allowable as "costs" under 28 U.S.C. § 1920 to those items listed in the statute, and rejected the argument that a federal court has discretion under Fed. R. Civ. P. 54(d) to award as "costs" expenses beyond those enumerated in 28 U.S.C. § 1920: "If Rule 54(d) grants courts discretion to tax whatever costs may seem appropriate, then § 1920, which enumerates the costs that may be taxed, serves no role whatsoever. We think the better view is that § 1920 defines the term 'costs' as used in Rule 54(d). *Section 1920 enumerates expenses that a federal court may tax as a cost under the discretionary authority found in Rule 54(d)*. It is phrased permissively because Rule 54(d) generally grants a federal court discretion to refuse to tax costs in favor of the prevailing party." Crawford, 482 U.S. at 441 (emphasis added). *See also* Philadelphia Mortg.

Trust v. Touche Ross & Co., 930 F.2d 306, 310 (3d Cir. 1991) (Crawford constitutes a "prohibition of taxation as costs of anything not explicitly mentioned in 28 U.S.C. § 1920.").

Items such as telephone, courier service, computerized research, word processing, transportation, meals, secretarial and paralegal overtime, and temporary paralegals, are not "costs" under 28 U.S.C. § 1920. Yet, Appellants submitted claims for these items in excess of $21,500, as if they were "costs." (Op. p. 13) The Bankruptcy Court correctly rejected this improper attempt to circumvent the statutory definition of "costs." (Op. pp. 14-15)

As support for their argument that Fed. R. Bankr. P. 7054(b) does not limit costs to the categories set forth in 28 U.S.C. § 1920, Appellants cite Behrle v. Olshansky, 139 F.R.D. 370 (W.D. Ark. 1991), in which the court, in the context of a dismissal under Fed. R. Civ. P. 41(d),[7] awarded attorneys' fees as "costs," notwithstanding 28 U.S.C. § 1920. (Appellants' Opening Brief at pp. 37-38) However, Behrle flies in the face of the Supreme Court's decision in Crawford, 482 U.S. at 441, and has been expressly repudiated by at least one district court within the Third Circuit. See Anders v. FPA Corp., 164 F.R.D. 383, 389-90 (D.N.J. 1995) (rejecting Behrle, reversing its own decision to award attorneys' fees as "costs" under Fed. R. Civ. P. 41(d), and limiting costs to items listed in 28 U.S.C. § 1920, "which enumerates expenses that a federal court may tax as costs"). Accordingly, Behrle should not be followed.

**B.    The Bankruptcy Court Properly Exercised Its Discretion In Refusing to Award Costs**

With respect to those items that (at least on their face) fall within the list set forth in 28 U.S.C. § 1920, namely those court reporting fees for transcripts and those charges for copies "necessarily obtained for use in the case," the Bankruptcy Court considered the documentation submitted by Appellants in support of the Motion – a single sheet of paper listing the totals expended (Sub-Ex. AA to Ex. 14, Kaplan Decl.) – and concluded that Appellants had failed to

---

[7]    Fed. R. Civ. P. 41(d), titled "Costs of Previously-Dismissed Action," addresses the situation of seriatim filing and dismissal, and authorizes the court to order payment of "costs" of the previously dismissed action "as it may deem proper." Rule 41(d) is not applicable here.

substantiate either the reasonableness or the necessity of the significant expenditures claimed for these items: $43,124.29 for photocopying and $8,256.93 for court reporting fees.

Appellants' claim for $43,124.29 in photocopying charges was based upon 287,749 pages at 15¢ per page. (Op. p. 14) The Bankruptcy Court found that 287,749 pages was a "clearly exorbitant number," and that "[t]here is absolutely no record presented by the Defendants to show the 287,749 copies were reasonably necessary." (Op. pp. 14-15) The Court correctly rejected the notion that each and every photocopy made in the course of the Adversary Proceeding was "necessarily obtained for use in the case," the statutory standard. (Op. p. 14) See, e.g., Krouse v. American Sterilizer Co., 928 F. Supp. 543, 546 (W.D. Pa. 1996) (not all copies made in the course of litigation fall within scope of 28 U.S.C. § 1920; most "copying costs are part of the normal overhead of litigation and are not recoverable.").

