# TAB 1

LEXSEE



Positive
As of: Feb 13, 2007

**IN RE: BELL ATLANTIC CORPORATION SECURTIES LITIGATION; THIS DOCUMENT RELATES TO: All ACTIONS**

**Civil Action Master File No. 91-0514, No. 91-0518, No. 91-0531, No. 91-0673, No. 91-0737, No. 91-0748, No. 93-999**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**1997 U.S. Dist. LEXIS 4938; Fed. Sec. L. Rep. (CCH) P99,467**

**April 16, 1997, Decided**
**April 17, 1997, Filed, ENTERED**

**SUBSEQUENT HISTORY:** [*1] As Amended February 2, 1998.

**DISPOSITION:** Defendant's Motion for Summary Judgement will be GRANTED as to Count I of the Second Consolidated Amended Complaint. The claim has been dismissed, Count II will be dismissed without prejudice.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff stockholders filed a class action suit against defendants, corporation and its officers, for violations of § 10(b) of the Securities Exchange Act of 1934 (Act), codified at 15 U.S.C.S. § 78j(b), Rule 10b-5, codified at17 C.F.R. § 240.10b-5 (1991), § 20(a) of the Act, codified at 15 U.S.C.S. § 78t(a), and negligent misrepresentation in violation of state law. The corporation and its officers filed a motion for summary judgment.

**OVERVIEW:** The stockholders claimed that the corporation and its officers artificially inflated the price of common stock by issuing false and misleading public statements about the corporation's financial performance, earnings trends, and anticipated earnings growth. The court held that (1) the corporation's forecast of earnings growth was issued with a reasonable basis of historical performance; (2) the corporation's accounting adjustments were disclosed to the market such that no reasonable investor would be misled about the effect of the adjustments on reported earnings; (3) the statements regarding access line growth were immaterial; (4) the corporation had no duty to disclose information regarding a strike; and (5) the corporation's prediction of a goodwill writedown was not without a reasonable basis. Accordingly, the court held that the stockholders failed to establish a genuine issue of material fact regarding their Rule 10b-5 claim. The court further held that control person liability under 15 U.S.C.S. § 78t(a) was precluded because the stockholders failed to establish an underlying securities law claim.

**OUTCOME:** The court granted the corporation and its officers' motion for summary judgment. The court declined to exercise pendent jurisdiction over the state law negligent misrepresentation claim and dismissed the claim accordingly.

**CORE TERMS:** earning, per share, accounting, estimate, press release, net income, misleading, subsidiary, first quarter, prediction, disclosure, stock, reasonable basis, cellular, earnings growth, accrual, normalized, summary judgment, analyst, writedown, financial services, investor, scienter, budget, misrepresentation, reversal, non-recurring, materiality, duty to disclose, failed to disclose

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN1] Fed. R. Civ. P. 56 (c) provides that a court may grant summary judgement when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The record, and all reasonable inferences drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment. If there is a disagreement about material facts or the conflicting inferences to be drawn from them, a trial is required to resolve the conflicting versions. In determining the motion, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version.

*Civil Procedure > Summary Judgment > Standards > General Overview*
*Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts*
[HN2] A disputed fact is material when it could effect the outcome of the suit under the governing substantive law. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
[HN3] The moving party must first demonstrate the absence of a genuine issue of material fact. That burden may be discharged by pointing out to the court that there is an absence of evidence in the record to support the nonmoving party's case. A defendant meets his burden under Fed. R. Civ. P. 56(c) when he conclusively shows that the facts upon which the plaintiff relied to support his allegation were not susceptible to the interpretation which he sought to give them.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Evidence > Procedural Considerations > Burdens of Proof > Ultimate Burden of Persuasion*
[HN4] Once the moving party has demonstrated the absence of a genuine issue, the nonmovant must go beyond

the pleadings and come forward with specific facts, by affidavits, depositions, answers to interrogatories or admissions on file showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Conversely, if the opponent has exceeded the mere scintilla threshold and has offered a genuine issue of material fact, summary judgment must be denied. The ultimate burden of persuasion remains with the moving party. There can be no genuine issue as to any material fact when, after adequate time for discovery, a party fails to establish the existence of an element essential to the nonmoving party's case on which the party will bear the burden of proof at trial.

*Criminal Law & Procedure > Scienter > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN5] In order to prove a violation of 17 C.F.R. § 240.10b-5, promulgated by the Securities Exchange Commission under § 10b of the Securities Exchange Act of 1934, found at 15 U.S.C.S. § 78j(b), a plaintiff must establish the following by a preponderance of the evidence: (1) that defendants, acting with scienter, an intent to deceive, manipulate or defraud, either (2) employed a manipulative or deceptive device, scheme or artifice to defraud or (3) made a misleading statement or omission, (3) of material fact, (4) upon which plaintiff, a purchaser or seller of the security, (5) relied upon in completing a transaction, (6) which caused economic loss to the plaintiff.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN6] See 17 C.F.R. § 240.10b-5 (1990).

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Duty to Disclose*
[HN7] In the absence of a duty to disclose, there is no liability under 17 C.F.R. § 240.10b-5 (1990) for failing to disclose material information. Thus, the mere possession and nondisclosure of material facts does not impose liability. However, Rule 10b-5 creates a statutory duty to speak the full truth when defendant undertakes to say anything. In addition, there is a duty to correct prior

statements, if the prior statements were true when made, but will mislead if left unrevised in light of subsequent events. A duty to disclose arises whenever secret information renders prior public statements materially misleading.

*Securities Law > Liability > Disclosures > Soft Information*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN8] A statement is false or misleading if it is factually inaccurate, or additional information is needed to clarify it. An omission can also satisfy this element where silence would make other statements misleading or false.

*Securities Law > Liability > Disclosures > Soft Information*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN9] In order to determine whether a forward looking statement can be deemed untrue, the court must examine whether the speaker, at the time it is made, (1) actually believed the statement to be accurate, or whether (2) there is a factual or historical basis for that belief.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Reliance > Fraud on the Market*
[HN10] Upon determining that defendants have made a misstatement or omission of material fact, a 17 C.F.R. § 240.10b-5 (1990) plaintiff is entitled to a rebuttable presumption of reliance where the security involved is actively traded in an open and developed market. An active and open market is one in which there are a large number of traders, a high level of activity and frequency of trades which rapidly reflects new information in the price. The plaintiffs meet the burden of proof on the element of reliance if they demonstrate that the defendants made material misrepresentations or withheld material information. The court will then presume that the misrepresentation occasioned an increase in the stock value that, in turn, induced the plaintiffs to purchase the stock.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN11] The presumption of reliance can be rebutted by showing that either: 1.) the misrepresentations did not affect the market price of the stock, i.e., price was not in fact inflated by misrepresentations, complete and truthful information had credibly entered the market so that the market price of the stock was corrected and did not respond to the misrepresentation or omissions; or 2.) plaintiffs would have purchased the stock even at the price it would have been at but for the misrepresentations.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN12] The truth on the market doctrine recognizes that, in a fraud on the market case, a defendants' misrepresentation or omission of material information is not material to the reasonable investor's decision to trade if accurate information has been made available to the market by other sources.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN13] Materiality as a substantial likelihood that, under all the circumstances, the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available to him.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Reliance > Fraud on the Market*
[HN14] According to the truth on the market doctrine, even if the court determines that, in isolation, a defendant's statements or forecasts are actionable as misrepresentations or omissions of material fact, a defendant may avoid liability by establishing that the market was aware of the allegedly concealed information. Thus, a defendant can avoid liability for a false statement or one that reveals less than the truth by showing that the market was not affected by the representation because the truth of the matter was known already and had been factored into market prices.

Case 1:05-cv-00548-JJF    Document 24-2    Filed 02/16/2007    Page 5 of 43

1997 U.S. Dist. LEXIS 4938, *; Fed. Sec. L. Rep. (CCH) P99,467

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Reliance > Truth on the Market*

[HN15] Before the truth on the market defense can be applied, a defendant must prove that the information withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by one-sided representations.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > General Overview*

[HN16] Scienter is a necessary element of a Rule 10b-5 action and is an independent basis for granting summary judgment. To establish scienter, plaintiffs must show that defendants had a mental state embracing an intent to deceive manipulate or defraud.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

*Torts > Negligence > Standards of Care > Reasonable Care > Recognition of Risk*

[HN17] Plaintiff can establish scienter by proving either actual knowledge or recklessness. Reckless conduct is limited to those highly unreasonable omissions involving not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care. The element is satisfied by conduct that presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it. Negligent conduct alone, whether gross, grave, or inexcusable does not suffice.

*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*

[HN18] See 15 U.S.C.S. § 78t(a).

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Definitions > General Overview*

*Securities Law > Liability > Secondary Liability > Controlling Persons > Defenses*

[HN19] Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78t(a) broadly defines control as any indirect means of discipline or influence short of actual direction: or ability to exert influence, directly or indirectly over the decision making process of another person. Culpable participation in the violation is required for control person liability, and the plaintiff must prove, in the case of inaction, that inaction was deliberate and done intentionally to further the fraud. Section 20(a) expressly provides a defense if the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims*

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Same Case & Controversy*

[HN20] The district court has power to exercise pendent jurisdiction over state claims that are so related to the federal claims that they form part of the same case or controversy. State claims are part of the same constitutional case if they derive from a common nucleus of operative fact and are such that the plaintiff would ordinarily be expected to try them in one judicial proceeding.

**COUNSEL:** For NEIL JOKELSON, NANCY JOKELSON, PLAINTIFFS: LAWRENCE DEUTSCH, CAROLE A. BRODERICK, BERGER & MONTAGUE, P.C., PHILA, PA USA. SHERRIE R. SAVETT, PHILADELPHIA, PA USA. ARNOLD LEVIN, LEVIN, FISHBEIN, SEDRAN & BERMAN, PHILADELPHIA, PA USA. For BERNICE BERGER, PLAINTIFF: LAWRENCE DEUTSCH, CAROLE A. BRODERICK, BERGER & MONTAGUE, P.C., PHILA, PA USA. ARNOLD LEVIN, LEVIN, FISHBEIN, SEDRAN & BERMAN, PHILADELPHIA, PA USA. [*2]

For BELL ATLANTIC CORPORATION, RAYMOND W. SMITH, PHILLIP A. CAMPBELL, DEFENDANTS: MARIAN C. MILLER, PEPPER, HAMILTON & SCHEETZ, PHILA, PA USA. ELEANOR N. EWING,

PEPPER, HAMILTON & SCHEETZ, PHILA, PA USA. JON A. BAUGHMAN, PEPPER, HAMILTON & SCHEETZ, PHILA, PA USA. MARGARET A. SUENDER, PEPPER, HAMILTON & SCHEETZ, PHILA, PA USA.

For IN RE: BELL ATLANTIC CORPORATION SECURITIES LITIGATION: SHERRIE R. SAVETT, PHILADELPHIA, PA USA.

JUDGES: JOSEPH L. McGLYNN, JR., J.

OPINION BY: JOSEPH L. McGLYNN, JR.

OPINION:

MEMORANDUM OF DECISION

MCGLYNN, District Judge.

April 16, 1997

Presently before this Court is a Motion for Summary Judgment filed on behalf of defendants, Bell Atlantic Corporation ("BAC"), BAC's Chief Executive Officer and Chairman, Raymond W. Smith ("Smith"), and BAC's Chief Financial Officer and Vice-Chairman, Phillip A. Campbell ("Campbell"), (collectively "defendants" or "BAC"). The plaintiffs in this class action are purchasers of BAC common stock seeking to hold defendants liable for violations of section 10(b) of the Securities Exchange Act of [*3] 1934, 15 U.S.C. § 78j(b)(1988); Rule 10b-5, 17 C.F.R. § 240.10b-5(b) (1991)("Rule 10b-5"); and section 20(a) of the Act, 15 U.S.C. § 78t(a)("Count I"). This court has subject matter jurisdiction over these claims. 28 U.S.C. § 1331. In addition, plaintiffs assert a state common law claim for negligent misrepresentation, ("Count II"), with jurisdiction grounded in 28 U.S.C.A. § 1367 (West Supp. 1991), supplemental jurisdiction.

Defendants now move for summary judgment on the grounds that, 1.) plaintiffs have not established a genuine issue of material fact with regard to three elements of the Rule 10b-5 claim: (a) misrepresentation or omission of material fact, (b) scienter, and (c) loss causation; 2.) dismissal of the predicate Rule 10b-5 claim requires dismissal of the § 20 claim; and 3.) this court should decline pendent jurisdiction over the state law claim for negligent misrepresentation. For the reasons set forth below, defendants' Motion will be GRANTED as to both counts.

I. PROCEDURAL HISTORY

On January 24, 1991, Neil and Nancy Jokelson and Bernice Berger filed a complaint in this matter. On January 31, 1991, they filed an amended complaint as of right. On February [*4] 11, 1991 the district court consolidated their case with five others involving the same subject matter in accordance with Fed.R.Civ.P. 23, and directed that a consolidated complaint be filed. On March 14, 1991 a Consolidated Amended Complaint ("Cons. Am. Compl.") was filed. The defendants moved to dismiss the Consolidated Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and the Motion was granted by an order dated October 30, 1991. In re Bell Atlantic Securities Lit., 1991 WL 234036 (E.D.Pa. 1991), rev'd, 993 F.2d 875 ("Appeal Opinion"). n1 Plaintiffs filed a Motion to Amend the judgement and for leave to file a Second Consolidated Amended Complaint ("Compl."). This court denied the motion on the grounds that 1.) the plaintiffs had previously amended and 2.) the proffered complaint could not survive a motion to dismiss. Plaintiffs appealed.

n1 The district court dismissed the Consolidated Amended Complaint for three reasons: (1) the information provided by Bell in the first three quarters of 1990 revealed that expenses were increasing at an increasing rate and revenues were increasing at a decreasing rate, and nothing else alleged in the complaint gave rise to a duty to predict a decrease in earnings or return on investment in the fourth quarter; (2) with respect to the affirmative predictions of October 1990, the predictions of a 15-20% increase in return on average common equity for 1990 and of a 6-9% growth in "normalized earnings for 1990" turned out to be not materially different from the actual results and no bad faith was alleged; and (3) the complaint lacked sufficient allegations that the defendants knew at the time of predicting a 10 cents per share write-down that the ultimate write down would be 15 cents per share and, in any event, the difference was not material under accepted accounting principles.

[*5]

The Court of Appeals reversed and remanded to the district court holding that leave to amend should have been granted pursuant to Fed.R.Civ.P. 15(a) because 1.) the Complaint was the first relevant attempt to amend the Cons. Am. Compl. n2 and 2.) the Complaint stated a cause of action under § 10b and Rule 10b-5 by alleging that (a) defendants made a series of misrepresentations in order to give the impression that the trend of increased earnings experienced by BAC prior to fiscal year 1990 would continue throughout that year, (b) defendants made those misrepresentations knowing them to be false or with reckless indifference as to whether they were false, (c) the market considered those misrepresentations

significant in evaluating BAC stock, (d) BAC stock is traded on an open market, and (e) as a result of those misrepresentations, plaintiffs purchased BAC stock at an artificially inflated price. In re Bell Atlantic Sec. Lit., 993 F.2d 875 (3d Cir. 1993)("Appeal Opinion"). Accordingly, the Court granted defendants leave to amend.

> n2 The Third Circuit found that the fact that some of the Plaintiffs had earlier amended as a matter of right within days of their original filing was irrelevant and did not prejudice or inconvenience defendants; and the Second Cons. Am Compl., which alleged new facts obtained in discovery between April and October 1991, was aimed at curing deficiencies identified by the district court as lacking in specificity. The Court reasoned that only if the proffered complaint did not succeed in curing identified deficiencies would the district court have been correct in denying the motion to amend.

[*6]

In its opinion, the Third Circuit stated that it would have affirmed the dismissal of the Consolidated Amended Complaint if there had been no prompt attempt to amend following the district court's dismissal because the complaint lacked sufficient allegations of scienter and the facts alleged therein did not require defendants to disclose more than they did about the expected fourth quarter results. Appeal Opinion at 10.

Further, while not specifically ruling that the Rule 12 proceedings should have been converted into Rule 56 proceedings because the district court relied on material outside the pleadings n3, the Court of appeals stated that summary judgement proceedings would have been a "safer course" and added that the parties contentions were more appropriately resolved in a Rule 56 proceeding. Appeal opinion at 11. This Motion for Summary Judgment was filed on March 29, 1996. The Court will now proceed with an analysis of the parties contentions according to the standard set forth in Rule 56. n4

> n3 In analyzing the complaint, the district court consulted the full text of the documents alleged to be misleading, a transcript of the entire speech to the securities analysts, and Bell's filings with the SEC.

[*7]

> n4 The Court of Appeals observed in this regard that the defendants proffered explanations

for 1.) an alleged retroactive credit that transformed a third quarter earnings decline into a reported earnings gain, 2.) an alleged misrepresentation concerning the expected amount of the write-off, and 3.) for other allegations of wrongdoing, were "plausible" and suggested that "it may be that the defendants can create a summary judgement record establishing that their reports and pronouncements were not misleading, that any inaccuracies taken singly and as a whole, were not material, or that they acted with pure heart and rational basis." Appeal Opinion at 14-15.

## II. Rule 56 Standard of Review

Summary judgment procedure is properly regarded as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. Celotex Corp. v. Catrett, 477 U.S. 317, 327, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The inquiry performed is the threshold inquiry of determining whether there is a need for trial. Anderson, 477 U.S. 242, 250, 106 [*8] S. Ct. 1505, 2511. n5

[HN1] Fed.R.Civ.P. 56 (c) provides that a court may grant summary judgement when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The record, and all reasonable inferences drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment. Anderson v. Liberty Lobby, 477 U.S. 242, 255-56, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Matsushita, 475 U.S. 574, 587. If there is a disagreement about material facts or the conflicting inferences to be drawn from them, a trial is required to resolve the conflicting versions." Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 84 (3d Cir. 1982). In determining the motion, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. McDaniels v. Flick, 59 F.3d 446, 453 (3rd Cir. 1995).

> n5 When the question for decision concerns drawing inferences from undisputed evidence, or interpreting and evaluating evidence to derive legal conclusions, a trial may not be necessary. William Schwarzer, Alan Hirsch, David Barrans, The Analysis and Decision of Summary Judgement Motions: A Monograph on Rule 56 of the Federal Rules of Civil Procedure, The Federal Judicial Center at p. 39 (1991).

[*9]

[HN2] A disputed fact is material when it could effect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). n6 A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.Id.; Anderson, 477 U.S. at 250. In other words, if proved at trial, the facts proffered by the nonmovant, have to be sufficient to survive a motion for directed verdict or judgment notwithstanding the verdict.Id; See also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

n6 When confronted with an asserted factual dispute, therefore, the court must examine the elements of the claims and defenses at issue on the motion and determine whether a resolution of the factual dispute could effect the disposition of any of those claims or defenses.

According to the trilogy of cases decided by the Supreme Court in 1986, Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986), Anderson [*10] v. Liberty Lobby, Inc, 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986), and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986), [HN3] the moving party must first demonstrate the absence of a genuine issue of material fact. That burden may be discharged by pointing out to the court that there is an absence of evidence in the record to support the nonmoving party's case. n7 Celotex, 477 U.S. at 323. A defendant meets his burden under Rule 56(c) when he "conclusively shows that the facts upon which the plaintiff relied to support his allegation were not susceptible to the interpretation which he sought to give them." n8

n7 The movant may either claim that the nonmovant has not offered enough proof to establish a requisite element of its case or the movant may attempt to negate an essential element of the nonmovant's case. The Supreme Court in Celotex, 477 U.S. 317 (1986), rejected the traditional view that the movant must offer affidavits or similar materials negating matters on which the nonmovant will bear the burden of proof at trial. Fed.R.Civ.P. 56(e) Advisory committee's notes (amended 1989).

[*11]

n8 In this regard, Matsushita demands that the inferences drawn from the non-moving party's evidence be reasonable in order to reach the jury. If the opponents' theory is senseless, no reasonable jury could find in their favor and summary judgment may be granted. Eastman Kodak Company v. Image Technical Services, 504 U.S. 451, 469-470, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992). On the other hand, if there is evidence in the record from which a reasonable inference in the nonmoving parties favor may be drawn, the moving party cannot obtain summary judgement. Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 364 (3d Cir. 1987).

