**TAB 2**

LEXSEE



Cited
As of: Feb 13, 2007

IN THE MATTER OF FEDERATED DEPARTMENT STORES, INC.,
ALLIED STORES CORPORATION, ET AL, Debtors

Consolidated Case No. 1-90-00130 Chapter 11, Document 3702

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN
DISTRICT OF OHIO, WESTERN DIVISION

1991 Bankr. LEXIS 288

March 7, 1991, Filed

CORE TERMS: personnel, trading, non-public, block-
ing, nonpublic, subordination, disallowance, subjecting,
violating, pendency

JUDGES: [*1]

J. Vincent Aug, Jr., United States Bankruptcy Judge.

OPINION BY:

AUG

OPINION:

ORDER PERMITTING SECURITIES TRADING
IN CERTAIN CIRCUMSTANCES

Upon the Motion of Fidelity Management & Re-
search Company, ("Fidelity"), a member of the Official
Bondholders' Committee (the "Committee") of Allied
Stores Corporation ("Allied"), for an order determining
that Fidelity will not be violating its duties as a Commit-
tee member (and accordingly will not be subjecting its
claims to possible disallowance, subordination, or other
adverse treatment) by trading in securities of Allied, co-
debtor Federated Department Stores, Inc. ("Federated"),
and Ralphs Grocery Company ("Ralphs"), a non-debtor,
during the pendency of the Allied and Federated Cases
(the "Cases"), provided that Fidelity establishes and ef-
fectively implements policies and procedures to prevent
the misuse of nonpublic information obtained through its
activities as a Committee member; and this Court having
considered Fidelity's Motion and accompanying Memo-
randum of Law, setting forth the information blocking

devices Fidelity proposes to employ; the Memorandum
of the Securities and Exchange Commission; the State-
ment of the Securities Industry Association and  [*2]
Certain Members of the Council of Institutional Inves-
tors; the Joinder of Caywood-Christian Capital Manage-
ment; the Response of the Federated Bondholders Com-
mittee; the Response of Debtors; and the Response of the
United States Trustee; and Memorandum of the U.S.
Trustee opposing Fidelity's Motion (Doc. 3469); and the
Court having concluded that the motion should be
granted; it is hereby

ORDERED, that Fidelity will not be violating its fi-
duciary duties as a committee member and accordingly,
will not be subjecting its claims to possible disallowance,
subordination, or other adverse treatment, by trading in
securities of the Debtors and Ralphs during the pendency
of these Cases, provided that Fidelity employs an appro-
priate information blocking device or "Chinese Wall"
which is reasonably designed to prevent Fidelity trading
personnel from receiving any nonpublic committee in-
formation through Fidelity committee personnel and to
prevent Fidelity committee personnel from receiving
information regarding Fidelity's trading in securities of
the Debtors or Ralphs in advance of such trades; and it is
further

ORDERED, that the "Chinese Wall" procedures to
be employed by Fidelity if its wishes [*3]  to trade in
securities of the Debtors and Ralphs shall include the
following information blocking procedures: (1) Fidelity
shall have all personnel who will have access to nonpub-
lic information in the bankruptcy proceeding ("commit-

tee personnel") execute a letter acknowledging that they may receive non-public information and that they are aware of the "Chinese Wall" procedures which are in effect with respect to the Debtors and Ralphs; (2) Fidelity committee personnel will share non-public Committee information with no other Fidelity employees (except the General Counsel for the purpose of rendering legal advice to committee personnel and who will not share such non-public committee information with other Fidelity employees); (3) Fidelity committee personnel will maintain all files containing non-public information generated from committee activities in cabinets inaccessible to other employees; (4) Fidelity committee personnel will receive no information regarding Fidelity's current securities trades in advance of such trades, except that committee personnel may receive reports on Fidelity's ownership of the securities represented by the Committee no more frequently than monthly; [*4] (5) Fidelity compliance department personnel shall review Fidelity's trades in securities of the Debtors and Ralphs to confirm that such trades were made in compliance with the "Chi-

nese Wall" procedures and shall keep and maintain records of their review; provided, however, this Order is not intended to preclude the Court from taking any action it may deem appropriate in the event that it is determined that an actual breach of fiduciary duty has occurred because the procedures employed are not so effective or for reasons unrelated to the fact of Fidelity's ability to trade based upon the establishment of the procedures set forth in this Order; and it is further

ORDERED, that with respect to the Joinder of Caywood-Christian Capital Management and certain other members of the Committee, such joining parties shall be covered by this Order (i) only if they are engaged in the trading of securities as a regular part of their business, and (ii) such entity files with the Court a copy of the information blocking devices they propose to employ.

Dated: Cincinnati, Ohio
March 7, 1991
SO ORDERED:

**TAB 3**

LEXSEE



Caution
As of: Feb 13, 2007

In re: NORTHWESTERN CORPORATION, Reorganized Debtor.

Case No. 03-12872 (JLP), Re: Docket No. 2832

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
DELAWARE

2005 Bankr. LEXIS 367

March 10, 2005, Decided

**DISPOSITION:** Joint motion of Magten Asset Management Corporation and Law Debenture Trust Company of New York, to approve proposed settlement agreement, denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Movants, an indenture trustee and holder, filed a <u>Fed. R. Bankr. P. 9019</u> motion to approve a settlement agreement with non-movant debtor. Nonmovants, the debtor, the creditors, and the plan committee, objected to the settlement.

**OVERVIEW:** The indenture trustee administering unsecured subordinated notes and the holder of such notes settled their action against the debtor concerning the notes. The plan committee established under the debtor's confirmed Chapter 11 plan of reorganization and the Class 7 unsecured creditors objected to the settlement. The settlement called for allocation to the trustee and holder of common stock, which was set aside in a disputed claim reserve for general unsecured claims. The court rejected the Rule 9019 motion to approve the settlement because the debtor had concluded that the settlement was not in the estate's best interests, violated express plan provisions, and could not be implemented, especially where the committee and creditors objected. The court held that the parties to the settlement could not dip into the disputed claim reserve, which was in excess of the holder's reserve, to distribute stock for the holder's benefit. The court held that a plan amendment was not legally available because the plan had been substantially

consummated and objection to the distribution was presented vigorously by creditors.

**OUTCOME:** The court denied the motion without prejudice.

**CORE TERMS:** settlement, settlement agreement, holders, confirmation, proposed settlement, approve, debtor-in-possession, disputed claims, common stock, disputed claim, distributed, court approval, present motion, confirmed, consummation, objecting, shares of common stock, proof of claim, oral argument, reasonableness, vigorously, distribute, allocated, realized, claimants, reserved

**LexisNexis(R) Headnotes**

*Civil Procedure > Settlements > General Overview*
*Contracts Law > Debtor & Creditor Relations*
*Contracts Law > Types of Contracts > Settlement Agreements*
[HN1] <u>Fed. R. Bankr. P. 9019</u> invokes the authority of the court to approve a compromise or settlement upon motion by the trustee. Under <u>11 U.S.C.S. § 1107</u>, a debtor-in-possession in a Chapter 11 case has the power of a trustee. However, where the plan of reorganization has been confirmed, and under <u>11 U.S.C.S. § 1141(b)</u>, the confirmation of the plan vests all of the property of the estate in the debtor, there is no longer a debtor-in-possession, i.e., trustee.

*Bankruptcy Law > Reorganizations > Plans > Modification*

[HN2] A confirmed plan may be modified or amended after confirmation, but only before substantial consummation has taken place.


*Bankruptcy Law > Reorganizations > Plans > Modification*

[HN3] See 11 U.S.C.S. § 1127(b).


*Civil Procedure > Settlements > Settlement Agreements > General Overview*
*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*

[HN4] Approval of a proposed settlement is within the "sound discretion" of the court, and the court is not burdened to decide numerous questions of law or fact, but rather canvases the issues and circumstances attending the litigation, including cost, to determine whether the agreement falls below the lowest point in range of reasonableness.


COUNSEL: [*1] For North Western Corporation aka North Western Public Service Company aka The Montana Power, L.L.C. aka North Western Energy, L.L.C. aka North Western Energy-SD/NE aka North Western Energy-Montana, Debtor In Possession: Charles Michael Terribile, Monica Leigh Loftin, Paul D. Brown, Scott D. Cousins, Victoria Watson Counihan, William E. Chipman Jr., Jr., Greenburg Traurig LLP, Wilmington, DE; Dennis A. Meloro, Greenberg Traurig, Wilmington, DE; Evelyn J. Meltzer, Pepper Hamilton LLP, Wilmington, DE; Robert Lee Striker, Leonard Street and Deinard, Minneapolis, MN; William Pierce Bowden, Ashby & Geddes, Wilmington, DE.


For OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Creditor Committee: Charlene D. Davis, Eric Michael Sutty, GianClaudio Finizio, The Bayard Firm, Wilmington, DE; Donna L. Harris, Cross & Simon, LLC, Wilmington, DE; John C. Phillips, Jr, Phillips, Goldman & Spence, Wilmington, DE.


For Official Committee of Unsecured Creditors of Netexit, Inc., et al., Creditor Committee: Donna L. Harris, Cross & Simon, LLC, Wilmington, DE.


JUDGES: John L. Peterson, United States Bankruptcy Judge.


OPINION BY: John L. Peterson


OPINION:

MEMORANDUM OPINION DENYING JOINT MOTION OF MAGTEN ASSET [*2] MANAGEMENT CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK

Magten Asset Management Corporation ("Magten") and Law Debenture Trust Company of New York as Indenture Trustee (the "Indenture Trustee") submitted, pursuant to this Court's direction, a motion for entry of an order under Federal Rule of Bankruptcy Procedure 9019 n1 approving a proposed settlement agreement (the "Settlement Agreement") with Northwestern Corporation (the "Debtor") involving litigation and claims by each of the parties [Docket No. 2832] (the "Motion"). Prior to the filing of the Motion, the Debtor had received correspondence from the Plan Committee, which was established under section 7.9 of the Debtor's Confirmed Amended Chapter 11 Plan of Reorganization, n2 and certain other creditors objecting to the terms of the proposed settlement. On February 16, 2005, the Debtor advised Magten and the Indenture Trustee that it would not honor or comply with the proposed Settlement Agreement on grounds that the agreement required consent of the Class 7 creditors and that such consent could not be obtained.

n1 [HN1] Federal Rule of Bankruptcy Procedure 9019 invokes the authority of the court to approve a compromise or settlement upon motion by the trustee. Under 11 U.S.C. § 1107, a debtor-in-possession in a chapter 11 case has the power of a trustee. However, in this case, the plan of reorganization has been confirmed, and under section 1141(b), the confirmation of the plan vests all of the property of the estate in the debtor. Thus, there is no longer a debtor-in-possession, *i.e.*, trustee. The present motion is filed pursuant to the terms of the settlement agreement and the Court may, under these circumstances, adopt and utilize the criteria commonly employed to approve or reject compromise agreements.

