# EXHIBIT 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>NORTHWESTERN CORPORATION,<br><br>Debtor. | Chapter 11<br><br>Case No. 03-12872 (CGC) |
| NORTHWESTERN CORPORATION,<br><br>Plaintiff,<br>v.<br><br>MAGTEN ASSET MANAGEMENT<br>CORPORATION, and TALTON R. EMBRY<br><br>Defendants. | Adv. No. 04-55051 (CGC) |

## DECLARATION OF TALTON R. EMBRY IN SUPPORT OF THE MOTION OF MAGTEN ASSET MANAGEMENT CORPORATION AND TALTON R. EMBRY TO DISMISS THE COMPLAINT OF NORTHWESTERN CORPORATION FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

TALTON EMBRY declares as follows:

1.    I am the principal and managing director of Magten Asset Management Corporation ("Magten"). I submit this declaration (the "Declaration") in support of the motion (the "Motion") of Magten Asset Management Corporation ("Magten") and Talton R. Embry to dismiss the above captioned complaint of Northwestern Corporation (the "Debtor") for failure to state a claim up on which relief can be granted.

2.    All facts set forth in this Declaration are based on my personal knowledge, upon my review of relevant documents, or on my opinion based upon my experience and knowledge

1

of the above captioned chapter 11 case. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration.

3.     Magten began acquiring shares of the QUIPS[1] in April 2003. As of the Petition Date, Magten held 801,200 shares of QUIPS and as of the date of this Declaration, Magten holds 1,244,061 shares of QUIPS.

4.     On or about November 25, 2003, I was informed that the Office of the United States Trustee appointed Magten to the Official Committee of Unsecured Creditors (the "Committee"). After having been informed of Magten's appointment to the Committee, but prior to attending any Committee meetings and prior to receiving any substantive information from the Committee or the Debtor concerning the Debtor or its operations, Magten executed 3 transactions for shares of QUIPS between December 1, 2003 and December 5, 2003, which were allocated over a variety of accounts. The sum total of shares of QUIPS acquired by Magten between December 1, 2003 and December 5, 2003 was 27,540.[2]

5.     Between December 5, 2003 and December 17, 2003, Magten did not execute any trades of QUIPS. During that period, Magten was informed that a Committee meeting had been scheduled for December 18, 2003. As of December 17, 2003, Magten was not in possession of any material, non-public information regarding the Debtor and its operations. However, Magten was concerned that as a result of any non-public information it may receive at the December 18, 2003 Committee meeting Magten would become restricted from trading in the Debtor's securities after that time. Accordingly, on December 17, 2003, a day prior to its initial

---

[1]     All capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.
[2]     The Debtor, in its Complaint, incorrectly indicates that Magten traded 28,540 shares of QUIPS while it was a member of the Committee because the Debtor double counts the 1000 QUIPS shares purchased on December 1, 2003 by counting the January 21, 2004 transaction as a separate purchase. The correct amount of QUIPS shares traded by Magten during the time it was on the Committee was 27,540.

participation in Committee meeting and a day prior to receiving non-public information from the Debtor, Magten sold 1,900 shares of QUIPS for a client account.[3] This sale was made in order to honor the client's standing request to withdraw funds on a monthly basis and the recognition that future withdrawal requests would most likely not be able to be met through the sale of the Debtor's securities.

6.    On December 17, 2003, Magten received a copy of the Committee By-Laws by email from counsel to the Committee. A copy of the By-Laws is attached to this Declaration as Exhibit A. Although Magten was officially appointed to the Committee on November 25, 2003, Magten did not receive any substantive information from the Committee concerning the Debtor or its operations prior to the December 18, 2003 Committee meeting.

7.    On December 18, 2003, I, as representative of Magten, attended my first Committee meeting. As I have previously indicated, with the exception of a copy of the Committee's By-Laws, the December 18, 2003 Committee meeting was the first time that Magten received any information from the Committee or the Debtor concerning the Debtor or its operations. In light of the fact that Magten obtained information concerning the Debtor and its operations at the December 18, 2003 Committee meeting, Magten ceased trading the QUIPS at that time.

8.    Due to the fact that Magten only has one employee, Magten believed that it would not be able to comply with the terms of the Trading Order entered by the Bankruptcy Court. Because Magten wanted the opportunity to be able to trade in the QUIPS and obtain the same

---

[3]    In reviewing the Debtor's Complaint, it appears that the Debtor has mistakenly counted the December 17, 2003 sale of 1,900 shares of QUIPS twice, thereby alleging improper sales of 3,800 shares. A careful examination of Magten's trading records produced to the Debtor shows that the front side and the back side of one trading slip is on two separate pages, and both sheets are referring to the same 1,900 share trade. A copy of Magten's December 17, 2003 trading record is attached to this Declaration as Exhibit B.

protections that the other members of the Committee received under the existing Trading Order, in or around January 2004, I endeavored, through counsel, to seek a consensual agreement with the Debtor, the Committee and the United States Trustee modifying the terms of the Trading Order. However, after garnering the support of the Debtor and the Committee, the United States Trustee would not support any such application. In light of the United States Trustee's position, Magten chose not to pursue the issue further. Accordingly, Magten continued its moratorium on trading in the Debtor's securities.

