**<u>EXHIBIT C</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 03-12872 (CGC) |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| Debtor. | : | |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | Adv. No. 04-55051 (CGC) |
| | : | |
| MAGTEN ASSET MANAGEMENT | : | |
| CORPORATION, and TALTON R. EMBRY | : | |
| | : | |
| Defendants. | : | |
| | : | |

### MOTION OF MAGTEN ASSET MANAGEMENT AND TALTON R. EMBRY
### TO DISMISS THE COMPLAINT OF NORTHWESTERN CORPORATION
### FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE
### GRANTED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

Magten Asset Management Corporation ("Magten"), and Talton R. Embry (together with Magten, the "Defendants"), by and through their undersigned counsel, file this motion (the "Motion") to dismiss the adversary complaint (the "Complaint") of Northwestern Corporation (the "Debtor") pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to bankruptcy cases by Federal Rule of Bankruptcy Procedure 7012(b). In support of its Motion, Defendants respectfully state as follows:

### PRELIMINARY STATEMENT

Magten owns approximately 1.2 million shares of QUIPS. By its Complaint, the Debtor is seeking a determination that the Defendants breached their legal and fiduciary duties as

120087.01600/40145348v1

members of the official committee of unsecured creditors (the "Committee") by trading approximately 120,000 shares of QUIPS. The Debtor alleges that by trading in the QUIPS, the Defendants misused material, non-public information provided by the Debtor, and violated the terms of the confidentiality agreement executed by Magten (the "Confidentiality Agreement") and an order permitting trading by members of the Committee (the "Trading Order").

In making its allegations concerning 120,000 of Defendants' approximately 1.2 million shares, the Debtor ignores three critical facts that mandate dismissal of the Complaint:

- More than 95,000 shares of QUIPS challenged by the Debtor were purchased after Magten ceased serving on the Committee and after the Debtor filed its plan and disclosure statement (in which the Debtor disclosed all material information to the public);

- Approximately 25,000 shares of QUIPS questioned by the Debtor were purchased prior to the Defendants' receipt of any substantive information from the Committee regarding the Debtor or its operations and prior to any Committee meetings; and

- The Debtor cannot and does not cite a scintilla of material, non-public information upon which the Defendants allegedly relied upon in making their trades – information, which, if it existed, would clearly be within the Debtor's purview.

With respect to the 25,000 shares of QUIPS purchased while Magten was serving as a member of the Committee, all of those transactions occurred before the December 18, 2003 Committee meeting, which, as the Debtor's Chief Restructuring Officer testified during the confirmation hearing, was the first time the Debtor's business plan was shared with the Committee. Therefore, the Debtor's own admissions clearly indicate that the Defendants were not in possession of any material, non-public information at the time the various trades were executed, precisely because these shares were purchased prior to that meeting.

Likewise, the Debtor is well aware of the fact that the remaining purchases all occurred after the Debtor filed its plan and disclosure statement on March 11, 2004,[1] in which the Debtor made public any and all material information concerning the Debtor. Again, the Debtor's filings

---

[1] See Declaration of Gary L. Kaplan, filed on September 28, 2004 ("Kaplan Declaration"), Exhibit A.

2

with this Court demonstrate that the Complaint is unfounded, not rooted in fact and wholly without merit.

Importantly, despite the serious nature of the allegations raised in the Complaint, nearly all of the Debtor's allegations are asserted "upon information and belief," even though the Debtor knew or could easily have ascertained what, if any, confidential information the Debtor or the Committee provided to the Defendants. As the original source of any confidential information provided to the Defendants, the Debtor has the burden of identifying the material non-public information upon which the Defendants are said to have traded. Instead, and misleadingly, the Debtor pleads its allegations "upon information and belief" and thereby reveals the baselessness of its actions and demonstrates the true nature of this proceeding – a harassment tactic designed to punish a vocal, objecting creditor that has vigorously pursued its own rights and remedies against the Debtor.

In the Complaint, the Debtor alleges that Magten violated the Trading Order and the Confidentiality Agreement. The Debtor makes these allegations despite the fact that neither the Trading Order nor the Confidentiality Agreement in any way restrict trading in the Debtor's securities. For example, the Trading Order itself makes clear that it merely establishes procedures for each Committee member "electing to avail itself, or its Affiliates of the Protections of [the] Order." Likewise the Confidentiality Agreement does not prohibit trading in the Debtor's securities, rather it governs the use of any confidential information provided by the Debtor and, in fact, specifically contemplates that recipients of information may continue to trade in the Debtor's securities.

When looked at as a whole – the Debtor's inability to point to any material, non-public information, the allegations made "upon information and belief," the mischaracterizations of the Trading Order and the Confidentiality Agreement, the failure to point to any basis to hold Mr. Embry liable for any actions, and the Debtor's own admissions that the Defendants were not in

3

possession of any material non-public information – it becomes clear that the Complaint is an outrageous attempt to retaliate against the Defendants.

For these reasons and for the reasons set forth below, the Complaint fails to state a claim upon which relief can be granted and should be dismissed in its entirety, with prejudice.

