**EXHIBIT D**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> NORTHWESTERN CORPORATION, <br><br> Debtor. | Chapter 11 <br><br> Case No. 03-12872 (CGC) |
| NORTHWESTERN CORPORATION, <br><br> Plaintiff, <br> v. <br><br> MAGTEN ASSET MANAGEMENT CORPORATION, and TALTON R. EMBRY <br><br> Defendants. | Adv. No. 04-55051 (CGC) |

### DECLARATION OF TALTON R. EMBRY IN SUPPORT OF THE MOTION OF MAGTEN ASSET MANAGEMENT CORPORATION AND TALTON R. EMBRY TO DISMISS THE COMPLAINT OF NORTHWESTERN CORPORATION FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

TALTON EMBRY declares as follows:

1. I am the principal and managing director of Magten Asset Management Corporation ("Magten"). I submit this declaration (the "Declaration") in support of the motion (the "Motion") of Magten Asset Management Corporation ("Magten") and Talton R. Embry to dismiss the above captioned complaint of Northwestern Corporation (the "Debtor") for failure to state a claim up on which relief can be granted.

2. All facts set forth in this Declaration are based on my personal knowledge, upon my review of relevant documents, or on my opinion based upon my experience and knowledge

1

of the above captioned chapter 11 case. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration.

3. Magten began acquiring shares of the QUIPS[1] in April 2003. As of the Petition Date, Magten held 801,200 shares of QUIPS and as of the date of this Declaration, Magten holds 1,244,061 shares of QUIPS.

4. On or about November 25, 2003, I was informed that the Office of the United States Trustee appointed Magten to the Official Committee of Unsecured Creditors (the "Committee"). After having been informed of Magten's appointment to the Committee, but prior to attending any Committee meetings and prior to receiving any substantive information from the Committee or the Debtor concerning the Debtor or its operations, Magten executed 3 transactions for shares of QUIPS between December 1, 2003 and December 5, 2003, which were allocated over a variety of accounts. The sum total of shares of QUIPS acquired by Magten between December 1, 2003 and December 5, 2003 was 27,540.[2]

5. Between December 5, 2003 and December 17, 2003, Magten did not execute any trades of QUIPS. During that period, Magten was informed that a Committee meeting had been scheduled for December 18, 2003. As of December 17, 2003, Magten was not in possession of any material, non-public information regarding the Debtor and its operations. However, Magten was concerned that as a result of any non-public information it may receive at the December 18, 2003 Committee meeting Magten would become restricted from trading in the Debtor's securities after that time. Accordingly, on December 17, 2003, a day prior to its initial

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.
[2] The Debtor, in its Complaint, incorrectly indicates that Magten traded 28,540 shares of QUIPS while it was a member of the Committee because the Debtor double counts the 1000 QUIPS shares purchased on December 1, 2003 by counting the January 21, 2004 transaction as a separate purchase. The correct amount of QUIPS shares traded by Magten during the time it was on the Committee was 27,540.

2

participation in Committee meeting and a day prior to receiving non-public information from the Debtor, Magten sold 1,900 shares of QUIPS for a client account.[3] This sale was made in order to honor the client's standing request to withdraw funds on a monthly basis and the recognition that future withdrawal requests would most likely not be able to be met through the sale of the Debtor's securities.

6. On December 17, 2003, Magten received a copy of the Committee By-Laws by email from counsel to the Committee. A copy of the By-Laws is attached to this Declaration as Exhibit A. Although Magten was officially appointed to the Committee on November 25, 2003, Magten did not receive any substantive information from the Committee concerning the Debtor or its operations prior to the December 18, 2003 Committee meeting.

7. On December 18, 2003, I, as representative of Magten, attended my first Committee meeting. As I have previously indicated, with the exception of a copy of the Committee's By-Laws, the December 18, 2003 Committee meeting was the first time that Magten received any information from the Committee or the Debtor concerning the Debtor or its operations. In light of the fact that Magten obtained information concerning the Debtor and its operations at the December 18, 2003 Committee meeting, Magten ceased trading the QUIPS at that time.

8. Due to the fact that Magten only has one employee, Magten believed that it would not be able to comply with the terms of the Trading Order entered by the Bankruptcy Court. Because Magten wanted the opportunity to be able to trade in the QUIPS and obtain the same

---

[3] In reviewing the Debtor's Complaint, it appears that the Debtor has mistakenly counted the December 17, 2003 sale of 1,900 shares of QUIPS twice, thereby alleging improper sales of 3,800 shares. A careful examination of Magten's trading records produced to the Debtor shows that the front side and the back side of one trading slip is on two separate pages, and both sheets are referring to the same 1,900 share trade. A copy of Magten's December 17, 2003 trading record is attached to this Declaration as Exhibit B.

3

protections that the other members of the Committee received under the existing Trading Order, in or around January 2004, I endeavored, through counsel, to seek a consensual agreement with the Debtor, the Committee and the United States Trustee modifying the terms of the Trading Order. However, after garnering the support of the Debtor and the Committee, the United States Trustee would not support any such application. In light of the United States Trustee's position, Magten chose not to pursue the issue further. Accordingly, Magten continued its moratorium on trading in the Debtor's securities.