As for the $8,256.93 in court reporting fees, the Bankruptcy Court found that "there is no record as to the fees of the court reporter or what part of the stenographic transcript was necessarily obtained for use in the defense of the case." (Op. p. 15) The Court denied the claim for court reporting fees "since there is no record to support" the claim "without listing who, where, what for, when and what rate for each deponent." (Op. p. 15) The Court's reasoning is especially apt since Appellants admittedly took on discovery burdens they had no obligation to take on, including "taking a number of depositions to *disprove* NorthWestern's allegations in the Complaint." (Appellants' Opening Brief at p. 36) (Emphasis added).

In sum, the Bankruptcy Court's factual findings were not "clearly erroneous," and the Court's legal analysis proceeded *arguendo* under the assumption that Appellants were the prevailing party. The Court decided, even from that perspective, not to exercise its discretion for the benefit of Appellants. The decision did not rest upon clearly erroneous findings of fact, errant

conclusions of law, or the improper application of law to fact.  It was therefore not an abuse of

discretion.  *See* <u>Orthopedic Bone Screw</u>, 193 F.3d at 795.

     The Bankruptcy Court's decision to deny costs should be affirmed.

## <u>CONCLUSION</u>

     The Order of the Bankruptcy Court dated June 6, 2005 should be affirmed.

Dated: Wilmington, Delaware
       February 16, 2007

                    Respectfully submitted,

                    GREENBERG TRAURIG, LLP

By:     *Victoria W. Counihan*

                    Victoria Watson Counihan (I.D. No. 3488)
                    Dennis A. Meloro (I.D. No. 4435)
                    The Nemours Building
                    1007 N. Orange Street, Suite 1200
                    Wilmington, DE  19801
                    (302) 661-7000 (telephone)
                    (302) 661-7360 (fax)

                    - and –

                    Jacques Semmelman
                    Steven J. Reisman
                    CURTIS, MALLET-PREVOST,
                      COLT & MOSLE LLP
                    101 Park Avenue
                    New York, NY  10178-0061
                    (212) 696-6000 (telephone)
                    (212) 697-1559 (fax)

                    ATTORNEYS FOR APPELLEE
                    NORTHWESTERN CORPORATION

**ADDENDUM**

| | NORTHWESTERN V. MAGTEN<br>Adv. Pro. 04-55051<br>DISCOVERY | |
|---|---|---|
| **Date Served** | **Discovery** | **Issued By** |
| **NOTICES** | | |
| 11/23/04 | NorthWestern Corporation's First Set Of Requests For Production To Magten Asset Management Corporation | NorthWestern Corporation |
| 11/23/04 | NorthWestern Corporation's First Set Of Interrogatories To Magten Asset Management Corporation | NorthWestern Corporation |
| 12/06/04 | Notice Of Deposition Of Talton R. Embry | NorthWestern Corporation |
| 12/06/04 | Notice Of Deposition Of Magten Asset Management Corporation | NorthWestern Corporation |
| 12/13/04 | Defendants First Request For Production Of Documents To NorthWestern Corporation | Magten Asset Management Corporation & Talton Embry |
| 12/14/04 | Notice of Deposition Pursuant To Rules 7030 and 9016 of the Federal Rules Of Bankruptcy Procedure and Rule 30(b)(6) of the Federal Rules of | Magten Asset Management Corporation & Talton Embry |
| 12/14/04 | Magten Asset Management Corporation and Talton Embry's First Set Of Interrogatories to NorthWestern Corporation | Talton Embry |
| **SUBPOENAS** | | |
| 12/08/04 | Notice of Subpoena To Capital Institutional Service | NorthWestern Corporation |
| 12/13/04 | Notice of Service of Subpoena To The Bank Of New York Company, Inc. | NorthWestern Corporation |
| 12/13/04 | Notice of Service of Subpoena To The Bear Sterns Companies Inc. | NorthWestern Corporation |