[HN4] Once the moving party has demonstrated the absence of a genuine issue, the nonmovant must go beyond the pleadings and come forward with "specific facts, by affidavits, depositions, answers to interrogatories or admissions on file showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(c)). n9 ; Matsushita, 475 U.S. at 586.("the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts"). If the evidence [*12] is merely colorable, or is not significantly probative, summary judgment may be granted. Liberty Lobby, 477 U.S. at 249-50. Conversely, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, summary judgment must be denied. Big Apple BMW v. BMW of North America, 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912, 122 L. Ed. 2d 659, 113 S. Ct. 1262 (1993). The ultimate burden of persuasion remains with the moving party. There can be no "genuine issue as to any material fact" when, after adequate time for discovery, a party fails to establish the existence of an element essential to the nonmoving party's case on which the party will bear the burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548. In a securities fraud case, summary judgment is improper if a plaintiff shows a genuine issue of material fact with regard to one particular statement by the company or its insiders". In Re Worlds of Wonder, 35 F.3d 1407, 1412 (9th Cir. 1994), cert. denied, 116 S. Ct. 185 (1995) and 116 S. Ct. 277 (1995). In Re Convergent Technologies, 948 F.2d 507, 512 (9th Cir. 1991).

n9 This sentence describing the nonmovant's burden in opposing the motion was added in 1963 to overrule a line of cases that had denied summary judgment motions on the strength of well pleaded allegations even though the opponent had

produced little or no evidentiary matter to establish that there is a genuine issue for trial. The advisory committee notes explain those cases were incompatible with the "very mission of the summary judgement procedure...to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56(e) advisory committee's notes (amended 1963).

[*13]

### III. STATEMENT OF FACTS

This action was filed on behalf of purchasers of the common stock of BAC between June 14, 1990 and January 22, 1991, ("class period"). According to the complaint, n10 BAC artificially inflated the price of its common stock during the class period by issuing false and misleading public statements about the company's financial performance, earnings trends, and anticipated earnings growth in contravention of § 10, Rule 10b-5, § 20, and Pennsylvania common law. By these statements, BAC allegedly intended to give the impression that the trend of increased earnings experienced by BAC prior to fiscal year 1990 would continue throughout that year. Specifically, the statements created or prolonged market misconceptions that BAC would continue to experience 6-9% earnings growth, as forecasted, leading to higher earnings and return on equity, and that BAC's non-communications businesses (particularly the financial services segment) were doing well. To that end, defendants also manipulated the timing of revenues and expenses, and concealed the amount of reported revenues and expenses that were non-recurring or out-of-period. n11

n10 All subsequent references to plaintiffs' "complaint" in this opinion are to the "Second Consolidated Amended Complaint".

[*14]

n11 Thus, plaintiffs claim is based, in part, on manipulative accounting practices employed by defendants.

On January 22, 1991, the end of the class period, the Defendant's issued a press release relating the financial results for the fourth quarter of 1990 and for that fiscal year. That day, BAC common stock declined $ 4 dollars per share, closing at $ 50. The market price continued to drop an additional $ 2.375 per share the next day, closing at $ 47.625 per share. This lawsuit followed.

The undisputed facts as developed from the depositions, documents and pleadings submitted to the court are as follows. BAC is a regional telecommunication company. It is one of the seven regional Bell operating companies ("RBOC's") created in 1984 as a result of the breakup of AT&T. During the class period, BAC conducted its business through a group of highly-regulated local telephone companies (collectively referred to as the "network services group" or "NSG"), n12 a non-regulated cellular telephone business, n13 and several non-telecommunications businesses. n14 BAC stock is actively traded on the New York, [*15] Philadelphia, Boston, Pacific, Midwest, London, Zurich, Geneva, Basil, Frankfurt and Tokyo stock exchanges. n15

n12 The NSG consisted of the following seven operating telephone subsidiaries: Bell Telephone Company of Pennsylvania, Diamond State Telephone Company (serving Delaware), New Jersey Bell Telephone Company, and four Chesapeake and Potomac Telephone Companies (serving Washington DC, Maryland, Virginia, and West Virginia). The NSG provided traditional and cellular mobile communications services to the Mid-Atlantic region of the United States and accounted for 88% of Bell's 1990 revenue.

n13 BAC's cellular subsidiary, Bell Atlantic Mobile Systems ("BAMS") provided cellular telephone service and marketed mobile equipment throughout the MidAtlantic region of the United States.

n14 These business segments included: (1) Financial Services (comprehensive equipment leasing, corporate financial services, and real estate investment and development); (2) Business Systems (computer and computer maintenance services, software support, and disaster recovery services); and (3) International (telecommunications consulting, software development, systems integration services, computer maintenance/repair outside the U.S., and investments in the New Zealand telephone company (Telecom Corporation of New Zealand) and in a Czech. cellular joint venture)).

[*16]

n15 The fraud on the market theory's presumption of reliance is only available if Bell stock was traded on an "open and developed" efficient market. Basic v. Levinson, 485 U.S. 224, 247, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988); Hayes v. Gross, 982 F.2d 104, 107 n.1 (3d Cir. 1992)(quoting Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989). In this case, it is undisputed that Defendant Bell's securities are traded on an open market.

In 1990, the year pertinent to this litigation, BAC had assets over 27 billion, total operating revenues (communications services as well as financial and real estate services) of over 12 billion, operating expenses of over 9 billion, and net income of 1.3 billion. Return on average common equity was 14.8%. (DX-Tab 2, BA1000851-910)(1990 Annual Report at 26).

As a publicly traded company, BAC is required to file reports with the Securities Exchange commission. n16 Using the calendar year as its fiscal year, BAC files quarterly reports of its financial performance within 45 days after the close of each quarter on Form 10-Q and an annual report within 90 days after the end of the fiscal year [*17] on Form 10-K. n17 In addition to the requisite SEC filings, BAC announces earnings to the public by press release for each quarter and for year end as soon as the results are finalized. n18 Management projections are also available to professionals through press conferences and speeches to analyst societies.

n16 In its own press releases and quarterly and annual SEC filings, BAC reported all subsidiary financial information, including that for Bell Atlantic Mobile Systems ("BAMS/cellular") and Bell Atlantic Systems Leasing ("BASL/financial services"), on a consolidated basis in accordance with GAAP. The NSG telephone company subsidiaries also filed their own Forms 10-Q and 10-K, each containing an MD&A. (Tomlinson dep. 24).

n17 The general requirements for these reports are prescribed by SEC Regulation S-K and in the instructions for each form. The reports include current financial statements, footnotes to those financial statements, and a section entitled Managements Discussion and Analysis of Financial Condition and Results of Operations("MD&A"). Item 303 of Regulation S-K prescribes the format and content of the MD&A. This section contains an analysis of current financial results (including changes in financial condi-

tion) and a comparison of the current results to the results of prior periods, usually the comparable period of the prior year. Form 10-K contains more detailed descriptions of various aspects of the company's businesses, and includes or incorporates financial statements also contained in the Annual Report to shareholders. Instructions to Form 10K (D3) request that registrants indicate whether the financial statements in the reports reflect a change from the preceding year in any accounting principles or practices or in the method of applying those accounting principles.

[*18]

n18 Press releases are two to three page announcements of key financial results and particularly newsworthy aspects of those results.

BAC's financial accounting methodology is governed by and must comply with Generally Accepted Accounting Principles(GAAP), a set of accounting policies determined by the Financial Accounting Standards Board ("FASB"). The SEC defers to these standards. See, Accountants SEC Practice Manual, (CCH) 1523 ("The SEC regards principles, standards and practices promulgated by the [FASB] ... as binding upon registrants filing financial statements with the SEC and upon the certifying accountants").

A. Financial Reporting Procedure

During the time period under scrutiny, BAC's internal structure and reporting system was rather complex. Monthly, raw financial data was collected from each of BAC's subsidiaries and consolidated by the Corporate Accounting Department, headed by Assistant Vice President of Finance, William Tomilson. (Tomilson Dep. 15). That department transmitted this data to Financial Analysis, headed by Assistant Vice President, Ronald E. Von Stetina, [*19] which added analytical information and disseminated the results to management and those involved in the financial disclosure process in the form of a monthly "Flash Report".Id. In addition to this procedure, Financial Analysis would prepare preliminary monthly and then final Quarterly Analysis Packages which more completely analyzed "flash report" data in preparation for reporting quarterly results. (Tomilson Dep. at 14). These packages, as well as any updates of that information, formed the basis for the quarterly earnings press release and the MD&A. (Ciango Dep. 28). In order to compensate for any lag time in current information created by a delay in printing or circulation of this package, Manager of Corporate Media Relations, Cynthia Ciango, ("Ciango"), would obtain any updates of the package

information directly from the departments in verbal or handwritten form before issuing the press release. Id.

### 1. The earnings press release

The earnings press release was initially drafted by Ciangio, following a "pre-meeting" with the Director of Investment Relations, Peter D. Crawford ("Crawford"). (Ciangio Dep. 18). This draft was critiqued by Crawford and a second draft was then [*20] drawn up by Ciango to be disseminated to a "team" of representatives of various departments. n19 That team would then convene in order to discuss the quarterly analysis package and issues raised by the results. (Ciango dep. 18),(Ludlow dep. 138),(Bulliner dep. 40),(Lynch dep. 102); See also (B2006307, TAB 10). The team would continue to comment on subsequent drafts. (Ciangio dep. 21);(Tomlinson dep. 152);(Von Stetina dep. at 41);(Bulliner dep. 25, 38). Eventually, a version incorporating comments from the various departments was submitted to senior members William Bardeen, Vice President for Finance and Controller, and Carolyn Burger, Vice President Secretary and Treasurer. (Ciangio dep. 21-23); (Bardeen dep. 8-9);(Burger dep. 61). Ultimately, the draft was submitted to Campbell and Smith for their approvals. (Ciangio dep. 21-23);(Buliner dep. 34-35). If any changes were made to the draft at any point, the draft was submitted to the legal department "just to make sure that nothing was changed that would create any misunderstanding in terms of public information and accuracy." n20 (Ciangio dep. 22-23). Finally, BAC consulted with Coopers & Lybrand, BAC's outside accountants, to discuss [*21] any "issues that would possibly impact the earnings release." (CL2010328, DX TAB 11). For example, in preparation for the issuance of the press release for the third quarter 1990, Ludlow held a conference call with accounting representatives of each of the subsidiaries.Id. The notice of the meeting advised that "your Coopers & Lybrand representative should be present during the calls." (CL2010328, DX TAB 11). The Coopers & Lybrand notes of the October 17, 1990 meeting reflect that, on behalf of the parent, Ludlow and two subordinates attended, as well as Coopers & Lybrand Audit partner, William Walsh and Audit Manager, Mitchell Cohen. (CL2010326, TAB 12). Various issues were discussed by this group with each subsidiary's representative and that subsidiary's C&L counterpart. This procedure was followed for the first quarter press release and the second quarter press release as well. See also, (CL2000018-19, TAB 13)(First quarter meeting held April 18, 1990), (CL200974, TAB 14)(Second quarter meeting held July 20, 1990).

n19 The team was comprised of the following departments and representatives: Investor Re-

lations (Crawford); Financial Analysis (VonStetina); Corporate Accounting (Tomlinson, Ludlow); and Legal. (Ciangio Dep at 13, 18);(Ludlow Dep 36).

[*22]

n20 BAC required approval of all earnings press releases by the legal department before issuance. (Ludlow dep. 79-81).

### 2. The Quarterly and Annual Report

For 1989 and 1990, the Management's Discussion and Analysis (MD&A) section of the 10Q was prepared by the Financial Analysis department following the issuance of the quarterly earnings press release. (Ludlow dep. 40);(Tomlinson dep. 22-23). The initial draft was distributed to "at least twenty people" for review and comment. (Ludlow Dep 76, 138; See also VonStetina dep. 127). Like the press release, the MD&A drafts were reviewed by managers Bardeen, VonStetina, Tomlinson, and Burger, and the legal department, before final review by Campbell, BAC's Chief Financial Officer. (VonStetina dep. 128);(Bulliner dep. 26, 39);(Burger dep. 61);(Lynch dep. 20, 25); (Ludlow dep. 77). Drafts would also be disseminated to Financial Analysis counterparts at the subsidiaries who had provided initial input for their subsidiary to the quarterly analysis package for comment. (Lynch dep. 18-19). This process was designed to identify all disclosure issues. There [*23] were no rigid policies as to what should be disclosed and no typical areas were regularly discussed in the MD&A. (Smith dep. 87-88); (Lynch dep. 24,37-38). Decisions about what to include were based on judgment and the perceived materiality of the disclosure. (Burger dep. 36-37);(Lynch dep. 22-23 & 51)(determination turned on whether there was a "significant impact on net income, revenues or expenses");(Crawford Dep 38)("went from rule of thumb that it represented 10% of corporate earnings to qualitative judgment that the information could result in a change in the trading value of the security"). Further, the form of disclosure was dictated to some degree by the way information was aggregated in the company's financial statements. (Burger dep. 133). Disclosure issues were reviewed and discussed with Coopers & Lybrand. (Tomlinson dep. 140-41 & 147; Cohen dep. at 6). In addition, the company would answer questions from analysts regarding any disclosure. (Burger dep. 42). The policy was err on the side of more rather than less disclosure. (Von Stetina dep. 125-29)("we tried to be as open as possible". . . "tried to put more in, rather than less"..."underlying objective in all [*24]  of this was to disclose as much as possible to the public about what was going on in the business");(Bulliner dep. at

51)(where uncertain, "we tended to err on the side of disclosing"); (Burger dep. 35-36) ("Our intent was to always be clear to our investment community").

Cooper's & Lybrand, after assessing "the accounting principles used and significant estimates made by management," certified both 1989 and 1990 financial statements as "in conformity with generally accepted accounting principles". (DX-TAB 146, B1000495, (1989)); (DX-TAB 2, BA1000907, (1990)).

B. Incentive Compensation

Since 1986 or 1987, BAC had short-term incentive compensation plans by which all management employees could earn annual bonus payments. (Bulliner dep. 128). The amount of the payments or employees' entitlement thereto was tied, in part, to BAC's earnings per share growth. Earnings growth, however, was only one of several criteria by which Company performance was measured for this purpose. (Smith dep. 76); (Aquino dep. 21); (Bulliner dep. 124), 128); (Campbell dep. 54-55). Further, in some years, earnings per share growth was adjusted before determining amount of incentive compensation for [*25] that portion of the growth attributed to factors "external to the company" such as a change in accounting principles. (Bulliner at 125-126). A comparable plan existed for union employees. (Von Stetina dep. 304). For 1990, incentive compensation amounted to 30-40% of the annual compensation of BAC's senior management. n21 (Albertini dep. 108). Without this compensation some BAC employees would have been paid at below market rates for their positions. (Von Stetina dep. 97).

n21 Incentive compensation is compensation that is tied in part to the financial performance of a corporation.

C. The Statements

Plaintiffs contend that defendants engaged in a grand scheme to falsely portray the true financial condition of BAC in order to inflate the price of the corporation's stock. The primary thrust of plaintiff's case is that BAC reported and predicted earnings growth for the year 1990 as compared to 1989 results while concealing the fact that most or all of this growth derived merely from non-recurring accounting [*26] adjustments and other one-time events rather than from operating performance. n22 Thus, according to plaintiffs, BAC successfully concealed the fact that "real" earnings were not growing at the rate reported or predicted. In furtherance of this de-

ceptive scheme, defendants overstated 1990 results and understated 1989 results by manipulating the timing of "reversals of overaccruals" and "retroactive credits" for various liabilities n23 and failing to disclose that reported revenues and expenses included non-recurring or out-of-period amounts. n24

n22 Plaintiffs do not allege that the accounting underlying these adjustments violated GAAP and concede that defendants were entitled to make these adjustments. Instead, they allege that statements reporting and predicting earnings growth, circulated in press releases, speeches to analysts, financial statements, and SEC filings were misleading because such adjustments were not disclosed.

n23 As described in detail later in this opinion, these accounting decisions relate to certain liabilities to long distance carriers ("84-800 and NECA") and for certain employee benefits (ie, pension and medical).

[*27]

n24 For example, as discussed later, BAC allegedly, did not disclose that fourth quarter 1990 earnings per share included $ .05 cents from an accounting change (ESOP), and did not disclose that a $ .10 charge to fourth quarter earnings would be an additional $ .05.

In support of their theory, plaintiffs identify the following representations made by the defendant's during the class period as false or misleading. n25

n25 The documents containing these statements are located in the record as follows: First quarter April 19 press release (DX-TAB 3) May 16, 1990 Form 10-Q (DX-TAB 4), second quarter July 23, 1990 press release and quarterly report to shareholders (DX-TAB 5), Third Quarter October 18, 1990 press release (DX-TAB 7), October 25, 1990 presentation to NYSSA (DX-TAB 36), October 25, 1990 press release (DX-TAB 107), November 9, 1990 Form 10Q (DX-TAB 8, BA1000573); January 22, 1990 press release (DX-TAB 9, 123).

1.)    [*28]    PREDICTION OF 6-9% EARNINGS GROWTH IN 1990

BAC repeatedly represented that earnings per share would grow 6-9% n26 when, in fact, (1) by June 1990, defendants internally estimated growth for 1990 of less than 6% and as low as 4.8%; (2) the NSG was only expected to contribute 3% to 1990 earnings growth (internally referred to as "the business problem") and the non-telecommunications segments were performing poorly (3) access line growth and revenue growth was slowing while expense growth was increasing; (4) growth results for the first three quarters of 1990 were overstated and results for 1989 were understated due to non-recurring events, listed and described in more detail below, so that defendants did not expect the 6% growth to come from "operations".

n26 For example,

(1) In the first quarter meeting with New York analysts on January 26, 1990, Campbell described charges in the fourth quarter of 1989 which had reduced earnings for that year and then stated,

"normalized ongoing results for the 1989 year...would have been $ 6.67 ($ 3.33 after a two for one stock split during the first quarter of 1990) per share on net income of $ 1.3 billion. This is the benchmark level for our industry planning process and from which we will resume our 6-9% earnings growth target and we fully expect to see some acceleration toward the upper end of that range in the longer term" (DX TAB 32);

(2) In a third quarter speech for New York analysts on July 25, 1990 Campbell stated that, "with growth of just over 6% we are still near the lower end of our target range of 6-9 percent...We expect to be at the lower end of this growth range until at least next year" (DX TAB 202); and

(3) In a fourth quarter meeting with the NYSSA analysts on October 25, 1990, Campbell stated he expected to achieve the "lower end" of its target for earnings growth of "six to nine percent" in the 1990-92 time frame. He also quantified the expectations for year end:

"Last year we indicated to you that we expected normalized per share earnings of $ 3.33--excluding some one-time write-downs of inventories and goodwill...And that's exactly where we ended the year. And we said that earnings would grow from that base to the lower half of our 6-9% objective in the '90-'92 time frame. We're solidly on that path despite some weakening demand due to the economic slowdown in some parts of our region. We expect normalized earnings for 1990 to be about 6 percent higher than last year without special adjustments." (DX TAB 36).

[*29]

2.) JULY 23, 1990 GROWTH STATEMENTS

Defendants represented that, as compared to the second quarter of 1989, the second quarter of 1990 showed growth n27 when, in fact, the results for the second quarter 1990 included non-recurring accounting adjustments, described below.

n27 The press release and quarterly report stated that, in the second quarter net income increased 6.2%, total operating revenues increased 6.7%, earnings per share at .92 increased 5.7% as compared to the second quarter of 1989. As compared to the first half of 89, net income grew 6.8%, revenues grew 7.9%, and EPS grew 6.4%. (PX 2004434, DX TAB 5). The report also stated, "Revenues reflected continued growth in volumes in both our telephone and non-telephone businesses and demonstrated the continued strength and resiliency of our regional services based economy."