[*3]

n2 The Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code was approved on October 29, 2004 [Docket No. 2238].

After the Court signed an order directing Magten *et al.* to file a motion for approval of the settlement agreement, the Motion was set for hearing for March 8, 2005. In response to the Motion, objections to approval of the

Settlement Agreement were filed by the Debtor, the Plan Committee and the Ad Hoc Committee of Class 7 Creditors. n3 To these objections, Magten and the Indenture Trustee filed a joint reply. At the hearing, counsel for the respective parties presented oral argument in support of their respective positions.

n3 The Ad Hoc Committee consists of Avenue Capital Partners, Drawbridge Special Opportunities Advisors LLC, Greenwich International Ltd., Harbert Distressed Investment Master Fund, Ltd., SOF Investments, L.P., Nationwide Life Insurance Company, Nationwide Mutual Insurance Company, and P. Schoenfeld Asset Management LLC.

[*4]

The Settlement Agreement arises from a series of ongoing litigation between Magten, the Debtor, the Debtor's officers and counsel involving ten separate, but interrelated, matters. At the outset, I determine that the pending matter is properly before the Court, as the Court invited the present motion to resolve NorthWestern's representations at a prior hearing that a settlement had been reached and required formal application for court approval. I further determine that Magten's argument that the agreement is binding on the parties without court approval is without merit. Indeed, the settlement documents plainly state that the agreement was subject to Bankruptcy Court approval. Thus, case authority dealing with section 363 of the Bankruptcy Code n4 (sale of property of the estate outside the ordinary course of business), *Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346 (3d Cir. 1999), or the fact that the Plan has vested the property in the Debtor and there is no longer a debtor-in-possession, *In re W.R.M.J. Johnson Fruit Farm, Inc.*, 107 B.R. 18 (Bankr. W.D. N.Y. 1989); *In re Nelson Co.*, 117 B.R. 813 (Bankr. E.D. Pa. 1990), [*5] are beside the point. Indeed, the issues raised by the objections make clear that the Court must decide whether the Settlement Agreement violates or is consistent with the terms of the Confirmed Plan in order to approve or reject the agreement. This is particularly true because section 7.9 of the Confirmed Plan provides that the Plan Committee was created for "the purpose of overseeing the remaining Claims reconciliation and settlement process," and if a settlement exceeds $ 100,001, which the present settlement surely does, the Debtor must settle in accordance with the Plan Committee By-Laws, "which provides the Plan Committee with, among other things, the right to object [to] such claims." Finally, it is clear from oral argument that the settlement provisions do impact the rights of Class 7 and Class 9 creditors, and thus court supervision is essential to protect such rights.

n4 Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Code ("Code"), 11 U.S.C. § 101 *et seq.*

[*6]

The present argument essentially involves the application of claims arising under unsecured subordinated notes called QUIPS, which were allowed in the Plan in the amount of $ 69,537,873.00. The Indenture Trustee administers such notes and Magten is one of the holders of such notes. Article IV, section 4.8(b)(ii) of the Plan provides that QUIPS note claimants may opt to receive payment of their notes in full under one of two options, but not both, namely:

(1) a Pro Rata Share of 505,591 shares of New Common Stock . . ., plus Warrants exercisable for an additional 2.3% of New Common Stock (collectively, "Option 1");or

(2) a Pro Rata Share of recoveries, if any, upon resolution of the QUIPS Litigation ("Option 2").

Option 2 is involved in the settlement language. Under Option 2, such holders of claims shall be treated as a Class 9 General Unsecured Claim, "subject to estimation and reserves of Disputed Claims as provided in section 7.5 of the Plan, with Distributions to holders of Class 8(b) Unsecured Subordinated Note Claims which choose Option 2 being made, if at all, only upon entry of a Final Order resolving the QUIPS Litigation (unless otherwise agreed to [*7] by the Debtor and the Committee);. . . ."

The QUIPS Litigation involves an action by Magten and the Indenture Trustee seeking to upset a transfer of assets to the Debtor from an entity known as Clark Fork and Blackfoot LLC, under circumstances alleged to occur through actual fraud (Adv. Pro. No. 04-53324). Allied with this adversary action is Magten's and the Indenture Trustee's appeal of the confirmation order, actions against an officer of the company, action against counsel for the Debtor and objections to the award of attorney's fees of said counsel, among other pending matters.

The settlement proposal calls for termination of all litigation and provides allocation and payment of the following by NorthWestern to Magten and the Indenture Trustee: (1) distribution of 3 82,732 shares of common stock at the reorganization plan value of $ 20.00 per share, plus 710,449 warrants at a value of $ 4.50 each;

and (2) distribution of those shares of common stock of set aside in a disputed claim reserve pursuant to a stipulation and court order establishing such reserve [Docket No. 2298, November 1, 2004], having a Plan value of $ 17.1 million, plus $ 300,000 of common stock from the general [*8] reserve set aside for Class 9 claimants. From these distributions, Magten and the Indenture Trustee would pay their own attorney's fees and costs (over $ 2 million) from the sale of such shares, the parties would execute mutual releases and all litigation would come to an end.

In the stipulation approved November 1, 2004, the parties agreed that Magten's proof of claim of $ 50 million would result in a reserve of 50% of the proof of claim, equaling $ 25 million of the Class 9 reserved shares, but to the extent that the litigation claim exceeded $ 25 million, the "holders of such claims shall have any deficiency satisfied out of the general Disputed Claims Reserve" described in the Plan. That general Class 9 reserve set aside $ 140 million of shares for over forty disputed claims, only two of which have been resolved.

While the Plan Committee and the Ad Hoc Committee challenge the amount, and therefore the reasonableness of the settlement, the crux of the real objection comes from the manner in which Magten's shares are being distributed, its impact on Class 7 and Class 9 creditors and the violation of section 4.8(b)(ii) of the Plan.

The Plan provides that to the extent shares allocated [*9] to Class 8(b) are not distributed to Option 2 holders, those shares are to be distributed to Class 7 and Class 9 creditors. See Debtor's Second Amended and Restated Plan of Reorganization, Section 4.8(b)(ii). Thus, Magten and the other non-accepting QUIPS holders who took Option 2 received only a Class 9 claim, not a distribution from the 505,591 shares allocated to Option 1 holders. To grant, as the Settlement Agreement does, both types of recovery requires the consent of the Class 7 and Class 9 creditors, either by way of amendment to the Plan or absence of any objections from those classes. But a plan amendment is not legally available because the Plan has been substantially consummated and objection to the distribution has been presented vigorously by Class 7.

[HN2] A confirmed plan may be modified or amended after confirmation, but only before substantial consummation has taken place. Section 1127(b) provides: [HN3] "The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan. . . ." Indeed, Notice of Substantial Consummation of the Plan was filed on December 29, 2004 [Docket No. [*10] 2519], and the notice received widespread publication.

As to consent by Class 7 creditors, as set forth in the Ad Hoc Committee objection, their veto right to the settlement has been clearly stated. Moreover, it is clear that the parties to the settlement realized that the Debtor could not, as it states, "dip into" the Class 9 disputed claim reserve, which is in excess of the Maglen reserve of $ 25 million, to distribute stock to Magten and the Indenture Trustee for the benefit of Magten. Yet, it is admitted that this general reserve is clearly where the 382,732 shares must come from. To do so would not only set Options 1 and 2 on their head after confirmation, and therefore violate the Plan, but would, according to the Debtor, have a serious potential adverse impact on the reserve for other disputed claims. For example, PPL Montana's disputed claim of $ 140 million was reserved at $ 50 million by stipulation, claims from rejection of pension plan exceed $ 12 to $ 15 million, and Hyland's claim of $ 30 million is still unresolved. To date, Cornerstone's claim of $ 19.5 million and Comanche Park of $ 750,000 have been resolved, with distributions made from the general reserve. To [*11] resolve the remaining claims, which have an asserted amount of $ 120 million, there remains 3,720,600 shares with a Plan value of $ 74,412,000. Such financial dilemma surely means that it is imprudent to distribute the 382,732 shares to Magten from the Class 9 reserve over and above the reserve fixed by the November 1, 2004 Stipulation.

I conclude that the Debtor and Magten et al. entered into the Settlement Agreement in good faith, knowing nevertheless that the Plan provisions required the consent of the Class 7 and Class 9 creditors, and certainly both later realized the Plan, at this late date, cannot be amended to accommodate the settlement terms.

Had the settling parties agreed upon a settlement amount which equaled the amount of the Magten/Indenture Trustee reserve of $ 25 million, the agreement may have been able to carry the day, for the parties recognize that [HN4] approval of a proposed settlement is within the "sound discretion" of the Court, and the Court is not burdened to decide numerous questions of law or fact, but rather canvases the issues and circumstances attending the litigation, including cost, to determine whether the agreement falls below the lowest point in [*12] range of reasonableness. In re Martin, 91 F.3d 389 (3d Cir. 1996); In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir. 1983).