9.    In or about January 2004, I executed on behalf of Magten a Confidentiality Agreement in connection with Magten's membership on the Committee.[4] An execution copy of the Confidentiality Agreement is attached to this Declaration as Exhibit C.

10.    On March 11, 2004 the Debtor filed its plan and disclosure statement, which the Debtor stated contained all material information concerning the Debtor and its operations. In April 2004, both the Debtor and the Committee wrote letters to the United States Trustee requesting the removal of Magten from the Committee. By letter dated May 6, 2004, Magten was informed by the United States Trustee that it had been removed from the Committee.

11.    Following Magten's removal from the Committee on May 6, 2004, I resumed trading shares of QUIPS on behalf of Magten on May 14, 2004. Because all material information regarding the Debtor was publicized in the Debtor's plan and disclosure statement previously filed with the Court and because Magten was no longer a member of the Committee, Magten was no longer restricted from trading in the Debtor's securities. Beginning on May 14, 2004, with the purchase of 2,000 shares, through the date of the Complaint, Magten purchased 95,000 shares of QUIPS.

---

[4]    Although the Confidentiality Agreement is dated December 18, 2003, it was not circulated to the Committee for execution until January 2004.

4

12.     On July 27, 2004, I was deposed by the Debtor in connection with Magten's objection to confirmation of the Debtor's First Amended Plan of Reorganization. At my deposition I was asked questions concerning Magten's trading, however, neither the notice of deposition nor the first request for the production of documents served by the Debtor requested records of or information concerning my purchases and sales of the QUIPS. Consequently, in preparing for my deposition, I did not review Magten's trading records. As such, when answering questions concerning Magten's trading activity, I was confused and, as a result, following the deposition, I reviewed Magten's trading records to refresh my recollection. I subsequently submitted a correction to my deposition testimony in which I set forth my best recollection regarding a transaction for 1000 shares of QUIPS that was "booked" on January 21, 2004 (the "January 2004 Trade"). My corrected testimony explained that the January 2004 Trade was the result of a misunderstanding I had with a broker, Richard Fels of Tradition Asiel.

13.     After I submitted the correction to my deposition testimony, I spent more time reviewing Magten's *internal* trading records in response to the Debtor's supplemental request for documents. Upon review of Magten's internal trading records, which were subsequently produced to the Debtor, I noticed a notation on an internal trading record for January 21, 2004. A copy of the December 3, 2003 and January 21, 2004 internal trading records are attached to this Declaration as Exhibit D. The notation indicated that there was no purchase of 1,000 shares on January 21, 2004, merely the "rebooking" of part of a trade made on December 3, 2003. On December 3, 2003, Magten had purchased 4,440 shares from Richard Fels at Tradition Asiel. In January 2004, an account reconciliation of our statements against the statements of our securities custodian, Bear Stearns & Co., revealed that 1,000 of the 4,440 shares purchased on December 3, 2003 were never delivered to Bear Stearns for a Magten account in which I hold a beneficial

interest. As the trade was now "stale," meaning that Bear Stearns needed new instructions to take in the 1,000 shares, I instructed Richard Fels of Tradition Asiel to cancel the original December 3, 2003 delivery instructions and have the securities delivered to a different Magten account in which I have a beneficial interest. Consistent with my instructions to Mr. Fels, my assistant, Ms. Jean Colditz, instructed Owen Lynch at Bear Stearns to take delivery of the shares in the correct account. Ms. Colditz also instructed Mr. Lynch to cancel any previously issued instructions to place the shares in a different Magten account. In turn, Ms. Colditz reconciled Magten's internal records to reflect this transaction. Although Ms. Colditz's communication with Bear Stearns regarding the booking error was not produced to the Debtor because I only came across it after the filing of the Complaint, her communication appropriately informed Bear Stearns of the error and authorized Bear Stearns to receive the securities into the correct account. A copy of the communication to Bear Stearns is attached to this Declaration as Exhibit E.

14.     Because Magten is actively engaged in the business of trading securities for its clients I do not remember the nature of the circumstances surrounding every trade. Therefore, although I did not originally recall the circumstances regarding the January 2004 Trade, the notations on Magten's trading records (which were produced to the Debtor in August 2004) clearly indicate that the January 2004 Trade was simply the reconciliation and completion of the December 3, 2003 purchase of 4,440 QUIPS shares. In fact, other than working with Bear Stearns and the broker to correct the delivery instructions for the 1000 undelivered shares from the December 3, 2003 purchase, Magten did not take any further action with reference to these shares subsequent to December 3, 2003. Thus, the January 21, 2004 trade was actually executed contemporaneously with the trades that were executed in December 2003, at a time when Magten did not possess any material non-public information

15.    Therefore, at no point during the five months that Magten was a member of the Committee or during the months following Magten's removal from the Committee did Magten trade in the Debtor's securities with material, non-public information.

I declare under the penalty of perjury that the above statements are true and correct.