## STATEMENT OF FACTS

1.     On September 14, 2003 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.     As of the Petition date, Magten held approximately 801,200 shares of QUIPS. See Declaration of Talton Embry, filed on September 28, 2004 ("Embry Declaration") ¶ 3. As of the date of this Motion, Magten holds 1,244,061 shares of QUIPS. Id.

3.     The Debtor is a publicly traded Delaware corporation that was incorporated in 1923. See Complaint ¶ 4. The Debtor, together with its direct and indirect non-debtor subsidiaries, comprises one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States. See id.

4.     Magten is a holder of certain of the Debtor's Series A 8.45% Quarterly Income Preferred Securities (the "QUIPS"), which were issued by Montana Power Capital I (the "Trust"). The Trust is a business trust established pursuant to the Delaware Business Trust Act. The sole assets of the Trust are the 8.45% Junior Subordinated Debentures due 2036 (the "Junior Debentures"). See id. ¶ 1.

5.     On September 30, 2003, the Office of the United States Trustee appointed the members of the Committee of the estate of the Debtor. See id. ¶ 9.

6.     On or about November 6, 2003, at the request of the Committee and prior to Magten being appointed to the Committee, the Court entered the Trading Order. See Kaplan Declaration, Exhibit C. The Trading Order provides a "safe harbor" to Committee members by

4

establishing procedures, which, if followed, protect members of the Committee from attacks on their claims against the estate such as disallowance, subordination or other adverse treatment. See id. The Trading Order, however, does not prohibit members of the Committee from trading in the securities of the NOR Group[2] nor provide that if the procedures outlined in the Trading Order are not followed by a member of the Committee, such member will be automatically deemed to have engaged in wrongful conduct. Id.

7.    On November 25, 2003, the Office of the United States Trustee appointed Magten to the Committee. See Complaint ¶ 14.

8.    Between December 1, 2003 and December 5, 2003, Magten executed 3 transactions, pursuant to which it acquired approximately 27,540 shares of QUIPS (the "December 2003 Trades").[3] See Embry Declaration ¶ 4.

9.    On December 17, 2003, Magten sold 1,900 shares of QUIPS (the "December 17 Trade") held in one of its client's accounts in order to raise liquidity in the client's account.[4] This client has a standing request to withdraw funds on a monthly basis.  Because Magten was concerned that it might be restricted from honoring such request following the December 18, 2003 Committee meeting, Magten executed the sale the day prior to the meeting in order to raise the necessary liquidity so as to be able to honor future withdrawal requests without the need to liquidate further shares. Id. ¶ 5.

---

[2]    The Committee's motion for the entry of the Trading Order (the "Committee Motion") defines the NOR Group as the Debtor and any non-debtor Affiliates of the Debtor. See Kaplan Declaration, Exhibit B.  In turn, Affiliates means with respect to any entity, any other entity directly or indirectly controlling, controlled by or under common control with such other entity.

[3]    The Debtor, in its Complaint, incorrectly indicates that Magten purchased 28,540 shares of QUIPS while it was a member of the Committee because the Debtor double counts the 1000 QUIPS shares purchased on December 3, 2003 by counting the January 21, 2004 transaction as a separate purchase.  The correct amount of QUIPS shares purchased by Magten during the time it was on the Committee was 27,540.

[4]    The Debtor has mistakenly counted this sale twice in the Complaint, alleging improper sales of 3,800 shares.  Careful examination of the records produced to the Debtor shows the front side and the back side of one trading slip on two separate pages, and as such both sheets are referring to the same 1,900 share trade.

5

10.    On December 17, 2003, the Defendants received a copy of the Committee By-Laws by email from counsel to the Committee. See id. ¶ 6. The By-Laws specifically provide that "[E]ach Member shall have the ability to trade, purchase, sell or otherwise dispose of its claims against or interests in the Debtor in accordance with applicable law including any orders any orders entered or to be entered by the Bankruptcy Court." See Embry Declaration, Exhibit A, section 1.7. The By-Laws set forth the structure, procedures and governance of the Committee. The By-Laws also contain a confidentiality clause. See id., section 4.1. This clause does not refer to trading activities but, rather, focuses solely on disclosure of confidential information. Id.

11.    On December 18, 2003, Magten attended its first Committee meeting. See Embry Declaration ¶ 7. Prior to the meeting, the Defendants did not receive any information from the Committee or the Debtor concerning the Debtors or its operations. Id. ¶ 7. William Austin, the Debtor's Chief Restructuring Officer later testified at the August 25, 2004 confirmation hearing that the Debtor first presented its business plan to the Committee on December 18, 2003. See Kaplan Declaration, Exhibit D.

12.    On January 13, 2004, the Defendants filed their proof of claim (the "Proof of Claim"), which was designated claim number 842 with regard to the QUIPS. See Complaint ¶ 11. The Proof of Claim seeks damages resulting from the fraudulent transfer of the assets of Northwestern Energy LLC to the Debtor on November 15, 2002 (the "Fraudulent Transfer"). Id.