9. In or about January 2004, I executed on behalf of Magten a Confidentiality Agreement in connection with Magten's membership on the Committee.[4] An execution copy of the Confidentiality Agreement is attached to this Declaration as Exhibit C.

10. On March 11, 2004 the Debtor filed its plan and disclosure statement, which the Debtor stated contained all material information concerning the Debtor and its operations. In April 2004, both the Debtor and the Committee wrote letters to the United States Trustee requesting the removal of Magten from the Committee. By letter dated May 6, 2004, Magten was informed by the United States Trustee that it had been removed from the Committee.

11. Following Magten's removal from the Committee on May 6, 2004, I resumed trading shares of QUIPS on behalf of Magten on May 14, 2004. Because all material information regarding the Debtor was publicized in the Debtor's plan and disclosure statement previously filed with the Court and because Magten was no longer a member of the Committee, Magten was no longer restricted from trading in the Debtor's securities. Beginning on May 14, 2004, with the purchase of 2,000 shares, through the date of the Complaint, Magten purchased 95,000 shares of QUIPS.

---

[4] Although the Confidentiality Agreement is dated December 18, 2003, it was not circulated to the Committee for execution until January 2004.

4

12. On July 27, 2004, I was deposed by the Debtor in connection with Magten's objection to confirmation of the Debtor's First Amended Plan of Reorganization. At my deposition I was asked questions concerning Magten's trading, however, neither the notice of deposition nor the first request for the production of documents served by the Debtor requested records of or information concerning my purchases and sales of the QUIPS. Consequently, in preparing for my deposition, I did not review Magten's trading records. As such, when answering questions concerning Magten's trading activity, I was confused and, as a result, following the deposition, I reviewed Magten's trading records to refresh my recollection. I subsequently submitted a correction to my deposition testimony in which I set forth my best recollection regarding a transaction for 1000 shares of QUIPS that was "booked" on January 21, 2004 (the "January 2004 Trade"). My corrected testimony explained that the January 2004 Trade was the result of a misunderstanding I had with a broker, Richard Fels of Tradition Asiel.

13. After I submitted the correction to my deposition testimony, I spent more time reviewing Magten's *internal* trading records in response to the Debtor's supplemental request for documents. Upon review of Magten's internal trading records, which were subsequently produced to the Debtor, I noticed a notation on an internal trading record for January 21, 2004. A copy of the December 3, 2003 and January 21, 2004 internal trading records are attached to this Declaration as Exhibit D. The notation indicated that there was no purchase of 1,000 shares on January 21, 2004, merely the "rebooking" of part of a trade made on December 3, 2003. On December 3, 2003, Magten had purchased 4,440 shares from Richard Fels at Tradition Asiel. In January 2004, an account reconciliation of our statements against the statements of our securities custodian, Bear Stearns & Co., revealed that 1,000 of the 4,440 shares purchased on December 3, 2003 were never delivered to Bear Stearns for a Magten account in which I hold a beneficial

5

interest. As the trade was now "stale," meaning that Bear Stearns needed new instructions to take in the 1,000 shares, I instructed Richard Fels of Tradition Asiel to cancel the original December 3, 2003 delivery instructions and have the securities delivered to a different Magten account in which I have a beneficial interest. Consistent with my instructions to Mr. Fels, my assistant, Ms. Jean Colditz, instructed Owen Lynch at Bear Stearns to take delivery of the shares in the correct account. Ms. Colditz also instructed Mr. Lynch to cancel any previously issued instructions to place the shares in a different Magten account. In turn, Ms. Colditz reconciled Magten's internal records to reflect this transaction. Although Ms. Colditz's communication with Bear Stearns regarding the booking error was not produced to the Debtor because I only came across it after the filing of the Complaint, her communication appropriately informed Bear Stearns of the error and authorized Bear Stearns to receive the securities into the correct account. A copy of the communication to Bear Stearns is attached to this Declaration as Exhibit E.

14. Because Magten is actively engaged in the business of trading securities for its clients I do not remember the nature of the circumstances surrounding every trade. Therefore, although I did not originally recall the circumstances regarding the January 2004 Trade, the notations on Magten's trading records (which were produced to the Debtor in August 2004) clearly indicate that the January 2004 Trade was simply the reconciliation and completion of the December 3, 2003 purchase of 4,440 QUIPS shares. In fact, other than working with Bear Stearns and the broker to correct the delivery instructions for the 1000 undelivered shares from the December 3, 2003 purchase, Magten did not take any further action with reference to these shares subsequent to December 3, 2003. Thus, the January 21, 2004 trade was actually executed contemporaneously with the trades that were executed in December 2003, at a time when Magten did not possess any material non-public information

6

15. Therefore, at no point during the five months that Magten was a member of the Committee or during the months following Magten's removal from the Committee did Magten trade in the Debtor's securities with material, non-public information.

7

I declare under the penalty of perjury that the above statements are true and correct.

Dated:  New York, New York
        September 28, 2004

By: _____
    Talton Embry

8