| NORTHWESTERN V. MAGTEN<br>Adv. Pro. 04-55051<br>DISCOVERY | | |
|---|---|---|
| **Date Served** | **Discovery** | **Issued By** |
| 12/13/04 | Notice of Subpoena To Merrill Lynch & Co., Inc. Global Headquarters | NorthWestern Corporation |
| 12/13/04 | Notice of Subpoena To Oscar Gruss & Son Incorporated | NorthWestern Corporation |
| 12/13/04 | Notice of Subpoena To Tradition Asiel Securities, Inc | NorthWestern Corporation |
| 12/13/04 | Subpoena To Paul, Hastings, Janofsky & Walker | Magten Asset Management and Talton R. Embry |
| 12/13/04 | Subpoena To OCM Opportunities Fund, IV, L.P. | Magten Asset Management and Talton R. Embry |
| 12/13/04 | Subpoena To Houlihan Lokey Howard & Zukin | Magten Asset Management and Talton R. Embry |
| 12/13/04 | Subpoena To Lazard Freres & Co. LLC | Magten Asset Management and Talton R. Embry |
| 12/13/04 | Subpoena To Paul, Weiss, Rifkind, Wharton & Garrison LLP | Magten Asset Management and Talton R. Embry |
| 12/13/04 | Subpoena To Franklin Templeton Mutual Series Fund | Magten Asset Management and Talton R. Embry |
| 12/13/04 | Subpoena To The Bank Of New York | Magten Asset Management and Talton R. Embry |
| 12/13/04 | Subpoena To HSBC Bank USA | Magten Asset Management and Talton R. Embry |
| 12/13/04 | Subpoena To AG Capital Recovery Partners III, L.P. | Magten Asset Management and Talton R. Embry |
| 12/13/04 | Subpoena To Avenue Capital Management | Magten Asset Management and Talton R. Embry |

A-2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                 :      Chapter 11
In re:                                           :
                                                 :      Case No. 03-12872
NORTHWESTERN CORPORATION,                        :      (KJC)
                                                 :
                          Debtor.                :
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                 :      Adv. Pro. No.
MAGTEN ASSET MANAGEMENT CORPORATION              :      04-55051 (KJC)
AND TALTON R. EMBRY,                             :
                                                 :
                          Appellants,            :
            v.                                   :
                                                 :      Civil Action No.
NORTHWESTERN CORPORATION,                        :      05-00548 (JJF)
                                                 :
                          Appellee.              :
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
```

### CERTIFICATE OF SERVICE

I, Victoria W. Counihan, being duly sworn according to law, deposes and says that I am a shareholder of Greenberg Traurig, LLP, which is counsel for Northwestern Corporation and hereby certify that on the 16th day of February 2007, I caused copies of the following to be served upon the parties listed below in the manner indicated.

- Answering Brief of Appellee Northwestern Corporation
- Appendix of Exhibits to Answering Brief of Appellee Northwestern Corporation
- Compendium of Unreported Cases to Answering Brief of Appellee Northwestern Corporation

| VIA U.S. MAIL: | VIA HAND DELIVERY: |
|---|---|
| Bonnie Steingart, Esq. | Dale Dube, Esq. |
| John W. Brewer, Esq. | Blank Rome LLP |
| Gary L. Kaplan, Esq. | 1201 Market Street |
| Fried Frank Harris Shriver & Jacobson LLP | Suite 800 |
| One New York Plaza | Wilmington DE 19801 |
| New York NY 10004 | |

Dated: February 16, 2007

*Victoria W. Counihan*

Victoria W. Counihan (No. 1488)
Greenberg Traurig, LLP
1007 North Orange Street, Suite 1200
The Nemours Building
Wilmington, DE 19801