3.) THIRD QUARTER STATEMENTS: October 18, 1990

a. Financial Results

Defendants, in reporting results for the third quarter of 1990, again represented that the company [*30] experienced growth as compared to the third quarter and

Case 1:05-cv-00548-JJF    Document 24-2    Filed 02/16/2007    Page 14 of 43

1997 U.S. Dist. LEXIS 4938, *; Fed. Sec. L. Rep. (CCH) P99,467

first six months of 1989, when in fact, results for the first, second, and third quarter of 1990 were overstated by non-recurring accounting adjustments, and the calculation and reporting of "growth" by reference to results for the third quarter of 1989 was misleading because results for the third quarter of 1989 had been negativly impacted by the effects of a strike. n28

> n28 The press release, in reporting third quarter results, stated, as compared to 3Q89, "net income increased 4.2%, total operating revenues increased 6.5%, total operating expenses increased 5.2%, earnings per share (EPS)($ .91) increased 5.8%, return on equity was 16.6% (14.6 in 89). For the first nine months of 1990, net income grew 5.9%, revenue grew 7.4%, expenses increased 6.3%, and EPS grew 6.2%. total access lines grew 3.2%, business access lines increased 5.1%. (DX TAB 7) Form 10Q for the third quarter was filed on August 10, 1989 repeated those representations. (DX TAB 6).

b. [*31] Cellular

The Defendants represented that Bell Atlantic Mobile Systems ("BAMs"), BAC's cellular subsidiary, was experiencing "positive results" and "continued growth in volumes" when, in fact, cellular telephone usage per customer had been weakening, average minutes of use per customer had been declining since October 1989, and BAMs had suffered losses in the first two quarters of 1990. n29 (Campanella at 272-83);(PX 167).

> n29 The press release stated, "Revenues also reflected continued growth in volumes in our non-telephone businesses"... Total usage grew at a "reduced rate" in September 1990. "In September, customer usage and demand for service grew at a reduced rate due to sluggishness in the economy." (TAB 7)..."We experienced strong business volumes in our local telephone companies, as well as in our wireless communication (cellular) and leasing businesses...These positive results, at a time when economic weakness exists, are indicative of the underlying strength of our businesses." The October 25, 1990 release stated that "Bell Atlantic Mobile Systems is solidly profitable now, and will be even more so in the future."

[*32]

c. Expense Controls

The defendants also represented that revenue growth was due to measures taken to reduce expenses when, in fact, reported growth was not due to expense controls employed by BAC, but to nonrecurring events. n30

> n30 Regarding expense measures, the release stated, "Tight expense measures contributed to net operating revenue growth of 11.2%" (and we are confident that we have the controls in place to guide our company through this period of economic uncertainty.).. As a prudent measure against future economic uncertainty, all employees are redoubling their efforts to cut expenses." The October 25, 1990 release stated, "our expense controls continue to produce strong operating performance, like the 11.4% growth for the first three quarters of the year".

d. Access Lines

Defendants represented that access lines had grown when, in fact, access line growth was slowing. n31 (Campanella at 45-50).

> n31 Regarding access lines the release noted, "Business Access Lines increased 5.1% for the quarter over the third quarter of 1989, while total access lines grew 3.2%, reaching nearly 17.3 million." The October 25 release stated, "Our revenue growth, is driven by a solid information based economy that is producing consistent demand for network services even now, in difficult economic times." "Access line growth has been particularly strong." However, the Court notes that the document also states, "our network usage may be reflecting some economic slowdown, as both interstate minutes of use, at 5.4% for the third quarter and intrastate minutes of use at about 8% are growing but they are growing at a moderate level and slightly slower rate than they were before."

[*33]

4.) THIRD QUARTER STATEMENTS: October 25, 1990

In an October 25, 1990 presentation to the New York Society of Securities Analysts ("NYSSA")(DX-TAB 36), BAC reported growth in third quarter, when in fact, third quarter results were, again, overstated by non-recurring accounting adjustments. n32

n32 This document also stated that EPS (2.73 for 9 months) is a 6.2% increase over last year. The difference between operating results at 11.4% and EPS at 6.2% is interest expense, ESOP and New Zealand. (PX 181 at A00045).

a. Anticipated Fourth Quarter Results:ESOP

BAC represented its expectations for the fourth quarter as follows: BAC could "sustain [its] strong operating performance as [it] moved towards year end" and "fourth quarter financial results would continue to reflect the strong performance registered by the company for the first nine months." Another statement represented that BAC "continued to have very strong results and expected a record year from [its] operating units even during uncertain [*34] economic times." In making these representations, however, BAC failed to disclose that $ .05 of anticipated earnings per share for the fourth quarter of 1990 would include five cents attributable to a tax benefit for an Employee Stock Ownership Plan (ESOP) rather than from operating earnings; $ .04 of the $ .05 cents was attributable to the first three quarters of 1990; and expenses related to the ESOP were reclassified on BAC's books. Further, these predictions of fourth quarter results failed to disclose that a.) Fourth quarter earnings would decline 18-30% from the performance registered for the first three quarters of 1990 and decline significantly from the fourth quarter of 1989 as evidenced by a November 2, 1990 internal document that noted that 1990 EPS would be only 2% higher than adjusted EPS for the fourth quarter of 1989 (3.44). This 2% was due to a change in accounting for BAC's ESOP; b.) that earnings in the fourth quarter would be lower than .81 EPS (10 cents per share less than the company's earnings for the first three quarters of the year. n33 ; c.) earnings were declining; revenues, while continuing to increase, were increasing at a decreasing rate (1st Q=9%, 2nd [*35] Q=6.7%, 3rd Q=6.5%); and expenses were rising at an increasing rate, and based on revenue and expense trends it was reasonable to anticipate that BAC would earn less (less income and less return on equity) in the fourth quarter than in the first half of 1990. Plaintiffs claim that the drop in the fourth quarter was known by October 1990.

n33 The average of the first three quarters = $ .91. $ .91 minus $ .10 charge =.81 EPS in fourth quarter of 1990. Following the October 25, 1990 meeting, the mean of analyst estimates of earnings for the fourth quarter of 1990 was .86 cents per share, as reflected in a December 12, 1990 Zacks investment research report. (Compl. at P66-68).

b. Fourth Quarter Charge of $ .10:(Goodwill Write-down)

Regarding a fourth quarter writedown in the goodwill of Bell Atlantic Systems Leasing,("BASLI"), BAC represented n34 that an expected charge to fourth quarter earnings would only be $ .10; that there would be "no further bookings of this sort"; and that the motivation for the charge was [*36] to reflect the market value of the financial services businesses more conservatively when, in fact, by November 2, 1990, the writedown was estimated to be $ .15 ($ 60 million) rather than $ .10 ($ 40 million); and the motivation for the writedown was not conservativism but, rather, a method to record the expected loss on the potential sale of one of the financial services businesses, Bell Atlantic Systems Leasing, BASLI. n35

n34 The release stated that "[We] expect to book a minor goodwill charge of approximately $ .10 cents per share in our financial services organization...As you know we always look very hard at year end to insure that our assets and liabilities are accurately reflected...We do expect to book a minor adjustment related to goodwill, and that will bring us slightly below some expectations...I want to make it clear that we do not have an asset exposure...Financial companies generally are undergoing significant devaluation. As you know we have in the past and we intend in the future to state the value of all of our businesses, including financial services in the most conservative possible way. So we will take a charge against goodwill to fully reflect the conservative market value of this business. And this is the source of approximately $ .10 cents charge that we will take to fourth quarter earnings. . .We don't anticipate in 1990, 1991 or beyond-any further bookings of this sort."..."the charge is merely a continuation of our conservative accounting practice to reflect lower market values in the financial services industry".

[*37]

Case 1:05-cv-00548-JJF     Document 24-2     Filed 02/16/2007     Page 16 of 43

1997 U.S. Dist. LEXIS 4938, *; Fed. Sec. L. Rep. (CCH) P99,467

n35 Plaintiffs also claim that failure to disclose this information in Form 10-Q for the third quarter filed on November 9, 1990 violated Item 303 of Regulation S-K of the Securities Exchange Commission, 17 C.F.R. § 229.303.

c. Return on Equity

The defendants represented that 15-17% return on average common equity was "sustainable" and would be 15-20% in 1990 when, in fact, the target would not be achieved and actual return on equity was 10.5% for the fourth quarter and 14.8% for the year, lower than the 16.4% average return on equity reported in the first nine months of 1990. n36

n36 With regard to return on equity for the year, BAC stated,

"Returns for the nine months show a 16.4% return on equity...We're comfortable and confident that the higher returns we're now realizing, in that 15-17% range, are sustainable and do create value for our owners. And returns on equity-we believe can yet improve in the 15-20% range.

[*38]

5.) FOURTH QUARTER OF 1989 NONRECURRING CHARGES

In a press release issued January 23, 1990, defendants represented that the funding of an employee benefits trust was onetime charge when, in fact, the trust was to be a recurring expense. n37

n37 The press release described charges taken in the fourth quarter of 1989 as follows. "1989 earnings at $ 5.43 per share compared with $ 6.65 per share in 1988, an 18% decrease..."our performance would have compared favorably with 1988 except for the approximately $ 320 in special charges against earnings we recorded at the end of 1989. These charges, which were of a one-time nature were associated with the revaluation of assets at some of the company's unregulated subsidiaries, the cost of an organizational realignment that included incentives for managers

to retire early or voluntarily leave, and debt refinancing at several of the companies telephone subsidiaries". . ."In addition the company began to accrue for and fund a trust to help cover the future cost of medical and dental benefits for non-management retirees".(TAB 207).

[*39]

6.) REAL ESTATE, FINANCIAL SERVICES, AND INTERNATIONAL BUSINESSES

Defendants represented that each of the non-telephone subsidiaries was doing well when, in fact, those businesses experienced an aggregate loss. Specifically, Bell Atlantic Properties (BAP) lost $ 13 million; by July, 1990, Bell Atlantic Systems Leasing Inc.'s, ("BASLI"), "growth trend [had] softened"; and by September 1990, BASLI was experiencing an "ongoing revenue decline". n38

n38 a.) In an April 19, 1990 press release, Campbell stated, "in addition, non-telephone businesses continued to grow at a very satisfactory rate." (DX-TAB 1); b.) September 20, 1990 in San Francisco, "I'm now looking forward to equally gratifying results during the next five years. As you know, that's a critical time frame for us, a period in which we expect to grow our international business to about 1.5 million dollars in revenues."; April 23, 1990 speech to Baltimore Institutional Investors, "It may take some time, but we expect international to be a big part of Bell Atlantic's Future."; c.) In an October 25, 1990 release, commenting on financial services business, "our properties business, our real estate business is appraised well above book, and in fact, Bell is the principle tenant. The residual values in our leasing companies are conservative and we have no unusual credit problems."

[*40]

7.     THE     ACCOUNTING     ADJUSTMENTS: REVERSALS OF ACCRUALS

AND RETROACTIVE CREDITS

Plaintiffs allege that the defendants, when reporting and predicting growth for 1990, failed to disclose that the results for the first three quarters of 1990 were inflated by nonrecurring charges, as follows. In the First Quarter of 1990, 1.) Income was reduced by $ 11.4 million as a result of a $ 42 million settlement; 2.) Income was increased by $ 20 million due to a mathematical error dis-

covered in the fourth quarter of 1989 that was improperly corrected in first quarter of 1990 n39 ; 3.) Income was also increased by $ 57 million due to reversals of accruals for various liabilities n40 ; and 4.) A statement in January 1990 describing non-recurring charges taken in 1989 failed to disclose that the funding of the retirees benefits trust was a recurring charge rather than a non-recurring charge.

n39 Plaintiffs also claims that, by delaying the correction of this error, defendants successfully understated results for the fourth quarter of 1989, as well.

n40 This claim challenges accruals for certain liabilities that are particular to the communications industry, NECA and 84-800 liability.

[*41]

In the Second Quarter of 1990, revenues were increased by $ 24 million as a result of a recoupment of employee benefits.

In the Third Quarter of 1990, reversals of accruals in connection with pension and medical benefits and reclassification of BAC's Employee Stock Option Plan ("ESOP") decreased expenses by $ 42 million. Net income and earnings were thereby increased by that amount. n41

n41 Plaintiffs claim that failure to disclose the fact and amount of the 42.1 million adjustment in expenses in Form 10-Q for the third quarter filed on November 9, 1990 violated Item 303 of Regulation S-K of the Securities Exchange Commission, 17 C.F.R. § 229.303.

In sum, Plaintiffs allege that any statements of historical fact quoted above, were 1.) misleading, when made, in that they fail to disclose additional information, or 2.) correct when made, but rendered misleading by after-acquired knowledge by the defendants of material information. Plaintiffs also allege that, based on the undisclosed information, all predictive [*42] statements were issued without a reasonable basis or without a good faith belief in the statements' truth.

D. A Closer Examination

A detailed examination of the events leading up to BAC's public statements and any underlying accounting transactions follows.

1.) 6-9% Earnings Growth

As noted above, throughout 1990, the defendants repeatedly represented that earnings would grow 6-9%. n42 Internal reports for 1990, listed below, reflect presentations made to BAC's Board of Directors and to various Board committees, and the contents of financial reports used by senior management:

n42 The defendants publicly stated that the source of the earnings growth would be the network services group (basic telephone). For example, in an April 1990 meeting with institutional investors, Crawford stated, "we have major businesses in three different stages of the life cycle, with three different growth patterns, risk profiles, and earnings characteristics. This still robust business supports an ability to earn at the lower end of our earnings objective of six to nine percent." (DX TAB 34); At an October 25, 1990 NYSSA meeting, Cambell stated that the NSG presently contributed "four to six" percent of earnings growth. (DX TAB 36). In deposition, Crawford stated that, "in any single year, results in any single business segment could be more or less than our target ranges". (Crawford dep. 181-82). The network business had the capacity over the several years following 1990 to account entirely for "the lower end" of the 6-9% target." Id. On July 25, 1990, based on second quarter results, "We expect to be at the lower end of this growth range until at least next year at which time the results from our development activities will begin to make a visible and sustainable contribution". (DX TAB 202).

[*43]

a.) On March 27, 1990 Campbell told the Board of Directors that that "management expected to be on target at 6% growth above normalized 1989 performance." (DX-TAB 41).

b.) On April 3, 1990, William Bardeen, Vice President of Finance and Controller, sent a "pre-flash" analysis of preliminary March results to Smith stating, "Based upon our trend analysis, we anticipate that we will exceed our Commitment View by $ 7.0 million and post net income of $ 1,404 million ($ 3.57 EPS) for the year." (DX-TAB 42).

c.) On May 11, 1990, Bardeen circulated the April flash report, commenting that net income for April was "over budget" by $ 36 million, and that net income of the first four months of the year was $ 6.2 million over budget and 7.3% higher than the corresponding 1989

period. "Earnings per share for the year to date were $ 1.20, a 6.2% increase over the same period last year." (DX-TAB 43).

d.) On June 26, 1990, Campbell reviewed financial results for the period ending May 31, 1990 with BAC's executive committee. He stated that, "the Corporation's financial performance was on target for both the month of May and year to date 1990" and that cumulative earnings per share of $ 1.53 were [*44] above the targeted level. (DX-TAB 44).

e.) On July 3, 1990, Bardeen sent Smith a "pre-flash" analysis of expected June and year-to-date results. June net income was below budget but year-to-date earnings were still estimated to be two cents over budget and a 6.4% increase over 1989. Based on current projections, Bardeen predicted that BAC would post net income of $ 1397 million ($ 3.55 EPS) for the year, equal to budget and representing a 6.6% EPS growth over normalized 1989. (DX-BA1008542, TAB 45).

f.) On July 24, 1990, Campbell addressed the Board stating, "earning per share for the first six months of the year totalled $ 1.82-2 cents above targeted EPS and $ .11 (6.4%) higher than the same period in 1989...we are still striving to achieve our 1990 EPS target of $ 3.55 which would produce 6.6% growth over normalized 1989 EPS of $ 3.33". He also noted that the weakening regional economy, as well as investments made in various business development projects, would make achievement of that target more difficult than in previous years." (DX TAB 46).

g.) On July 25, 1990, Bardeen sent Smith a Key Financial Information Report updated for June 1990. The report states that the "Network [*45] companies" operating results continue to exceed the budget due principally to higher access revenues." Bardeen noted that the weakening regional economy was becoming evident in those companies' volumes and concluded, "our current best view of the year indicates that 1990 earnings per share will total $ 3.54 or a 6.3% increase over 1989, as opposed to targeted EPS and EPS growth of $ 3.55 and 6.6%." (DX-TAB 47).

h.) On August 24, 1990, Bardeen sent Smith a Key Financial Information Report updated for July 1990. The letter stated that "the Network companies' operating results continue to exceed the budget due principally to higher access revenues," although volumes were beginning to fall below budgeted levels due to the weakening regional economy. Bardeen again repeated that "our last best view for the year indicated that 1990 earnings per share will total $ 3.54, or a 6.3% increase over 1989." (DX TAB 49).

i.) On October 3, 1990, Bardeen sent Smith a Projected Earnings Report. This showed that income for the month of September would probably be less than budgeted, although revenues were still higher than anticipated at the NSG. Bardeen also noted that third quarter net income would [*46] probably by $ 13 million below budget. He estimated year-to-date net income as $ 5 million below budget but still 5.5% ahead of 1989, and year to date earnings as $ 2.74, a 6.6% increase over 1989 and still one cent over budget. He concluded that total EPS for the year would be reported at $ 3.55 or a 6.6% growth over 1989. (DX-TAB 50).

j.) On October 18, BAC announced third quarter earnings by press release of $ .91 per share, a 5.8% increase over the third quarter of 1989. Year to date earnings were $ 2.73 per share, an increase of 6.2% over 1989.(DX-TAB 7).

k.) An "Earnings Update," dated October 23, 1990, predicted year-end normalized earnings per share growth of 6.3%. (TAB 51).

l.) On November 14, 1990, Bardeen circulated the flash report for October 1990. The report indicated that net income was $ 10.8 million below budget for that month, but Network Services was still overrunning its budget due to higher-than-budgeted network access volumes and rates. (DX-TAB 52).

m.) On November 14, 1990, Bardeen separately summarized for Smith what he considered the "earnings per share that should be expected by the investment community based on your recent presentations to Wall Street [*47] analysts versus where our best view of EPS for the year currently stands." That summary reflected a "market expectation" of $ 3.43 ($ 3.53 minus a $ .10 cent charge), compared to a best estimate as of that date of $ 3.42. Bardeen stated that "we will work to bring results in at the market expectation of $ 3.43." (DX-TAB 39).

n.) On December 13, 1990, Bardeen circulated the flash report for November 1990. The report indicated that net income for November was $ 17.1 million below budget, but that December results needed to exceed the budget by only $ 4 million to achieve 6% normalized growth. (DX-TAB 53).

o.) On December 18, 1990, management informed BAC's Executive Committee that the Company was "on track" to meet its growth target of 6% growth in earnings, excluding the special charge. (DX-TAB 54).

p.) On January 4, 1991, Bardeen sent Smith a Projected Earnings Report stating that his best estimate was that December's net income, before deduction of the special charge, would be $ 5.6 million over budget, and that projected EPS without the charge would be $ 3.53 and even possibly $ 3.54. (DX-TAB 55).

q.) On January 14, 1991, Bardeen circulated the flash report for December 1990. [*48] The report stated that, excluding the special charge taken for that month, full year EPS totaled $ 3.53, representing 6.0% growth over normalized 1989 results. The report also noted that Network Services overran its budget by $ 6.1 million. (DX-TAB 56).

Plaintiffs submit, however, a June 1990 internal report that projected earnings per share growth of 4.8% for the year, (BA10008563, DX-TAB 60) n43 ; an internal report estimating "4-6% growth in the NSG for 1990 and 2-3% growth potential" from the nontelecommunications companies (cellular and business systems); and an internal report reflecting BAC's concern, referred to as "the business problem", that NSG growth at only 3% per year would not support the achievment of 6% overall growth.

n43 The document that allegedly reveals that defendants had knowledge in June 1990 that BAC would not achieve the 6-9% EPS forecast, is dated June 25, 1990. It is entitled "Bell Atlantic Corporation 1990 Short Term Compensation" and is part of a multi-page draft entitled "Projected Earnings Report". (DX BA1008563, TAB 60). Two columns each of net income and earnings estimates are aligned under the heading "Entity Estimates". "Book" EPS growth under "Entity Estimates" is 4.8%. The document shows that an aggregation of subsidiary estimates, (i.e. "entity's" expected final booked net income as translated into earnings per share), produced EPS growth of 4.8%. (VonStetina dep. 140-41)("entity view" represents consolidation of estimates given by each of the entities. It's simply "adding them up"); (Von Stetina dep. 147) ("snap shot in time of what total years earnings could look like, based on knowledge as of that day.").