Since the Debtor has now concluded the settlement is not in the best interests of the estate, that it violates express provisions of the Plan and therefore cannot be implemented, particularly where Class 7 and Class 9 creditors vigorously object, as does the Plan Committee, the only conclusion for the Court is that the proposed Settlement Agreement must be rejected for the reasons set forth above. This memorandum does not foreclose

further settlement negotiations, and indeed it may be in the best interest of all parties to revisit the present proposal within the limits of the Magten/Indenture Trustee reserve, with a potential supplement from other sources of new common stock, particularly where one of the objectors have taken note that an officer of the company was also the beneficiary of the proposed settlement. n5

n5 One unsettling fact, as stated at the hearing by counsel for the Indenture Trustee, is that the Option 1 bond holders who overwhelmingly voted in favor of the Plan have not received distribution of their shares of new Common Stock due to the dispute over payment and allocation of the Indenture Trustee's attorney's fees. Thus, that class is being held hostage by the continuing litigation, which apparently does not bother the objecting parties.

[*13]

For the reasons set forth above, the Joint Motion of Magten and Law Debenture to approve the Settlement Agreement is DENIED without prejudice. A separate order denying the Motion shall enter.

Dated: March 10, 2005

The Honorable John L. Peterson

United States Bankruptcy Judge

TAB 4

LEXSEE



Positive
As of: Feb 13, 2007

**Kastar, Inc. v. K Mart Enterprises, Inc.**

No. 74-C-1266

**United States District Court for the Eastern District of New York**

**1976 U.S. Dist. LEXIS 14839; 190 U.S.P.Q. (BNA) 550**

**May 29, 1976**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patentee filed a motion for voluntary dismissal of its patent infringement claim against defendant alleged infringer, for dismissal of the alleged infringer's counterclaim seeking a declaration that the patent was invalid, and to quash notices of depositions as unnecessary.

**OVERVIEW:** The patentee sought voluntary dismissal of its patent infringement claim after it was established that its wirestripper had been advertised and offered for sale more than one year prior to the filing of the patent application. The alleged infringer opposed the motion for voluntary dismissal unless it was granted attorneys' fees under 35 U.S.C.S. § 285. The court held that the patent application was filed a day late if the initial shipment date was controlling and several weeks late if the date when orders were first taken was controlling. The court further held that the course of conduct in preparing and filing the application did not indicate any awareness of the critical date or any conscious effort to deceive the Patent Office and, therefore, that the alleged infringer did not meet the burden of proof of showing that this was the exceptional case that called for the assessment of attorneys' fees in addition to normal costs. Because the patentee had indicated that it would withdraw its claim of unfair competition if the patent count was dismissed without attorneys' fees, the court made such withdrawal a condition of its order.

**OUTCOME:** The court granted the patentee's motion for voluntary dismissal of its patent infringement claim,

the patentee's motion to dismiss the alleged infringer's counterclaim as moot, and the patentee's motion to quash the notices of deposition concerning the patent infringement claim. The court further ordered that the patentee's unfair competition claim be dismissed as a condition of this order, with costs of the action to the alleged infringer.

**CORE TERMS:** patent, wirestripper, invention, infringement, catalog, shipment, inventor, notice, unfair competition, public use, counterclaim, deposition, delivery, voluntary dismissal, one year, exceptional, settlement, motion to dismiss, leading case, time limit, advertized, dedicating, patented, Patent Law, production of documents, patent infringement, extension of time, prevailing party, patent case, law suit

**LexisNexis(R) Headnotes**

*Civil Procedure > Dismissals > Voluntary Dismissals > Court Orders > Conditions*
*Patent Law > Remedies > Collateral Assessments > Attorney Fees*
[HN1] Voluntary dismissal after the defendant has answered cannot be effective except by court order and upon such terms and conditions as the court deems proper. Fed. R. Civ. P. 41(a)(2).

*Contracts Law > Types of Contracts > Executory Contracts*

*Patent Law > Anticipation & Novelty > General Overview*
*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
[HN2] The time limit for filing a patent after an offer for sale is contained in 35 U.S.C.S. § 102, which provides in its pertinent parts: A person shall be entitled to a patent unless (b) the invention was in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States. What constitutes placing an invention "on sale" has been a subject of prolific litigation. A single public use or sale may trigger the time limit for filing a patent application.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Statutory Bars > Public Use Bar > General Overview*
[HN3] A patent is barred if the application is filed more than one year after the solicitation of an order, even though the article is to be produced later, where (1) the complete invention is embodied in the thing offered for sale, (2) the invention has been tested sufficiently to verify that it is operable and commercially marketable, and (3) the sale is for profit.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*
*Patent Law > Remedies > Collateral Assessments > Attorney Fees*
[HN4] Attorney's fees are not usually allowed even in patent cases. The statutory provision is set forth in 35 U.S.C.S. § 285 and reads in toto: The court in exceptional cases may award reasonable attorney fees to the prevailing party.

*Patent Law > Remedies > Collateral Assessments > Attorney Fees*
[HN5] Only where the court is convinced that the patent in suit is so wholly devoid of substance that the plaintiff could not have had a bona fide belief in its validity shall it award the defendant reasonable attorneys' fees pursuant to 35 U.S.C.S. § 285.

*Patent Law > Remedies > Collateral Assessments > Attorney Fees*
[HN6] Fraud on the Patent Office would certainly be enough to make a case exceptional, but conduct short of fraud and in excess of simple negligence is also an adequate foundation for deciding that a patent action is exceptional.

**COUNSEL:** [*1]

Lackenbach, Lilling & Siegel, New York, N.Y. (James E. Siegel, New York, N.Y., of counsel) for plaintiff.

Cowan, Liebowitz & Latman, P.C., New York, N.Y. (Richard E. Alexander, Chicago, Ill., and Ruth Stern Geis, of counsel) for defendant.

**OPINION BY:**

JUDD

**OPINION:**

Judd, District Judge.

Plaintiff in this patent and unfair competition action has moved (a) for voluntary dismissal of Count I of the complaint, (b) for dismissal of defendant's counterclaim as moot, and (c) to quash notices of depositions as unnecessary.

Facts

Kastar, Inc. has sued K Mart Enterprises, Inc. for patent infringement and for unfair competition. Count I of the complaint, based on federal jurisdiction of patent cases, alleges infringement of Patent No. 3, 733,627 for an "Electrician's Combination Tool", informally described as a wirestripper. Count II of the complaint, based on diversity jurisdiction, alleges unfair competition in that defendant is selling an exact duplicate of plaintiff's wirestripper, with product, packaging, illustrations, and all printing on the package identical with that marketed by the plaintiff. Plaintiff alleges that it had been selling its wirestripper to defendant even before [*2] the issuance of its patent, but that defendant caused duplicate wirestrippers to be made in Japan after plaintiff obtained its patent.

Defendant's answer denies most of the allegations of the complaint, except the fact that it previously purchased wirestrippers from the plaintiff. Defendant counterclaimed for a declaratory judgment that the patent is invalid because of (1) lack of invention, (2) obviousness, (3) prior sale, and (4) inadequate specification.

After substantial discovery by both sides, evidence was developed indicating that plaintiff's wirestripper had been advertised and offered for sale prior to May 20, 1970, although the patent application was not filed until May 20, 1971. Plaintiff thereafter filed in the Patent Office an instrument dedicating the patent to the public. Its motion to discontinue Count I is based on the fact that the dedication prevents any further infringement and that it is willing to forgo any damages for prior infringement. [HN1] Voluntary dismissal after the defendant has an-

Case 1:05-cv-00548-JJF    Document 24-3    Filed 02/16/2007    Page 13 of 27

1976 U.S. Dist. LEXIS 14839, *; 190 U.S.P.Q. (BNA) 550

swered cannot be effective except by court order and "upon such terms and conditions as the court deems proper." F.R.Civ.P. 41(a)(2).

Defendant opposes the motion to [*3] dismiss unless it is granted attorney's fees under 35 U.S.C. § 285, asserting that the plaintiff must have known before the suit was brought that the wirestripper had been offered for sale more than a year before the patent was filed.

First Sales of Wirestripper

The wirestripper in suit is designated as Catalog No. 511A, in plaintiff's Interim Catalog No. 868A, which bears the same 1968 copyright mark as its predecessor Interim Catalog No. 868, but which the affidavits show was first published in October 1970.

The first reference to the wirestripper in the record appears to be about May 1, 1969. At that time the inventor, Harry Epstein of the plaintiff's organization delivered three sheets of drawings to Mr. Lackenbach, one of plaintiff's patent counsel. Mr. Lackenbach undertook to make a patentability investigation and render a report. One of the evident purposes of this delivery was to obtain an early date for purposes of priority over competing inventions. However, difficulties ensued in completing a commercial embodiment of the invention.

The wirestripper was apparently originally designated as No. 511. A letter "To All Salesmen" from the president of Kastar dated [*4] January 14, 1970 stated that one thing after another had gone wrong with the device, that some bends would have to be reversd in order to enable it to cut wire, and that shipment must be delayed for any customers to whom the wirestripper had been sold.The necessary changes to make the tool operative had been completed by March 4, 1970 or shortly thereafter.

Mrs. Katz, plaintiff's office manager, testified that orders for 2,503 pieces had been received "up until May 1970." On May 12, 1970, Mr. Kaplan notified his salesmen that plaintiff was finally able to deliver No. 511A, that samples were on the way, and that shipments would be made by the end of the week (which might mean Friday, May 15, 1970).

The first shipment of No. 511A wirestrippers, 720 units, appears to have been made on May 19, 1970, pursuant to an order from Strauss Stores received on March 26. The invoice indicates that the shipment originated in Bellport, Long Island, and was received in Maspeth, New York, on May 21, 1970.

The Patent Application

A copy of the patent application was forwarded to plaintiff on April 9, 1971 by its patent counsel, over a

month before the application would have to be filed, if [*5] May 19, 1970 was the date of the first public sale. The application was executed by the inventor, Harry Epstein, over a month later, on May 13, 1971. He probably signed the required oath that the invention had not been on sale for more than one year, although the document is not in the record. The application was not filed in the United States Patent Office, however, until May 20, 1971, a day late if the May 19, 1971 shipment date is controlling, and several weeks late if the date when orders were first taken is controlling.

Plaintiff contends that the wirestripper was not completed and reduced to practice at the time of the orders, and therefore that the delivery of the items to Strauss Stores on May 21, 1970 was really an offer for sale, which could have been accepted or rejected. This argument would mean that no offer for sale could have been made on the dates recorded on plaintiff's invoices as the dates of orders.