Dated:  New York, New York
        September 28, 2004

By: _____
    Talton Embry

# EXHIBIT A

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
NORTHWESTERN CORPORATION**

**Chapter 11 Case No. 03-12872 (Judge Case)**

**BY-LAWS**

1.    THE COMMITTEE

        1.1    Appointment of Committee.  On September 30, 2003, the United

States Trustee for the District of Delaware, under the authority conferred by

Section 1102(a)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the

"Bankruptcy Code"), appointed the Official Committee of Unsecured Creditors (the

"Committee") of NorthWestern Corporation (the "Debtor"), the members of which are

referred to individually as a "Member" and collectively as the "Members."  The functions

of the Committee are set forth in Section 1103 of the Bankruptcy Code.

        1.2    Membership.  The Committee is composed of the Members listed

in Exhibit "A" hereto, which also identifies the representatives, alternates and counsel of

the respective Members, if any.

        1.3    Chairperson.  The Committee has selected Thomas Fuller as

Chairperson (the "Chair").  In the event the Chair resigns or for any other reason is

unable to serve, the majority of the Members entitled to vote shall choose a successor.

Additionally, such a majority may at any time replace the Chair for cause.

        1.4    Counsel.  The Committee has retained, subject to approval of the

United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"),

the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP to serve as the

Committee's co-counsel ("Counsel"), in the performance of the Committee's duties

under Section 1103 of the Bankruptcy Code.  The Committee also has retained, subject to approval of the Bankruptcy Court, The Bayard Firm to serve as the Committee's co-counsel.

    1.5    <u>Financial Advisor</u>.  The Committee has retained, subject to Bankruptcy Court approval, Houlihan, Lokey, Howard & Zukin LLC, as its financial advisor to assist in the performance of the Committee's duties under Section 1103 of the Bankruptcy Code.

    1.6    <u>Other Professional Persons</u>.  The Committee may retain, pursuant to Bankruptcy Court approval, any other professionals, including, but not limited to additional financial and business advisors, appraisers and accountants, to assist the Committee with the performance of its duties under Section 1103 of the Bankruptcy Code.

    1.7    <u>Change in Investment Position; Resignation</u>.  A Member shall promptly notify Counsel in writing if it no longer holds any claims against the Debtor.  If a Member ceases to be a creditor of the Debtor, such Member shall thereupon be deemed to have resigned from the Committee and neither such creditor-Member nor its assignee, if any, shall have the right to designate a successor.  A Member may also resign at any time by giving written notice thereof to the United States Trustee and Counsel.  Each Member shall have the ability to trade, purchase, sell or otherwise dispose of its claims against or interests in the Debtor in accordance with applicable law including any orders entered or to be entered by the Bankruptcy Court.

    1.8    <u>Substitutions and Vacancies</u>.  Each Member may change or substitute its representatives at any time or, in the event any representative of a Member

resigns, dies, is no longer employed by or is no longer an agent of the creditor represented, or for any other reason is unable to serve, to designate a successor representative or alternate, as the case may be, which shall be any authorized employee or agent of such Member.

      1.9    <u>Replacements</u>.  Upon the resignation or removal (pursuant to applicable law) of a Member, the Committee may recommend a replacement to the United States Trustee, or the Committee may refrain from recommending a replacement. Until a vacancy on the Committee is filled, the Committee may perform all of its functions with its reduced number (disregarding such vacancy for purposes of determining a quorum and a majority).

2.     MEETINGS AND ACTION BY THE COMMITTEE.

      2.1    <u>Calling and Notice</u>.  Meetings of the Committee may be called by the Chair or by Counsel at the direction of the Chair, and shall be called by either Counsel or the Chair upon the request of a majority of the voting Members.  Notice of the time and place of each meeting of the Committee shall be given to each Member and its counsel reasonably (under the circumstances) in advance of such meeting.  No notice of an adjourned meeting need be given, other than by announcement at the meeting at which the adjournment is taken and by reasonable notice (under the circumstances) to any Members and their counsel who were not present at such meeting.  The Committee shall endeavor, whenever feasible, to determine at each meeting when the next meeting shall be held.  If feasible, each notice of a meeting shall be in writing or email; if not feasible, notice may be given orally, by telephone or otherwise.

2.2    <u>Place of Meetings; Meetings by Conference Call</u>.  Meetings of the Committee shall be held at such place designated by the Chair or by Counsel.  As necessary and appropriate in the judgment of the Chair or Counsel, meetings may be conducted by telephone conference call.

2.3    <u>Meeting Agenda</u>.  The agenda for regularly scheduled meetings shall be prepared by the Chair with advice of Counsel, taking into account suggestions (if any) by other Members.  If feasible, a proposed agenda and any relevant documents to be discussed at each Committee meeting will be circulated to each Member and its counsel reasonably (under the circumstances) in advance of each Committee meeting.

2.4    <u>Quorum</u>. A majority of all voting Members (other than any Members who have resigned or been removed) shall constitute a quorum for the transaction of business at any meeting.  A quorum shall include any voting Members attending by telephone connection.