13.    In or about January 2004, Magten executed the Confidentiality Agreement in connection with its membership on the Committee.[5] See Embry Declaration ¶ 9. The Confidentiality Agreement required recipients of confidential information to keep the information confidential until such information is generally made available to the public other

---

[5] Although the Confidentiality Agreement is dated December 18, 2003, it was not circulated to the Committee for execution until January 2004.

6

than as a result of disclosure in violation of the Confidentiality Agreement. The Agreement does not however, prohibit a member from trading in the Debtor's securities.

14.     On March 11, 2004, the Debtor filed its plan of reorganization and related disclosure statement (the "Initial Disclosure Statement") with the Court. See Kaplan Declaration, Exhibit A. The Plan provided that the holders of the QUIPS would receive 2% of the equity of the reorganized Debtors if their class accepted the Plan and nothing if the class rejected the Plan. See Initial Disclosure Statement at 35-36. Consequently, the Plan and the valuations underlying the Plan show the QUIPS to be out of the money. See id. at 61-68.

15.     On May 14, 2004, the Debtor filed the first amended disclosure statement with the Court (the "First Amended Disclosure Statement").[6] See Kaplan Declaration, Exhibit A.

16.     Beginning on May 14, 2004, with the purchase of 2,000 shares, through the date of the Complaint, Magten purchased 95,000 shares of QUIPS (the "Post Disclosure Trades"). See Embry Declaration ¶11

17.     In July 2004, the Debtor's deposed Mr. Embry in connection with Magten's objection to confirmation of the Plan and requested records of all trading in the QUIPS. See Embry Declaration ¶ 12. In August 2004, the Defendants provided their trading records regarding the QUIPS to the Debtor. See Embry Declaration ¶ 14.

18.     On August 20, 2004, the Debtor initiated the above captioned adversary proceeding against the Defendants, seeking damages and equitable relief relating the Defendants' trading activities regarding the QUIPS. The Complaint wholly relies on the allegation that the Defendants traded QUIPS while members of the Committee. See Complaint.

19.     On August 20, 2004, the Debtor filed a motion seeking to estimate Magten's claim and to set a disputed cash reserve pursuant thereto (the "Motion to Estimate"), seeking to

---

[6]     On May 17, 2004, the Debtor filed another first amended disclosure statement with the Court. This document is a blackline document that shows the changes made from the Disclosure Statement, to the First Amended Disclosure Statement. On May 25, 2004, the Debtor filed a revised First Amended Disclosure Statement.

estimate Magten's claim at $0.[7]  The hearing on the Motion to Estimate has been postponed until October 6, 2004.

20.     On August 31, 2004, the Debtor filed its second amended and restated disclosure statement (the "Second Amended and Restated Disclosure Statement").  On September 2, 2004, the Court entered an Order approving the Second Amended and Restated Disclosure Statement.

I.    THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

A.    Standard for Dismissal Under Federal Rule 12(b)(6)

21.     In deciding whether or not a complaint should be dismissed for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure ("F.R.C.P.") 12(b)(6), the allegations in the complaint are accepted as true for purposes of testing the sufficiency of the complaint.  See Hishon v. King and Spalding, 467 U.S. 69, 73 (1984).  However, although facts set forth in a pleading must be accepted as true in deciding a 12(b)(6) motion, "a court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997)).

22.     Likewise, "[l]egal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." Official Comm.Of Asbestos Claimants Of G-I Holding, Inc., v. Heyman, 277 B.R. 20, 29 (S.D.N.Y 2002) (quoting L'Eureopeenne de Bangue v. La Republica de Venezuela, 700 F. Supp. 114, 122 (S.D.N.Y. 1988)).  Because the central purpose of the complaint is to provide the defendant "fair notice of what the Debtor's claim is and the grounds upon which it rests," the Debtor's legal allegations must be supported by some factual basis sufficient to allow the defendants to prepare a fair response. Conley v. Gibson, 355 U.S. 41, 47 (1957).  To the extent that the Debtor's claims set forth conclusory

---

[7]     While the motion to estimate does not request a specific amount with reference to the Proof of Claim, the proposed order attached to the Motion to Estimate sets the amount of the Proof of Claim at zero.

8

allegations or unwarranted deductions of fact, the court is not obliged to accept such allegations or deductions as true. Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir. 2000).

23.     In the Complaint, many of the Debtor's assertions are set forth upon information and belief and it is from these assumptions that the Debtor claims it is entitled to relief. Although pursuant to Federal Rule of Civil Procedure 8 a plaintiff is permitted to aver facts that are believed to be true (but for which a plaintiff lacks evidentiary support at the time of pleading), such is only permissible when the facts that would support the allegations are within the *defendant's knowledge or control*. 2-8 Moore's Federal Practice – Civil § 8.04 [4] (2004). In the Complaint, the Debtor alleges "upon information and belief" that it provided Magten and/or Mr. Embry with material, non-public information. Specifically, the following allegations, among others are made "upon information and belief":

> 16.  Upon information and belief, upon being appointed to the Committee, Magten obtained possession of the Debtor's and the Committee's material, non-public information.