[*49]

### 2.) FOURTH QUARTER: ESOP

a.) $ .05 TAX BENEFIT INCLUDED IN FOURTH QUARTER EARNINGS

In 1989, BAC established two leveraged Employee Stock Ownership Plans ("ESOP's"). [Def's B2006140, TAB 92] The ESOP's took a loan to purchase BAC common stock. n44 The stock was to be used over a ten year period, beginning on January 1, 1990, as BAC's matching contribution to its employee savings plans. [Def's B2006080, TAB 79]. For each quarter of 1990, BAC paid dividends on the stock held by the ESOP's. n45 These dividends were tax deductible by BAC pursuant to section 404(k) of the Internal Revenue Code. n46

BAC included the tax deduction attributable to the entire year in reported earnings per share for fourth quarter of 1990 rather than restating the first three quarters to reflect a tax deduction of $ .02 for the first quarter, $ .01 for the second quarter, and $ .01 for the third quarter. As a result of the accounting treatment applied by BAC to the deduction, reported fourth quarter earnings per share were increased by $ .05 per share.

In 1990, when the company first began accounting for the tax benefit generated by the payment of dividends, the accounting treatment was governed [*50] by APB Opinion No. 11 (Accounting for Income Taxes) and FASB EITF 86-4. These standards provided for the credit of the tax deduction directly to retained earnings without running the benefit through the income statement to reduce expense and increase income. n47 In December 1987, FASB issued Statement 96 (Accounting for Income Taxes)("SFAS 96") superseding APB Opinion 11 and Issue 86-4, [DX- B2007886-2007887, TAB 83] and scheduled to become effective beginning December 15, 1988, allowing the inclusion of the tax benefit in the calculation of net income, and thereby into the computation of earnings per share. However, in the fall of 1988, and again in December 1989, the effective date of SFAS 96 was deferred until December 1991 by the FASB due to considerable debate on the issue n48 and the FASB decided to modify certain provisions of SFAS 96. Id. Beginning in 1990, a question arose as to whether companies still reporting under APB Opinion 11 could calculate their net income and then add the amount of the tax deduction to that figure solely for the purposes of computing earnings per share. (DX-B2000281, B2006150, B2006080-B2006084, B2007884-B2007890, TABS 86, 87, 88, 89). See [*51] also Ludlow Dep. 91-92. Deliberations of the EITF concerning the calculation of EPS under APB Opinion No. 11 continued but a consensus was not reached by June 1990. In August 1990, Louis Miller, a specialist in BAC's Corporate Accounting department, concluded that there was authoritative support for including the tax deduction in the calculation of EPS and that the APB Opinion 11 permitted, and the EITF sanctioned, diversity in accounting treatment of the tax benefit as long as there was disclosure. [DX B2006174-B2006176, TAB 93]. On September 11, 1990 Miller advised Jane Ludlow that Bell Walsh, C&L audit partner, did not object to inclusion of the tax in the earnings per share calculation. [Def's B2006137, TAB 100]. In early October, BAC decided to postpone the inclusion of the tax benefit in the calculation of EPS for the third quarter of 1990. [DX TAB 101, B2006125]. On December 14, 1990, the EITF issued a statement acknowledging that diversity in practice on the issue was permissible under GAAP. (Ludlow dep 69). In addition, the AICPA terminated its discussion of the issue. (Ludlow dep. at 94 Tomlinson dep 90-91). Accordingly, BAC included the

benefit when calculating earnings [*52] per share, but not in the calculation of net income. The accounting treatment complied with GAAP. Further, after determining that the amount attributable to the first three quarters was immaterial, and gaining the approval of Coopers & Lybrand, BAC included the deduction for the entire year in reported fourth quarter earnings. (CL2001516, TAB 102)("We also concur that the effect on EPS is immaterial and restatement of quarterly earnings per share computation is not necessary"). Because the benefit was not included in income, the accounting treatment applied to the deduction for contributions complied with GAAP. The fact that BAC's accounting treatment had changed was not disclosed until February 15, 1991 in BAC's 1990 Annual Report n49 (DX-TAB 2 at 29, 54). However, on January 23, 1991, Dean Witter reported that fourth quarter earnings included a one time charge and "a positive $ .05 per share benefit from ESOP accounting." (DX-TAB 103); Lehman Brothers similarly reported on the same day that the company's fourth quarter results included the benefit derived from the ESOP. (TAB 104). In sum, GAAP permitted BAC to include this tax benefit in earnings per share and C&L accepted that accounting [*53] treatment. n50

n44 Specifically, the ESOP's borrowed $ 790 million which was used to purchase 8.2 million shares of BAC common stock from the company's treasury and 8.8 million shares on the open market.

n45 [CL100081, TAB 80]

n46 Pursuant to section 404(k) of the Internal Revenue Code in effect in 1990, dividends paid on common shares held by an ESOP were tax deductible if the dividends were used to make payments on a loan, the proceeds of which had been used to acquire the employer's stock for the ESOP. Tax deductions confer a benefit on shareholders by reducing the company's overall tax liability.

n47 Pursuant to APB Opinion No. 11 and EITF 86-4, "the resulting tax benefit from ESOP dividends distributed to employees should be credited directly to retained earnings." without running the tax benefit through the Income Statement. [B2006167, TAB 81]. See also Accountants SEC Practice Manual (Financial Statements) 4543 at 4457 (June 1990)("ESOP" sponser reports the tax benefit from dividends paid to the ESOP as a credit directly to retained earnings

in accordance with APB No. 11"). [DX TAB 82, B2006172-2006173]. In December 1987, FASB issued Statement 96 (Accounting for Income Taxes)("SFAS 96"), superseding APB Opinion 11 and Issue 86-4, and proposing that the tax deduction be recognized as a reduction of income tax expense rather than credited directly to retained earnings. [Def's B2007886-2007887, TAB 83].

[*54]

n48 In March of 1988, the FASB convened a series of meetings to consider requests to amend SFAS 96.

n49 The disclosure occurred in the section headed "Significant Accounting Policies" and in Note 15 to the consolidated financial statements. The report stated that "effective in 1990, for purposes of computing EPS, net income is increased by the tax benefit related to dividends paid on shares held by the Company's ESOP". The footnote stated "EPS for the fourth quarter included 5 cents...the first three quarters were not restated because the change would not be material". (Annual Report at 29,54 TAB 2).

n50 Plaintiffs also submit an internal company document, purportedly revealing that BAC knew that numbers reported throughout 1990 were misleading. That document states, "during 1990, the company reported $ 95 million in revenues which were non-recurring, or reported out-of-period" and "strong yr/yr growth somewhat misleading". However, this statement, referring only to revenues and not earnings for 1990, is irrelevant to Plaintiff's claim regarding the treatment of BAC's ESOP.

b.)    [*55]    EXPENSE RECLASSIFICATION: ESOP

During 1990, BAC re-classified the expense incurred for matching employee contributions to BAC's savings plan. The background of this change is as follows. BAC offers employees a 401(k) savings plan in which BAC matched employee contributions to the plan up to a set maximum figure. During 1989, BAC matched employees contributions with cash so that the expense of those contributions was booked as "Employee Expense". The two ESOP's instituted by BAC in 1989, described above, obtained a loan to purchase shares of BAC stock.(TAB 92). This loan was evidenced by a note guar-

anteed by BAC so that the debt is accounted for as a liability on BAC's consolidated financial statements and interest payments on the loan are recorded as "Interest Expense". (TAB 2 at 36). In 1990, BAC changed its method of matching employee contributions to the savings plan from cash to the BAC shares that were purchased by the ESOP's for this purpose. The ESOP's paid interest on the debt they incurred to buy those shares with funds from BAC's contributions to the ESOP trusts.Id at 48-9. As required by ESOP accounting rules, these contributions were classified as "Interest". Id [*56] . at 35. As a result employee expense figures decreased. "Employee Expense" is a category of "Operating Expense" and "Interest Expense" is not. Operating Income is the difference between "Operating Revenues" and "Operating Expenses". Plaintiffs complain that this change led the market to believe that BAC's "Operating Income" was growing faster than it actually was.

Plaintiffs also claim that, until BAC issued the 1990 Annual Report 10-K, the changed treatment of BAC's matching contributions and the substantial increase to operating income and interest expense remained undisclosed. n51 BAC's Form 10-Q for the second quarter of 1989 described the establishment of the ESOP's "for two BAC savings plans" in Note 6 to the Consolidated Financial Statements. The footnote explains the purchase of the stock with debt and states that "the shares of common stock acquired by the ESOP trusts will be used over a ten year period, beginning January 1, 1990, to provide the company's matching contributions to such employee savings plans and concluded that because the notes evidencing the debt are guaranteed by the company, they would be included in the financial statements as long term debt". (TAB 4 at p.8); and the first quarter 1990 Form 10Q, noted that interest expense grew by 10.5% over the first quarter of 1989 because "interest recognized on debt associated with the leveraged employee stock ownership plans established by the company in 1989". (TAB 4 at p.8); See also ((2Q10Q), TAB 8 at p.9)(3Q10Q TAB 8 at p.10); TAB 161 (Crawford speech 9/19-9/21 1990, "interest expense is higher due to our leveraged ESOP"). The expense continued to be fully accounted for, albeit in a different account, and the ultimate earnings per share was not affected.

n51 That report states, "employee costs decreased approximately $ 41. million during 1990 as a net result of the effects of accounting for the Company's leveraged employee stock ownership plans (ESOP's) which became effective January 1, 1990, and an increase in the Companys' matching contributions percentages to the savings plans in 1990. Under ESOP accounting rules, the por-

tion of the Company's contributions representing accrued interest on the ESOP debt, which totaled $ 64 million in 1990, is classified as interest expense. This decrease in employee costs was partially offset by a $ 23 million increase in the company's' contributions to the savings plan." (TAB 2 p. 35, and Note 8). C&L determined that this disclosure fully complied with the recommendations for ESOP accounting made by FASB's Emerging Issues Task Force, in Issue 89-8. (DX TAB 162).

[*58]

3.) PREDICTED GOODWILL n52 WRITEDOWN (BASLI)

n52 Goodwill is the excess of cost of an acquired enterprise over the sum of identifiable net assets. Accounting for an intangible asset involves determining an initial carrying amount, accounting for that amount after acquisition under normal business conditions, and accounting for that amount if the value declines substantially and permanently. FASB Accounting Standards Current Text § 160.401, 1991).

At an New York Society of Secutities Analysts meeting on October 25, 1990; in a press release issued that day; and in BAC's third quarter Form 10Q, issued on November 9, 1990, n53 the defendants announced their intention to take an "approximately $ .10 cents" charge against fourth quarter earnings...and that they expected "no additional writedowns". Also, the 10Q for the third quarter stated, "In the fourth quarter, the company announced that it would revalue the amount of goodwill in its Financial Services Group. This reevaluation is expected to reduce 1990 [*59] net income by approximately $ 40 million ($ .10 EPS)." The charge ultimately taken in the fourth quarter 1990 was $ .15 cents ($ 60 million).

n53 MD&A at p.11.

This charge was related to the valuation of one of BAC's financial services businesses, Bell Atlantic Systems Leasing ("BASLI"). By October of 1990, BAC was engaged in non-public negotiations with General Electric Capital Corporation to sell BASLI. These negotiations were still ongoing in January 1991. A sale at BASLI's book value would have produced a loss of approximately $ 40 million (.10 per share). (Bardeen dep. 83-84). The sale of BASLI was not consummated during 1990 and

was not sold until several years later because the company could not obtain an acceptable price. (TAB 110); (Albertini dep. 39-41); (Von Stetina dep. 169)("We turned them [GE] down because we didn't feel like their offering price was fair");(Bulliner dep 59-60);(Campbell dep. 155-56). The record reveals that, by late October, it appeared that a sale was likely to be consummated [*60] but an agreement as to price had not been reached. Despite this fact, Campbell decided to make an announcement so that analysts would be aware that the asset was likely to be revalued. (Campbell dep. 156); (Crawford dep. 118) ("description of charge intended to convey financial information without going into actual negotiations"). In January 1991, the company determined that it would accept less than book price. Some of that loss would be due to uncollectible loans to BAC officers. The charge ultimately taken to earnings in connection with the revaluation of BASLI was $ .15 per share, a five cent difference between the projected and actual writedown (1.5% of 1990 earnings).

During an October 23, 1990 presentation to the Finance Committee of the Board, Bardeen discussed a "negative impact on earnings in the $ 40 million dollar range" arising out of the sale of BASLI. He also recommended $ .10 to Campbell as the best estimate for the announcement,(Campbell dep. 156), an estimate based on the company's "best assessment of the market value of this entity and any related tax settlements." (TAB 114).

That day, November 2, 1990, Bardeen wrote to William Walsh, the Coopers & Lybrand partner [*61] in charge of auditing BAC. That letter confirms that the decision to disclose the "probable fourth quarter 1990 charge related to Financial Services" was triggered by continuing discussions for the sale of BASLI and stated that "we are beginning to recognize that disposition at or near current book value ($ 105 million) would still produce a tax charge of $ 40 million ($ .10 EPS)...even if negotiations breakdown, we will want to consider a valuation adjustment prior to year end" (Nov. 2, 1990, DX TAB 108).

Plaintiffs submit that the Defendants knew that the charge would be an additional five cents by November 14, 1990. A document dated that day, lists the BASLI writedown as $ .10 and the current best view of earnings per share at $ 3.42. It states, "we will work to bring results in at the market expectation of $ 3.43"..."Please remember, if we decide to consummate the sale of BASLI at the current proposed purchase price, earnings per share would be reduced by an additional $ .05". n54 (DX-TAB 115). Deposition testimony reveals that the company did not consider public disclosure of a figure higher than $ .10 in November because a decision as to sale price had not yet been made." (Campbell [*62] dep.

152-53); (Crawford dep. 112)(company had expectations of bettering price).

n54 Plaintiffs claim that this document allows a reasonable inference that the Company's estimates of the expected loss were $ 60 million, equal to 15 cents per share.

On November 27, 1990, Campbell informed the Board that discussions as of that date had yielded a proposed price below the expectations held at the time the $ .10 charge had been announced n55 but also confirmed that management was working to bring the price back up toward the initial target. (BA1000334-41, TAB 117). A November 30, 1990 internal document revealed that the charge was estimated as a range running between $ 40 million ($ .10) and $ 60 million ($ .15). (TAB 118). The record reveals that uncertainty continued into January 1990, when Ciango was directed to prepare two drafts of the fourth quarter release, one announcing the $ .10 charge, and one announcing the .15 charge. (TAB 119, 120). The final decision was made "shortly" before the earnings announcement [*63] on January 21, 1990 when management determined that the Company could no longer expect to get its originally anticipated price for BASLI. (Crawford dep. 108).

n55 GE quotes this price in a letter dated December 19, 1990, summarizing its understanding of the status of the discussions for the sale of BASLI. (TAB 121).

Coopers & Lybrand audited the treatment of the charge and "concurred with Management's disclosure of this matter in the financial statements and the MD&A. (TAB 111).

On January 22, 1991, the Finance Committee of the Board recommended a sale at a maximum loss of $ 60 million. (TAB 116). The sale did not take place until several years later.

4.) THIRD QUARTER 1989 STRIKE

In the third quarter of 1989, BAC experienced a strike/work stoppage by its unionized employees. Plaintiffs claim that reporting growth for third quarter 1990 as compared to third quarter 1989 was misleading because defendant's failed to disclose the quantifiable adverse impact of the 1989 strike on 1990 net income. Regarding [*64] the overall increase in employee costs as compared to the third quarter 1988, the Form 10Q for the third quarter 1989 reported that, "these increases were partially offset by a net reduction in employee costs re-

sulting from a month-long strike by nonmanagment employees of the Network Services companies. However, strike-related increases in other operating expenses offset this reduction in employee costs." (TAB 146 at 8). n56 In addition, newspapers reported the strike. (DX TAB 203)(New York Times, August 7, 1989).

n56 The NSG, also disclosed the fact of a strike in their own forms. For example, Bell of Pennsylvania's Form 10Q states, "A reduction in non-management wage expense as a result of the August 1989 work stoppage was more than offset by additional overtime pay to management employees during the work stoppage and an increase in post-strike non management overtime to relieve the backlog of work orders."

Although plaintiffs claim that the strike reduced 3Q89 reported income by $ 20.6 million (14 million [*65] lost revenues and $ 6.6 million increased expenses)(TAB 1), n57 an internal document, (DX-TAB 204, Exhibit 112, PX-91), reveals that BAC estimated lost revenues at $ 14 million, and a net expense impact, after offsetting management overtime and wage savings, of only $ 1.3 million.

n57 If accepted as accurate estimates, $ 14 million in revenues is 1.2% of BAC's local service operating revenues for the quarter and $ 6.6 million represents .03% of operating expenses for that period. (Def.'s Mot.Sum.Judgement. at 115).

BAC considered the calculation of the effect of the strike extremely speculative due to numerous offsetting factors. (Smith dep. 143)(final impact "impossible" to determine "with all the gives and takes that go on in our business"); (Smith dep. 144,146)(The revenues lost during the strike as a result of "pent-up" demand would be quickly replaced after the strike's end and thus the strike will have little overall impact). BAC determined that the impact was immaterial so that further discussion of the [*66] strike in 1990 was unnecessary. (Lynch dep. at 57),(DX-TAB 205). In evaluating the 1989 disclosure documents, Coopers & Lybrand also found the effect to be immaterial. (TAB 206, CL4001123)("and the immaterial impact of the work stoppage on the financial statements"); See also, (Smith dep. 143)("strike impact minimal"); (Campanella dep. 25, 56)(did not effect net income or revenue "very much"..."did not have any significant impact").

5.) CELLULAR

The average cellular minutes of use per customer declined over the course of 1990. n58 The fact that average cellular minutes of use declines as the customer base grows is a well known phenomena in the cellular telephone industry in every region and in all cellular businesses. n59 (Smith dep. at 135). BAC disclosed the decrease in monthly minutes of use per customer. At the October 25, 1990 NYSSA conference, in response to question about the decline in cellular growth in the third quarter, Smith stated,

When you compare year over year were about the same that we've been in the past and we don't see any substantial turndown. We see some weakening in the minutes of use, but that is very predictable according to the charts we've [*67] been looking at all along, in terms of the maturation of the customer base. We expect that if we do get into a more significant recession than we've seen, then we'll see things slow down a bit further...basically it has been statistical at this point... "We're looking at this time to see whether we'll be disclosing more information, we haven't made that decision yet")(DX-TAB 36).

n58 Average usage minutes per customer during 1990 were: January-166; February-150; March-162; April-151; May-157; June-148; July-134; August-136; September-128; October-140; November-124; December-116.

n59 The first customers to sign on are those with the greatest need. As the price of the service and equipment goes down, additional customers subscribe but use the service less. (Burger dep. at 25; Campbell dep. at 269; VonStetina dep. at 155-56).

Market analyst reports acknowledged awareness of declining cellular minutes of use. For example, John Baur, an analyst for Kidder Peabody, released a report on August 3, 1990, noting [*68] "a marked deterioration in the average monthly bill paid by the industries' customers." n60 The fourth quarter decline was more pronounced than that of the first three quarters. n61

n60 (KP 000005-06, TAB 190); (DX-TAB 9)(October 30, 1990 report-"Revenue per subscriber continues to fall"); (TAB 192)(November

13, 1990 Report noting "This drop is probably due to the continuing evolution in customer mix-as cellular penetration increases, more lower revenue users are added which tends to bring the average revenue per subscriber down").

n61 The January 22 release noted "a fourth quarter economy driven downturn in demand". (TAB 9)

At no time did BAC disclose profit margins, expense, or net income figures for BAMS alone. n62 BAC reported its revenues each quarter from "Other Communications and Related Services" and "Other Operating Expenses" which included certain BAMS revenues and costs and explained any significant components of those results.

n62 Smith, Barney 1/4/91, p.6 TAB 72 ("BEL does not release financial results for its cellular operation; however, the company does disclose operating statistics.")