Proceedings in this Action

The complaint was filed on August 30, 1974 and the answer and counterclaim on October 29, 1974. Plaintiff served interrogatories on October 25, 1974 and defendant on October 29, 1974 filed a notice of deposition of plaintiff's [*6] patent counsel, the inventor, and plaintiff's president. Also on October 29, 1974 defendant filed a request for production of documents, consisting of 22 paragraphs each beginning "All documents relating * * *." On November 27, 1974 defendant filed partial answers to some of plaintiff's interrogatories. On January 24, 1975 a stipulation was filed substituting new attorneys for the defendant, who thereupon served a new request for production of documents, with 29 paragraphs each beginning "All documents which refer * * *." On April 22, 1975 plaintiff filed objections to each of the 29 requests.

After defendant moved to compel production of such documents, the court conferred with counsel in chambers, and on June 20, 1975 entered an order directing the production of certain documents and providing for confidential treatment of some information in a manner agreed by counsel. The court's notes of the pretrial conference of June 12, 1975 indicate "belligerent attorneys."

Plaintiff's counsel asserted at that time that he was convinced that there had been no prior public use or sale. Plaintiff contemplated making a motion for summary judgment on the issue of infringement and defendant [*7] contemplated making a similar motion on the subject of public use. No such motions were made, but plaintiff moved on the basis of an affidavit verified November 26, 1975 for an extension of time to answer defendant's requests for admissions, and for counsel fees to

compensate it for having had to request an extension which was unreasonably denied. The affidavit of plaintiff's counsel pointed out that defendant had delayed five months before answering plaintiff's requests for admissions, that settlement talks had been undertaken during discussions in Chicago, and that when the settlement talks failed, defendant refused to grant an extension of time for answers which had been due on November 17, 1975. The answers to the requests for admissions were filed on the return day of the motion on December 5, 1975, and no order appears to have been entered.

Apparently depositions had been taken during the intervening months, although they were not filed in the court.

Plaintiff's counsel asserts that one of the obstacles to the Chicago settlement proposals was that S. S. Kresge Company, which owns the defendant company, feared some claim of antitrust violations if it settled the patent [*8] case without obtaining a definite adjudication of invalidity.

On February 10, 1976, plaintiff's counsel sent to the court a copy of a document dedicating U.S. Letters Patent No. 3,733,627 to the public.

Plaintiff has indicated that it may drop the unfair competition claim in Count II if defendant drops its counterclaim and the court does not award attorneys' fees.

Defendant accuses plaintiff of bad faith both in the obtaining of the patent and in the conduct of the law suit, because plaintiff's counsel should have known when the suit began that the patent was not valid.

Legal Issues

1. Prior Sale

[HN2] The time limit for filing a patent after an offer for sale is contained in 35 U.S.C. § 102, which provides in its pertinent parts:

A person shall be entitled to a patent unless * * *

(b) the invention was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *.

What constitutes placing an invention "on sale" has been a subject of prolific litigation. See cases under § 102 n.71 et seq.

A single public use or sale may trigger the time limit for filing a patent application. Smith [*9] & Griggs Manufacturing Co. v. Sprague, 123 U.S. 249, 257 (1887). It has been held, on the other hand, that an executory contract to construct and sell does not constitute putting an invention "on sale." McCreery Engineering Co. v. Massachusetts Fan Co., 195 Fed. 498 (1st Cir. 1912). The court in the McCreery case states (p. 502) that:

The completion of the transaction by delivery and acceptance affords evidence that the article was "on sale" within the meaning of the statute.

It quoted (at p. 502) from Norfolk & Western Ry Co. v. Sims, 191 U.S. 441, 447 (1903), that a sale requires both a contract of sale and delivery of the property.

The statement that an invention must be "completed, delivered, and accepted" before it can be found to be on sale, was quoted in B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co., 124 F.2d 95, 97, 51 USPQ 420, 422 (1st Cir. 1941). This case related to a made-to-order invention, however and therefore is distinguishable from the wirestrippers involved in this case.

The Second Circuit dealt with a somewhat similar situation in Burke Electric Co. v. Independent Pneumatic Tool Co., 234 Fed. 93 (2d Cir. 1916). Where it appeared that patented motors [*10] had been ordered before the critical date but could not be delivered until after the critical date, the Court said:

If patented articles are on hand ready to be delivered to any purchaser, they are on sale, whether any of them has been sold or not. But, if they are not, they cannot be said to be on sale within the meaning of the act, though the invention itself has ceased to be experimental and is complete.

In an article written after the patent application in this case was filed, the author criticized the notion that a mere offer to sell was insufficient to put an invention on sale, but stated, "Unfortunately, many subsequent decisions adopted this dictum as law." Barrett, New Guidelines for Applying the On Sale Bar to Patentability, 24 Stanford L. Rev. (1972), 730, 737.

A definitive interpretation of the "on sale" provision was given by Judge Conner, speaking for the Second Circuit, in Timely Products Corp. v. Arron, 523 F.2d 288, 187 USPQ 257 (2d Cir. 1975). There electrically heated socks were advertized more than a year before the filing date of the patent application, but were not actually available for delivery until after the critical date. The court specifically disapproved [*11] the McCreery, Sturtevant and Burke trilogy of cases, and held (523 F.2d at 299-302, 187 USPQ at 265-268) that [HN3] a patent is barred if the application is filed more than one year after the solicitation of an order, even though the article is to be produced later, where (1) the complete invention is embodied in the thing offered for sale, (2) the invention has been tested sufficiently to verify that it is operable and commercially marketable, and (3) the sale is for

profit. While there was ground for predicting the Timely Products decision, it was not available as an authority either in 1971 when plaintiff's patent application was filed or in 1974 when this action was filed.

2. Attorney's Fees

[HN4] Attorney's fees are not usually allowed even in patent cases. The statutory provision is set forth in 35 U.S.C. § 285 and reads in toto

The court in exceptional cases may award reasonable attorney fees to the prevailing party.

This provision, from the 1952 revision of the Patent Law, sets more restrictive standards than Section 70 of the old Patent Law (R.S. § 4921), which provided simply that

The court may in its discretion award reasonable attorneys' fees to the prevailing party [*12] upon the entry of judgment on any patent case.

A leading case under the pre-1952 law was Park-In-Theatres Inc. v. Perkins, 190 F.2d 137, 90 USPQ 163 (9th Cir. 1951), where a patent for a drive-in theatre had been invalidated as lacking any invention. The court said (p. 142, 90 USPQ at 167),

[The] payment of attorney's fees for the victor is not to be regarded as a penalty for failure to win a patent infringement suit. The exercise of discretion in favor of such an allowance should be bottomed upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force, which makes it grossly unjust that the winner of the particular law suit be left to bear the burden of his own counsel fees which prevailing litigants normally bear.

The court stated that bad faith might be shown by "dilatory tactics or willful effort to prevent expeditious disposition of litigation." (p. 143, 90 USPQ at 168). In that case no bad faith was found.

Judge Tenney dealt with the present language of § 285 in Indiana General Corp. v. Krystinel Corp., 297 F.Supp. 427 (S.D.N.Y. 1969), 161 USPQ 82 affd, 421 F.2d 1023, 164 USPQ 321 (2d Cir.), [*13] cert. denied, 398 U.S. 928, 165 USPQ 609 (1970). He found that the plaintiff had been less than candid with the Patent Office, and that the patent was void for obviousness, but still denied attorney's fees, saying (297 F.Supp. at 449, 161 USPQ at 99, 100):

It is established in this District that [HN5] only where the court is convinced that the patent in suit is so wholly devoid of substance that the plaintiff could not have had a bona fide belief in its validity shall it award the defendant reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

The Indiana General case has been described as the leading case in this circuit on the award of attorney's fees in patent suits. Kahn v. Dynamics Corp. of America, 508 F.2d 939, 944, 184 USPQ 260, 263-264 (2d Cir.) (as modified on denial of rehearing), cert. denied, 421 U.S. 930, 185 USPQ 505 (1975).

In the Kahn case, where attorney's fees were allowed, the court found that the patent applicants had deceived and misled the Patent Examiner with respect to prior art and that they had made no effort to investigate defendant's detailed explanations of why there was no infringement, although three years elapsed between the commencement of the [*14] suit and the trial. The trial court inferred that plaintiff's purpose in commencing the action was to threaten potentially costly litigation in order to force defendant to accept a license under the patent. In affirming, the Court of Appeals stated (p. 945, 184 USPQ at 264):

[HN6] Fraud on the Patent Office would certainly be enough to make a case exceptional, "[but] conduct short of fraud and in excess of simple negligence is also an adequate foundation for deciding that a patent action is exceptional."

quoting from Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288, 294, 160 USPQ 577, 580-581 (9th Cir. 1969). In the Kahn case, the Court of Appeals expressly found support for a determination of bad faith on the part of plaintiff.

See also Becton, Dickinson and Co. v. Sherwood Medical Industries, Inc., 516 F.2d 514, 187 USPQ 200 (5th Cir. 1975); Kramer v. Duralite Company, Inc., 514 F.2d 1076, 185 USPQ 641 (2d Cir. 1975).

Denial of costs was approved in Larchmont Engineering, Inc. v. Toggenburg Ski Center, Inc., 444 F.2d 490, 170 USPQ 241 (2d Cir. 1971), where plaintiff moved for voluntary dismissal with prejudice after extensive pretrial discovery. [*15] Dismissal without costs was granted in spite of the fact that defendant sought a hearing on counsel fees. The Court of Appeals found no abuse of discretion in such denial, pointing out that there is a "broad policy against allowing costs to be erected as an undue barrier to litigation * * *." 444 F.2d at 491, 170 USPQ at 241-242.

Discussion

A reasonably negligent inventor in 1971, when the patent application was filed, might have thought that the year in which to file the application ran from May 21, 1970, when the first wirestrippers were delivered. A reasonably negligent patent attorney, who received the inventor's affidavit that on May 13 the invention had not been on sale for more than one year, might have believed that it was all right to proceed in routine fashion instead

of sending the patent application to Washington immediately by messenger.

The course of conduct in preparing and filing the application does not indicate any awareness of the critical date or any conscious effort to deceive the Patent Office.