2.5    <u>Voting; Polling by Telephone</u>.  Each voting Member shall be entitled to one vote, and may attend and vote (a) in person by its representative or (b) through a designated alternate or counsel.  Action of the Committee shall be authorized by the vote of a majority of the Members present at the time of the vote if there is a quorum.  The designation of alternates at meetings may be in such form, written or oral, as may be acceptable to the Chair, upon advice of Counsel.  If the matter to be voted on is one of significance and urgency, as determined by the Chair or a majority of the voting Members present, with the advice of Counsel, a reasonable effort shall be made during the meeting to poll by telephone all absent voting Members, provided that the failure to reach any such absent voting Member will not affect the validity of any vote

otherwise proper under these By-Laws.  Telephone votes solicited pursuant to this

Section shall be given full voting effect, and may be counted in computing a quorum in

respect of the relevant action.  Attendance at meetings of the Committee shall be limited

to Members, their respective counsel, professionals or agents employed or retained by the

Committee, and other persons invited by the Committee for special or limited purposes.

The Committee may elect to meet in executive session, which shall be open only to all

Members, their respective counsel, and professionals employed by the Committee.

      2.6    Action Without Meeting; Action Without Vote.  Any action

required or permitted to be taken by the Committee, or any subcommittee formed

pursuant to Section 3.4 of these By-Laws, may be taken without a meeting provided that

a reasonable effort is made to contact each voting Member or subcommittee Member or

its counsel for its vote, and further provided that the action voted on is approved by no

less than a majority of the Members of the Committee or subcommittee.  Such polling

shall be conducted by the Chair or by Counsel upon the direction of the Chair or by the

chair of a subcommittee.  Notwithstanding anything else contained in this Section 2.6 to

the contrary, when exigent circumstances exist whereby compliance with the normal

Committee meeting procedures set forth herein is impracticable, the Chair shall be

empowered, without prior Committee action or consent, to take any action required or

permitted to be taken by the Committee, or any subcommittee formed pursuant to Section

3.4 of these By-Laws, if advised by Counsel that such action involves a matter of less

than $100,000.  Any action taken pursuant to this Section shall be memorialized in

writing and filed with the minutes of the Committee or subcommittee, as the case may be.

2.7    <u>Conflicts of Interest</u>.  In the event that any matter under review or consideration by the Committee may involve a conflict of interest with respect to any Member, such Member shall disclose such conflict, shall abstain from voting on the matter if determined by a majority of the Committee then present to involve a conflict of interest requiring abstention, and, upon such determination, may be excluded by vote of a majority of the Members then present and not subject to such conflict of interest from that portion of the meeting at which such matter is considered.  Only for the purpose of a vote under this Section to exclude a Member from a meeting, any Member not allowed to vote shall be counted for a quorum.  A determination of the existence of a conflict of interest shall be made by a majority of the Members present and not subject to the alleged conflict of interest, upon advice of Counsel.

Each Member of the Committee retains the right to appear in the Debtor's chapter 11 case in respect of its own interests and to take a position different from that of the Committee, <u>provided</u>, <u>however,</u> that no Member shall purport to represent or speak for the Committee in connection therewith.

The Committee hereby authorizes Counsel, and any other professionals retained by the Committee in accordance with Sections 1.5 and 1.6 hereof (collectively, the "Professionals"), following appropriate direction from the Committee, to investigate, analyze and, if authorized by the Court, prosecute any potential claim or cause of action that may be asserted by or on behalf of the Debtor against any party in interest in the Debtor's chapter 11 case including, without limitation, the Members.

3.    ACTION BY REPRESENTATIVES OF THE COMMITTEE

3.1    Chair.  The Chair shall preside at all meetings of the Committee, and subject to the control of the Committee, shall have such powers and duties as are set forth in these By-Laws or as the Committee assigns to it.

3.2    Executive Committee.  An executive committee (the "Executive Committee") may be formed which shall be comprised of those Members appointed in accordance with Section 3.4 of these By-Laws (the "Executive Committee Members"). The Executive Committee shall have only those rights and obligations set forth in this Section 3 and, for purposes of these By-Laws, shall be authorized to act only upon the unanimous consent of all of its members.  An Executive Committee Member may resign from the Executive Committee at any time by giving notice of its resignation to each Member of the Committee and Counsel.  An Executive Committee Member will be deemed to have resigned from the Executive Committee upon ceasing to be a Member of the Committee or if the Committee votes to remove such Executive Committee Member. In the event of a vacancy on the Executive Committee, the Members shall elect a replacement or alternate to serve on such Executive Committee.

3.3    Emergency Motions.  The Executive Committee, with the advice of Counsel, shall be empowered, without prior Committee action or consent, to consent to or otherwise act upon applications or motions for Bankruptcy Court orders on an emergency basis if the Executive Committee, with the advice of Counsel, determines that it is not feasible to obtain a vote of the Committee pursuant to these By-Laws, and to act on urgent or other matters where a quorum of the entire Committee, under the circumstances, cannot be convened or contacted for such action.  Notwithstanding the

foregoing, the Executive Committee will take every reasonable effort possible to communicate with the Committee before taking any such actions. The Committee shall be advised of any Bankruptcy Court orders, motions, applications or other matters so acted upon by the Executive Committee pursuant to this Section promptly and in any event no later than the next succeeding Committee meeting.

3.4  Subcommittees. The Committee may form an Executive Committee and/or one or more subcommittees, to be appointed by the Chair or Executive Committee upon consultation with the Committee and to serve at the Committee's pleasure, with such powers and duties as the Members of the Committee shall determine.