> 29.  Upon information and belief, the Defendants remained in possession of, and relied upon, the Debtor's and the Committee's non-public information[8] with respect to some or all of these QUIPS purchases.

> 49.  Upon information and belief, while a Member of the Committee, the Defendants were furnished material, non-public information of the Committee and the Debtor. The Defendants have retained possession, custody, and control over the non-public information.

24.     As these facts are plainly within the plaintiff's knowledge or control, the Debtor must plead the facts relevant to the dates and content of such distribution. See Static Control

---

[8]   It should be noted that in several allegations in the Complaint the Debtor fails to allege that the non-public information given to Magten was material. As discussed in greater detail in Section III.B, it is only improper to trade on non-public information if such information is "material". Without more factual details, this is simply not enough information to proceed with the Complaint.

9

Components, Inc. v. Parkprint Imaging, Inc., 135 F. Supp. 2d 722, 728 n.6 (M.D.N.C. 2001) (noting that pleading of allegations upon information and belief is permissible when necessary matters are not within plaintiff's knowledge); Perington Wholesale Inc. v. Burger King Corp., 631 F.2d 1369, 1372 (10th Cir. 1979) (pleading upon information and belief is permissible when necessary information is in the hands of defendants).  Precisely because this information is in the Debtor's possession or readily available to the Debtor, the Motion to Dismiss should be granted because the Plaintiff has failed to satisfy even the liberal pleading requirements of Federal Rule of Civil Procedure 8 by not setting forth the specific facts within its purview.

II.    THERE IS NO BLANKET PROHIBITION ON TRADING IN THE DEBTOR'S SECURITIES WHILE A MEMBER OF THE COMMITTEE

25.    There can be no dispute that mere membership on a creditors' committee in and of itself does not prohibit an entity from trading in the Debtor's securities.  The SEC has held that view since 1991 when it submitted a memorandum supporting the issuance of a trading order in Federated Department Stores, Inc., Bankr. No. 1-90-00130.  See Kaplan Declaration, Exhibit E.  There, the SEC took the position that so long as the individuals trading the in the Debtor's securities did not receive confidential information, an entity **"is not precluded from serving on the committee and, at the same time, trading in the debtor's securities."**  See id. at 3. (emphasis added).  Furthermore, the SEC explained that in its view, trading by members of a creditors' committee implicates concerns **only** under the securities laws, and no longer directly implicated the Bankruptcy Code.  See id. at 18-21; See also 6-94 Collier Bankruptcy Practice Guide P 94.06 [3] (2004).

26.    Simply stated, there is no *per se* prohibition on trading in the securities of a Debtor while serving on a creditors' committee.  In fact, the issue of a *per se* rule has been considered and summarily rejected by the Third Circuit.  See Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims, 160 F.3d 982, 986 (3d Cir. 1998).  In Citicorp, CVC, the Debtor's controlling equity holder and member of the Debtor's Board of Directors,

10

used its controlling equity position to manipulate the bankruptcy process for its own benefit. Prior to the filing of the debtor's disclosure statement, CVC anonymously and surreptitiously purchased millions of dollars of the claims of third parties without disclosing its fiduciary relationship. Simultaneously, CVC ordered the Debtor's officers to provide it with internal projections not provided to the creditors committee and caused the Debtor to delay the filing of a plan of reorganization so that it could implement its scheme. Id. When CVC's conduct became known to the committee, the committee initiated an adversary proceeding against CVC and sought to subordinate CVC's claim.[9] Id. at 986. Although the Bankruptcy Court initially applied a *per se* rule that when a claim is purchased by an insider at a discount without adequate disclosure to the debtor and creditors such claim will be limited, the District Court for the Western District of Pennsylvania and subsequently the Third Circuit flatly rejected the adoption of a *per se* rule. Id. at 986-987 (noting "that the purchase of notes at a discount by a fiduciary of a debtor is not improper under all circumstances. . ."); see also Viking Assocs., L.L.C. v. Drewes (In re Olson), 120 F.3d 98, 102 n.4 (8th Cir. 1997)  (holding that where insiders purchase claims of debtor at a discount while in possession of insider information, there is no "abuse of process" merely by pursuing one's economic self interest); 6-94 Collier Bankruptcy Practice Guide P 94.06 [3] (2004) (noting that taken together these cases stand for the proposition that if a fiduciary "merely acts as a creditor without abusing its insider status. . .the fiduciary has committed no wrong under the bankruptcy laws.").

27.    However, the Debtor, by its Complaint is urging this Court to adopt the same *per se* rule that has been rejected by the Third Circuit.  Moreover, by the very terms of the Complaint the Debtor is seeking to extend that rule to mean that once the United States Trustee performs the ministerial task of appointing the members of a creditors' committee, those institutions must

---

[9]    As discussed in greater detail in Section IV, below, Citicorp and its progeny (as more fully developed by the Eighth Circuit) limit the ability of the Debtor to bring the Complaint, which is more properly pursued by the Committee and its representatives to the extent such entities have suffered any harm from the Defendant's trading activities.

11

instantly cease trading in a debtor's securities, regardless of whether the trades were executed

before becoming an active member of the committee and regardless of whether the institution is

actually in possession of material, non-public information.