[*69]

6.) REVENUE DECLINE, EXPENSE INCREASE

Throughout the year, while not explicitly stating that revenues were continuing to increase but increasing at a decreasing rate and that expenses were rising at an increasing rate, BAC disclosed the historical figures. For example, BAC disclosed revenues for the first quarter of $ 3.02 billion a 9% growth, (TAB 3), for the second quarter, $ 3.08 billion, a 6.7% growth, (TAB 5), and for the third quarter, a growth of 6.5%. In addition, BAC disclosed figures showing that expenses were rising at an increasing rate. In 1990, BAC reported that, first quarter expenses were $ 2.36 billion, an 8.2% growth; second quarter expenses were 2.39 billion, a 5.6% growth; and third quarter expenses were 2.42 billion.(Tab 7).

7.) ACCESS LINES

BAC never forecasted or predicted future access line growth. While access line growth was slowing, there was a significantly sharper downturn in access line growth and other demand indicators in the fourth quarter. n63 In the 10-Q for each quarter, BAC accurately reported actual access line growth, both in percentage rates and raw operating statistics, throughout 1990. (TAB 4, TAB 5, TAB 7, TAB 8). This data shows [*70] that for the first three quarters that the rate of growth was slowing slightly. The net overall growth was 3% and a 5-6% growth in business lines.

n63 A fourth quarter, economy driven downturn in demand was evidence by lower growth in access lines and toll volumes and lower cellular usage per customer. (TAB 123).

8.) NONRECURRING EVENTS:

FIRST QUARTER: REVENUE DECREASE $ 11 MILLION SETTLEMENT

SECOND QUARTER:REVENUE INCREASE $ 24 MILLION EMPLOYEE BENEFITS

In the first quarter of 1990, revenues were decreased by $ 11 million and in the second quarter, revenues were increased by $ 24 million as a result of certain one-time events. Plaintiffs claim that failing to disclose these one-time events was misleading. However, first quarter 1990 press release disclosed that,

"the first quarter results include accounting for a proposed settlement with the Pennsylvania Office of consumer advocate and Attorney Generals Office relating to an inquiry into Bell of Pennsylvania's past sales [*71] and marketing activity." (TAB 3).

Form 10-Q for that quarter further stated that,

"these increases [in revenues] were partially offset by an additional accrual of $ 11.4 million recorded for a tentative settlement reached between Bell of Pennsylvania, the Pennsylvania Attorney General's Office, and the Office of Consumer Advocate related to past sales and marketing activities."(TAB 4).

In addition, the possibility of a recoupment of $ 24 million in the first quarter was disclosed in Form 10Q for that quarter:

"On April 2, 1990 the company filed an employee discount revenue recovery plan with the PUC. The plan requests a one time recoupment of $ 24 million representing past due revenues retroactive to the date of the rate case order. The company expects the PUC to rule on this plan by June 1990." (TAB 148)

Furthermore, the second quarter Form 10-Q provides that,

"The quarterly and year to date increases were enhanced by the recognition in May 1990 of $ 24 million in revenue by Bell of Pennsylvania in connection with the retroactive recoupment of costs incurred to provide discounted employee telephone service" (TAB 6 at MD&A p.7)

On November 9, [*72] 1990, third quarter Form 10Q was filed with SEC. That document stated,

"The year to date increases were also enhanced by the recognition in May 1990 of $ 24.1 million in revenue by Bell of Pennsylvania in connection with the retroactive recoupment of costs incurred to provide discounted employee telephone service. This increase was partially offset by decrease in revenue of $ 11.4 million related to settlements reached between Bell of Pennsylvania, the Pennsylvania Attorney General and the Office of Consumer Advocate related to past sales and marketing activity". n64

n64 (DX-TAB 8, BA1000573 at 8)

## 9.) NONRECURRING EVENTS:REVERSALS OF ACCRUALS & RETROACTIVE CREDITS

Plaintiffs contend that, in 1989 and 1990, the timing of certain accounting adjustments was intentionally manipulated by BAC in order to create the appearance of growth. In sum, the accounting treatment applied to each of these events complied with GAAP, was accepted by Coopers & Lybrand, and was disclosed to the [*73] market. These types of adjustments were a regular part of BAC's accounting processes, as they were for all other RBOCs. n65

n65 For example, the 1989 annual report stated that "revenue adjustments recorded to reflect estimated rates of return on certain interstate services also contributed to the increase in access revenues in 1989." (TAB 146).

a.) Liability for Access Revenue:"84-800 liability"

In 1990, the FCC regulated the rates local telephone companies could charge long distance carriers for access to the local network. (Beville dep. 12-13). During the 1980's, the FCC regulated these rates by setting the amount of return a telephone company could earn on its capital investment costs. (Beville dep. 11)(the "authorized rate of return"). Regulated companies used the FCC rates to set their rates so that projected revenues were limited to the authorized rate of return on capital costs. (Oliver dep. 10). In practice, actual revenues and expenses were not identical to the projected revenues and expenses that [*74] were used to calculate rates and telephone companies would earn more than was allowed under governing regulations. The 84-800 docket dictated how the regulated companies were required to treat revenues earned over and above the FCC's prescribed rates of return. (McGarvey dep. 28; Hanley dep. 177).

b. First Quarter: 84-800

During 1989, BAC and AT&T, BAC's largest long-distance carrier, entered into negotiations to settle BAC's liability to refund access charges to AT&T. On October 31, 1989, BAC and AT&T entered into an agreement whereby BAC would pay AT&T approximately $ 9.9 million on or before January 31, 1990 in settlement of its liability so long as the FCC did not issue new rules which changed the calculation of the refund liability. n66 (TAB 140). The rules did not change and BAC made the required payment in the first quarter of 1990. Id. BAC reversed any remaining accruals for liability to AT&T.

n66 That agreement provided, "Pay to AT&T on or before January 31, 1990 that amount provided that the commission does not revise the automatic refund rules invalidated in AT&T v. FCC, 836 F.2d 1386 (D.C. Cir. 1988). (PX 15).

[*75]

In addition, in March 1990, BAC modified its method for estimating the refund liability based on parameters set out in an order issued by the FCC on January 9, 1990. Once refund liability was resized for any reason, GAAP (APB 20 (changes in estimates), and FAS statement NO. 5 (accounting for contingent liabilities)), required the reversal of any accrual in excess of the newly calculated liability. BAC reversed a total of approximately $ 37.5 million of accruals in the first quarter of 1990. n67 Upon reviewing the financial statements for that quarter, Coopers & Lybrand expressly concurred that the accounting treatment was in accordance with APB # 20 and with the decision by BAC not to disclose the adjustments in the financial statements based on immateriality. n68 (TAB 147)("The accruals made were reasonable and disclosures made were adequate"). The

first quarter 10-Q, MD&A, disclosed the adjustments and the 1990 impact. That report states, "Adjustments recorded to reflect revised estimates of access revenue liabilities increased revenues approximately $ 62 million during the quarter." (TAB 4). This figure represents the sum of reversals relating to net 84-800 adjustments and [*76] NECA liability, described below.

n67 (TAB 142, 143)

n68 (TAB 146, 2)("An audit included assessing the accounting principles used and significant estimates made by management").

c. First Quarter accrual reversal: NECA

($ 20 million Mathematical Error)

As part of the 1989 year-end audit process conducted in the beginning of 1990, C&L performed a "detailed review of documentation supporting a $ 20.8 million NECA contingency accrual." n69 (TAB 155). This review revealed that Bell of Pennsylvania had made a mathematical error. Id.; (Horn dep. 13). The error occurred when "someone picked up a number when adding the schedule across incorrectly." (Horn dep at 41.) To correct the error, Coopers and Lybrand concluded that the $ 20.8 million should be reversed.Id. n70 However, at the time the error was detected, BAC's financial books were closed for 1989, and adjustments could no longer be made to the financial statements within the computer system. (Horn dep. at 35)("We would have had to try to reopen [*77] the systems, which would have been–which was physically impossible at the time...once we cleared or closed the books and generated the financial results, the system closes down and starts counting for transactions in the following month.") C&L determined that the error was too immaterial to require the extraordinary and costly step of reopening the financial statements, or even "separate disclosure". (Horn dep. at 32; CL2001506, TAB 156). Therefore, the error was corrected by reversing the accrual during the first quarter of 1990 with C&L's concurrence. As noted above, the first quarter 10Q for 1990 stated, "Adjustments recorded to reflect revised estimates of access revenue liabilities increased revenues approximately $ 62 million during the quarter."

n69 During the first quarter of 1989 Bell of Pennsylvania concluded it owed $ 9.4 million contingent liability to NECA. TAB 155. In

December 1989, Bell of Pennsylvania reviewed the existing accruals and "as a result, increased contingent liability to $ 20.8 million." Id. Von Stetina dep at 233.

n70 In correcting the error, C&L determined that Bell of Pennsylvania actually should have no NECA contingent liability.

[*78]

d. Third Quarter reversals

Plaintiffs allege that "approximately $ 13.5 million of BAC's reported operating revenues for the third quarter of 1990 resulted from the reversal of accruals for 84-800 liabilities." (No 19, TAB 1) The actual amount of access revenue liability reversed in the third quarter was $ 12.1 million. The impact was disclosed in the MD&A for the third quarter. That document states, "adjustments recorded to reflect revised estimates of access revenue liabilities in both 1989 and 1990 decreased access revenues approximately $ 13 million during the quarter." n71

n71 This disclosure compared the effect of such adjustments for the third quarter of 1989 with that of 1990. In 1989, BAC reversed $ 25.1 million. The difference in the impact on revenues in 3Q89 (increase of 25.1M) and in 3Q90(increase of 12.1m) is approximately 13 million. (TAB 8 at p 8).

BAC's Third quarter report stated, "Adjustments recorded to reflect revised estimates of access revenue liabilities in both 1989 and 1990 decreased [*79] access revenues approximately $ 13 million during the quarter but increased year to date revenues approximately $ 32 million". (DX TAB 8, BA1000573)

e. Fourth Quarter [1989]:

Medical Benefits Trust and Pension Benefits

$ 320 million in previously announced special charges against earnings were recorded in 1989. A press release issued on January 23, 1990 (TAB 207) described those charges as follows. "1989 earnings 5.43 per share compared with 6.65 per share in 1988 an 18% decrease..."our performance would have compared favorably with 1988 except for the approximately $ 320 in special charges against earnings we recorded at the end of 1989. These charges, which were of a one time nature were associated with the revaluation of assets at some of the company's un-

regulated subsidiaries, the cost of an organizational realignment that included incentives for managers to retire early or voluntarily leave, and debt refinancing at several of the companies telephone subsidiaries"..."In addition the company began to accrue for and fund a trust to help cover the future cost of medical and dental benefits for nonmanagement retirees. Only a portion of the expense in setting [*80] up the retirees trust in 1989, referred to in the second sentence, would be nonrecurring. (Campbell dep. 118-120). The funding of the trust, for the most part, was the first installment of a recurring expense. An internal document dated January 24, 1990, from Gary Delson, Director of Financial Reports to his supervisor, Mr.Tomlinson, (B20232242, TAB 207), explains that this press release was "unclear" as to whether the funding of the trust was a recurring or nonrecurring charge to earnings and that the final draft omitted the word "primarily" from the sentence "these charges which were (primarily) of one-time nature despite notations on drafts that the trust was a recurring charge. The document acknowledged that the adverse consequences of the error is that financial community could anticipate 1990 EPS to be $ 7.50. n72 The report noted that "in fact, we expect to achieve 7.09 next year 6% growth over "true" normalized 1989 EPS of $ 6.67". One newspaper article reported the entire $ 320 million as a non-recurring charges. (TAB 207).

> n72 This incorrect figure would be derived by analysts calculating "normalized" 1989 EPS in the following way: $ 320 million is 1.62 EPS. (5.43 + 1.62 = $ 7.05) $ 7.50 is 6% growth over $ 7.05.

[*81]

Further, on January 26, 1990, Campbell, addressing a group of New York analysts, stated that the purpose of the meeting is "to walk you through the specifics for each of the nonrecurring initiatives and how each affected our results. He identified each of the charges BAC had included in its "normalized" 1989 results, concluding that "normalized results for the year, adjusting reported EPS for these charges, were $ 6.67 per share, and that number would be the "benchmark level" for BAC business planning process and from which it would measure its 6% earnings growth.(TAB 209). Campbell also stated that he "deliberately avoided including any mention of the charges we incurred for funding the Post Employment Benefits Trust because I wanted to focus only on non-recurring events which effected 1989 results". Id. (emphasis in original). He described that the funding

of the trust with an annual amount of $ 137 million, which accounted for and impact of $ .38 cents on 1989 EPS. "Since this item represents an annual expense, the quarterly results were retroactively restated to recognize the charge. Id. On January 25, 1990, an analyst, Mr. Toole issued a report for Merryl Lynch [*82] comparing BA reported earnings to the Merryl Lynch estimate and noted, "Exclusive of charges of a nonrecurring variety, EPS would have been $ 6.67 per share, and exclusive of the recurring trust expenses earnings would have been $ 7.05. (Toole dep. 66-67). (TAB 71).

f. Third Quarter 1990 Adjustment to Accruals

Medical and Pension Benefits

In May 1990, BAC became aware of higher than expected accruals resulting from its funding of medical benefits trust. In September 1990, BAC became aware of overfunding of pension benefits trusts. A task force was formed to determine the reason for this and in August 1990, the task force completed its report documenting the cause of the problem, and prepared instructions for journalizing entries to correct the overfunding of the trusts. The adjustments were booked in the third quarter of 1990. C&L concurred. Third quarter Form 10Q disclosed the adjustments. These adjustments reduced expenses and thereby increased income by 42.1 million. Earnings per share for the third quarter also increased by $ .10 (EPS would have been .81 compared to .86 in third quarter of 1989. Reported EPS for the third quarter was $ .91. n73

> n73 As noted previously, an internal document analyzing the company's 1990 earnings "the company's revenues and income as reported in 1990 were "misleading".

[*83]

Plaintiffs note that a Brown Brother's Harriman & Company report dated Oct 26, 1990 remarked that third quarter operating expenses rose only 5.2%, and viewed this as a positive element of the company's financial results. Bear Stearns, commenting on the company's third quarter performance, noted in a report dated Oct 26, 1990, "In terms of operating expenses, we were impressed with the 1% decline in employee costs and other benefits."

Medical Trusts

BAC created VEBA n74 trusts for company expenditures for medical, dental, and vision benefits for active management, active nonmanagement, and re-

tired management employees. (B2006882, B2006852, TAB 163,164). Through the close of 1989, the trusts were funded in an amount equal to the bills for medical claims that BAC received from its carriers. The only exception was December when the company would fund the trust for estimated claims incurred but not yet processed for the balance of the calendar year ("the pipeline accrual" or "PA"). The company received a tax deduction in the year of funding the PA. The PA recorded on the company's books was "trued-up" twice a year based on actual claims paid. n75 (TAB 166,167,168,169)(Bardeen dep. at [*84] 98)

n74 VEBA stands for "voluntary employee beneficiary association" a type of trust provided for in section 501(c)(9) of the Internal Revenue Code.

n75 While adjustments to true-up accruals for medical and pension trusts were routine practice at BAC, they were not previously reported because they were determined to be immaterial. However, adjustments made in 1990 were considered to be more significant because of the overfunding the company experienced in the period January through July 1990 as a result of the implementation of "ghost premiums.'

In addition, BAC established the Retiree Health Care Trust in November 1989 to provide benefits to nonmanagment retirees. (TAB 165). In January 1990, BAC changed the method used to fund the VEBA trusts and began to accrue for trust liabilities based on a "ghost premium" developed by BA's insurance carrier Blue Cross/Blue Shield, Aetna, Prudential, and Vision Services.(TAB 167, 172). n76 In early 1990, BAC Human Resources Group began to review the claims data and [*85] the most recent estimates of the PA to determine whether the "ghost premium" rates were correct. (TAB 174). It became apparent in May 30, 1990, that the company was overfunding for medical and pension benefits relative to actual expenditures. As a result of this finding, Corporate Accounting initiated a study of the accounting for 1990 medical benefits expenses. (B2000026-B2000031, B2006763, TAB 173, 179). Initial analysis indicated that the overfunding was the result of the premium rates being set too high by the insurance carriers. (B200029, TAB 173). By late June 1990, Aetna provided revised ghost premiums but they were determined, upon review, to be improperly calculated. Id.

Benefits accounting experts analyzed the problem to determine whether an adjustment was necessary and the study was completed in August of 1990. (Von Stetina dep at 137-38). Results were reported in a comprehensive memorandum prepared by Jane Ludlow describing the problems and the impact on expenses. (B2007132, TAB 182). The review of liability revealed other errors that would further reduce expenses. The one-time adjustment necessary to true-up the medical benefits trust would decrease previously booked [*86] expenses by approximately $ 10.7 million. (B2007132-B2007137, DX-TAB 182). The adjustments were booked during the third quarter. (B2007022, TAB 183).

n76 Until January 1990, BAC funded the trust based on an interim accrual rate developed by outside actuaries. The accrual rate would be trued-up later in the year based on the claims-paid experience with the trust. (B2006842, B2000015, TAB 167, 170). The new premium was based on prior years claims experience and health care trends.

Pension

Until September 1990, pension expenses continued accruing at the 1989 annual rates, until September 1990, when BAC received adjusted 1990 pension expense data from Bell Atlantic Trust Administration. (DX TAB 184). Once the new rates were received, a retroactive adjustment was necessary in order to true-up the year-to-date expense amounts as of September 1990. Accordingly, the estimates were booked in the third quarter. n77 True-ups are characteristic of the nature of pensions and benefits. (Von Stetina dep. at 220). C & L concurred. [*87] (see, CL2010541-42, TAB 186)(The third quarter audit papers state, "C&L has reviewed the company's calculations and allocations among their subsidiaries and agrees that they are reasonable and consistent with prior years. The amounts listed below represent the adjustments which should be recorded in September of 1990."). C&L also concurred with an adjustment of $ 9.4 million in the third quarter to reverse overaccruals for medical dental and vision benefits. (CL2010456, TAB 187). Furthermore, Form 10Q for the third quarter disclosed that, "Pension and benefit expenses decreased 20.0% and 8.8% in the third quarter and year-to-date, respectively, as the impact of a September 1990 adjustment to pension accrual rates and the above mentioned early retirement plan at Network Services more than offset business growth-related increases at the subsidiar-

Case 1:05-cv-00548-JJF    Document 24-2    Filed 02/16/2007    Page 29 of 43

1997 U.S. Dist. LEXIS 4938, *; Fed. Sec. L. Rep. (CCH) P99,467

ies." Analysts were aware of the adjustment. (Toole dep. 76-77.)

n77 For Bell Atlantic Management Pension Plan, the retroactive adjustment was estimated at $ 15, 115,926 and for the non-management plan the estimate was $ 11,247,522. Notice was forwarded to the regional telephone companies on September 24, 1990. VonStetina at 220.

[*88]

## 10.) FINANCIAL SERVICES, REAL ESTATE (BAP), INTERNATIONAL

BAC never published detailed financial information about these companies. Rather, as with BAMs cellular, it published on a consolidated basis. Each 10-Q contained a section on revenues of the "Financial Services and Real Estate Services Companies". BAC never published its budgets. BAC's third quarter 10Q stated "Revenues of the Financial and Real Estate Services companies increased 11.6% and 14.1% for the three and nine month periods ended September 30, 1990, due principally to the growth of the Company's lease financing subsidiaries." (DX-TAB 8). This statement was accurate. (CL2010597, CL2010598 TAB 193) ($ 20.5M/$ 177.4M=11.5558%) ($ 71.8M/$ 510M = 14.0784%) n78

n78

BAP lost $ 13 million by the end of the third quarter. The Defendants note, however, that BAP was budgeted to lose $ 15 million so that actual loss was less than budgeted loss. (B2037373, TAB 194); (Campbell dep. 261); (TAB 195).

Arguably, these financial services businesses were [*89] "profitable". Through the third quarter of 1990, TriCon earned $ 25.3 million (B2037369 TAB 194) and BASLI showed a year to date income of $ 5.7 million. (B20337370, B2038098, TAB 194, 197). BASLI's growth trends were "softening" and experienced an "ongoing revenue decline" by October, BASLI had a stronger than anticipated fourth quarter and met its budget for the year. (B2038091, B2038098, TAB 199, 197).

An October 25, NYSSA statement described the financial services and real estate subsidiaries and the companies decision to re-value and de-emphasize.(SEE BA1004853, TAB 36).