Defendant's argument makes it necessary also to consider the situation facing plaintiff's attorney when this action was begun in 1974. Applying the rule that [*16] an attorney should always cross-examine his own client, it is probably true that plaintiff's attorney should have investigated all features of the patent, and that he might have learned in advance that the patent application was actually filed several days or weeks later than it should have been. He probably should have been aware of the 1972 article in the Stanford Law Review and perhaps of the trend of decisions which led to Judge Conner's 1975 opinion in Timely Products. In the practical operation of the legal profession, however, it is not always possible for an attorney to do everything that the practice manuals may dictate. A reasonably negligent attorney, seeing a valid patent in his files, might well think that there was no obstacle to an infringement suit.

It is scarcely realistic to require that an attorney before filing a complaint be familiar with all the 29 groups of documents that the defendant later sought to inspect. Plaintiff's attorney moved to terminate the patent action as soon as the invalidity became manifest. This was an indication of good faith rather than of bad faith.

Defendant also argues that the revised Catalog #868A bore the same 1968 copyright [*17] logo as the original Catalog #868, and therefore that the wirestripper was on sale in 1968. There is no showing, however, that the revised catalog was actually filed in the Library of Congress in 1968 and no contradiction of the affidavit that it was first published in October 1970. A reasonably negligent manufacturer could well reprint a catalog with an old copyright notice. This is not a suit for infringement of the catalog copyright, so the notice is not a critical fact. Since the wirestripper was not operative until March 1970, it could not have been advertized for sale in 1970.

The court therefore concludes that defendant has not met the burden of proof of showing that this is the exceptional case which calls for the assessment of attorneys' fees in addition to normal costs.

In view of the indications that plaintiff would withdraw its claim of unfair competition if the patent count is dismissed without attorneys' fees, the court may properly make such withdrawal a condition of this order.

It is ordered that plaintiff's motion for voluntary dismissal of Count I of the complaint be granted, that plaintiff's motion to dismiss defendant's counterclaim as moot be granted, [*18] that plaintiff's motion to quash the notices of deposition concerning Count I of the complaint be granted, and that Count II of the complaint be dismissed as a condition of this order, with costs of the action to the defendant.



TAB 5

LEXSEE

THOMAS R. ROUSSEAU, Plaintiff, v. ECHOSPHERE CORPORATION t/d/b/a
ECHOSTAR COMMUNICATIONS CORPORATION, ECHOSTAR, ECHO
COMMUNICATIONS, Defendant.

Civil Action No. 03-1230

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

2005 U.S. Dist. LEXIS 22587

August 30, 2005, Decided
August 30, 2005, Filed

**DISPOSITION:** [*1] Defendant's Motion for Attorneys' Fees and Costs from Plaintiff's Counsel (Docket No. 45) granted with respect to its request pursuant to 28 U.S.C. § 1927 and denied with respect to its request pursuant to Federal Rule of Civil Procedure 54(d).

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** An attorney commenced an action on behalf of plaintiff employee alleging that defendant employer's termination of his employment violated state and federal law. The parties reached a settlement that included a voluntary dismissal of the case. The employer filed a motion under 28 U.S.C.S. § 1927 and Fed. R. Civ. P. 54(d) to recover from the employee's attorney, the reasonable attorneys' fees and costs that it incurred over a certain period.

**OVERVIEW:** The employer could not obtain attorneys' fees pursuant to Rule 54(d)(2), because the rule required that any such motion be filed within 14 days of entry of judgment. Because the employer had not cited any authority to demonstrate that was a prevailing party and because the law in this area was unsettled, the magistrate recommended that the court conclude that the employer had failed to meet its burden with respect to its request for costs pursuant to Rule 54(d)(1). The magistrate recommended that the court find that the attorney had in his possession a document that undermined the argument he had been advocating since the case began--that the employee had made a simple mistake when he wrote two Social Security Numbers on his application materials. The actions the attorney took after that point constituted unreasonable and vexatious conduct that multiplied the proceedings. Thus, the employer has demonstrated that

the attorney should be required to personally satisfy the excess costs, expenses and attorneys' fees it reasonably incurred because of his conduct under 28 U.S.C.S. § 1927. It was further recommended that the employer be reimbursed costs in the amount of $ 696.74.

**OUTCOME:** The magistrate judge recommended that the employer's motion for attorneys' fees and costs from the employee's counsel be granted with respect to its request pursuant to the federal statute, but denied with respect to its request pursuant to the federal rule. It was further recommended that the employer be reimbursed costs and that it be given 10 days in which to supply the evidence necessary to support its request for reasonable attorneys' fees.

**CORE TERMS:** prevailing party, message, e-mail, discovery, stricken, deposition, unreasonably, retaliation, recommended, vexatiously, multiplied, protective order, recommendation, necessary to support, extension of time, summary judgment, dyslexia, ssn, memory, social security, voluntary dismissal, conduct discovery, motion to strike, hourly rate, unsubstantiated, undersigned, termination, terminated, reputation, falsifying

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
[HN1] See Fed. R. Civ. P. 54(d)(1).

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*

[HN2] Fed. R. Civ. P. 54 provides a mechanism, but not a source of law, for obtaining attorneys' fees. Fed. R. Civ. P. 54(d)(2)(B) requires the moving party to identify the statute, rule, or other grounds entitling it to the award.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
*Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview*
[HN3] Fed. R. Civ. P. 54(d)(2) is not a mechanism for bringing motions for attorneys' fees pursuant to 28 U.S.C.S. § 1927. Fed. R. Civ. P. 54(d)(2)(E).

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
[HN4] The United States Supreme Court has indicated that the term "prevailing party" is used in numerous fee-shifting statutes and should be interpreted consistently.

*Civil Procedure > Dismissals > General Overview*
*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
[HN5] The United States Supreme Court has held that in order for a party to be a "prevailing party," there must be an alteration in the legal relationship of the parties. The Court therefore has rejected the "catalyst theory" by which some courts had given plaintiffs prevailing party status when they achieved their goals because the defendant had voluntarily changed its behavior. However, the issue of whether a plaintiff's voluntary dismissal of an action with prejudice renders the defendant a prevailing party still remains unresolved.

*Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview*
[HN6] See 28 U.S.C.S. § 1927.

*Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview*
[HN7] 28 U.S.C.S. § 1927 limits attorney sanctions imposed thereunder to those situations where an attorney has: (1) multiplied proceedings; (2) unreasonably and vexatiously; (3) thereby increasing the cost of the proceedings; (4) with bad faith or with intentional misconduct. The sanctions that may be imposed under § 1927 are also limited to excess costs and expenses that are incurred "because of such conduct."

*Civil Procedure > Dismissals > General Overview*
*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
*Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview*
[HN8] The voluntary dismissal of an action does not deprive a court of jurisdiction to decide collateral matters such as requests for attorneys' fees.

*Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview*
[HN9] Indications of bad faith under 28 U.S.C.S. § 1927 are findings that the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment. Inasmuch as § 1927 addresses the impact conduct has on the proceedings, sanctions that are imposed under § 1927 must only impose costs and expenses that result from the particular misconduct. Moreover, these costs and expenses are limited to those that could be taxed under 28 U.S.C.S. § 1920. Under § 1927, even if a lawsuit was initially filed in good faith, sanctions may be imposed on an attorney for all costs and fees incurred after the continuation of the suit which is deemed to be in bad faith.

*Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview*
[HN10] 28 U.S.C.S. § 1927 does not require that a movant be a "prevailing party" in order to recover thereunder. Indeed, the United States Supreme Court has noted that the statute does not distinguish between winners and losers, or between plaintiffs and defendants. The statute is indifferent to the equities of a dispute and to the values advanced by the substantive law. It is concerned only with limiting the abuse of court processes.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
[HN11] In assessing the reasonableness of a claimed fee, courts use the "lodestar" formula, which requires multiplying the number of hours reasonably expended by a reasonable hourly rate. When the applicant for a fee has carried his burden of showing that the claimed rates and number of hours are reasonable, the resulting product is presumed to be the reasonable fee to which counsel is entitled. In calculating the hours reasonably expended, a court should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary. Hours that would not generally be billed to one's own

client are not properly billed to an adversary. Thus, courts have a positive and affirmative function in the fee fixing process, not merely a passive role. The burden is on the moving party to establish the prevailing market rate, which is the rate charged in the community by lawyers of reasonably comparable skill, experience and reputation for similar services. The fee applicant should produce satisfactory evidence-in addition to the attorney's own affidavits-that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

**COUNSEL:** For THOMAS R. ROUSSEAU, Plaintiff: Charles A. Lamberton, Lamberton Law Firm, Pittsburgh, PA.

For ECHOSPHERE CORPORATION, trading and doing business as ECHOSTAR COMMUNICATIONS CORPORATION trading and doing business as ECHOSTAR trading and doing business as ECHO COMMUNICATIONS, Defendant: Gregory A. Miller, John A. Goodman, Buchanan Ingersoll, Pittsburgh, PA.

**JUDGES:** AMY REYNOLDS HAY, United States Magistrate Judge. Judge McVerry.

**OPINION BY:** AMY REYNOLDS HAY

**OPINION:**

REPORT AND RECOMMENDATION

I. Recommendation

It is respectfully recommended that Defendant's Motion for Attorneys' Fees and Costs from Plaintiff's Counsel (Docket No. 45) be granted with respect to its request pursuant to 28 U.S.C. § 1927 and denied with respect to its request pursuant to Federal Rule of Civil Procedure 54(d). It is further recommended [*2] that Defendant be reimbursed costs in the amount of $ 696.74 and that, if this Report and Recommendation is adopted by the Court, Defendant be given ten days in which to supply the affidavits and evidence necessary to support its request for reasonable attorneys' fees that it incurred pursuant to § 1927.