3.5  Professionals. The Professionals shall act at the request of the Committee (or, when appropriate, a subcommittee or the Executive Committee) or the Chair, and shall perform the duties specified in their respective orders of retention, together with such implementing duties as are set forth in these By-Laws or as may be requested by the Chair, the Committee, any subcommittee or the Executive Committee.

3.6  Secretary. There shall be no secretary for the Committee or any subcommittee. In lieu thereof, Counsel shall, at the request of any Member keep the minutes of all or any meetings of the Committee and any subcommittee, and shall be responsible for giving notice of meetings of the Committee and subcommittee. Unless requested by any Member, no minutes will be kept of any meeting of the Committee. Minutes of each meeting at which minutes are taken shall be circulated to all Members for their review, and shall be adopted by a majority of the Members present at the meeting which is the subject of such minutes. Subject to changes approved by the Committee or subcommittee, as appropriate, the minutes generally shall be limited to a

concise statement of the action taken at a meeting and a brief statement of any significant items discussed by the Committee or subcommittee, but without any details of such discussion.  The minutes shall list the Members present.

4.    MISCELLANEOUS.

    4.1    Confidentiality.  All (a) information, documents and matters of whatever nature and kind disclosed to the Committee which are identified as confidential, (b) information or documents generated by the Committee, by any of the Professionals or by any Member or counsel to any Member for use by the Committee which are identified as confidential, (c) communications among Members in their capacity as such, and (d) deliberations occurring, or statements made by Committee members, at any Committee meeting (collectively, "Confidential Material"), will, except as otherwise provided herein, be kept confidential and not be disclosed in any manner whatsoever.  The Professionals shall endeavor to identify any given information or document, as the case may be, as constituting Confidential Material.  Notwithstanding the foregoing, Confidential Material may be disclosed (w) to a Member's directors, officers, employees, members, principals, professional advisors or agents who, in the disclosing Member's judgment, need to know such information (it being understood that such directors, officers, employees, members, principals, professional advisors and agents shall be informed by the Member of the confidential nature of such information and shall undertake to be bound by these rules of confidentiality), (x) to governmental or regulatory or self-regulatory authorities as deemed necessary by counsel to the disclosing Member, (y) to any third party if such Member is obligated by law to do so (in which event such Member shall promptly advise Counsel of such disclosure or prospective

disclosure prior to it being disclosed or, if not practicable, as soon as possible thereafter but no later than two (2) business days after such disclosure) or (z) becomes generally available to the public other than as a result of disclosure by the Committee, any of the Members or the Professionals.

The Committee reserves the right to designate particular additional information as Confidential Material on an ad hoc basis.

Notwithstanding a Member's resignation or removal from the Committee, such Member shall remain bound by the provisions of this Section.

4.2    Media Communications.  Subject to review and approval in advance by the Committee, communications with the media with respect to Committee views or positions in the Debtor's chapter 11 case shall be made only by the Chair or Counsel.

4.3    Amendments.  These By-Laws may be amended, repealed or adopted by the vote of a majority of the Members of the Committee entitled to vote.

4.4    Reimbursement Applications.  Counsel to the Committee shall prepare and submit applications on behalf of each of the Members for reimbursement of expenses in accordance with Section 503 of the Bankruptcy Code.

4.5    Robert's Rules.  If not set forth in these By-Laws, any procedures with respect to Committee meetings shall be governed by Robert's Rules of Order. Dated this 8th day of October, 2003.

By: _____
      Chairman of the Offical Committee of Unsecured Creditors

EXHIBIT "A"

| Member | Representative | Counsel |
|---|---|---|
| ANGELO GORDON & CO. | Tom Fuller | |
| FRANKLIN MUTUAL ADVISERS, LLC | Michael Embler<br>Eric Yip | Brad Takahashi |
| OAKTREE CAPITAL MANAGEMENT, LLC | Gloria Noh Cannon | |
| AVENUE CAPITAL GROUP | John Barrett | |
| THE BANK OF NEW YORK | Irene Siegel | Amanda Darwin |
| HSBC BANK USA | Robert A. Conrad | Constantine Potamianos<br>Tina Niehold Moss |
| WILMINGTON TRUST COMPANY | James Nesci<br>Sandra Ortiz | Stephen Herrmann |
| COMANCHE PARK LLC | Allan McGarvey | Steven K. Kortanek |

# EXHIBIT B

... ..... IMMUNUMEDICINE CORPORATION

BUY / SELL

TRADE DATE: 1/1/03

TOTAL POSITION: 1,200

SECURITY NAME:

PRICE: REDACTED

COMMISSION: 54

SETTLE. DATE: 1/1/03

Merdeast Power Ref

BROKER: Brian Gould

BKR. CODE: QSGH

BKR. NAME: McGr Store

TICKER: MFPC

AMOUNT
1,800

| PRINCIPAL | INTEREST | SEC FEE | COMM | NET | TRANSACT # |
|-----------|----------|---------|------|-----|------------|
|           |          |         |      |     |            |
|           |          |         |      |     |            |
|           |          |         |      |     |            |
|           |          |         |      |     |            |
|           |          |         |      |     |            |
|           |          |         |      |     |            |