28.    Indeed, because blanket restrictions prohibiting institutions from trading in a

debtor's securities while a member of a creditors' committee would cause many institutions to

forgoe participation in the Chapter 11 committee process, it has become almost routine for courts

to enter comfort orders providing court-approved mechanisms for such trading activities.  Kaplan

Declaration, Exhibit E at 3.  Compliance with these orders is not mandatory, but is only designed

as a "safe harbor" to provide comfort to committee members that if certain procedures are

followed, such member reduces the risk of violating the securities laws.[10]  By their very nature,

consistent with both the applicable securities laws and the Citicorp decision, courts issuing these

orders have recognized that so long as individuals making the trading decisions do not have

access to material non-public information, these institutions may continue to trade in a debtor's

securities.

A.    Magten Did Not Violate the Trading Order by Choosing Not to Avail Itself of the
Order's Protections

29.    The Committee in this case has taken the position that members of the Committee

are free to trade in the Debtors' securities so long as the members of the committee comply with

applicable securities laws.  For example, in the Committee's motion seeking entry of the Trading

Order, the Committee stated:

> The Committee believes that any current or future Members that
> engage in the business of trading Securities should not be
> precluded from trading in Securities of any member of the NOR
> Group during their tenure on the Committee.

---

[10]    It should be noted that the establishment of an ethical wall and compliance with a trading order does not
insulate a committee member from lawsuits nor does it provide blanket immunity for trading activities.  See
Robert A. Benjamin, Note, Fiduciary Responsibilities of Creditors' Committee Members with Respect to
Securities and Commodities Transactions, 10 AM. BANKR. INST. L. REV. 493, 496 (2002) (noting "[a]
potential plaintiff would always be able to raise a claim against the committee member upon a showing that
the ethical wall was not effective and that information had been passed to improper hands.").

120087.01600/40145348v1

Kaplan Declaration, Exhibit B ¶ 13.

30.     Additionally, the Committee By-Laws, which govern how Committee members must comport themselves specifically provide that:

> [E]ach Member shall have the ability to trade, purchase, sell or otherwise dispose of its claims against or interests in the Debtor in accordance with applicable law including any orders entered or to be entered by the Bankruptcy Court.

Embry Declaration, Exhibit A at section 1.7.

31.     Additionally, through its support of the Trading Order, the Debtor has recognized that so long as the individuals making the trading decisions do not possess material non-public information concerning the Debtor, members of the Committee may freely trade in the Debtor's securities and should not face charges that they breached their duties or otherwise acted inappropriately.

32.     In the Complaint the Debtor asserts "[A]s members of the Committee, Defendants were *obligated* to comply with the Securities Trading Order." See Complaint ¶ 48 (emphasis added). Despite this, conspicuously absent from the Complaint is any citation to express language in the Trading Order or elsewhere that supports this allegation. In fact, as discussed above, courts in this district have specifically held that there is no *per se* breach of fiduciary duty, such as the one the Debtor urges in the Complaint, when claims against the Debtor are purchased by fiduciaries at a discount. See Citicorp, 160 F.3d at 986.

33.     Magten encountered difficulties in complying with the terms Trading Order because of Magten's corporate structure. Magten attempted to address its concerns by negotiating the terms of a consensual order modifying the terms of the trading order. However, after garnering the support of the Debtor and the Committee, the United States Trustee represented to the Defendants that he would not support any such application. In light of the United States Trustee's position, Magten chose not to pursue the issue further. Importantly, the modified order was sought only after Magten had ceased trading in the Debtor's securities.

13

However, when the terms of a modified order could not be reached consensually, Magten continued its moratorium on trading in the Debtor's securities and did not resume its trading activities until it was no longer on the Committee and all information it possessed became public.

34.    Despite this practical inability to comply with the Trading Order as written, the language of the Trading Order makes it clear that participation in the protections provided by the Trading Order is an option presented to the Members of the Committee that, if feasible to such Member, offers a "safe harbor" to those Members that wish to trade.  However, the Trading Order is not a requirement for the execution of proper and legal trades by Committee members, and the Debtors reliance on it as such is fatally flawed.

B.    The Defendants Did Not Violate the Confidentiality Order

35.    The Confidentiality Agreement prohibits the parties thereto from disclosing confidential information about the Debtor, it does not govern trading in the Debtor's securities. However, to avoid allegations such as those raised by the Debtor, the Confidentiality Agreement provides, in pertinent part:

> It being understood that nothing herein shall prevent Receiving Parties who have established an Ethical Wall pursuant to the Order Permitting Securities Trading Establishment of Ethical Wall, entered by the Bankruptcy Court on November 6, 2003, from trading NorthWestern's securities in accordance with the procedures set forth in such order or from otherwise trading such securities in accordance with the procedures set forth in such order *or from otherwise trading such securities in accordance with applicable securities laws*. (emphasis added).

Embry Declaration, Exhibit C at 3.