In support of their contention that BAC withheld information about BASLI, Plaintiffs note that an internal document dated after the October 25, 1990 NYSSA meeting announcing the $ .10 writedown, states, " As a hardworking actor myself, I am heartened to know I have a good scriptwriter behind me." The author of this note is an actor.

## JANUARY 22, 1990: REPORTED FINANCIAL RESULTS

On January 22, 1991 BAC issued a press release reporting that for the year ending December 31, 1990 earnings per share were $ 3.38. This is the figure calculated after subtracting a $ .15 charge taken in the fourth quarter for the [*90] BASLI writedown. The press release stated that "earnings per share growth after eliminating nonrecurring charges in both years was 6%." Thus, factoring out the $ .15 charge and charges taken in the fourth quarter of 1989, "normalized" 1990 earning per share ($ 3.53) exceeded 1989 "normalized" earnings per share ($ 3.33) by 6%. Total net income for the year was $ 1.31 billion and operating revenues of 12.3 billion had increased 7.4% over the prior year. (BA1000194, DX-TAB 9).

For the fourth quarter, the January 22, 1991 press release reported that income had declined to $ .65 cents per share, from 91 cents in the third quarter of 1990 and an average of 91 cents per share in the preceding nine months. BAC's return on average common equity for the quarter declined to 10.5% and to 14.8% for the year, lower than the 16.4% represented at the October 25, 1990 meeting with analysts and the 16.4% average return on equity reported in the first nine months of 1990. In the following year, 1991, the companies income declined to 2.61 per share in the first nine months of the year (excluding a gain on the sale of an investment) from 2.73 per share in the same 1990 period and the market price fell [*91] further to $ 43-$ 46 per share. (Compl. at 22).

## IV. THE APPLICABLE LAW

A. Section 10(b) and Rule 10b-5

The 1934 Act was designed to ensure a fair and honest market for the trading of securities and protect investors against manipulation of stock prices. See S.Rep.O.792, 73d Cong., 2d Sess., 1-5 (1934). The Supreme Court has "repeatedly described the 'fundamental purpose' of the Act as implementing a philosophy of full disclosure". Santa Fe Industries v. Green, 430 U.S. 462, 477-78, 51 L. Ed. 2d 480, 97 S. Ct. 1292 (1977). [HN5] In order to prove a violation of Rule 10b-5 n79, promulgated by the Securities Exchange Commission under § 10b of the Securities Exchange Act of 1934, 15 U.S.C. §

78j(b), a plaintiff must establish the following by a pre-ponderance of the evidence:

n79 [HN6] Rule 10b-5 provides: It shall be unlawful for any person, directly or indirectly,...

(a)To employ any device, scheme, or artifice to defraud,

(b)To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not mis-leading, or

(c)To engage in any act, practice, or course of business which oper-ates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any se-curity.

17 CFR § 240.10b-5 (1990)

Neither § 10(b) nor Rule 10b-5 explicitly provides a private right of action, but the courts have inferred one.  Basic, 485 U.S. at 229. A plaintiff has standing by virtue of being a pur-chaser or seller of a security who has traded shares between the time the alleged misrepresen-tations were made and the time the truth was re-vealed.

[*92]

(1) that defendants, acting with scienter, an intent to de-ceive, manipulate or defraud, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194-214, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976), either

(2) employed a manipulative or deceptive device, scheme or artifice to defraud. Rule 10b-5(c) or

(3) made a misleading statement or omission, Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 476-77, 51 L. Ed.

2d 480, 97 S. Ct. 1292 (1977); Schreiber v. Burlington Northern, Inc., 472 U.S. 1, 7-8, 105 S. Ct. 2458, 86 L. Ed. 2d 1 (1985);

(3) of material fact, TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976);

(4) upon which plaintiff, a purchaser or seller of the se-curity, Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731-55, 44 L. Ed. 2d 539, 95 S. Ct. 1917 (1975),

(5) relied upon in completing a transaction, Basic v. Lev-inson,485 U.S. 224, 243, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1975);

(6) which caused economic loss to the plaintiff.  In re Phillips Petroleum Sec. Lit., 881 F.2d 1236, 1244 (3d Cir. 1989); Bastian v. Petren Resources Corp., 892 F.2d 680, 683-86 (7th Cir. 1990).

The absence of either the scienter or the materiality elements is sufficient to support a motion for summary judgment. Bryson v. Royal Business Group, 763 F.2d 491, 493 & n.3 (1st Cir. 1985). The defendants [*93] seek summary judgment on the basis of the absence of an actionable misleading statement or omission and/or the absence of scienter, materiality, and loss causation.

## DUTY TO DISCLOSE

It is well established that [HN7] in the absence of a duty to disclose, there is no liability under these provi-sions for failing to disclose material information. Chiarella v. United States, 445 U.S. 222, 63 L. Ed. 2d 348, 100 S. Ct. 1108 (1980). Thus, the mere possession and nondisclosure of material facts does not impose li-ability. However, Rule 10b-5 creates a statutory duty to speak the full truth when defendant undertakes to say anything". n80 First Virginia Bankshares v. Benson, 559 F.2d 1307, 1317 (5th Cir. 1977), cert. denied, 435 U.S. 952, 55 L. Ed. 2d 802, 98 S. Ct. 1580 (1978); Huddleston, 640 F.2d 534, 543-44. In addition, there is a duty to correct prior statements, if the prior statements were true when made, but will mislead if left unrevised in light of subsequent events. n81 In Re Phillips Petro-leum, 881 F.2d 1236, 1245 (3d Cir. 1989); Time Warner Inc. Sec. Lit., 9 F.3d 259, 267-68 (2d Cir. 1993), cert. denied, 114 S. Ct. 1397 (1994). A duty to disclose arises whenever secret information renders prior public state-ments materially [*94] misleading. Id. The timing of a correction to an earnings prediction or similar statement involves some discretion. The question of whether a cor-rection is sufficiently prompt must be determined in each case based upon the particular facts and circumstances surrounding the prior disclosure and the material changes

Case 1:05-cv-00548-JJF    Document 24-2    Filed 02/16/2007    Page 31 of 43

1997 U.S. Dist. LEXIS 4938, *; Fed. Sec. L. Rep. (CCH) P99,467

which trigger the duty to correct. n82 In re Phillips Petroleum, 881 F.2d 1236, 1246 (3d Cir. 1989). The correction may have to be made when it can be calculated "with substantial certainty". Good v. Zenith Electronics Corp., 751 F. Supp. 1320, 1322 (N.D.Ill. 1990). A fact question as to when information "solidified" bars summary judgment for defendants.Id. n83 Generally, there is no duty to make predictions or economic prognostications. While the SEC encourages such disclosures n84, it does not mandate management projections or other forward-looking statements either in its filings or in general. n85 Krim v. Banctexas Group, Inc., 989 F.2d 1435, 1446 (5th Cir. 1993)(no general duty to volunteer an economic forecast and affirming summary judgment for defendant); Arber v. Essex Wire Corp., 490 F.2d 414, 421 (6th Cir.), cert. denied, 419 U.S. 830, 42 L. Ed. 2d 56, 95 S. Ct. 53 (1974)(same). [*95] There is no duty to disclose general economic conditions because federal securities laws do not compel disclosure of the obvious." In re Trump Casino, 7 F.3d 377, 377; Krim, 989 F.2d at 1446 (compliance with securities laws requires issuers to disclose material firm-specific information regarding predictions but information concerning general economic facts and conditions is presumed to be known to investors and analysts). There is also no duty to disclose internal forecasts to the public. As the Ninth circuit has explained, "it is just good business practice...to generate projections for internal corporate use." In Re Convergent Technologies Securities Lit.,948 F.2d 507, 516 (9th Cir 1991). Thus, issuers need not reveal all projections. Any firm generates a range of estimates internally or through consultants. It may reveal the projection it thinks best while withholding others, so long as the one revealed rests upon a reasonable basis-a question on which other estimates may reflect without automatically depriving the published one of foundation. In Re Stac Electronics, 89 F.3d 1399, 1411 (9th Cir. 1996). Weiglos v. Commonwealth Edison, 892 F.2d 509, 516 (7th Cir. [*96] 1989)(Corporations need not disclose tentative internal estimates, even though they conflict with published estimates, unless the internal estimates are so certain that they reveal the published figures as materially misleading.) Further, it is well established that mere inquiries, preliminary discussions or communications preparatory to a possible acquisition of one company by another do not require disclosure under § 10b. Disclosure is required only where there are firm offers for acquisition or an acquisition seems reasonably assured at the time. As noted in Staffin v. Greenburg,1980 WL 1404 (D.C.Pa.), such matters are not material and need not be disclosed because public disclosure of tentative, indefinite, and contingent facts, would itself be misleading. In the corporate world, as elsewhere, the initial ruminations of executives must complete a circuitous course before becoming if ever, actuality.

n80 See also Rand v. M/A-Com, Inc., 824 F. Supp. 242 (D.Mass. 1992)(A duty to disclose arises (1) when a corporate insider trades on confidential information; (2) when a corporation has made inaccurate, incomplete or misleading prior disclosures, whether voluntary or required; and (3) when a statute or regulation requires disclosure).

[*97]

n81 See also, Backman v. Polaroid, 910 F.2d 10, 17 (1st Cir. 1990)"); Rudolph v Arthur Andersen & Co., 800 F.2d 1040, 1043 (11th Cir. 1986), cert. denied, 480 U.S. 946, 94 L. Ed. 2d 790, 107 S. Ct. 1604 (1987); Isquith v Middle South Utilities, 847 F.2d 186, 205 n.13 (discussing SEC position that issuers must correct predictive statements that no longer have a reasonable basis and the complex inquiry necessary to remove adequacy of disclosure issue from the jury); First Virginia Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir. 1977) cert. denied, 435 U.S. 952, 55 L. Ed. 2d 802, 98 S. Ct. 1580 (1978)(holding that duty to disclose the whole truth arises when a defendant undertakes to disclose material information).

n82 In Flynn v. Bass Bros. Enterprises, Inc., 744 F.2d 978 (3d Cir. 1984), the Third Circuit held that ascertaining a duty to disclose soft information should be made by the courts on a case by case basis. The factors to be considered are: 1.) the facts upon which the information is based; 2.) the qualifications of the fact compilers; 3.) the original intended purpose of the information; 4.) relevance to the stockholders and their decisions; 5.) degree of possible subjectivity in the information preparation; 6.) uniqueness of the information; 7.) other, perhaps more reliable, sources of information. Id. at 988.

[*98]

n83 See also, Kulicke & Soffa Indus. Inc Sec. Lit., 747 F. Supp. 1136, 1139-42 (E.D.Pa. 1990)(correcting an earnings forecast by making a press release 9 days after the company's CEO received data indicating the forecast could not be met was not reckless. Plaintiff's JNOV denied).

Case 1:05-cv-00548-JJF    Document 24-2    Filed 02/16/2007    Page 32 of 43

1997 U.S. Dist. LEXIS 4938, *; Fed. Sec. L. Rep. (CCH) P99,467

n84 The SEC published a statement encouraging the disclosure of management projections. See Guides for Disclosure of Projections of Future Economic Performance, Securities Act Release No. 5992, [1978 Transfer Binder] Fed. Sec. L. Rep. (CCH) P81, 756 (Nov. 7, 1978). The SEC permits certain companies to issue forward-looking statements in the documents they file with the SEC, statements made prior to filing but reaffirmed therein, without being held liable under the antifraud securities laws. See, Safe Harbor Rules for Projections, Securities Act Release No. 6084, [1979 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 82, 117 (July 5, 1979). See also 17 C.F.R. 240.3b-6 (1991).

n85 Corporations, most likely prefer disclosing only soft information of a high degree of certainty to avoid transgressing Rule 10b-5 and investors would prefer the disclosed information be reliable, since investing in securities entails risks.

[*99]

## . False or Misleading Statements

[HN8] A statement is false or misleading if it is factually inaccurate, or additional information is needed to clarify it. An omission can also satisfy this element where silence would make other statements misleading or false. n86 Misrepresentations of historical fact clearly satisfy this requirement. In addition, statements of soft information n87 (i.e., forecasts, predictions, or statements of opinion) may be actionable. Kline v. First Western Government Sec., 24 F.3d 480, 486 (3d Cir. 1994). The Third Circuit has squarely held that opinions, predictions, and other forward-looking publications of soft information may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them. n88 In re Donald Trump Casino Sec. Lit, 7 F.3d 357, 368-69 (3d Cir. 1993), cert. denied, Gollomp v. Trump, 510 U.S. 1178, 114 S. Ct. 1219, 127 L. Ed. 2d 565 (1994). n89 Thus, [HN9] in order to determine whether a forward looking statement can be deemed untrue, the court must examine whether the speaker, at the time it is made, (1) actually believed the statement to be accurate, or whether (2) there is a factual or historical basis for that belief. Kline, 24 F.3d [*100] at 486. Past results are typically the most reasonable basis for predictions. See e.g., Craftmatic Sec. Lit., 890 F.2d 628, 642 n.19 (3d Cir. 1989)(predictions of increasing revenues, earnings, and market share by telephone company were reasonably based upon MCI's long history of positive earnings including through three of the four quarters in the class period); Weiglos v. Commonwealth Edison, 892 F.2d 509, 515 (7th Cir. 1989). Small differences

between stated earnings goals and internal earnings estimates do not alone deprive statements of a reasonable basis where the company repeatedly emphasized that a certain factor could affect fiscal earnings. Roots Partnership v. Lands' End Inc, 965 F.2d 1411, 1418 (7th Cir. 1992)(plaintiffs only entitled to an inference that the defendants statements implied that its earnings goals of 10% were within the company's reach. n90 Projections of performance not worded as guarantees are generally not actionable under the securities laws. Raab v. General Physics Corp., 4 F.3d 286, 289(4th Cir.1993); Krim, 989 F.2d at 1446). Statements relating to long term prospects are not necessarily actionable because of negative short term results. [*101] Apple Computer, 886 F.2d 1109, 1113 (9th Cir.), cert. denied, 496 U.S. 943, 110 S. Ct. 3229, 110 L. Ed. 2d 676 (1990)("even if defendants were aware of facts suggesting that Caere's first quarter earnings might be depressed, they easily could have 'genuinely believed' that Caere's long term outlook was good, and there could have been a reasonable basis for that belief"). Finally, failure of the predictions to come true is not proof of fraud or lack of a reasonable basis. See Santa Fe Indus. v. Green, 430 U.S. 462, 51 L. Ed. 2d 480, 97 S. Ct. 1292 (1977)(faulty economic predictions issued in good faith or with a reasonable basis do not give rise to section 10(b) liability); Eisenberg v. Gagnon, 766 F.2d 770, 775 (3d Cir. 1985)(inaccurate predictions are not generally actionable based solely on inaccuracies contained therein).

n86 In sum, a statement is potentially actionable if, when read in light of all the information then available to the market or a failure to disclose particular information, it conveyed a false or misleading impression.

n87 Soft information is defined as "statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as earnings projections, estimates, and forecasts." Craftmatic Sec Litig. v. Kraftsow, 890 F.2d 628, 642 (3d Cir. 1989).

[*102]

n88 See also, Shapiro v. UJB Financial Corp., 964 F.2d 272, 281-83 (3d Cir.), cert. denied, ___ U.S. ___, 113 S. Ct. 365, 121 L. Ed. 2d 278 (1992); Herskowitz v. Nutri/System, 857 F.2d 179, 184 (3d Cir. 1988), cert. denied, 489 U.S. 1054, 103 L. Ed. 2d 584, 109 S. Ct. 1315 (1989); Eisenberg v. Gagnon, 766 F.2d 770, 776

(3d Cir.), cert. denied, Wasserstrom v. Eisenberg, 474 U.S. 946, 88 L. Ed. 2d 290, 106 S. Ct. 342, 106 S. Ct. 343 (1985).

Other circuits have a more fully articulated standard: [A prediction is actionable]...(3) if the speaker is aware of undisclosed facts tending to seriously undermine the statement's accuracy. However, if the speaker is aware of such seriously undermining facts, there is no reasonable basis for the belief that the prediction is true. Thus, the requirement that the statement must have a "reasonable basis" encompasses this situation. In re Apple Computors Sec. Lit., 886 F.2d 1109, 1113 (9th Cir. 1989), cert. denied, 110 S. Ct. (1990); Hanon v. Dataproducts, 976 F.2d 497, 503-04 (9th Cir. 1992).See also, Kaplan v. Rose, 49 F.3d 1363, 1375 (9th Cir 1994); Rubinstein v. Collins, 20 F.3d 160, 166 (5th Cir. 1988), U.S. (citing, Isquith v. Middle South Utilities, 847 F.2d 186, 203-4 (5th Cir.), cert. denied, 488 U.S. 926, 102 L. Ed. 2d 329, 109 S. Ct. 310 (1988)).

[*103]

n89 Plaintiffs must put forth sufficient facts to call either the reasonable basis and good faith issues into question. Roots Partnership v. Lands' End Inc, 965 F.2d 1411, 1418 (7th Cir. 1992)

n90 The Court in Roots noted that Plaintiffs had not allege that the company could not have met its earnings goals even with reasonable strong Christmas sales, a factor the company repeatedly emphasized could affect its fiscal earnings. The statements made throughout year expressed a goal to earn 10% net pre-tax profits over the next 5 years, including the current year. Some of the statements expressed uncertainty about the current year until the Christmas season results were known. When the statements were made, internal projections for the current year varied from 9.9% to 9.38%.

**Presumed Reliance**

The Supreme Court recently has endorsed the application of a presumption of reliance in Rule 10b-5 cases. Basic v. Levinson, 485 U.S. 224, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988). n91 [HN10] Upon determining that defendants have made a misstatement or omission of material fact, a Rule 10b-5 Plaintiff is entitled to a rebuttable [*104] presumption of reliance where the security involved is actively traded in an open and developed market. Basic v. Levinson, 485 U.S. at 245, 247-250, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988); Virginia Bankshares Inc v. Sandberg, 501 U.S. 1083, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991). n92 An active and open market is one in which there are a large number of traders, a high level of activity and frequency of trades which rapidly reflects new information in the price. The plaintiffs meet the burden of proof on the element of reliance if they demonstrate that the defendants made material misrepresentations or withheld material information. The court will then presume that the misrepresentation occasioned an increase in the stock value that, in turn, induced the plaintiffs to purchase the stock. Peil v. Speiser, 806 F.2d 1154, 1160 (3d Cir. 1986). n93 The presumption is based on the fraud on the market theory, which, in turn, is based on the efficient capital markets hypothesis which assumes that material information about a company is immediately reflected in the price of the stock. Purchasers or sellers rely upon the integrity of this price by assuming it is based on proper information. Peil v. Speiser, 806 F.2d 1154 (3d Cir. 1986); [*105] See also, Provenz v. Miller, 102 F.3d 1478 (9th Cir. 1996). Plaintiff need only allege only that he suffered injury in his capacity as a purchaser or seller in the security. Shapiro v. UJB Financial Corp., 964 F.2d 272, 281-83 (3d Cir.), cert. denied, U.S. , 113 S. Ct. 365, 121 L. Ed. 2d 278 (1992). Defendants do not dispute plaintiffs' allegations of reliance.

n91 The purpose of requiring a showing of reliance is to establish a connection between plaintiff's harm and defendants conduct. Rosenberg v. Digilog Inc., 648 F. Supp. 40, 43 (E.D. Pa. 1985).

n92 The presumption is supported by the fraud on the market theory. This theory recognizes that, in an efficient market for stock, the market price of the stock reflects all available, credible information concerning the company and its business. Investors are entitled to rely upon the integrity of the market price as reflecting only true information. Peil v. Speiser, 806 F.2d 1154 (3d Cir. 1986). A plaintiff's who relies on the integrity of the stock price, also relies on statements made to the market, including fraudulent statements that cause the market to misvalue (or overvalue) that stock.

The failure to disclose material negative information about a company or its subsidiaries or the making of false positive statements, will cause a company's stock to sell at a higher price than that at which it would have sold if the true

facts had been known. An investor who trades stock at the price set by the market is entitled to rely on the integrity of that price; that is, he relies on that price to reflect only true information about the stock. Because Plaintiff trades in reliance upon the integrity of the market price of the stock, if plaintiff proves that a public misrepresentation or omission is material, it is presumed that the plaintiff relied on it. Such a presumption is consistent with the Acts policy of requiring full and fair disclosure and fostering reliance on market integrity.