II. Report

Before the Court for disposition is Defendant's Motion for Attorneys' Fees and Costs from Plaintiff's Counsel (Docket No. 45). In this motion, Defendant, Echosphere Corporation t/d/b/a Echostar Communications Corporation, Echostar, Echo Communications ("Echosphere"), moves under 28 U.S.C. § 1927 and Federal Rule of Civil Procedure 54(d) to recover from

Plaintiff's counsel, Charles A. Lamberton, the reasonable attorneys' fees and costs that it incurred from the date that it filed a Supplement to Motion for Sanctions (March 25, 2004) through the date that Lamberton admitted that his client had intentionally used two different Social Security Numbers on his application materials and agreed to voluntarily dismiss this case with prejudice (December 6, 2004). For the reasons that follow, the Court should [*3] conclude that Defendant cannot recover attorneys' fees pursuant to Rule 54(d)(2) and that it has failed to demonstrate that it is a "prevailing party" for purposes of Rule 54(d)(1). Defendant has demonstrated that Lamberton vexatiously and unreasonably multiplied the proceedings for purposes of § 1927 and that it incurred excess expenses in the amount of $ 696.74. However, Defendant has not supported its request for attorneys' fees and it should therefore be given ten days in which to supply the affidavits and evidence necessary to support its request for reasonable attorneys' fees that it incurred pursuant to § 1927.

Lamberton commenced this action on behalf of Plaintiff, Thomas R. Rousseau, on July 10, 2003, by filing a praecipe for a writ of summons in the Court of Common Pleas of Allegheny County. On July 30, 2003, Lamberton filed a complaint, in which he alleged that Echosphere's termination of Rousseau's employment on May 8, 2002 constituted retaliation in violation of Pennsylvania public policy for Rousseau's having filed a workers' compensation claim and retaliation under the Americans With Disabilities Act, 42 U.S.C. § 12203(a) ("ADA"), and the [*4] Pennsylvania Human Relations Act, 43 P.S. § 955(d) ("PHRA"), for his having requested an accommodation in the workplace. The complaint alleged that Defendant's proffered reason for Rousseau's termination - "knowingly falsifying company documents" - was merely a pretext for unlawful retaliation discrimination.

On August 18, 2003, Defendant removed the action to this Court on the basis of the federal question presented by Plaintiff's ADA retaliation claim. Discovery commenced and the parties came to the Court for various status and discovery conferences.

On March 23, 2004, Defendant filed a motion for Rule 37 sanctions, which it supplemented on March 25, 2004. In this motion, Defendant requested that the case be dismissed for Plaintiff's acts of "abusing the discovery process, perpetrating a fraud on this Court and attempting to conceal the one document that would expose Plaintiff's fraudulent conduct." (Docket No. 16 at 1.) Defendant argued in particular that an April 14, 2002 e-mail message Lamberton had produced after the close of discovery undermined the position taken by Rousseau and Lamberton throughout the case, namely that Rousseau's use of two Social [*5] Security Numbers on his

employment application materials had been a "simple mistake" attributable to his mild form of adult dyslexia.

On April 19, 2004, Lamberton filed a brief in opposition to Defendant's motion and a cross-motion for sanctions under Rule 11 (Docket No. 24). On April 21, 2004, Defendant filed a motion to strike this opposition brief and Rule 11 motion on the grounds that: (1) it was 51 pages long, far in excess of the 25-page limitation indicated in the Court's order on motion practice; (2) it contained scandalous, irrelevant and outrageous allegations against Defendant and Defendant's counsel that had nothing to do with the Rule 37 motion; (3) it contained many unsubstantiated allegations that had no record cite, or that were based upon mischaracterizations of record cites or that were simply Lamberton testifying; and (4) Lamberton did not file a motion or comply with Rule 11 or Local Rule 37.1 procedures. Defendant also filed two motions for extension of time to file summary judgment motions (Docket Nos. 19, 28), which Lamberton opposed (Docket Nos. 20, 21, 22, 29).

On May 12, 2004, the undersigned filed a Memorandum and Order that denied Defendant's motion for [*6] sanctions, granted Defendant's motion to strike Plaintiff's opposition brief and Rule 11 motion, denied Plaintiff's motion for Rule 11 sanctions, granted Defendant's second motion for extension of time and afforded Defendant an additional 60 days in which to conduct discovery related to Plaintiff's belated production of the April 14, 2002 e-mail. The Memorandum Opinion noted that Defendant made "a compelling argument for dismissal," but also observed that dismissal with prejudice is a harsh sanction to be resorted to only in extreme cases. "Here the balance favors allowing the case to proceed to a conclusion on the merits, but not before the defendant is afforded an opportunity to conduct additional discovery during the next sixty (60) days, if it so chooses, relative to the belated production of the April 13 [sic] and Plaintiff's explanations therefor." (Docket No. 30 at 4.)

On May 21, 2004, Lamberton filed a notice of appeal (Docket No. 31) to Judge McVerry of the May 12, 2004 Memorandum and Order. The appeal argued that Plaintiff had been "sanctioned" when the Court allowed Defendant an additional 60 days to conduct discovery. On June 1, 2004, Defendant filed a motion [*7] to strike the appeal on the grounds that: (1) it contained many unsubstantiated allegations that had no record cite, that were based upon mischaracterizations of record cites or that were simply Lamberton testifying; (2) it contained immaterial and unsubstantiated allegations about Defendant and Defendant's counsel and their conduct during the case; (3) it incorporated by reference numerous excerpts and exhibits from the 51-page opposition brief that had been stricken; and (4) it contained allegations of

errors by the Magistrate Judge that were not relevant to the proper standard of review (Docket No. 32).

On September 17, 2004, the Court entered a Memorandum Order denying Plaintiff's appeal. The Court first noted that the appeal contained numerous allegations that either had no record cite or constituted Lamberton's unsworn testimony and numerous excerpts and exhibits from Plaintiff's opposition brief that had already been stricken from the record. The Court struck all of these items from the record. (Docket No. 37 at 2-3.) The Court then found and ruled that:

> Plaintiff has completely misconstrued the nature of the Magistrate Judge's allowance of additional discovery. The [*8] allowance of additional discovery is not one of the possible sanctions listed in Rule 37 nor did the Magistrate Judge refer to the allowance of additional discovery as a sanction. . . . Rather, the Court finds and rules that Magistrate Judge Hay appropriately exercised her discretion in allowing the Defendant an additional sixty (60) days for discovery.

(Docket No. 37 at 3, 4.)

The Court also concluded that Plaintiff was not prejudiced when his opposition brief was stricken because the Defendant's motion for Rule 37 sanctions was not granted. The Court noted that Plaintiff's Rule 11 motion did not comport with the safe harbor provisions of that rule and held that it had properly been stricken from the record. Finally, the Court rejected Plaintiff's argument that the Memorandum and Order was clearly erroneous and contrary to law because Defendant had judicially admitted Plaintiff made a mistake in misrecording his Social Security Number, stating that "Defendant has steadfastly argued that Plaintiff was terminated for falsifying company documents, i.e., intentionally using two different Social Security numbers when completing his employment documents." (Docket No. 37 at 4.) [*9]

On November 1, 2004, Lamberton filed a motion for protective order, requesting that the Court prevent Defendant from taking a second deposition of Rousseau because he suffered from mental illnesses and because a second deposition was unnecessary (Docket No. 40). Defendant filed an opposition to this motion on November 10, 2004 (Docket No. 42). On November 24, 2004, the undersigned entered a Memorandum and Order that denied Lamberton's motion for a protective order but adopted certain limitations that Defendant had voluntarily agreed to employ to protect Rousseau during the

deposition, namely taking it at the courthouse in two-hour increments at such time as the undersigned was generally available to determine whether the deposition should be adjourned, whether the questions were abusive or oppressive and whether counsel for the parties were conducting themselves pursuant to the applicable rules of procedure and professional conduct. (Docket No. 43.)

On December 6, 2004, the parties entered into a stipulation for dismissal with prejudice, which was signed by Judge McVerry on December 9, 2004 (Docket No. 44). Defendant filed its motion for attorneys' fees and costs on January 21, 2005 (Docket [*10] No. 45).

Costs and Attorneys' Fees Under Rule 54(d)

Defendant requests costs and attorneys' fees n1 pursuant to Federal Rule of Civil Procedure 54(d). Rule 54(d) provides that: [HN1]

> Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law. Such costs may be taxed by the clerk on one day's notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.

Fed.R.Civ.P. 54(d)(1). [HN2] The rule also provides a mechanism, but not a source of law, for obtaining attorneys' fees. See Fed.R.Civ.P. 54(d)(2)(B) (requiring the moving party to identify the statute, rule, or other grounds entitling it to the award). n2 Defendant cannot obtain attorneys' fees pursuant to Rule 54(d)(2), because the Rule requires that any such motion be filed within [*11] 14 days of entry of judgment. Id. Therefore, to the extent that Defendant seeks attorneys' fees pursuant to Rule 54(d)(2), its motion should be denied.

n1 There are many variations on the phrase "attorneys' fees" (e.g., "attorney fees," "attorney's fees," etc.). The Court of Appeals for the Third Circuit has not expressed a preference. See Lundy v. Haymond, 205 F. Supp. 2d 403, 406 n.2 (E.D. Pa. 2002) (discussing this issue). The Court will use the spelling "attorneys' fees" to reflect the language utilized in Rule 54(d) and § 1927.

n2 [HN3] Rule 54(d)(2) is not a mechanism for bringing motions for attorneys' fees pursuant to 28 U.S.C. § 1927. See Fed.R.Civ.P. 54(d)(2)(E). Defendant's request for attorneys' fees pursuant to § 1927 is discussed below.

With respect to Defendant's request for costs pursuant to Rule 54(d)(1), Lamberton argues that Defendant is not a "prevailing party" because the action was voluntarily dismissed. [*12] His legal argument contains the following quote from a district court case in support: "In the same light when a complaint is dismissed [by voluntary stipulation], the defendant cannot be a 'prevailing party.' Defendant has not 'prevailed' over the plaintiff on any issue central to the merits of this litigation." (Lamberton Decl. P122) (quoting Sellers v. Local 1598, Dist. Council 88, Am. Fed. State, County & Mun. Employees, 614 F. Supp. 141, 144 (E.D. Pa. 1985)). n3 However, Lamberton has changed the bracketed portion of this quotation, which originally said "for lack of jurisdiction," not "by voluntary stipulation." Thus, the Sellers case does not support his position. Moreover, to the extent that Sellers held that a court may not impose sanctions in a case that is dismissed for lack of jurisdiction, it cannot stand after the Supreme Court's decision in Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 395, 110 L. Ed. 2d 359, 110 S. Ct. 2447 (1990), holding that "district courts may enforce Rule 11 even after the plaintiff has filed a notice of dismissal under Rule 41(a)(1)."

n3 Sellers involved a request for attorneys' fees pursuant to 42 U.S.C. § 1988. However, [HN4] the Supreme Court has indicated that the term "prevailing party" is used in numerous fee-shifting statutes and should be interpreted consistently. Buckhannon Bd. & Care Home, Inc. v. West Va. Dep't of Health & Human Res., 532 U.S. 598, 603 n.4, 149 L. Ed. 2d 855, 121 S. Ct. 1835 (2001).