REDACTED

AUTHORIZED SIGNATURE: M

Eileen

MAGTEN ASSET MANAGEMENT CORPORATION

To: Ted Lang
410-231-5788

BUY. / SELL

TRADE DATE: 12/17/03

SETTLE. DATE: 12/26/03

TOTAL POSITION: 1,800

SECURITY NAME: _____ REDACTED

PRICE: _____

COMMISSION: 5 c/

BROKER: Joen Gruzen

BKR. CODE: OSCHH

TICKER: MGPD

BKR. NAME: _____

| AMOUNT | PRINCIPAL | INTEREST | SEC FEE | COMM | NET | TRANSACT# |
|--------|-----------|----------|---------|------|-----|-----------|
| 1,800 | | | | | | #569096,77,78 |

REDACTED

REDACTED

REDACTED

# EXHIBIT C

December 18, 2003

**VIA FACSIMILE AND OVERNIGHT DELIVERY**

Alan W. Kornberg, Esq.
Paul Weiss Rifkind Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019

Re: NorthWestern Corporation, Chapter 11 Case No. 03-12872 (CGC) – Confidentiality
    Agreement with Official Committee of Unsecured Creditors

Dear Alan:

NorthWestern Corporation ("NorthWestern") wishes to continue discussions regarding NorthWestern's financial condition, business, and bankruptcy case with the Committee (as defined below) and its members. To further the purposes of such discussions and NorthWestern's Chapter 11 case, NorthWestern is willing to provide certain information to the Official Committee of Unsecured Creditors (the "Committee") regarding NorthWestern which NorthWestern considers to be nonpublic and confidential or proprietary in nature. As a condition to being furnished Information (defined below), the Committee, its members and advisors agree to treat all such Information in accordance with the provisions of this letter agreement.

The term "Information" as used in this letter agreement shall mean all nonpublic documents and other information (including information communicated orally or contained on any computer tapes, computer disks or any other form of electronic or magnetic media) concerning NorthWestern or any of its affiliates that NorthWestern or any of the officers, directors, employees, representatives, advisors, agents of NorthWestern, including NorthWestern's financial and legal advisors (collectively, the "Disclosing Parties") furnishes or otherwise discloses to the Committee, the Committee's legal and financial advisors or any of the Committee's affiliates, including the individual members (the "Members") of the Committee to the extent such Members receive confidential and proprietary Information (collectively, the "Receiving Parties"), together with all analyses, compilations, studies or other documents, records or data (including information contained on any computer tapes, computer disks or any other form of electronic or magnetic media) prepared by the Receiving Parties that contain or otherwise reflect or are generated from such documents and information and also including any Information heretofore provided to the Receiving Parties provided, however, Information shall only include information is (a) nonpublic and confidential or proprietary in nature concerning NorthWestern or any of its affiliates and its business and (b) marked "confidential" or should reasonably have been understood because of the legends or other markings, the circumstances of disclosure or the nature of the information itself to be nonpublic and confidential or proprietary in nature; *provided, however,* that: (i) the Receiving Parties shall be permitted to provide all such

Alan W. Kornberg, Esq.
Confidentiality Agreement
December ___, 2003
Page 2

analyses, compilations, studies or other documents, records or data (including information contained on any computer tapes, computer disks or any other form of electronic or magnetic media) to any state or federal regulatory bodies having jurisdiction over NorthWestern in the Committee's reasonable discretion; (ii) the Receiving Parties shall be permitted to disclose to such regulatory bodies the fact that the Information has been made available to the Committee; and (iii) the Receiving Parties may make any disclosure of Information to which the Disclosing Party gives its written consent in advance of the disclosure. Notwithstanding the foregoing, there shall not be disclosure of Information to any state or federal regulatory body having jurisdiction over NorthWestern without first complying with the terms and procedures of this letter agreement. The term "Information" does not include information that: (i) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Parties in violation of this letter agreement; (ii) becomes available to the Receiving Parties on a non-confidential basis from a source other than the Disclosing Party or its representatives, provided that such source is not actually known by the Receiving Parties to be bound by a confidentiality agreement with or other obligation of secrecy to the Disclosing Party; (iii) was available to the Receiving Parties on a non-confidential basis prior to its disclosure to the Receiving Parties by the Disclosing Party; or (iv) is independently developed by the Receiving Parties without the use of Information provided by the Disclosing Party.

The Committee and its Members agree that, except as otherwise required by law, regulation or the rules of any national securities exchange or regulatory authority, the Committee, its Members and their representatives: (i) will use Information solely for the purposes set forth in this letter agreement; and (ii) will keep all Information confidential. In all cases in which Information is provided to the Committee or its Members' representatives, the Committee or the Members, as applicable, must inform such representatives of the confidential nature of the Information and they must agree to be bound by this letter agreement to the same extent that the Committee and its Members are bound. In any event, the Committee or its Members, as applicable, are responsible for any breach of this letter agreement by any of their representatives.