36.    Moreover, by its own terms, the Confidentiality Agreement does not apply to information that is or becomes generally available to the public. Id. at 2.  Therefore, the Defendants did not violate the Confidentiality Agreement when they executed the December 2003 Trades and the Post Disclosure Trades.  The December 2003 Trades occurred *before* the Confidentiality Agreement was signed and before confidential information was received. Furthermore, the Post Disclosure Trades were executed *after* any non-public information in the

14

Defendants' possession became public.  Both the December 2003 Trades and the Post Disclosure Trades were executed in accordance with all applicable securities laws ands in no way are connected to the use of confidential or material non-public information.

37.    Lastly, the Debtor has not offered any details or references to any confidential or material non-public information that the Defendants have disclosed to a third party in violation of the Confidentiality Agreement.  The reason for this is simple – there was no violation of the Trading Order or the Confidentiality Agreement.  For these reasons, the Complaint is deficient in and should be dismissed with prejudice.

III.    MAGTEN DID NOT RECIEVE ANY MATERIAL, NON-PUBLIC INFORMATION PRIOR TO EXECUTING THE TRADES IN QUESTION

38.    As a matter of law, there is no *per se* prohibition in trading in the Debtor's securities and there was no violation of the Trading Order or the Confidentiality Agreement.  Nor is there any evidence that the Defendants traded on material, non-public information.  The Debtor's admissions to this Court and its pleadings filed with this Court establish that the Defendants were not in possession of any material, non-public information at the time the trades were executed.  In the context of securities fraud cases, a fact is material "if there is a substantial likelihood that a reasonable [investor] (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." Longman v. Food Lion, Inc., 197 F.3d 675, 682-83 (4th Cir. 1999).  The Debtor must show "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [investor]." Reliance Ins. Co. v. Eisner & Lubin, 685 F. Supp. 449, 454 (D. N.J. 1988) aff'd, 897 F.2d 523 (3d Cir. 1990); see also Healey v. Catalyst Recovery of Pa., Inc., 616 F.2d 641, 647 (3d Cir. 1980) ("materiality" test geared toward Debtor's decision making process).  Here, the Defendants were not in possession of any material, non-public information when they traded in the Debtor's securities.

15

A.    Magten Was Not In Possession Of Material Non-Public Information At The Time Of The December 2003 Trades

39.    As noted above, prior to December 18, 2003 Magten did not receive any material non-public information regarding the Debtor and prior to December 18, 2003, the Defendants did not receive any substantive information concerning from the Committee or the Debtor the Debtor or its operations.  The By-Laws, received by the Defendants on December 17, 2003, set out the procedures and governance of the Committee and its members.  The By-Laws contemplate trading by members of the Committee with or without the Trading Order protections, and they require members of the Committee to refrain from disclosing confidential information.  The By-Laws themselves are not marked "confidential" and they do not contain any material information.

40.    All of the December 2003 trades were executed prior to the Debtor or the Committee providing any material, non-public information to the Defendants.  Indeed, the Complaint is completely devoid of any of the specifics as to when the Defendants received information and what information was received.  Moreover, the only factual assertions made by the Debtor concerning the December 2003 trades is that Magten signed the Confidentiality Agreement.  If the Debtor provided the Defendants with material, non-public information – a fact the Debtor has conspicuously omitted from the Complaint – such was provided at the December 18 meeting between the Committee and the Debtor.  However, all of the December 2003 Trades were executed prior to this meeting – a fact that is not disputed by the Debtor.

41.    In addition, the Debtor contends that there is one trade executed on January 21, 2004 for 1000 shares that was executed by the Defendants after the Committee meeting.  However, the purchase of 1,000 shares of QUIPS alleged to have taken place on January 21, 2004, really took place on December 3, 2003, but was not delivered to the Defendants' account at Bear Stearns until January 21, 2004, after the Defendants reconciled their internal records with the Bear Stearns account statements and made Bear Stearns aware of the error.[11]  In fact other

---

[11] Although ordinarily a Rule 12(b)(6) motion is limited to the facts and information set forth on the face of the

16

than working with Bear Stearns and the broker to correct the delivery instructions for the 1000 undelivered shares from the December 3, 2003 purchase, the Defendants did not take any further action with reference to these shares subsequent to December 3, 2003. For this reason, the January 21, 2004 trade was actually executed contemporaneously with the December 2003 Trades, at a time when the Defendants did not possess any material non-public information.

42.     Lastly, the December 17 Trade – which was also executed prior to the Committee meeting – was executed on that date as a prophylactic measure precisely because Mr. Embry believed it was possible that the Defendants would receive material, non-public information at the December 18 meeting. Specifically, the December 17 Trade was executed so as to honor a client's monthly liquidity request without violating Magten's fiduciary duties to creditors or the applicable securities laws. It is disingenuous for the Debtor to twist the Defendants' precautionary measures into its ongoing personal vendetta against the Defendants.

43.     Thus, the December 2003 Trades were executed by the Defendants prior to the receipt of any material non-public information by the Defendants. After the receipt of such material, non-public information, no trades were executed by the Defendants until after the Debtor had filed its plan and disclosure statement and after Magten had been removed from the Committee.