[*106]

n93 [HN11] The presumption can be rebutted by showing that either: 1.) the misrepresentations did not affect the market price of the stock (i.e., price was not in fact inflated by misrepresentations, complete and truthful information had credibly entered the market so that the market price of the stock was corrected and did not respond to the misrepresentation or omissions); or 2.) plaintiffs would have purchased the stock even at the price it would have been at but for the misrepresentations. Essentially, defendant must prove there is no link between any alleged misrepresentation and the price plaintiff paid for the stock or the decision to trade at a fair price. The burden of proof is probably merely just shifted to defendant to prove no reliance.

In the case at hand, Plaintiff's rely on the fraud on the market theory. It is undisputed that Plaintiffs are purchasers of a security that is traded over national securities exchanges and thus, is actively traded in an open and developed market. Thus, Plaintiffs reliance is not on defendants fraudulent actions directly, but on the marketplaces's reflection [*107] of the value of the stock.

An essential corollary to this theory, is the principle of "truth in the market". Weiglos, 892 F.2d 509 (7th Cir. 1989)("Prompt incorporation of news into stock price is the foundation for the fraud on the market doctrine and supports a truth on the market doctrine as well"). [HN12] This doctrine recognizes that, in a fraud on the market case, a defendants' misrepresentations or omission of material information is not material to the reasonable investor's decision to trade if accurate information has been made available to the market by other sources. Raab v. General Physics Corp, 4 F.3d 286, 289 (4th Cir. 1993)(citing, In re Apple Computer Sec. lit., 886 F.2d 1109, 1115 (9th Cir. 1989), cert. denied, 496 U.S. 953 (1990); Weiglos v. Commonwealth Edison Co.,

892 F.2d 509, 516 (7th Cir. 1989); In re Kulicke & Soffa Indus. Sec. Lit., 697 F. Supp. 183, 186 (E.D.Pa. 1988).

**Materiality and the "Total Mix"**

The Supreme Court defined [HN13] materiality as a substantial likelihood that, under all the circumstances, the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information [*108] made available to him." n94 TSC Industries, 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976); Basic v. Levinson, 485 U.S. 224, 231-232, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)(Information is material only if its disclosure would have "significantly altered the total mix of facts available to the investor" and if "there is a substantial likelihood that a reasonable investor would have considered the fact important to his investment decision"). That mix of information includes what is already part of the public domain. Weiglos, 892 F.2d at 516; Provenz 102 F.3d 1478)(citing, Convergent Technologies, 948 F.2d at 513 (In a "fraud on the market" case, "an omission is materially misleading only if the information has not already entered the market...If the market has become aware of the allegedly concealed information, 'the facts allegedly omitted by the defendant would already be reflected in the stock price and the market will not be misled."); Associated Randall Bank v. Griffin, Kubik, 3 F.3d 208, 213-14 (7th Cir.1993). Further, the false or omitted information does not involve a material fact because it will not "effect the total mix of information." United Paperworks Intern. v. International Paper, 985 F.2d 1190, 1199 [*109] ("widely reported in readily available media, and shareholders may be deemed to have constructive notice of the facts reported").

n94 The Court established a narrow definition of materiality because an unnecessarily low standard for materiality would subject the corporation and its management to liability for insignificant omissions or misstatements and management's fears of exposing itself to liability may cause it simply to bury the shareholders or investors in an avalanche of trivial information-a result that is hardly conducive to informed decision making. TSC Industries, 426 U.S. at 448, 449. Although the Court in Northway defined materiality in the context of a proxy statement that allegedly violated SEC Rule 14a, the same definition applies equally to determinations of materiality under the antifraud provisions of the federal securities laws. Healey v Catalyst Recovery, 616 F.2d 641 (3d Cir. 1980).

Case 1:05-cv-00548-JJF    Document 24-2    Filed 02/16/2007    Page 35 of 43

1997 U.S. Dist. LEXIS 4938, *; Fed. Sec. L. Rep. (CCH) P99,467

The question of materiality is one of mixed law and fact, involving as it does the application of a legal standard to a particular set of facts. See TSC Industries inc. c. Northway, Inc. 426 U.S. 438, 450, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976). Although a determination of materiality "requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him," Id., materiality is appropriately resolved as a matter of law, and summary judgment should be granted when "reasonable minds cannot differ on the question of materiality. Id. at 450 (quoting Johns Hopkins University v. Hutton, 422 F.2d 1124, 1129 (4th Cir.1970), cert. denied, 416 U.S. 916, 40 L. Ed. 2d 118, 94 S. Ct. 1622, 94 S. Ct. 1623 (1974); Gould v. American Hawaiian SS Co., 535 F.2d 761, 771 (3d Cir 1976); Harnett v. Ryan Homes, 496 F.2d 832 (3d Cir. 1974))("To deny a defendant in a securities case alleging nondisclosure of material facts the benefit of summary judgment procedures would cause a wholly innocent person to incur enormous legal expenses in defending [*110] an unmeritorious and frivolous lawsuit at trial. Such a result cannot be countenanced by our judicial system"). The court will examine each of plaintiffs contentions to determine whether there can be a reasonable difference of opinion on materiality. [*111]

Pursuant to the "truth on the market doctrine", a statement's potential to mislead and its materiality to the investment decision of reasonable investor can be nullified if the representation is accompanied by cautionary language within the document or the correct information has been revealed by some other disclosure. n95

n95 Summary judgement may also be based on the "bespeaks caution doctrine" when "reasonable minds cannot disagree as to whether the mix of information in the document is misleading. This doctrine provides a mechanism by which a court can rule as a matter of law that defendants forward looking statements contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud. Provenz (citing, WOW, 35 F.3d at 1413.) It is not new but a reformulation of two fundamental concepts in securities fraud law: reliance and materiality. Id. Blanket warnings are insufficient.

The bespeaks caution doctrine was explicitly adopted by third circuit in In re Trump Casino, 7 F.3d 357, 364. The court concluded that under the "bespeaks caution" doctrine, "a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law. When the bespeaks cau-

tion doctrine is applied to the fraud on the market theory, it is clear that optimistic forecasts in one document are not actionable if the market was sufficiently warned in a prior or simultaneous document that those forecasts might not be fulfilled. See Raab 4 F.3d at 289; Arazie v. Mullane, 2 F.3d 1456, 1467 (7th cir 1993); Provenz v. Miller, 102 F.3d 1478 (9th Cir 1996)(citing, In Re Worlds of Wonder Securities Lit., 35 F.3d 1407, 1413-15 (9th Cir. 1991)).

[HN14] According to the "truth on the market" doctrine, even if the Court determines that, in isolation, defendants statements or forecasts are actionable as misrepresentations or omissions of material fact, defendants may avoid liability by establishing that the market was aware of the allegedly concealed information. Weiglos v. Commonwealth Edison, 892 F.2d 509, 516 (7th Cir. 1989). Thus, a defendant can avoid liability for a false statement or one that reveals less than the truth by showing that the market was not affected by the representation because the truth of the matter was known already and had been factored into market prices. John Newman, Basic Truths: "The Implications of the Fraud on the Market Theory for Evaluating the "Misleading' and "Materiality" Elements of the Securities Fraud Claims, 20 J.Corp.L. 571, 576 (1995). [*112] [HN15]

Before the truth on the market defense can be applied, the defendants must prove that the information withheld or misrepresented was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by one-sided representations." Provenz v. Miller, 102 F.3d 1478 (9th Cir. 1996).

**Scienter**

[HN16] Scienter is a necessary element of a Rule 10b-5 action and is an independent basis for granting summary judgment. O'Connor v. Lafferty, 965 F.2d 893, 900 (10th Cir. 1992). To establish scienter, plaintiffs must show that defendants had a mental state embracing an intent to deceive manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976). Interpreting the Supreme Courts scienter requirement with regard to predictive statements, the Third Circuit has explained that "an opinion must not be made with reckless disregard for its truth or falsity or with a lack of genuine belief that the information disclosed is accurate and complete in all material respects." Kline v. First Western, 24 F.3d 480, 486 (3d Cir. 1994). Thus, simply establishing that the predictive statement at issue [*113] did not have a reasonable basis, that is, they were negligently made, would not entitle plaintiffs to recover. Rather, it must be proved that de-

fendant knew or was "recklessly indifferent to the fact that the statement did not have a reasonable basis.

[HN17] Plaintiff can establish scienter by proving either actual knowledge or recklessness. Software, 38 F.3d 1078. In this Circuit, reckless conduct is limited to those highly unreasonable omissions involving not merely "simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979); Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir.), cert. denied, 455 U.S. 938 (1985). The element is satisfied by conduct that presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." Id. Negligent conduct alone, whether gross, grave, or inexcusable does not suffice. Hochfelder, 425 U.S. at 194-314.

Scienter may be proved by "facts establishing a motive to commit fraud and an opportunity to do so" or by alleging "facts constituting circumstantial evidence" of recklessness [*114] or conscious misbehavior. Acito v. Imerca Group, Inc., 47 F.3d 47 (2d Cir. 1995). The mere publication of inaccurate accounting figures, or a failure to follow GAAP without more, does not establish scienter. Software, 38 F.3d at 1089. An allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is also insufficient to create a reasonable inference of scienter. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock could be subject to securities fraud. Acito, 47 F.3d at 53 (2d Cir. 1995); Tuchman v. DSC Communications, 14 F.3d 1061, 1068-69 (5th Cir. 1994). Futher, mismanagement or poor business judgement in coping with a downturn in the economy or in the particular industry does not create liability under Rule 10b-5. Rather there must be the element of deception or scienter. Serabian v. Amoskeag Bank Shares, 24 F.3d 357 (1st Cir. 1994)

## V. DISCUSSION

### II. § 10b and Rule 10b-5 Claims

#### 1. Earnings Growth Target

It is undisputed that, throughout 1990, the defendants predicted that BAC earnings [*115] would grow 6-9%. n96 Plaintiffs claim that defendants' predictions of 6-9% earnings growth lacked a reasonable basis because 1.) a June 1990 internal report projected earnings per share for the year of 4.8% and because 2.) past reported growth was due merely to non-recurring events, discussed below, rather than to "operating" earnings, 3) an internal estimate revealed that Defendants expected only 4-6% growth from the NSG and only 2-3% from BAC's

other businesses which were operating at a loss (PX-6, B2042299.1), and 4.) an internal document revealed that the NSG, BAC's core business could not support 6% growth (referred to therein as the "business problem"). (PX 209, B2051648).

n96 The defendants also publicly stated on various occasions that the source of the earnings growth would be the NSG. For example, in April 1990, Crawford stated, "we have major businesses in three different stages of the life cycle, with three different growth patterns, risk profiles, and earnings characteristics. This still robust business supports an ability to earn at the lower end of our earnings objective of six to nine percent." (DX TAB 34); At a meeting with the New York Society of Securities Analysts (NYSSA) on October 25, 1990, Cambell stated that the network services business presently contributed "four to six" percent of earnings growth. (DX TAB 36). In deposition, Crawford explained that "in any single year, results in any single business segment could be more or less than our target ranges". Crawford dep. 181-82. The network business had the capacity over the several years following 1990 to account entirely for "the lower end" of the 6-9% target." Id. "We expect to be at the lower end of this growth range until at least next year at which time the results from our development activities will begin to make a visible and sustainable contribution". (DX TAB 202).

[*116]

Arguably, this is not a failed forecast. The defendants publicly indicated that the base from which one should measure the 6-9% growth is "normalized" earnings of $ 3.33 for 1989. n97 Simple calculations show that, by these statements, defendants were predicting earnings per share for 1990 of approximately 106% of $ 3.33, or $ 3.53, before subtracting special charges. Actual results for the fourth quarter and for the year were disclosed by press release on January 22, 1991. In that release, BAC reported a special charge of fifteen cents and reported earnings per share of $ 3.38 and stated that "earnings per share growth after eliminating non-recurring charges in both years was 6%". n98 BAC's outside auditor, Coopers & Lybrand, verified this press release as accurate. (DX-CL2001595, TAB 40). Thus, ostensibly, the forecast of at least six percent growth in 1990 was met. Furthermore, there is evidence in the record that BAC achieved 6% growth even after eliminating the effect of non-recurring and one-time adjustments, discussed below. n99

Case 1:05-cv-00548-JJF    Document 24-2    Filed 02/16/2007    Page 37 of 43

1997 U.S. Dist. LEXIS 4938, *; Fed. Sec. L. Rep. (CCH) P99,467

n97 In October, BAC stated, "Last year we indicated to you that we expected normalized per share earnings of $ 3.33-excluding some one-time write-downs of inventories and goodwill...And that's exactly where we ended the year. And we said that earnings would grow from that base to the lower half of our 6-9% objective in the '90-'92 time frame...We expect normalized earnings for 1990 to be about 6 percent higher than last year without special adjustments." At the same meeting, Cambell announced a charge of approximately ten cents to 1990 fourth quarter earnings. This statement is challenged by the plaintiffs but will be considered by the court later in this opinion under the heading "goodwill writedown".(DX TAB 36).

[*117]

n98 Factoring out the $ .15 cents charge, reported earnings per share of $ 3.38 would be $ 3.53.

n99 The document, dated January 23, 1991, reflects that one-time items that increased earnings were subtracted and those that decreased expenses were added back in to the figures for 1989 and 1990 so that only "operating" earnings remain for comparison. The resulting figure, a percentage representing earnings growth for 1990 over 1989 attributable only to operations, is 6.1%. (BA100082). Plaintiff does not contest anything in this document. Instead, Plaintiff has submitted a document that purportedly contradicts the growth percentage. However, this submission does not permit a reasonable inference that 6% growth for 1990 was not achieved and, therefore, does not create a genuine issue of fact. That document reports "normalized 1990 net income as $ 1,318.5 ($ 3.34 EPS according to Plaintiff's calculations compared to $ 3.33 EPS for 1989), a figure markedly lower than the $ 1,375.1 figure that produced 6.1% growth according to the January 23 document, referred to above. However, this document compares 1990 to 1991 rather than to 1989. Because "normalizing" is a process by which years are equalized for comparison purposes and different years are characterized by different accounting events, normalizing 1990 results for adjustments taken in a year other than 1989 will produce different normalized base figure for 1990. We note that, because these documents were generated after the

end of the class period, they do not provide a reasonable basis for defendants predictions nor do they negate the existence of a reasonable basis therefor. The January 23 document merely demonstrates that BAC, in fact, experienced 6% growth without the challenged one-time adjustments, contradicting Plaintiff's claim that defendants were aware that growth for 1990 would come only from the challenged adjustments rather than from operations.

[*118]

The forecast of 6-9% was issued with a reasonable basis. Historical performance itself can provide a reasonable basis for future growth. In re Craftmatic, 890 F.2d at 642 n.19 (Management projections of profit and growth can have a reasonable basis if there is a history of profitable operations.) BAC's Annual Report for 1990 issued on February 15, 1991 reported 6% earnings growth in 1990 and that "the total value of your investment in Bell grew for the seventh consecutive year." (DX-TAB 2). In addition, an analyst report issued by Nomura securities on BAC stated "our confidence in BAC management is very high...Management has delivered at least its targeted 6-9% earnings growth on a normalized basis every year since divestiture."(DX BA1000133, TAB 25).

Throughout 1990, BAC generated internal estimates of earnings growth for the year. The prediction of 6-9% for the year was consistent with all reliable estimates. Plaintiffs claim that several internal estimates were inconsistent with the prediction and deprive it of a reasonable basis. Plaintiffs first quote an internal document predicting 4.8% growth for 1990, but fail to point to record evidence that this estimate is reliable, [*119] certain, or that it represents an inescapable fate. n100 Defendants, on the other hand, have provided ample evidence that this estimate was not considered to be reliable or certain by BAC. n101 Because this estimate was not considered reliable by management, this document did not represent the company's view. Such evidence can not undermine the reasonable basis or good faith belief for the defendants projections of 6-9% earnings growth provided by other internal estimates. Another internal estimate cited by the Plaintiffs, estimates 4-6% growth from the NSG. Again, as long as the attainment of 6% growth is within reach, it has not been foreclosed, and the prediction is not deprived of a reasonable basis.

n100 As noted above. (See, type print p.35).

n101 These "Entity Estimates" were not considered by management to be reliable projections

Case 1:05-cv-00548-JJF    Document 24-2    Filed 02/16/2007    Page 38 of 43

1997 U.S. Dist. LEXIS 4938, *; Fed. Sec. L. Rep. (CCH) P99,467

of the company's actual performance because they do not take into account decisions made at the corporate headquarters level or acceptable expense levels. See (DX-BA 1008542, TAB 62)(July 3, 1990 "pre flash" analysis by Bardeen, concluding that net income for the year would equal budget and 6.6% EPS growth: In so concluding, Bardeen noted that "estimates provided by the companies result in a lower projected net income. Their lower forecast can be attributed to expense estimates which exceed those of my staff. We have also recognized anticipated medical expense accrual reversals which have not been communicated to the companies.") The "Administrative View", an estimate that takes into account these corporate factors, is a more accurate reflection of the Company view. This estimate projected EPS growth of 6.6%. (DX-BA1008557, TAB 60); (Von Stetina dep. 142) (administrative view "based on what entities provided plus information that we were cognizant of that they might not have been aware of at that point in time").

[*120]

Moreover, defendants' awareness of what is referred to internally as the "business problem," does not undermine a reasonable basis or good faith belief in the prediction of 6-9% growth for 1990. Undisputed deposition testimony reveals that the "business problem" was a long term concern that the earnings growth from the NSG would not be sufficient, in itself, to achvieve the 6-9% growth forcasted each year. (Bardeen dep. 76)("limited long term growth from the basic core businesses"); (VonStetina dep. 242)("The long term business problem was that the [NSG] growth rates in earnings would not be sufficient in and of themselves to achieve 6-9% each year, and...growth would have to come from the non-regulated businesses"). Plaintiffs put forth no evidence showing that this was not a long term problem or that the estimate of only 3% growth applies to 1990. Documents reflecting that BAC anticipated that growth in the NSG would be insuffient to meet yearly predictions in the future, does not erode the Defendants' reasonable basis or good faith belief in the achievment of this target in the short term. Indeed, the record reveals that the NSG had the capacity to account for the lower end of [*121] the 6-9% range for several more years. (Crawford dep. 181-82)(NSG has capacity over the several years following 1990 to account entirely for "the lower end" of the 6-9% range); (TAB 34)("this still robust business supports an ability to earn at the lower end of our earnings objective of 6-9%").

Plaintiffs contend that certain nonregulated business segments were performing poorly (i.e., BAP, the real estate subsidiary lost $ 13 million in 1990 and the growth trend in BASLI, the Financial Services subsidiary, was "softening" throughout that year). However, in light of the fact that the defendants expected 6% of the earnings growth to derive from the NSG, some negative information about the other subsidiaries would not deprive the predictions of 6-9% growth of a reasonable basis or defendants of a good faith belief in the truth of their statements.

Finally, other events, discussed below, allegedly deprived the prediction of 6% growth from having a reasonable basis and also rendered any quarterly statements reporting attained growth misleading. However, these nonrecurring events were sufficiently disclosed, were not material, or defendants had no duty to disclose the information.

[*122] 2. Reversals of Accruals and Retroactive Credits

Plaintiffs complain that any growth expected for the year would come, not from operating performance, but from accounting manipulations that allowed defendants to overstate earnings for 1990 and understate 1989 earnings. Plaintiffs do not challenge the underlying accounting and concede that Defendants were entitled to make these accounting adjustments under GAAP. Instead, they claim only that defendants intentionally manipulated the timing of the adjustments in order to show at least 6% growth in 1990 over the results reported for 1989. This can be translated into a claim that statements made regarding growth in 1990 as compared to 1989 were misleading in that they failed to disclose the amount of growth attributable to non-recurring and out-of-period transactions, and that predictions of 6-9% growth for 1990 lacked a reasonable basis because defendants knew that growth would not be from operations. However, the record reveals that the timing of the adjustments was reasonable. There is no evidence that BAC delayed making a reversal, despite discovering that an overaccrual existed and sizing the amount of the overaccrual. Regardless [*123] of when it occurs, reversing an overaccrual, as required under GAAP, will always have a "ballooning" effect on financial results.