[*13]

He also cites In re Orthopedic "Bone Screw" Products Liability Litigation, 132 F.3d 152 (3d Cir. 1997). In that case, the Court of Appeals held that a district court that lacked subject matter jurisdiction over an action could not impose the sanction of dismissal with prejudice because this ruling acted as an adjudication on the merits, rather than an adjudication on a collateral matter. This case does not involve a lack of subject matter jurisdiction, nor was the dismissal with prejudice imposed on anyone as a sanction, but was voluntarily stipulated to by the parties. Thus, the Orthopedic Bone Screw case provides no guidance here.

Defendant refers to itself as the "prevailing party." (Docket No. 45 P84; Docket No. 46 at 4.) However, it cites no authority in support of this proposition. The issue of whether a defendant is a prevailing party when a plaintiff has voluntarily dismissed the case with prejudice has produced at least three different responses from federal courts. Compare Cantrell v. International Bhd. of Elec. Workers, 69 F.3d 456, 456 (10th Cir. 1995) (en banc) (defendant is a prevailing party), and First Commodity Traders, Inc. v. Heinold Commodities, Inc., 766 F.2d 1007, 1015 (7th Cir. 1985) [*14] (same), with Marquart v. Lodge 837, 26 F.3d 842, 852 (8th Cir. 1994) (defendant is not a prevailing party), with Dean v. Riser, 240 F.3d 505, 511 (5th Cir. 2001) (defendant is not a prevailing party unless it can demonstrate that the plaintiff withdrew to avoid a disfavorable judgment on the merits).

In 2001, [HN5] the Supreme Court held that in order for a party to be a "prevailing party," there must be an "alteration in the legal relationship of the parties." Buckhannon Bd. & Care Home, Inc. v. West Va. Dep't of Health & Human Res., 532 U.S. 598, 605, 149 L. Ed. 2d 855, 121 S. Ct. 1835 (2001). The Court therefore rejected the "catalyst theory" by which some courts had given plaintiffs prevailing party status when they achieved their goals because the defendant had voluntarily changed its behavior. However, the issue of whether a plaintiff's voluntary dismissal of an action with prejudice renders the defendant a prevailing party still remains unresolved. Compare Preservation Coalition of Erie County v. Federal Transit Admin., 356 F.3d 445, 451 (2d Cir. 2004) (a stipulation and order, by which the parties dismissed the case with prejudice and removed the [*15] ongoing judicial oversight the court had previously imposed, did not provide the defendants with prevailing party status), and Bridgeport Music, Inc. v. London Music, U.K., 345 F. Supp. 2d 836, 839 (M.D. Tenn. 2004) (Rule 41(a)(1) voluntary dismissal "did not entail any determination, oversight or involvement by the court, aside from the perfunctory act of entering judgment to terminate the case."), with Claiborne v. Wisdom, 414 F.3d 715, 719 (7th Cir. 2005) (when plaintiff moved to voluntarily dismiss her Fair Housing Act claims and district court entered an order upon the plaintiff's motion dismissing the action with prejudice, the order effected a legal alteration in the relationship because a future suit would be barred on res judicata grounds). The Court of Appeals for the Third Circuit has not addressed this issue.

Because Defendant has not cited any authority to demonstrate that it is a prevailing party and because the law in this area is unsettled, the Court should conclude that Defendant has failed to meet its burden. Therefore, with respect to its request for costs pursuant to Rule 54(d)(1), Defendant's motion should be denied.

Sanctions [*16] Under 28 U.S.C. § 1927

Defendant moves, pursuant to 28 U.S.C. § 1927, to recover attorneys' fees and costs from Lamberton for the period between March 25, 2004 and December 6, 2004. Section 1927 provides as follows: [HN6]

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. n4 The Court of Appeals has stated that:

> [HN7] The statute thus limits attorney sanctions imposed thereunder to those situations where an attorney has: (1) multiplied proceedings; (2) unreasonably and vexatiously; (3) thereby increasing the cost of the proceedings; (4) with bad faith or with intentional misconduct. The sanctions that may be imposed under § 1927 are also limited to excess costs and expenses that are incurred "because of such conduct."

LaSalle Nat'l Bank v. First Conn. Holding Group, LLC, 287 F.3d 279, 288 (3d Cir. 2002) [*17] (citing In re Prudential Ins. Co. Am. Sales Practice Litig., 278 F.3d 175, 188 (3d Cir. 2002)).

> n4 As noted above, [HN8] the voluntary dismissal of an action does not deprive a court of jurisdiction to decide collateral matters such as requests for attorneys' fees. See Macheska v. Thomson Learning, 347 F. Supp. 2d 169, 179 (M.D. Pa. 2004) (citing cases specifically with respect to § 1927).

The court has further stated that:

> [HN9] "Indications of this bad faith are findings that the claims advanced were meritless, that counsel knew or should

have known this, and that the motive for filing the suit was for an improper purpose such as harassment." Inasmuch as § 1927 addresses the impact conduct has on the proceedings, sanctions that are imposed under § 1927 must only impose costs and expenses that result from the particular misconduct. Moreover, these costs and expenses are limited to those that could be taxed under 28 U.S.C. § 1920.

In re Prudential, 278 F.3d at 188 [*18] (quoting Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1375 (6th Cir. 1987)) (other citations omitted). "Under § 1927, even if a lawsuit was initially filed in good faith, sanctions may be imposed on an attorney for all costs and fees incurred after the continuation of the suit which is deemed to be in bad faith." Boykin v. Bloomsburg University of Pa., 905 F. Supp. 1335, 1347 (M.D. Pa. 1995) (citation omitted). See Hall v. Cole, 412 U.S. 1, 15, 36 L. Ed. 2d 702, 93 S. Ct. 1943 (1973) ("'bad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation.")

Lamberton again argues that Defendant is not a prevailing party. However, in this instance, the argument is irrelevant because [HN10] § 1927 does not require that a movant be a "prevailing party" in order to recover thereunder. Indeed, the Supreme Court has noted that the statute "does not distinguish between winners and losers, or between plaintiffs and defendants. The statute is indifferent to the equities of a dispute and to the values advanced by the substantive law. It is concerned only with limiting the abuse of court processes." Roadway Express, Inc. v. Piper, 447 U.S. 752, 762, 65 L. Ed. 2d 488, 100 S. Ct. 2455 (1980). [*19] n5

n5 In Roadway Express, the Supreme Court held that the word "costs" in § 1927 (at the time, all the statute provided for) did not include attorneys' fees. Congress subsequently amended the statute to provide for "excess costs, expenses, and attorneys' fees."

Underlying Facts

Rousseau completed an employment application on March 29, 2002 and began working for Echosphere on April 28, 2002. (Compl. P9; Answer P9.) On April 29, 2002, he completed an Employment Eligibility Verification INS Form I-9. On the application, Rousseau put down a number that was not his true Social Security Number, and on the I-9 he wrote two different Social Security Numbers. (Compl. PP12-13, 21; Answer PP12-13, 21.) The complaint alleged that Rousseau suffers from a mild form of adult dyslexia and that his use of multiple Social Security Numbers on his application materials was a simple mistake, attributable to this condition. (Compl. PP8, 25.)

On May 8, 2002, Human Resources Manager Jill Harmon called Rousseau into her office [*20] and told him that Echosphere was terminating his employment for "knowingly falsifying company documents." (Compl. PP42-43; Answer PP42-43.) Thereafter, he filed for unemployment compensation benefits, which Echosphere opposed. The application was initially denied, but following a hearing, a referee granted his request. (Compl. PP47-50; Answer PP47-50.)

The complaint alleges that Defendant's proffered reason for Rousseau's termination was a pretext for unlawful retaliation discrimination because he was terminated the day after he notified his supervisor, Alex Wagner, that he had been cleared for modified duty with a temporary lifting restriction of up to twenty pounds (Rousseau had reported on May 2 that he injured his back the day before while lifting a computer monitor). Rousseau suggested that other employees could help him with heavy lifting and he proposed that Echosphere purchase a hoisting device to help him lift the monitors. The complaint alleges that Wagner was displeased by the statement that Rousseau would be on modified duty, ignored his request for accommodation and told Rousseau that his job description required him to lift 65 pounds and there were times when he would [*21] be on shift alone. (Compl. PP27, 39-41; Answer PP27, 39.)

After filing the complaint, Plaintiff continued to assert in discovery that Rousseau's use of multiple Social Security Numbers on his application materials had been a "simple mistake" resulting from his adult dyslexia. See Rousseau Dep. at 180 (Docket No. 16 Ex. F); Pl.'s Resp. Def.'s Interrog. No. 9(c) (Docket No. 16 Ex. C); Pl.'s Supp. Resp. Def.'s Interrog. No. 5 (Docket No. 16 Ex. G). However, in more recent filings, Lamberton has also argued to Defendant and this Court that Rousseau suffers from a number of mental illnesses that impair his memory (Docket No. 40 Exs. 2-6, 8) and that he "has a tendency to 'gap fill' with inaccurate or incomplete facts when his memory fails him" (Docket No. 16 Ex. Q).

Defendant contends that, no later than March 25, 2004, Lamberton had evidence that refuted the position he had advanced on Rousseau's behalf throughout this case. The evidence consists of an e-mail message that Rousseau had sent to Wagner on April 14, 2002 and it stated as follows:

Thanks, Alex, by the way last year some-one used my old SSN and bagged my re-fund, so I was issued a temp SSN, I guess all of my existing [*22] personal stuff will still be on my old ssn? credit, FBI, etc.? If [Defendant] has any problems let me know so I can let them use my old ssn. As for tax stuff the new number will be used. Thanks, Tom.