Except as provided in this letter agreement, the Committee and its Members agree that, without the prior written consent of NorthWestern, the Committee, its Members and their representatives will not disclose to any other person the fact that the Information has been made available to them; *provided, however*, that the Committee and its Members may make such disclosure if such disclosure is allowed by this letter agreement or if the Committee or its Members have been advised by their respective legal counsel that such disclosure is required by law, regulation or legal process or by the rules of any national securities exchange or regulatory authority. Prior to any disclosure of Information as may be required by law or applicable rules and regulation, however, the Committee or its Members will give prompt notice (unless prohibited by law) to NorthWestern such that

Alan W. Kornberg, Esq.
Confidentiality Agreement
December ___, 2003
Page 3

NorthWestern or its representatives may seek, at their sole expense, an appropriate protective order or other appropriate remedy or waive compliance with the provisions of this letter agreement.

The Committee and its Members acknowledge that they are aware, and that they will advise their representatives who are informed as to the matters that are the subject of this letter agreement, that the United States securities laws prohibit any person who has received from an issuer material, non-public information from purchasing or selling or offering to purchase or sell securities of such issuer or from communication of such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities. It being understood that nothing herein shall prevent Receiving Parties who have established an Ethical Wall pursuant to the Order Permitting Securities Trading Upon Establishment of Ethical Wall, entered by the Bankruptcy Court on November 6, 2003, from trading NorthWestern's securities in accordance with the procedures set forth in such order or from otherwise trading such securities in accordance with applicable securities laws..

If the Receiving Parties or any of their representatives is requested or required to disclose any Information pursuant to a subpoena, court order, civil investigative demand or similar judicial process or other oral or written request issued by a court of competent jurisdiction or by a federal, state or local governmental or regulatory body, or by law or regulation, the Committee or its legal advisors shall provide NorthWestern with prompt written notice (unless prohibited by law) of the existence, terms, and circumstances such that NorthWestern or any of its representatives may seek, at their sole expense, an appropriate protective order or other appropriate remedy or waive compliance with the provisions of this letter agreement. If, in the absence of a protective order or other remedy or the receipt of a waiver by NorthWestern, the Committee's legal advisors are nonetheless legally compelled to disclose the Information, the Committee's legal advisors may, without legal liability hereunder, disclose only that portion of the Information which they are required to disclose, provided that the Committee's legal advisors shall exercise their commercially reasonable efforts to preserve the confidentiality of the Information in reasonably cooperating with NorthWestern to obtain an appropriate protective order.

The Committee and its Members agree that money damages would not be a sufficient remedy for any breach of this letter agreement and that NorthWestern may seek equitable relief, including injunction and specific performance, in the event of any breach of the provisions of this letter agreement, in addition to all other remedies available at law or in equity, including monetary damages as to individual Members only, and that the Committee or the Members, as applicable, will not raise the defense of an adequate remedy at law in any action seeking equitable relief.

Alan W. Kornberg, Esq.
Confidentiality Agreement
December ___, 2003
Page 4


      The agreements set forth in this letter agreement may be modified or waived only by a separate writing by NorthWestern and the Committee expressly modifying or waiving such agreements.  It is further understood and agreed that no failure or delay in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

      If any term, provision, covenant, or restriction of this letter agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this letter agreement shall remain in full force and effect.

      Any notice hereunder shall be made in writing, by first class mail, by overnight courier or by facsimile to:


      If to NorthWestern, to:

      NorthWestern Corporation
      125 South Dakota Avenue
      Suite 1100
      Sioux, South Dakota 57104
      Fax: (605) 978-2963
      Attn: Eric R. Jacobsen, Esq.

      With a copy to:

      Paul, Hastings, Janofsky & Walker LLP
      600 Peachtree Street NE, Suite 2400
      Atlanta, Georgia 30308
      Fax: (404) 815-2424
      Attn: Jesse H. Austin, III, Esq.

Alan W. Kornberg, Esq.
Confidentiality Agreement
December ___, 2003
Page 5

> If to the Committee, to:
>
> AG Capital Recovery Partners III, L.P.
> c/o Angelo Gordon & Co.
> 345 Park Avenue
> New York, New York  10167
> Fax: (212) 867-6395
> Attn:  Mr. Thomas M. Fuller
>
> With a copy to:
>
> Paul Weiss Rifkind Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019
> Fax: (212) 373-2053
> Attn: Alan W. Kornberg, Esq.

The term "person" as used in this letter agreement will be interpreted broadly to include, without limitation, any corporation, company, group, partnership or other entity or individual.  This letter agreement shall be construed in accordance with the laws of the State of New York.

Please confirm your agreement with the foregoing by signing and returning one copy of this letter agreement to the undersigned, whereupon this letter agreement shall become a binding agreement between NorthWestern , the Committee and its Members.

Alan W. Kornberg, Esq.
Confidentiality Agreement
December ___, 2003
Page 6

Very truly yours,

_____

Jesse H. Austin, III
for Paul, Hastings, Janofsky & Walker
LLP

Counsel for NorthWestern Corporation,
as Debtor and Debtor-in-Possession

Accepted and agreed as of
December __, 2003

By_____
Alan W. Kornberg
Paul Weiss Rifkind Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019

Counsel for the Official Committee of Unsecured Creditors

Alan W. Kornberg, Esq.
Confidentiality Agreement
December ___, 2003
Page 7


Accepted and agreed as to each
individual Member of the Committee:

OCM Opportunities Fund IV, L.P.
By: Oaktree Capital Management, LLC, its General Partner


_____
By:
Title:



Franklin Mutual Advisers, LLC


_____
By:
Title:



The Bank of New York, as Trustee


_____
By:
Title:



Wilmington Trust Company, as Trustee


_____
By:
Title:

Alan W. Kornberg, Esq.
Confidentiality Agreement
December ___, 2003
Page 8

HSBC Bank USA, as Indenture Trustee

_____
By:
Title:

Avenue Capital Management

_____
By:
Title:

AG Capital Recovery Partners III, L.P.