B.     Magten Did Not Breach its Fiduciary Duty Because All Material Information Was Publicized at the Time of the Post Disclosure Trades

44.     A party seeking Chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing adequate information to enable a

---

complaint, courts have held that information to which the plaintiff has been given access may properly be relied upon when considering a Motion to Dismiss. Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) ("When determining the sufficiency of plaintiff's claims for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiff['s] . . . complaint, . . . to documents attached to the complaint . . . *or incorporated in it by reference, to matters of which judicial notice may be taken*, or to documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit."); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991). Here, because Magten provided its trading records to the Debtor prior to the filing of the Complaint, the records attached to the Embry Declaration can be properly considered by this Court.

17

creditor to make an informed judgment about the Plan.  Krystal Cadillac-Oldsmobile GMC Truck, Inc., v. General Motors Corp., 337 F.3d 314, 321 (3d Cir. 2003), cert. denied, 124 S.Ct. 2172 (2004).  "The disclosure statement must contain information that is *material*, important and necessary for creditors and shareholders to properly evaluate a proposed plan and thus enable the creditors and shareholders to make a reasonably informed decision on the plan." In re William F. Gable Co., 10 B.R. 248, 249 (Bankr. N.D. W. Va. 1981)(emphasis added).  "Materiality . . . is measured by an objective standard drawn from the definition of 'adequate information' at section 1125(a) that asks what the 'hypothetical reasonable investor typical of holders of claims or interests of the relevant class' would want to know in order to make an informed judgment about the plan." Official Comm. of Unsecured Creditors v. H.B Michelson (In re H.B. Michelson), 141 B.R. 715, 725 (Bankr. E.D. Cal. 1992).

45.    On March 11, 2004, the Debtor filed the Initial Disclosure Statement with the Court and the First Amended Disclosure Statement was filed on May 14, 2004.  As noted above, Magten ceased trading in the Debtor's securities until after it was removed from the Committee and after the plan and disclosure statement had been filed.  All material information regarding the Debtor was publicized prior to the execution of the first of the Post Disclosure Trades.  The Defendants cannot be punished for trading securities based on information they may have possessed prior to executing certain trades, if such information was also made public prior to the execution of such trades.

46.    In challenging the Post Disclosure Trades the Debtor ignores its admission that all material information about the Debtor and the Debtor's financial condition was contained in the plan and disclosure statement.  The Debtor affirmatively represented that "[i]n this case, the Debtor believes that the Disclosure Statement contains adequate information within the meaning of Section 1125(a) of the Bankruptcy Code." Debtor's Motion for Order Approving the Disclosure Statement (filed on March 11, 2004, Dkt. No. 933) ¶33. Moreover, adopting the Debtor's position would mean that all members of a creditor's committee are forever barred from

18

trading in the Debtor's securities even after they no longer serve on the committee and after all material information has been made public.

IV.    THE DEBTOR CANNOT EQUITABLY SUBORDINATE THE DEFENDANTS' CLAIMS BECAUSE THE DEBTOR HAS SUFFERED NO HARM

47.    The Third Circuit has noted that actions for breach of fiduciary duty are appropriate only when the Debtor has "no alternative means for recovering from his losses." Charles L. Emil v. Unum Life Ins. Co. of America, 2003 U.S. Dist. LEXIS 1540, *6 (M.D. Pa. 2002)(citing Ream v. Frey, 107 F.3d 147, 152. (3d Cir. 1997). The Third Circuit has interpreted Section 1103(c) of the Bankruptcy Code as implying a fiduciary duty on the part of members of a creditor's committee toward their constituent members. See In re PWS Holding Corp., 228 F.3d 224, 246 (3d Cir. 2000). A committee member violates its fiduciary duty by pursuing a course of action that furthers its self-interest to the potential detriment of fellow committee members. See Westmoreland Human Opportunities, Inc. v. Walsh (In re Life Service Systems, Inc.), 246 F.3d 233, 256 (3d Cir. 2001).

48.    Magten did not owe a fiduciary duty to the Debtor. An Official Committee of Unsecured Creditors is not a fiduciary for a bankruptcy estate as a whole. Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305, 1315 (1st Cir. 1993). While a creditors' committee and its members must act in accordance with the provisions of the Bankruptcy Code and with proper regard for the bankruptcy court, the committee is a fiduciary for those whom it represents, not for the debtor or the estate generally. Id.; In re Microboard Processing, Inc., 95 Bankr. 283, 285 (Bankr. D. Conn. 1989).

49.    Magten, in its capacity as a member of the Committee, owed a fiduciary duty to the Debtor's creditors, but not to the Debtor or the Debtor's estate. Therefore, because it is not owed a duty, the Debtor lacks standing to bring the Complaint and cannot properly assert a claim based on a breach of fiduciary duty against the Defendants. See Citicorp 160 F.3d at 986 (noting that the adversary proceeding against CVC had been initiated by the creditors committee);

19

Viking Assocs., 120 F.3d at 102 (holding that only the seller of a claim that had been harmed

when such claim had been purchased by an insider on inside information could properly object to

the transfer of claims to an insider or fiduciary).