Furthermore, even if these adjustments were intentionally timed by defendant to show earnings growth, the adjustments were disclosed to the market so that no reasonable investor would be misled about the effect of these adjustments on reported earnings. In other words, no reasonable investor would be misled into thinking that the improvement in the reported financial results of the company was caused only by improved operating revenues.

a. Second and Third Quarter

The first group of challenged adjustments, involves the reversal of an accrual, an estimation made by management of future expenses or liabilities that must be "reversed", i.e. added back in to revenues, if eventually proved to be inaccurate by the actual expenses or liabilities, or by subsequent changes in rates used to calculate the accrual.

Nothing in the record indicates that the overaccruals were anything more than poor business judgement. "Mere failure to provide adequate reserves (or to perform competently other management tasks) does not implicate the concerns of the federal securities [*124] laws and is not normally actionable." Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357 (1st Cir. 1994)(citing, Shapiro v. UJB Financial Corp., 964 F.2d 272, 281 (3d Cir. 1993). The accounting, explicitly approved by independent outside auditors, was in compliance with GAAP.

This court agrees that information about the source of a company's reported growth may be material in some cases. Certainly, if the amount of growth derived from accounting adjustments rather than an improvement in the business is material, that information must be disclosed if it will render statements misleading. See e.g, Weeks Dredging & Contracting v. American Dredging, 451 F. Supp. 468, 479 (E.D.Pa. 1978). In this case, however, the challenged adjustments were disclosed to the market. While the drafting of some of the documents that disclosed these transactions may have been inartful at times, there was sufficient disclosure from which the market could deduce the amount and effect of one-time events.

b. First Quarter Reversal of Accruals n102 :$ 20 Million Mistake

> n102 The plaintiffs challenge another one-time charge in the first quarter, the AT&T settlement. However, the information is immaterial because the amount and effect of the AT&T settlement was disclosed prior to the class period.

[*125]

Plaintiffs claim that a mathematical error that resulted in an overaccrual for NECA liability should have been corrected in the fourth quarter of 1989 rather than the first quarter of 1990. The error was detected in January 1990 during the routine year-end audit by Coopers & Lybrand. Plaintiffs claim that Defendants were able to boost first quarter earnings by reversing the accrual in 1990 despite knowing that the reversal was necessary before the financials were issued for the fourth quarter of 1989. By overstating 1990 revenues and understating

1989 revenues, BAC was able to show revenue growth in the 1990 compared to the 1989. The reversal of this error and of additional overaccruals detected while investigating the error, caused $ 20.8 million in revenues to be added to 1990 financial results.

However, nothing indicates that this decision as to the timing of the reversal represents anything more than the difference between two permissible judgments. By the time BAC and Coopers & Lybrand knew that a reversal was necessary and quantified the amount, the "books were already closed for 1989" and there was testimony that it would have been physically impossible to change the financial [*126] statements in the computer system. Cooper's and Lybrand determined that the error was immaterial so that reversal in the 1989 financial statements was unnecessary.

Furthermore, apart from the timing of the reversal, there can be no liability imposed for the mathematical error because the mere publication of inaccurate accounting figures (or failure to follow GAAP) without more, does not establish scienter. Provenz v. Miller, 102 F.3d 1478, 1489 (9th Cir. 1996). Further, as noted above regarding the second and third quarter, there is also no liability for the overaccrual itself. Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357 (1st Cir. 1994)(citing, Shapiro v. UJB Financial Corp., 964 F.2d 272, 281 (3d Cir. 1993)("Mere failure to provide adequate reserves does not implicate the concerns of the federal securities laws and is not normally actionable").

Moreover, as discussed in connection with the other reversals during 1990, this adjustment was disclosed before the end of the class period. The first quarter 10-Q for 1990 contained the statement, "Adjustments recorded to reflect revised estimates of access revenue liabilities increased revenues approximately $ 62 [*127] million during the quarter."

3. Access Line, Revenues, Expenses

Plaintiffs contend that the Defendants made positive statements regarding access line growth during the class period, but failed to disclose that access line growth was slowing so consistently that it was perceived as a "trend" by October 1990.

Defendants' statements regarding access line growth are not material. The historical figures were accurately disclosed from which a reasonable investor could deduce that access lines were growing at a reduced rate. Each quarter, BAC's 10-Q reported actual access line growth, both in percentage rates and raw operating statistics. (DX-TAB 4, 5, 7, 8) Because the defendants never predicted or forecasted future access line growth, there was no duty to provide interim figures. n103 Chiarella v. United States, 445 U.S. 222, 235, 63 L. Ed. 2d 348, 100

Case 1:05-cv-00548-JJF     Document 24-2     Filed 02/16/2007     Page 40 of 43

1997 U.S. Dist. LEXIS 4938, *; Fed. Sec. L. Rep. (CCH) P99,467

S. Ct. 1108 (1980)("A duty to disclose does not arise from the mere possession of non-public information").

> n103 Neither the statements quoted by Plaintiff's, nor the reporting of quarterly figures amounted to a partial disclosure or a prediction of future growth. Thus, Plaintiff's have not provided evidence demonstrating that defendant's had a duty to disclose additional information.

[*128]

In addition, Plaintiffs contend that various statements and reports failed to disclose that revenues were increasing but at a decreasing rate, and expenses were increasing at an increasing rate. However, as with access line growth, BAC disclosed the actual figures necessary to make this simple calculation. (TABs 3, 5, 7).

As a matter of law, there is no genuine issue of material fact as to any statement regarding the rate of growth in access lines, revenues, or expenses. Accordingly, summary judgment may be granted as to these claims.

4. Third Quarter 1989 Strike

Plaintiffs complain that the Defendants, when reporting results for the third quarter of 1990, failed to disclose the quantifiable adverse impact a 1989 strike had on 3Q89 net income. This omission allegedly made the reporting of growth for the third quarter of 1990 as compared to the same quarter of 1989 misleading. However, there was no duty to disclose this information and it is immaterial.

BAC disclosed the fact of a strike in Form 10-Q for the third quarter of 1989. (TAB 146 at 8). Once disclosed, there was no duty to re-report this fact or to disclose BAC's internal estimate of the strikes' impact.(DX-TAB [*129] 204). There is no evidence that BAC considered the estimate to be reliable or certain. The defendants have offered testimonial evidence to the contrary. (Smith dep. 143, 144-46)(final impact "impossible" to determine with all the "gives and takes that go on in our business"... revenues lost due to "pent up" demand would be quickly replaced at the strikes end and thus, it will have little overall impact); (Lynch dep. at 57)(DX-TAB 205, 206)(Both BAC and C&L determined that the impact was immaterial). Furthermore, the fact that a strike will have a negative impact on business is commonly known. This is not the industry-specific information that the securities laws require be disclosed. Finally, because BAC disclosed actual income, revenue, and expense figures both in third quarter, 1989 and in third quarter,

1990, the figures for a reasonable investors analysis and comparison were available.

5. Goodwill Writedown

Plaintiffs contend that, at the time of announcing a $ .10 writedown or sometime thereafter, BAC knew but failed to disclose that the writedown would actually be $ .15. There is no evidence in the record that defendants knew that the writedown would be $ .15 at the [*130] time it was announced. Thus, this prediction did not lack a reasonable basis. However, because BAC predicted that there would be "no further writedowns in 1990, 1991, or beyond," the defendants made a prediction which must be corrected if it becomes materially misleading.

Plaintiffs point to an internal document that purportedly creates a factual issue as to when BAC decided to writedown goodwill an additional $ .05 cents.(DX-TAB 115). n104 However, the wording of that document, and internal documents drafted later in the year, belies any reasonable inference BAC had decided, with such certainty that a duty to disclose was triggered. The document states "If we decide to sell BASLI at the current proposed purchase price, earnings per share would be reduced by an additional $ .05." (DX-TAB 115). Even assuming that the internal documents create a factual issue as to when the decision was made, the difference between the projected and the actual writedown, 1.5% of 1990 earnings, was not material and would not likely influence the decision-making of a reasonable investor. (DX 39, 108). Furthermore, another internal memo quoted by the Plaintiffs, does not give rise to a reasonable [*131] inference of scienter. The typewritten portion of the memo, drafted by Crawford, dated October 29, 1990, states that, "$ .10 did not have significant impact on our stock price" and attached analyst reports. One of those receiving the reports hand-wrote back to Crawford in the margin: "Good Reviews! Thanks for all your hard work in the engineering process. As a hard-working actor myself, I am heartened to know that I have a good script writer behind me". (DX-TAB 122). Plaintiffs claim that the notation on the memo proves that defendants had consciously "fooled" the analysts as to the amount of the charge announced at the October 25, 1990 meeting. However, even reading the evidence in light most favorable to the plaintiffs, this notation cannot give rise to a reasonable inference of scienter. The allusion to "acting" does not refer to conscious deception but to the author's hobby. The author, in fact, appears frequently in dramatic performances. (DX-213) The Supreme Court has made clear that strained or inconclusive inferences alone should not defeat summary judgment. Anderson v. Liberty Lobby, 477 U.S. 242, 252-57, 106 S. Ct. 2505,

91 L. Ed. 2d 202 (1986); See also, Vaughn v. Teledyne, 628 F.2d 1214, 1218-22 (9th [*132] Cir. 1990).

n104 The Court notes that the use of the qualifier, "approximately," in the original announcement of a .10 cents writedown on October 25, 1990, discloses at least some uncertainty as to the amount of the writedown.

Plaintiffs also contend that Defendant's statements regarding the writedown were misleading because they failed to disclose that the writedown only related to BASLI, rather than to the Financial Services segment as a whole. A variation on this claim is that Defendants failed to disclose that the writedown related to a sale of BASLI and a potential loss realized therefrom. However, this information is clearly not material. As long as the amount, purpose, and effect of the charge was disclosed, no reasonable investor would have considered the basis for the charge significant. Vosgerichian v. Commodore Int'l, Inc., 832 F. Supp. 909, 911-912 (E.D.Pa. 1993), vacated on other grounds, 862 F. Supp. 1371 (E.D. Pa. 1994). Further, there is no general duty to disclose any information about [*133] negotiations regarding a potential acquisition or other extraordinary corporate transaction. Basic v. Levinson, 485 U.S. 224, 234, 238-41, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988); See e.g., In re General Motors Class E. Stock Buyout Sec. Lit., 694 F. Supp. 1119, 1128-29 (D.Del. 1988)(corporation did not have a duty to disclose negotiations concerning sale of subsidiary). The statements made regarding the writedown did not constitute a public denial of the fact that negotiations were pending. See e.g., Basic, 485 U.S. at 239 n.17. Further, there is no information in the record that the parties to the negotiation had come to an agreement. Accordingly, BAC did not have a duty to disclose the fact that non-public negotiations for the sale of BASLI were being conducted.

6.) Expense Measures

Defendants complain that Plaintiffs' statements regarding the effect of expense measures taken in 1990 failed to disclose that reported growth was due to nonrecurring items rather than to expense measures. This is not an actionable omission. Rather, statements about expense measures were literally true. Expense controls were merely one of a number of factors "contributing to net operating revenue growth". No reasonable [*134] investor would understand defendants' statements to mean that "expense measures" were the only reason for the net operating revenue growth and nothing in the record demonstrates that the defendants' knew, at the time

of making the announcement, that expense measures had been completely ineffective.

7. Bell Atlantic Employee Stock Ownership Plan ("ESOP")

Five cents of fourth quarter EPS was attributable to the ESOP tax benefit and .04 of that was attributable to the first three quarters of 1990. Plaintiffs contend that BAC violated GAAP by including the tax benefit from dividends paid to the ESOP in the company's reported income. However, consistent with GAAP, the $ .05 benefit was only included in the calculation of earnings per share for the year, not in the calculation of net income. While, this increase in EPS was not disclosed until after the class period, nothing in the record suggests that this inclusion was unreasonable.

Plaintiffs, thus, challenge the timing of the change in the fourth quarter and the decision to include the entire years tax benefit in the fourth quarter. However, Coopers & Lybrand concurred with the inclusion of the $ .04 from the first three quarters [*135] of 1990 in the fourth quarter and determined that the amount was immaterial so that the first three quarters need not be restated. While the inclusion was not explicitly disclosed by BAC until the issuance of the Annual Report 10-K in February 1991, analyst reports issued on January 23, 1990, the day after the class period, shows awareness that $ .05 was added to fourth quarter earnings as result of ESOP accounting. (DX TAB 103, 104). Furthermore, even if the timing of the disclosure was unreasonable, the amount of the tax benefit is immaterial.

The second claim regarding BAC's ESOP accounting finds fault with a change in the account in which ESOP expenses are listed. Plaintiff's argue that because "Employee Expense" is a category of "Operating Expense" and "Interest Expense" is not, the market was led to believe that BAC's "Operating Income" (the difference between "Operating Revenues" and "Operating Expenses"), was growing faster than it actually was. GAAP mandates that this expense must be listed in the interest expense account and the change was disclosed to the market. In the first quarter MD&A for 1990, BAC noted that interest expense grew by 10.5% over the first quarter of [*136] 1989 because of "interest recognized on the debt associated with the leveraged employee stock ownership plans established by the company in 1989."(TAB 4), (TAB 8 at 9, second quarter);(TAB 8 at 10, third quarter).

Cellular (BAMs)

Plaintiffs claim that defendant's positive statements regarding "non-telephone companies" failed to disclose that cellular minutes of use per customer was declining at

BAMs, BAC's cellular subsidiary. However, the fact that cellular minutes of use was declining was disclosed at the October 25, 1990 NYSSA conference in response to questions from analysts, and is, therefore, immaterial.(DX-TAB 36)

Furthermore, the statements are not misleading. The statements that total cellular usage grew at a "reduced rate" in September 1990 and that "revenues grew approximately $ 10 million and $ 45 million respectively" are not misleading.(TAB 8). Because the decline in minutes of use was disclosed, the growth in revenues would be understood to be the result of growth in total customer usage rather than minutes of use. Plaintiffs also claim that the defendants failed to disclose materially lower profit margins, or expense or net income figures for BAMs in 1990. [*137] However, BAC never disclosed this information on BAMs. Rather, it reported only noteworthy results from subsidiaries and their general results on a consolidated basis. There is no duty to disclose even the most material information absent undertaking to speak on the particular subject.

9.) Return on Equity

Plaintiffs claim that Defendants' prediction that they could sustain a return on equity of 15-17% was fraudulent. Actual return on equity was 14.8% for the year. There is nothing in the record to show that the defendants knew that the 15-17% figure would not be achieved or that the prediction lacked a reasonable basis. The difference between actual and predicted results is immaterial as a matter of law.

10) Funding of the Medical Benefits Trust

Plaintiffs claim that Defendant's press release statements regarding the funding of the trust in 1989 was misleading because it implied that the trust was a one-time charge instead of the first installment of a recurring expense. Defendants argue that the press release clearly separates the indisputably non-recurring charges relating to asset writedowns and restructuring from the trust funding. n105 However, even if this [*138] press release was unclear as to the amount of charges that would continue through 1990, there would be no misunderstanding as to the normalized basis upon which BAC assessed its 1990 earnings growth. On January 26, 1990, Campbell stated that normalized results for the year, adjusting reported EPS for these [nonrecurring] charges, were $ 6.67 [3.33 after stock split] per share, and that that number would be the benchmark level from which BAC would measure its 6% earnings growth (TAB 209). n106

n105 They argue that charges expressly identified as of a one-time nature are itemized in the

first sentence while, the second sentence, beginning "in addition," notes that the company "began" to accrue for and fund the trust."

n106 Plaintiffs have submitted the affidavit of Harris Devor, and the affidavit of John Torkelson, in opposition to defendants Motion for Summary Judgment. As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving parties case. However, where the record is clear, the court is not required to defer to the contrary declarations of plaintiffs' experts. In Re Apple Computer Sec. Lit, 886 F.2d 1109, 1116 (9th Cir. 1989); Provenz, 102 F.3d 1478 (1996); In Re Adobe Systems, 787 F. Supp. 912 (N.D.Cal. 1992).

[*139]

11.) BASLI and BAP

Plaintiffs contend that statements failed to disclose that Bell Atlantic Properties ("BAP"), the real estate subsidiary, lost $ 13 million in the third quarter and that BASLI's growth trends were softening and was experiencing an ongoing revenue decline. This cannot form the basis for a claim of fraud. The defendants never disclosed detailed financial information for the subsidiaries. Rather, it disclosed only noteworthy information on a consolidated basis. Furthermore, some of the allegedly undisclosed information was actually positive news that would not undermine a positive statement. For example, with respect to BAP, while it did lose $ 13 million, it was budgeted to lose $ 15. Finally, there is no evidence of scienter with respect to statements about these subsidiaries aside from the motive provided by the existence of incentive compensation. As noted previously, evidence of incentive compesation, without more, is insufficient to defeat summary judgment.

Based on the foregoing analysis, the Defendant's Motion for Summary Judgment must be granted.

**II. Control-Person Liability under Section 20(a)**

Plaintiffs allege in Count I that the individual [*140] defendants, Raymond W. Smith and Phillip A. Campbell are liable as controlling persons of BAC by virtue of their corporate positions pursuant to Section 20(a) of the 1934 Act. [HN18] That section provides that "(a) every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." [HN19] Section 20(a) broadly defines control as

any "indirect means of discipline or influence short of actual direction: or "ability to exert influence, directly or indirectly over the decision making process of another person." Culpable participation in the violation is required for control person liability, and the plaintiff must prove (in the case of inaction) that inaction was deliberate and done intentionally to further the fraud. § 20(a) expressly provides a defense if the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Liability under section 20 is predicated on an independent violation [*141] of the Securities laws. The individual defendants can be held liable under § 20 only if an independent Rule 10b-5 violation by Bell has been proven.

Because I have granted summary judgement in defendants favor on the § 10 and Rule 10b-5 claim, section 20(a) liability is precluded and summary judgment will be granted as to that claim as well.

### III. Count II Negligent Misrepresentation

The plaintiffs also contend that this court has the power to exercise supplemental jurisdiction over Plaintiffs' state common law claim of negligent misrepresentation. [HN20] This court has power to exercise pendent jurisdiction over state claims that are "so related" to the federal claims that they form part of the same case or controversy. State claims are part of the same constitutional case if they "derive from a common nucleus of operative fact" and "are such that [the plaintiff] would ordinarily be expected to try them in one judicial proceeding". United Mine Workers v. Gibbs, 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966). The power to exercise supplemental jurisdiction exists when a Plaintiff makes a § 10b and Rule 10b-5 claim and state law claims based on the same allegedly [*142] fraudulent conduct (case). The court however, has broad discretionary powers to decline pendent jurisdiction pursuant to § 1367(c). Under the statute, district courts are expressly authorized to decline to exercise supplemental jurisdiction over a claim under subsection (a) if (c) the district

court has dismissed all claims over which this court has original jurisdiction. Because I have dismissed the federal claims in the action, I will exercise my discretion to decline supplemental jurisdiction. Accordingly, Count II negligent misrepresentation claim is dismissed without prejudice.

### VI. Conclusion

For the reasons stated above, I conclude that plaintiffs have not established a genuine issue of material fact regarding essential elements of their Rule 10b-5 claim (Count I) and defendants are entitled to judgment as a matter of law. Accordingly, Defendant's Motion for Summary Judgement will be GRANTED as to Count I of the Second Consolidated Amended Complaint. Because the Rule 10b-5 claim has been dismissed, Plaintiff's derivative claim pursuant to § 20(a) against Defendants Campbell and Smith (Count I) must fail as well. Finally, pursuant to § 1367 (c)(3) I decline [*143] to exercise supplemental jurisdiction over the state common law claim for negligent misrepresentation and Count II will be dismissed without prejudice.

### ORDER

**McGlynn, J.**

Now, This 16th day of April, 1997, upon consideration of the Motion for Summary Judgement submitted on behalf of Defendants Bell Atlantic Corporation, Raymond W. Smith, and Phillip A. Campbell; Plaintiff's Memorandum in Opposition to Defendants' Motion; Defendants Reply Memorandum in Support of their Motion; and Plaintiffs Supplemental Memorandum in Opposition to Defendants' Motion, for the reasons stated in the attached memorandum, it is **Ordered** that Defendant's Motion for Summary Judgment is **Granted.** Judgement is hereby entered in favor of the Defendants, and against the Plaintiffs on Count I. Count II is dismissed without prejudice.

BY THE COURT:

Joseph L. McGlynn, Jr, J.