(Docket No. 16, Ex. O.) n6 Lamberton indicates that, when he discussed the substance of this message with Rousseau, Rousseau was "genuinely perplexed" and that Lamberton doubted that Rousseau's identity had been stolen as he stated in this message. (Lamberton Decl. P60.)

> n6 This e-mail message, produced by Lam-berton with number 010002, was on the bottom of a page had been previously produced at num-ber 000009, which contained one e-mail message at the top and blank space at the bottom. (Docket No. 16 Exs. L, O.) Counsel for both sides have argued at length about the circumstances sur-rounding the belated production of document 010002 and why the April 14, 2002 message was missing from document 000009. For purposes of this motion, it is not necessary for the Court to address this issue, as Defendant requests attor-neys' fees only from the date document 010002 was produced.

[*23]

Defendant argues that, once he was aware of this damaging evidence, Lamberton not only refused to dis-miss the case but he vexatiously and unreasonably multi-plied the proceedings thereafter by: (1) opposing Defen-dant's simple requests for extension of time in which to file a motion for summary judgment until after it could take Rousseau's deposition to inquire about the e-mail message; (2) filing a 51-page opposition brief (which was stricken from the record by the Court) in which he proposed unsupported medical theories to excuse Rous-seau's "simple mistake"; (3) filing a motion for Rule 11 sanctions (which was also stricken from the record by the Court) in which he asserted that Defendant knew that the so-called "damning email" did not prove that Rousseau's actions were intentional and not a simple mistake but filed its motion for Rule 37 sanctions anyway; (4) filing an appeal (portions of which were stricken from the re-cord by the Court) from the May 12, 2004 Memorandum and Order that had denied Defendant's motion for sanc-tions, in which he asserted that the Court's decision to

allow Defendant sixty additional days to conduct discov-ery related to the belatedly produced e-mail [*24] mes-sage constituted a "sanction"; (5) filing a motion for pro-tective order to prevent Defendant from deposing Rous-seau; and (6) voluntarily dismissing the case when Rous-seau finally told him that he had purposely written two Social Security Numbers.

In a declaration filed in opposition to Defendant's motion, Lamberton states that, shortly after his motion for a protective order was denied (November 24, 2004):

> I had a conversation with Mr. Rousseau on the telephone to explain the likely sub-ject matter of his second deposition, and the conditions imposed in the Magistrate's order. During this conversation, Mr. Rousseau became upset and complained he was being treated unfairly. He said he did not understand why Defendant was making "such a big deal" out of his social security numbers. I briefly reminded him it was Defendant's position he had delib-erately recorded two separate social secu-rity numbers on his hiring documents in an effort to deceive the company. In re-sponse, Mr. Rousseau said:

>> "To be honest, I knew one of those numbers was mine, but I just couldn't remember which."

> I was stunned. After spending more than $ 140,000.00 in attorney time pursuing Mr. Rousseau's [*25] case, he had now admitted he recorded two num-bers on purpose (even though he had no fraudulent intent in doing so). I was also absolutely livid given how easy it would have been to explain this fact *if* it had been dis-closed at the beginning of the case. I asked Mr. Rousseau why he had not told me the truth. He did not have an explanation. I told Mr. Rousseau that the Rules of Civil Procedure and Professional Conduct required that I dis-close this fact to defense counsel.

(Docket No. 49, Lamberton Decl. PP102-03.) Lamberton states that Rousseau's disclosure did not change his view of the merits of the case, but his professional relationship with Rousseau was permanently damaged and he deter-mined that he would have to withdraw his appearance as counsel. (Lamberton Decl. PP104-05.) Lamberton then telephoned Gregory A. Miller, one of the two primary lawyers working on the case for Echosphere, and re-vealed what Rousseau had told him. He indicated that he

would withdraw as Rousseau's counsel and that he did not know what Rousseau would do. He suggested the possibility of Echosphere making a settlement offer, but Miller said no such offer would be forthcoming. When Lamberton [*26] informed Rousseau of these developments, Rousseau instructed him to end the litigation. (Lamberton Decl. PP106-07.)

Lamberton has not explained why the verbal admission made to him by Rousseau at some point between November 24, 2004 and December 6, 2004 gave him sufficient cause to seek to withdraw his appearance and to voluntarily dismiss the case, but this same information as revealed to him by the e-mail message he was aware of no later than March 25, 2004 did not. In addition, as noted above, around the time Lamberton produced the e-mail message, he began to supplement the claim of Rousseau's dyslexia with the claim that Rousseau suffers from a number of mental illnesses that impair his memory and that he "has a tendency to 'gap fill' with inaccurate or incomplete facts when his memory fails him." Lamberton has not explained why, given his own assessment of his client's mental state, Defendant should have been expected to rely on what Rousseau said.

Lamberton continues to argue the merits of this case in his declaration. However, as Defendant notes, the merits of the case are irrelevant at this point because it has been dismissed and Defendant's position is that Lamberton's actions [*27] between March 25, 2004 and December 6, 2004 were delaying tactics designed to prevent Defendant from examining Rousseau about the April 14, 2002 e-mail message. Lamberton also attaches as exhibits a Concise Statement of Material Facts and a Supporting Memorandum of Law that he *intended to file* in connection with a motion for summary judgment on the affirmative defense of after-acquired evidence. (Docket No. 49 Exs. 2-3.) These exhibits should not be considered because they are not part of the record. Finally, Lamberton argues that the purpose of Defendant's current motion is to "distract" him from filing a response to a motion for summary judgment submitted by counsel in another case also involving an employee that he represents who was terminated by Echosphere. (Docket No. 49 P137 & Ex. 7.) The motive behind Defendant's motion is irrelevant; either Defendant has met its burden of demonstrating that Lamberton vexatiously and unreasonably multiplied the proceedings or it has failed to do so.

Based upon the record, the Court should conclude that, no later than March 25, 2004, Lamberton had in his possession a document that undermined the argument he had been advocating since this [*28] case began-that Rousseau had made a simple mistake when he wrote two Social Security Numbers on his application materials. The actions Lamberton took between that date and De-

cember 6, 2004-filing oppositions to Defendant's requests for extension of time to file a summary judgment motion, filing a 51-page opposition brief and Rule 11 motion without requesting leave of Court to exceed the page limitation and without utilizing the safe harbor provisions of Rule 11, filing an appeal of Defendant's motion for sanctions that had been denied by contending that an extension of discovery to investigate the belatedly produced e-mail message was a sanction, and filing a motion for protective order to prevent Rousseau from being deposed about the e-mail message-constituted unreasonable and vexatious conduct that multiplied the proceedings. Thus, Defendant has demonstrated that Lamberton should be required to personally satisfy the excess costs, expenses and attorneys' fees it reasonably incurred because of his conduct.

Calculating the Fees and Costs

The Court of Appeals has stated that: [HN11]

In assessing the reasonableness of a claimed fee in cases like this, we use the "lodestar" formula, [*29] which requires multiplying the number of hours reasonably expended by a reasonable hourly rate. See Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). "When the applicant for a fee has carried his burden of showing that the claimed rates and number of hours are reasonable, the resulting product is presumed to be the reasonable fee to which counsel is entitled." Delaware Valley Citizens' Council, 478 U.S. at 564, 106 S.Ct. 3088 (internal quotation omitted).

In calculating the hours reasonably expended, a court should "review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are 'excessive, redundant, or otherwise unnecessary.'" Public Int. Research Group of N.J., Inc. v. Windall, 51 F.3d 1179, 1188 (3d Cir. 1995) (internal citation omitted) "Hours that would not generally be billed to one's own client are not properly billed to an adversary." Public Interest Group, 51 F.3d at 1188. [*30] Thus, we have a positive and affirmative function in the fee fixing process, not merely a passive role.

Maldonado v. Houstoun, 256 F.3d 181, 184 (3d Cir. 2001) (some citations omitted). The burden is on the moving party to establish the prevailing market rate, which is the rate charged in the community by lawyers of reasonably comparable skill, experience and reputation for similar services. The fee applicant should "produce satisfactory evidence-in addition to the attorney's own affidavits-that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 896 n.11, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984).

Gregory Miller states in an affidavit that, from the date he filed the motion for sanctions until the date Lamberton agreed to dismiss the case, he spent 21.60 hours at an hourly rate of $ 300.00 and attorney John A. Goodman spent 83.80 hours at an hourly rate of $ 215.00, for a total of $ 24,497.00. (Miller Aff. PP10-12.) He further states that they incurred the following necessary expenses: photocopies ($ 30.60), telecopies ($ 45.00) and on-line [*31] search services ($ 621.14), for a total of $ 696.74. (Miller Aff. P13.) The combined total of these amounts is $ 25,193.74. (Miller Aff. P14.)

Defendant has supported its request for $ 696.74 in excess expenses with documentation (Miller Aff. Ex. A) and Lamberton has not challenged it. However, Defense counsel has not submitted evidence other than Miller's own affidavit to substantiate that the requested attorneys' fees are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

The Court cannot resolve this issue on the present record. Therefore, it is recommended that, if this Report and Recommendation is adopted by the Court, Defendant should be given ten days in which to supply the affidavits and evidence necessary to support its request for reasonable attorneys' fees that it incurred pursuant to § 1927.

For these reasons, it is recommended that Defendant's Motion for Attorneys' Fees and Costs from Plaintiff's Counsel (Docket No. 45) be granted with respect to its request pursuant to 28 U.S.C. § 1927 and denied with respect to its request pursuant to Federal Rule of Civil Procedure 54(d) [*32] . It is further recommended that Defendant be reimbursed costs in the amount of $ 696.74 and that, if this Report and Recommendation is adopted by the Court, Defendant be given ten days in which to supply the affidavits and evidence necessary to support its request for reasonable attorneys' fees that it incurred pursuant to § 1927.

Within ten days after being served with a copy, any party may serve and file written objections to the report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

AMY REYNOLDS HAY

United States Magistrate Judge

Dated: 30 August, 2005