_____
By:
Title:

Comanche Park, LLC

_____
By:
Title:

Magten Asset Management Corp.

_____
By:
Title:

ATL/990628.2

# EXHIBIT D

MAGTEN ASSET MANAGEMENT CORPORATION

BUY/SELL

TRADE DATE: 11/3/03

TOTAL POSITION: 4,440

SECURITY NAME: REDACTED

PRICE: REDACTED

COMMISSION:

SETTLE. DATE: 11/6/03

BROKER: Fred/Jo Astra /  BKR. NAME: Richard Zak

BKR. CODE: TRAD  TICKER: MTZO

| AMOUNT | PRINCIPAL | INTEREST | SEC FEE | COMM | NET | TRANSACT # |
|--------|-----------|----------|---------|------|-----|------------|
| 4,440 | | | | | | #583936 |
| 1,000 | | | | | | #583937 |
| | REDACTED | | | | | |
| 1,000 | | | | | | #583938 |

REDACTED

AUTHORIZED SIGNATURE: ___

Save Accounts

564407

MAGTEN    168

**MAGTEN ASSET MANAGEMENT CORPORATION**

BUY / SELL

TRADE DATE: 1/21/04

TOTAL POSITION: 1,000

SECURITY NAME: Montana Power PSd   REDACTED

PRICE: REDACTED

COMMISSION: Net

SETTLE. DATE: 1/21/04

BROKER: Tradition Asiel

BKR. CODE: NPAD

BKR. NAME: Richard Yos

TICKER: MTPP

| AMOUNT | PRINCIPAL | INTEREST | SEC FEE | COMM | NET | TRANSACT # |
|--------|-----------|----------|---------|------|-----|------------|
| 1,000 | | | REDACTED | | | #5b4408 |

Spoke w/ Renee — she is keeping trade —

REDACTED

1,000 shares put in G-T from Cancellation of 1,000 shares in TPE Personale trade 12/3/03 — Cancel #5b480.

AUTHORIZED SIGNATURE: Per Kelly Every   Breakdown to Richard

# EXHIBIT E

08/20/04  FRI 10:18 FAX 212 813 9058        MAGTEN ASSET                                      ☑ 0

# magten

To: Owen Lynch

MAGTEN ASSET MGNT

BEAR STEARNS SECURITIES CORP.
MS. RENEE JOSEPH    212-272-
1 METROTECH CENTER        8238
NORTH
BROOKLYN        , NY    11201

A/C TITLE : MAGTEN GROUP TRUST
YOUR A/C #: 102-04708

DATE: 01/21/04

TO WHOM IT MAY CONCERN:

WE HAVE PURCHASED/SOLD FOR THE ABOVE ACCOUNT THE FOLLOWING SECURITIES:

| SECURITY DESCRIPTION | TRANS TYPE | TRADE/ SETTLE | QUANTITY/ ORIG. FACE | PRICE CURRENCY | PRINCIPAL | INTEREST | OTH CHGS | COMMISS | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| MONTANA POWER 8.45% PFD 12/31/36  A 612083204 | PURCH | 01/21/04 01/26/04 | 1,000 | 15.5000 | 15,500.00 | 0.00 | 0.00 | 0.00 | 15,500.00 |

BROKER: TRADITION ASIEL SECURITIES INC.

this security is being delivered
from Pershing DTC #443

AUTHORIZED SIGNATURE

08/20/04  FRI 10:18 FAX 212 813 9058      MAGTEN ASSET                                      @003

MAGTEN ASSET MGNT

BEAR STEARNS & CO.
MR. OWEN LYNCH

245 PARK AVENUE

NEW YORK          ,  NY    10167

A/C TITLE : TALTON R. EMBRY PERSONAL
            MAGTEN ASSET MANAGEMENT CORP
YOUR A/C #: 055-51215 552

DATE: 01/21/04

TO WHOM IT MAY CONCERN:

WE HAVE PURCHASED/SOLD FOR THE ABOVE ACCOUNT THE FOLLOWING SECURITIES:

| SECURITY DESCRIPTION | TRANS TYPE | TRADE/ SETTLE | QUANTITY/ ORIG. FACE | PRICE CURRENCY | PRINCIPAL | INTEREST | OTH CHGS | COMMISS | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| ** CANCELLATIONS ** | | | | | | | | | |
| MONTANA POWER 8.45% PFD12/31/36  A 612083204 | PURCH | 12/03/03 12/08/03 | 1,000 | 15.5000 | 15,500.00 | 0.00 | 0.00 | 0.00 | 15,500.00 |
| | | | | | BROKER: TRADITION ASIEL SECURITIES INC. | | | | |

*Cancel from TR Embry Personal a/c — you never booked it —*

-------------------------------
AUTHORIZED SIGNATURE