50.    In addition, the Debtor lacks standing to pursue these causes of action because it

has not been harmed by the transactions in question, and does not allege such harm in the

Complaint.[12]  Contrary to the Debtor's allegations in the Complaint, equitable subordination of

the Defendants' claims is not an available remedy because the Debtor has suffered no harm.  See

Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims, 323 F.3d 228,

232 (3d Cir. 2003), cert. denied, 124 S. Ct. 178 (2003) (affirming the conclusion of the

Bankruptcy Court that equitable subordination was warranted by CVC's conduct and finding

specific economic harm to non-selling noteholder creditors).  Simply stated, the Debtor has

suffered no harm.  It was neither the seller nor the buyer of any of the securities in question and

all of the transactions were transparent to the Debtor because they took place in the open market.

In fact, even if the Defendants had traded on material, non-public information the Debtor would

not have standing to challenge the trades because the Debtor has suffered no harm.  The simple

fact is that the conduct of the Defendants was both permissible and legitimate.

V.    THE DEBTOR FAILS TO PROVIDE ANY BASIS TO ASSERT CLAIMS AGAINST
      MR. EMBRY INDVIDUALLY

51.    In addition to the foregoing, the Complaint fails to provide any basis to hold Mr.

Embry liable for any of the allegations therein.  Mr. Embry holds no claims against the Debtor,

and thus there are no claims that could be subject to equitable subordination or disallowance by

the Debtor.  Mr. Embry never engaged in any trading of the Debtor's securities on his own

behalf nor was Mr. Embry a member of the Committee in his individual capacity.  Thus, Mr.

Embry did not have fiduciary duties to the Debtor or its creditors.  All actions taken by Mr.

---

[12] In essence, the Debtor is bringing a private right of action for an alleged violation of the federal securities laws.
In addition to being an improper plaintiff, the Debtor is bringing an action for violating the securities laws cannot be
brought in this forum, as the district court has exclusive jurisdiction for such actions. See 15 U.S.C.S §78aa.

20

Embry were taken on behalf of Magten. Because the Complaint is devoid of any facts to support a claim against Mr. Embry in his individual capacity, the claims against Mr. Embry should be dismissed.

### CONCLUSION

52.    The totality of the circumstances surrounding the Defendants' trading activity compels dismissal of the Complaint. Magten owned and had already acquired approximately 90% of the shares of QUIPS it currently owns *prior to* being appointed to the Committee. All of the valuations provided to Magten showed the QUIPS to be "out of the money." Even though the Defendants did not trade on this information, this fact would tend to lead someone to *sell* the QUIPS, not purchase them as the Defendants have. Magten held over 1 million shares of QUIPS before being appointed to the Committee. Magten displayed a strong desire to acquire QUIPS well before the bankruptcy case, as its pre-petition trading activity clearly suggests. The Debtor is making bald and conclusory allegations when the facts of the case show there is clearly no basis to bring the Complaint.

53.    Defendants did not trade in the Debtor's securities from December 17, 2003, prior to the first Committee meeting they attended, until after the Debtor had filed its plan and disclosure statement and was no longer a member of the Committee. The lack of specificity and particularity of the Complaint speak volumes to its legitimacy or lack thereof. The Debtor has a working relationship with the Committee and the ability to ascertain from the Committee what information was passed along to the Defendants and certainly knows what, if any, information it provided to the Defendants. The Debtor also has the Defendants trading records with reference to the QUIPS. In sum, the Debtor has access to all of the information it needs to fully develop the information necessary to form the basis of a valid complaint, yet the Complaint offers only vague conclusory allegations asserted upon information and belief wholly lacking any factual substantiation. The Defendants cannot properly defend the Complaint because it does not provide any notice of the specifics and substance of the claims therein.

21

54.    Moreover, the Complaint is devoid of any facts to hold Mr. Embry personally liable for the alleged breach of fiduciary duty as Mr. Embry engaged in no trading on his own behalf, was not a Committee member in his individual capacity, and holds no claims that could be subject to equitable subordination or disallowance.  The Court should not countenance such a blatant misappropriation of judicial and estate resources by allowing the Debtor to go forward with this charade.

WHEREFORE, for the reasons set forth above, the Defendants respectfully request that the Court grant the Motion and grant such other relief as the Court deems just and proper.

Dated:  Wilmington, Delaware
        September 28, 2004

                                    BLANK ROME LLP

                                    _____
                                    Mark J. Packel (DE No. 4048)
                                    Elio Battista, Jr. (DE No. 3814)
                                    1201 Market Street, Suite 800
                                    Wilmington, DE 19801
                                    Telephone:   (302) 425-6400
                                    Facsimile:   (302) 425-6464

                                           -and –

                                    FRIED, FRANK, HARRIS, SHRIVER &
                                        JACOBSON LLP
                                    Bonnie Steingart, Esq.
                                    Gary L. Kaplan, Esq.
                                    One New York Plaza
                                    New York, NY 10004
                                    Telephone:  (212) 859-8000
                                    Facsimile:  (212) 859-4000

                                    Counsel for Magten Asset Management
                                        Corporation

22

120087.01600/40145348v1