1          THE COURT:  Go ahead.

2          MR. SMITH (TELEPHONIC):  It says, quote, "Request

3   for compensation for services of professionals whose time is

4   de minimis raise their red flag in our review other than

5   professionals with exceptional expertise.  The fleeting

6   involvement of bankruptcy attorneys in a case often results

7   from a staffing inefficiency.  Given the itinerate attorney's

8   lack of knowledge of the case, the attorney's time may be

9   less productive than attorneys regularly assigned to the

10  case.  When this occurs we would expect an appropriate

11  deduction be made to the time charged."  End quote, Your

12  Honor.  Now I also want to point out a few things, Your

13  Honor, regarding the time of the -- for lack of a better word

14  well call them itinerate attorneys.  Yes, we just went

15  through a response to Exhibit 6, and as of the time of those

16  with less than ten hours, I think the point was asserted that

17  these were people with special expertise outside the

18  bankruptcy arena.  If I'm misquoting, I'd like to be

19  corrected on that.  But in viewing the response to Exhibit 6,

20  we do see on the first page of that, of course, Mr. Austin's

21  time there and we're having no dispute with the 2,587 hours

22  that he put in and it shows that he's a partner and the

23  department is corporate bankruptcy.  On the very next page,

24  though, of response to Exhibit 6, there's two attorneys,

25  Thomas P. Brennan (phonetical), also in the Corporate

1    Bankruptcy Department.  He bills one hour to the case at an
2    hourly rate of $540 an hour.  Also on that same page, the
3    second page of the response to Exhibit 6, the attorney
4    Catherine A. Trackler (phonetical), she's also in the
5    Corporate Bankruptcy Department, and she billed 3.3 hours and
6    that was for a total of $1,633.50.  Your Honor, I think the
7    point made in Jasava is that back to when the Bankruptcy Code
8    was enacted in 1979, there was legislative history to the
9    fact that bankruptcy to entice all these professionals to
10   practice bankruptcy law and bankruptcy attorneys should be
11   paid the same inside bankruptcy as the attorneys outside
12   bankruptcy.  But I think there's also a -- basically there's
13   a -- accordingly the billing practices should be the same,
14   and outside bankruptcy there are often billing reductions and
15   discretionary reductions that are taken by attorneys for
16   private clients.  Many times, such reductions are for
17   attorneys who bill just small matters on this case.  In our
18   fee audit experience, many law firms make this reduction
19   voluntarily.  Paul Hastings has not made such a reduction.
20   Again, we think that there is good authority for such a
21   reduction.  We think such a reduction is appropriate in this
22   case, and that's why we made that recommendation.
23              THE COURT:  All right, thank you, Mr. Smith, I'll
24   take those comments under advisement.  Can we have counsel
25   for Magten to approach the podium and you may address your

1  objections to the fees.

2  MR. AMEANI:  Good morning, Your Honor.  Dijon

3  Ameani, Schorch, Ameani, and Monvease (all phonetical) for

4  Magten Asset Management.  I'm here, Your Honor, to present

5  Magten's objection to Paul Hastings final fee application.

6  We have basically two principal objections.  The first, as we

7  discussed with Your Honor in our call on Friday, was that we

8  believe that this application should be deferred pending the

9  determination by the District Court of Magten's appeal

10  relating to Paul Hastings' disqualification and whether they

11  should have been disqualified in this matter.  The second

12  objection goes to the representation that Paul Hastings made

13  to this Court previously to Judge Case in connection with

14  that disqualification motion, and as they went forward, how

15  their actions conflicted with that representation, in

16  particular in remaining involved in matters that they told

17  the Court that they would no longer be involved in.  Before I

18  get to those two things, I wanted to address a couple of

19  things that Mr. Austin said, and that first one was the

20  scatter-gun approach that he likes to quote about Magten's

21  approach.  Nothing could be further from the truth about

22  Magten's approach to this case.  It's been a very focused

23  approach, Your Honor.  It is focused on one transaction in

24  particular and that is what people refer to as the going-flat

25  transaction.  We refer to it as a fraudulent transfer

1   transaction, but it involves, as Your Honor probably is fully
2   aware by this point, the transfer of significant assets from
3   Clark Fork to Northwestern just prior to the filing of this
4   bankruptcy and which I think no one disputes any longer that
5   that transfer was for anything but adequate consideration,
6   that in that transfer Northwestern benefitted to the tune of
7   hundreds of millions of dollars more than it relinquished in
8   return.  All of Magten's actions in this bankruptcy have been
9   focused on trying to get the right result for the creditors
10  of Clark Fork who were disenfranchised by that transfer, and
11  it was in the process of doing that that Paul Hastings'
12  conflicts arose.  It was in the process of focusing on that
13  aspect of the case that it became clear, although not crystal
14  clear until Mr. Austin submitted an affidavit, I believe, in
15  July 2004, that Paul Hastings had been involved in that
16  transaction and had been involved in that transaction for
17  both parties, both for Clark Fork and for Northwestern.  And
18  a little bit of the history since -- and you'll indulge me
19  for a moment, Your Honor, if you will -- a little bit of the
20  history since Judge Case was involved previously on how that
21  came about, how that discovery of that came about.  It was
22  during the course of negotiations in trying to determine how
23  things would be divided in this bankruptcy that there were
24  indications that Paul Hastings may have been on both sides of
25  that transaction, although that wasn't clear from the

1  records. Despite having put in several affidavits to the
2  Court, Paul Hastings had never disclosed that it had been
3  involved in both sides of that transaction. In March of
4  2004, my firm, on behalf of Magten, began making demands upon
5  Paul Hastings and asking them point blank, Were you involved
6  in both sides of the transaction? We'd like to know that.
7  And they avoided responding to that and forced us to
8  initially file a 328(c) statement with the Court, and
9  subsequently a disqualification motion following which, even
10  in response to that in affidavits, they did not disclose the
11  dual role that they played in that transaction. They only
12  finally disclosed it in response to an order from Judge Case
13  that they -- or direction, is probably closer to what it was,
14  a direction that they should file an affidavit disclosing
15  what their role was in that transaction, which they did in
16  July of 2004. It's noteworthy that in Judge Case's opinion
17  on the disqualification even though he denied our motion, he
18  did note that Paul Hastings should have made that disclosure
19  at the time, and that it was improper for them not to have
20  done so. He absolved them only on a basis of whether they
21  had an intention to withhold that information and only on the
22  basis of a last minute in-court declaration by the U.S.
23  Trustee's Office that they had in fact been advised of that
24  fact at the beginning of the bankruptcy and had chosen, I
25  guess, to keep it to themselves. On that basis he found that

1   it was not intentional, their nondisclosure.  He then held
2   that effectively Magten didn't have the standing to challenge
3   the conflict because Magten was not a creditor of Clark Fork.
4   And also found that the two parties to the transaction has
5   consented to that transaction, which it turned out
6   subsequently was a misstatement on the part of Paul Hastings
7   as well.  Clark Fork could never have consented to the dual
8   role of Paul Hastings in that transaction, at least there's
9   no record that they had done so.  But based on that finding,
10  Judge Case held that Magten should not be disqualified.
11  Nevertheless, in response to that motion, Paul Hastings
12  stated that in order to avoid any potential or appearance of
13  any conflict of interest it would withdraw from all -- it was
14  withdrawing or it had withdrawn from all matters related to
15  the Magten adversary proceeding which is addressed to that
16  very transaction, what is called -- referred to generally as
17  the going-flat transaction.  We believe that this final fee
18  application should be deferred pending the outcome of the
19  appeal from the disqualification order.  We believe that we
20  have substantial grounds for that appeal, and if that appeal
21  were to be granted, then the tenure of how the Court would
22  deal with the fee application would be different.  We also
23  believe that in light of the representation that they made,
24  that Paul Hastings made, this fee application should be taken
25  -- a much closer look should be taken of this fee application

1    and Paul Hastings should be directed to go back and review

2    its own files to determine to what degree it continued to

3    work on matters related to the adversary proceeding.  And in

4    that respect, I think, Your Honor has a lot of experience

5    because if you look at what Paul Hastings has done since the

6    disqualification motion, since they represented that they

7    were getting out, they proposed a plan.  They confirmed a

8    plan, and in the process of that plan proposal and

9    confirmation, they took issue again with the going-flat

10   transaction and Magten's objections to the going-flat

11   transactions, and those have been the subject of further

12   proceedings before Your Honor, which Your Honor is fully

13   aware of.  They subsequently settled the case with Magten,

14   and they entered into the settlement with Magten and again,

15   the settlement was directed principally to the Magten

16   adversary proceeding and all matters related to it.  They

17   then repudiated that settlement.  All right?  They then

18   suggested to us that we go to mediation, not the mediation

19   that's currently scheduled or that was directed by the Court

20   under the Court's rules with respect to any particular

21   appeal, but they actually suggested that we go to a mediator

22   whom they selected.  A $10,000 a day, we call him a holistic

23   mediator, out in Hawaii, Your Honor.  They came to us.  They

24   suggested we go to a mediation with them and try to further

25   resolve this matter with them.  They subsequently, just prior

1    to the time that that mediation was to begin, stated that

2    they would not attend the mediation.  They were no longer

3    interested in any attempts at mediation.  Everything they've

4    done since the time that they represented that they would no

5    longer be involved in the adversary proceeding or matters

6    related to it, go to the heart of that particular proceeding.

7    They've never withdrawn despite having told the Court that

8    they were withdrawing from that proceeding.  They've never

9    withdrawn from that proceeding.  We have no record of anyone

10   else, any other outside counsel having actually appeared or

11   done anything in that proceeding.  All matters related to

12   that fraudulent conveyance matter have been dealt through

13   with Paul Hastings since the inception of this case, and it

14   goes back to the -- at the heart of our problem with this,

15   and why it's the -- it remains part of Magten's overall

16   focus, the heart of our problem with this is the fact that

17   Paul Hastings having been on both sides of the transaction,

18   the fraudulent transfer transaction, Paul Hastings in fact

19   did have a conflict there and that conflict has in fact

20   pervaded everything they've done in this case.  It truly

21   calls into question whether they dealt with all the creditors

22   of this case equitably, which we understand the standard to

23   be.  And as a consequence of that, until the disqualification

24   motion is decided, they should not have their final fees

25   ruled upon.  With respect to the particular matters that they

said that they withdrew from they shouldn't get any fees from that either. We've laid out for Your Honor about $308,000, I believe, in expenses that we were able to glean from their fee application was either related to the Magten -- all was related to the Magten adversary proceeding, and we've laid out for Your Honor what those were. But in the process of taking discovery in this case, it also became apparent that Paul Hastings, admittedly so, did not keep its time records in such a manner that it was actually separating the time that it was spending on matters related to the Magten adversary proceeding, and so we've asked Your Honor to direct them to go back and do so, so that we can get a clearer picture of how much in fact was devoted to that. At this point, Your Honor, in terms of the conflict, the other point that I wanted to make was, it would appear rather clear that although when we first made the disqualification motion we stood alone in claiming that Paul Hastings had a conflict. Your Honor has now also seen that in the context of the 9019 motion, other parties came forward and set forth what they believe was Paul Hastings' conflict as well. The Plan Committee, the Creditors Committee, the Ad Hoc, Class 7 Committee, both of them filed objections to the 9019, and one of the principal objections they filed in the 9019 hearing for the settlement was the fact that they felt that Paul Hastings had such a conflict. So, I think at this point, our

point simply is that there's a fairly -- There's no question that there was a fraudulent transfer. There's no question that Paul Hastings was on both sides of the transfer. There's a fairly substantial argument that as a result of that conflict, they should have been disqualified from being the debtor's counsel, and they certainly should have been disqualified from dealing with that particular matter. They represented to the Court that they were not going to deal with that matter, with the fraudulent transfer, at least with respect to Magten's objection to it. They continued to do so. They put in a fee application that has some $300,000 of time that can be clearly identified in that respect, but they've admitted that they didn't keep their time in such a manner that other time that might have been spent on it is not also buried in other areas, and as a consequence, the fee application should be deferred for the time being until the disqualification is decided and absent that, if Your Honor wants to deal with the fee application, the $300,000 should not be granted to them, and they should be directed to go back and determine from their own time records other time that was spent on that matter. Thank you, Your Honor.

THE COURT:    Thank you.

MS. PHILLIPS:    Good afternoon, Your Honor. Margaret Phillips of Paul Weiss Rifkind Wharton & Garrison on behalf of the Plan Committee. I want to sort of clarify for

1    the record something Mr. -- Magten's counsel just stated that

2    one of the Plan Committee's principal objection to the

3    settlement motion that was denied was the fact that Paul

4    Hastings had a conflict.  That was not the case.  The

5    principal objection was the fact that the settlement

6    expressly violated the terms of the plan, and I also wanted

7    to express the Plan Committee's support of Paul Hastings' fee

8    application.  This has been a difficult and complex Chapter

9    11 case, as I'm sure Your Honor is aware at this point, and

10   the debtor's plan of reorganization was successfully

11   confirmed because of the tireless efforts of Paul Hastings

12   and the other professionals that were involved in this case.

13        THE COURT:  Thank you.  Do you want to respond, Mr.

14   Austin?

15        MR. AUSTIN:  First off, to clarify the record, Your

16   Honor, Northwestern and certainly Paul Hastings takes issue

17   that (a) there was a fraudulent transfer, a transfer of the

18   assets from Clark Fork to Northwestern, and (b) that Paul

19   Hastings itself has a conflict.  Essentially all I've heard

20   Mr. Ameani do is to reargue his disqualification motion.

21   That matter had been resolved in favor of Paul Hastings.

22   There's been no stay of that.  The history that he tried to

23   bring up is effectively not relevant.  You know, the Court,

24   Judge Case after full deliberations and hearing denied the

25   motion to disqualify and in its rulings did not put any

1    restrictions on Paul Hastings as to the role it could play

2    and the services it rendered as general lead bankruptcy

3    counsel to Northwestern.  The issues which Mr. Ameani claims

4    that Paul Hastings effectively shouldn't have been involved

5    in was development and reorganization plan that was

6    overwhelmingly supported by Northwestern's approximately, I

7    guess, 98 percent of its creditor body, and effectively

8    responding to objections raised by Law Debenture and Magten,

9    which, I guess, Mr. Ameani's suggesting that we're supposed

10   to depress to know exactly what Magten's going to raise

11   before it raises it and should be prepared to have some else

12   to deal with the situation.  That simply is not how this

13   bankruptcy case was run, and it was not how Magten -- It was

14   not -- Magten was aware of anything different.  As to the

15   Magten adversary proceeding, the Greenberg Traurig firm as of

16   that point was counsel of record and it was clear as we

17   stated we stepped back and took no more action in that case.

18   And the last point, Your Honor, we do take issue with how our

19   time was kept.  We clearly delineated our time.  We kept it

20   in accordance with the rules.  We had more multiple sub-files

21   for which we recorded time and the time that related to the

22   Magten litigation, the going-flat litigation, as we called

23   it, it was what we called Magten 41, and other than one item

24   which we did make an adjustment for, Your Honor, all that

25   time was recorded prior to the point that we advised the

1    Court we were stepping down as counsel to Northwestern with
2    respect to that actual pending adversary case.  In this
3    particular instance, Your Honor, Judge Case effectively said
4    through confirmation of the plan, that the plan was fair and
5    equitable, and that the creditors -- to all creditors, and
6    indeed, the creditors noted this by voting overwhelmingly to
7    support this.  Subsequent history that Mr. Ameani's trying to
8    bring up also is not relevant, and we ask the Court to deny
9    Magten's objections and approve the application.  One last
10   point, is just an observation, on the one hand Mr. Ameani was
11   arguing last week that this application should come on.  But
12   seemingly today, he's having kind of a different perspective
13   in that you should effectively defer ruling on it pending the
14   outcome of the appeal for which there was no stay.  We also
15   want to make a correction, Your Honor, when last week we
16   suggested that possibly the Court should defer ruling until
17   there's a completion of the District Court ordered mediation.
18   We have reviewed the matters that are going to be addressed
19   before the mediator, and we retract that statement, Your
20   Honor.  We do not think there's a need for this Court to
21   delay ruling on the application pending the outcome of the
22   mediation.  Those issues before the mediator would not, we
23   believe, effect the ultimate result by this Court hopefully
24   granting the application and making payment if for some
25   reason down the road, there's an adverse ruling to Paul

1   Hastings either as to the disqualification motion or what

2   have you.  We believe at that point an appropriate remedy

3   could be fashioned because we are officers of this Court.

4   This case is still pending before this Court.  It has not yet

5   been closed, and if this matter is ever remanded back and

6   we're forced to order disgorgement in any way, we certainly

7   are available and before this Court to face those

8   consequences.  Thank you.

9          THE COURT:  Thank you.  I'll take this matter under

10  advisement.  Do we have the Graves' application?  Counsel.

11         MR. ABBOTT:  Good morning, Your Honor.  Just

12  barely.  Maybe it's still morning for a minute or so.  Your

13  Honor, my name is Derek Abbott of Morris, Nichols, Arsht &

14  Tunnell.  I'm here on the related matters of the revised

15  final fee application of the Graves Law Office and the

16  alternative nunc pro tunc application for the debtors to

17  retain ELM Consulting.  Your Honor, I'm here in both those

18  capacities.  By way of preview, Your Honor, very briefly, I

19  think it's important to note at the outset that we have come

20  to peace with Mr. Smith who I think is on the phone and will

21  acknowledge that with the exception of a couple of issues.

22  The two issues that I think the Court's interested in hearing

23  about and Mr. Smith is obviously reserving judgment on are

24  the issue of the propriety of Graves Law Office paying fees

25  to ELM Consulting as an expense.  That said, Your Honor,

1    we've discussed with Mr. Smith his comments both to the fees

2    and expenses relating to Graves Law Office, and other than

3    the propriety of the structure, the fees and expenses of ELM

4    Consulting, Your Honor, and to be brief, what we're left

5    with, Your Honor, is a revised final fee application

6    reflecting the comments of the fee auditor for fees in the

7    amount of $185,435 for Graves Law Offices and expenses --

8    and, Your Honor, I'll put those in two buckets to make it

9    clear.  Expenses not related to the fees of ELM Consulting in

10   the amount of $60,737.11 and then a balance after a number of

11   deductions for expenses of Graves Law Office for ELM fees in

12   the amount of $841,793.11.  Your Honor, the deductions per

13   Mr. Smith's comments to the ELM matter were approximately

14   $22,000 related to an expense surcharge noted by the Court at

15   one of the prior hearings.  Your Honor, an adjustment of

16   eight thousand some odd dollars related to the

17   appropriateness of the billing for non-working travel time.

18   $148.87 adjustment, Your Honor, for a meal that wasn't

19   sufficiently described.  A $5 charge for an alcoholic

20   beverage, Your Honor.  And a $16,492 communications charge.

21   All of those items, Your Honor, were reduced to get us to

22   that final aggregate number of both ELM related expenses and

23   other case expenses of $902,000 -- excuse me, $902,530.22.

24   Your Honor, what I would like to do is spend a little time

25   describing the background.  I've got two witnesses that I

1  think together hopefully should be in the twenty to thirty

2  minute range, depending on the Court's questions.  I do note

3  there are no objections to either of these applications, and

4  perhaps the easiest thing to do, Your Honor, would be to

5  commence with the testimony, but I'm at the Court's pleasure

6  on that.

7        THE COURT:  Go ahead, proceed as you wish.

8        MR. ABBOTT:  I'd like to call, Your Honor, Lee

9  Graves to the stand.

10       THE COURT:  All right.

11                      LEE GRAVES

12 being duly sworn according to law, testifies as follows:

13                 DIRECT EXAMINATION

14 BY MR. ABBOTT:

15 Q.   Mr. Graves, would you please tell the Court who you are

16 and what you do.

17 A.   My name is Lee Graves.  I am principal in Graves Law

18 Offices as well as principal of ELM.

19 Q.   Can you explain what Graves Law Offices is and then

20 follow up with an explanation briefly of what ELM Consulting

21 is?

22 A.   Yes.  Primarily Graves Law Offices is an environmental

23 law practice in which we focus on environmental remediation,

24 natural resource damages, and overall environmental

25 compliance issues.  Our firm is a very small firm.  We only

1    have three attorneys of which I'm the principal again.  ELM

2    Consulting is a environmental consulting firm of only twenty

3    people.  Approximately, they're made up of environmental

4    engineers, design engineers, geologists, ecotoxicologists,

5    human health toxicologists, and are primarily individuals

6    with I would say on the average of over fifteen years'

7    experience with those folks.

8    Q.    When did you first become associated with Northwestern

9    Corporation or its affiliates?

10   A.    I would say approximately three years ago, just prior to

11   the acquisition of Montana Power by Northwestern.

12   Q.    Can you explain in rough terms what the Graves Law

13   Offices do for Northwestern and its affiliates?

14   A.    Primarily we handle all their environmental matters

15   which range from the management of several manufactured gas

16   sites in three states, Nebraska, South Dakota, and Montana.

17   Of those nine, there's three, I would say, active sites in

18   Helena, Montana.  Aberdeen and Mitchell, which have been part

19   of a voluntary program with enforcement oversight by the

20   agencies.  Graves Law Offices has been working on those sites

21   in conjunction with the consultants.  We have been doing

22   pilot studies, characterizations, sampling to determine what

23   risk to human health in the environment are at those sites.

24   Coordinating that matter with Northwestern as well as with

25   the state and federal agencies. There's other sites in

1   Nebraska which we're beginning conversations with state

2   agencies on as well.  We've also provided support services

3   for Northwestern through the bankruptcy as to quantification

4   of environmental liabilities that support the plan.  We've

5   been doing enforcement compliance and auditing for the

6   company in its general operation.  We have been supporting

7   quantification of liabilities as it relates to the reserve

8   numbers for SEC reporting requirements, Sorbey & Oxie

9   (phonetical) requirements.  And also been managing the

10  Milltown Dam matter in negotiations near Mesula (phonetical),

11  Montana.

12  Q.    In the course of your representation of Northwestern as

13  affiliates, does the Graves Law Office use consultants?

14  A.    Yes, we do.

15  Q.    Can you describe the use of those consultants very

16  generally for the Court, please.

17  A.    Generally, we hire experts in that environmental matters

18  generally are very technically driven as to environmental

19  risks, fate and transport of constituents, clean-up levels,

20  quantification of contamination in the environment, how to

21  clean it up, how to approach it, and with that takes a number

22  of different disciplines to draw conclusions and give -- Just

23  to give an opinion as to the issues.  Graves Law Offices

24  retains consultants and different firms including the ELM

25  Consulting to manage those expertise under an umbrella of

1   attorney/client privilege in anticipation of litigation. And

2   those experts all are directed by counsel and that allows the

3   opportunity to manage the strategy and hopefully end resolve

4   of the liability for the corporation.

5   Q.   This structure that you've described where Graves Law

6   Office retains the consultants directly in order to protect

7   attorney/client privilege and work product protections, is

8   that structure unique to your firm's engagement with

9   Northwestern or is that what you do with all your clients?

10   A.   Depending upon the matter. The majority of our matter

11   is anticipation of litigation. So we will retain experts

12   directly, and I know ELM Consulting has been retained by law

13   firms directly if Graves Law is not the law firm involved.

14   So the general state of the industry is very litigation

15   driven in terms of environmental matters, and so, the

16   majority of the experts working with legal counsel are of a

17   privilege nature.

18   Q.   And just so the Court's got this information, Mr.

19   Graves, how long have you been involved in the environmental

20   litigation and legal arena?

21   A.   Probably about -- I guess career stretching from more of

22   a finance attorney and contract attorney in Washington in the

23   '80s, Exxon-Valvese (phonetical) ran aground, I went back

24   into the federal government as an attorney to work on the

25   Exxon-Valvese matter and take over major litigation for

1  federal and state agencies in California, Montrose Chemical

2  litigation which was the preeminent natural resource damage

3  case in the country and, I think, still is today.

4  Q.   Is it fair to say that you're relatively experienced in

5  the environmental litigation world?

6  A.   I think the basis of the natural resource damage and

7  remediation experience -- our practice is a small practice

8  but we're probably preeminent in the field.   There's probably

9  no better group of experience in the country than we have

10  internally between technical folks and myself on the legal

11  matter.

12  Q.   Focusing again quickly on the differences between what

13  Graves Law Offices does and what ELM Consultants do for

14  Graves Law Offices, I want to ask you a series of questions

15  regarding ELM Consulting's role, not Graves Law Office but

16  ELM Consulting's role.   Would you say that ELM Consulting had

17  the responsibility to control, manage, administer, invest,

18  purchase, or sell assets significant to this debtor and its

19  reorganization proceedings?

20  A.   No.

21  Q.   Was ELM Consulting itself involved in the negotiation of

22  a plan of reorganization?

23  A.   No.

24  Q.   Is the service the ELM provides directly related to the

25  principal work carried out by the debtor or the routine

1   maintenance of its operation?

2   A.    No.

3   Q.    Did anyone at ELM Consulting have the discretion or

4   autonomy to exercise professional judgment in the

5   administration of the Northwestern debtor's estates?

6   A.    No.

7   Q.    Were professionals -- Excuse me, were ELM Consultants

8   heavily involved in the administration of these cases?

9   A.    I'm sorry, which cases?

10  Q.    I'm sorry, the Northwestern bankruptcy cases.

11  A.    No.

12  Q.    And finally, you talk a little bit about some of the

13  qualifications for the consultants at ELM, but did they

14  possess some special skill or knowledge that would leave one

15  to believe that they are professionals in the ordinary

16  meaning of the word?

17  A.    As it relates to their discipline, yes.

18  Q.    Thank you.  Back to your involvement with this estate or

19  these debtors and both pre-petition and during the case, do

20  you understand that on or about the first day or week of the

21  case these debtors sought court approval to use both Graves

22  Law Office and ELM Consulting as ordinary course

23  professionals in these matters?

24  A.    Oh, absolutely.

25  Q.    And sometime later was there a different sort of

1    retention sought for Graves Law Office?

2    A.    I believe -- I hope I get the character right, it's

3    special counsel and that was I think due primarily to the

4    amount of monies going through shifted that from ordinary to

5    special.  I believe that's the nomenclature for its shift.

6              MR. ABBOTT:  Your Honor, may I approach the witness

7    with a document?

8              THE COURT:  Yes.

9              MR. ABBOTT:  And the bench as well, Your Honor, in

10   case you haven't got the Graves retention application in your

11   binder.

12             THE COURT:  I've got it.

13             MR. ABBOTT:  Thank you, Your Honor.

14   BY MR. ABBOTT:

15   Q.    Mr. Graves, I've handed you a document that on its face

16   is marked Docket No. 591 dated December 22nd, 2003.  Have you

17   seen this document before?

18   A.    Yes.

19   Q.    And is this the application that the debtors filed to

20   retain Graves as special counsel?

21   A.    Yes, it is.

22   Q.    Does this document disclose the structure of the

23   relationship between Graves Law Office and Elm Consulting?

24   A.    Yes, it does as does our original engagement letter

25   prior to bankruptcy.  I believe it's page 3, item 6.

1    Q.    That's the discussion in the application.  Is not that

2    engagement letter -- I stand corrected.  I believe the copy

3    that I handed you does not have all the attachments and I

4    apologize, but to the best of your belief was the engagement

5    letter between the debtors and Graves Law Offices attached to

6    that application?

7    A.    Yes, it was, the original application.  I don't see it

8    on this copy though.

9              THE COURT:  Are you talking about Mr. Graves'

10   affidavit?

11             THE WITNESS:  No, it was the original engagement

12   letter of Graves Law Offices with Northwestern prior to

13   bankruptcy.

14             THE COURT:  Oh.

15             MR. ABBOTT:  Your Honor, I had understood that was

16   attached and disclosed as redacted to protect certain

17   confidential information.  I've got a copy here I could hand

18   up if it's not attached to the Court's copy.

19             THE COURT:  I've got a copy of the docket file and

20   I don't see that attached.  Is it marked as an exhibit or a

21   schedule?

22             MR. ABBOTT:  Your Honor, I believe it was, although

23   I don't -- It was filed under seal, Your Honor.  Footnote 3

24   on page 3 of the application reflects that it was filed under

25   seal because it did have some privileged information in it.

1   The copy I've got that is attached to my copy has been

2   redacted, I believe.  Your Honor, very briefly, my point in

3   referencing this was to point to the disclosures made in

4   there that were not redacted regarding the structure of the

5   arrangement between ELM Consulting and Graves Law Offices.

6   Again, I'm happy to hand that up to the Court if it was not

7   included in the file as having been filed under seal, but I

8   could just as easily, perhaps, get Mr. Graves to testify to

9   that disclosure.

10          THE COURT:  I don't have anything from the docket

11  sheets which are included in the applications and that has

12  anything to do with the scope and services pre-petition, but

13  what has attached here is a retention letter, Exhibit B, and

14  then there is in the application the recitation relative to a

15  connection between Graves and ELM and how Graves will in turn

16  employ an environmental consulting firm to perform

17  environmental work including field sampling, laboratory

18  testing remediation and one of those firms is ELM, E-L-M.

19          MR. ABBOTT:  Your Honor, I believe Exhibit B was

20  the document to which I was referring.  It's an engagement

21  letter, Your Honor, dated December 14, 2001.  If I may

22  approach, I could hand the Court my copy.

23          THE COURT:  That's not in the exhibit I have, but I

24  have seen that exhibit in a prior hearing.

25  BY MR. ABBOTT:

1  Q.   Mr. Graves, did that engagement letter attached as

2  Exhibit B describe the structure of GLO's retention of ELM

3  Consulting and also disclose the nature of your majority

4  ownership interest in each of those entities?

5  A.   Yes, and it was also representative of the discussions

6  with Northwestern management in that one of the other

7  managers of ELM was with me when we initially met with and

8  introduced how to manage environmental liabilities, the

9  combined approach using ELM for privilege and legal and the

10  consulting for the technical support.

11  Q.   And that structure and arrangement was the arrangement

12  and structure that existed when you were first retained in

13  2001 --

14  A.   Correct.

15  Q.   -- and throughout the duration of the bankruptcy case

16  and in fact today, post-confirmation in effect today; is that

17  true?

18  A.   The relationship and how the environmental sites are

19  being managed hasn't changed since the first engagement in

20  2001.

21  Q.   Thank you.

22          MR. ABBOTT:   Your Honor, that's all I have for Mr.

23  Graves.

24          THE COURT:   All right.

25          MR. ABBOTT:   I would pass the witness to the Court

1    or interested parties if there's further inquiry.

2           THE COURT:  I have no questions.  Thank you very

3    much.

4           THE WITNESS:  Thank you, sir.

5           MR. ABBOTT:  Your Honor, I would next call Mike

6    Young.

7                        MICHAEL J. YOUNG

8    being duly sworn according to law, testifies as follows:

9                        DIRECT EXAMINATION

10   BY MR. ABBOTT:

11   Q.   Mr. Young, will you please tell the Court who you are

12   and what you do.

13   A.   Yes.  My name is Michael J. Young.  I'm a senior

14   corporate counsel at Northwestern Corporation, and my

15   principal responsibilities are to work doing the commercial

16   work of the utility and in that context I handle basically

17   all of the environmental work for the utility.

18   Q.   And how long have you been with the company?

19   A.   I've been with Northwestern since January 1st of 2001.

20   Q.   And in connection with your responsibilities with the

21   company, are you aware of Graves Law Office and ELM

22   Consulting?

23   A.   Yes, I am.

24   Q.   Since when?

25   A.   I was first introduced to Graves Law Offices and ELM

1   Consulting approximately this time during the year 2002,

2   shortly after we had closed on the Montana Power acquisition.

3   So it might have been the May/June time period of 2002.

4   Q.   Are you aware of the structure of their engagement

5   whereby Northwestern retained Graves and Graves retained

6   consultants?

7   A.   Very much, yes.

8   Q.   Do you understand why they do that?

9   A.   Yes, I've -- In my previous employments both with

10  Northwestern with NRG Energy in Minneapolis and also with

11  Cargale (phonetical) Inc., I was involved pretty

12  significantly with environmental work, and at both those

13  companies, similar to the way Northwestern has it structured,

14  we would typically engage a consulting firm directly through

15  the use of outside counsel.

16  Q.   And why was that?

17  A.   The principal reason was to solidify the privilege

18  because a lot of the work was done in anticipation of

19  litigation.

20  Q.   And is this structure an arrangement one that

21  Northwestern employs with counsel other than Graves from time

22  to time?

23  A.   Yes, I have some recollection on that and certain

24  matters Northwestern has engaged other consultants through

25  the use of lawyers particularly when there's anticipated

1  litigation.

2  Q.    Is it your understanding that this structure, in terms

3  of the retention, has always been in place with Graves Law

4  Office as far as you're aware?

5  A.    Yes, as far as I'm aware, and in fact, I did work on the

6  engagement letter, so I was very familiar with the structure.

7  Q.    Would you describe briefly in your own words what Graves

8  Law Offices does for Northwestern?

9  A.    Well, it's kind of a unique relationship because you

10  kind of get a double bang for your buck.  I mean, you get Lee

11  Graves who's an extremely experienced environmental lawyer

12  who had significant experience in negotiating settlements and

13  consent decrees with regulatory agencies, which is something

14  that Northwestern was involved with very deeply once it

15  acquired Montana Power with respect to the Milltown Dam

16  situation.  And then of course we saw coming down the

17  pipeline potential other problems and issues involving

18  manufactured gas plant sites in our states in which we

19  operate, and on top of that, he was affiliated with a very,

20  very strong consulting firm that had a high level of

21  competency, was extremely well respected in the industry.

22  So, we felt that we were making a very efficient engagement

23  by getting access to two very valuable resources.

24  Q.    And you were sitting here in the courtroom when Mr.

25  Graves testified about what he did for the company; is that correct?

1   A.    That's correct.

2   Q.    Was his testimony consistent with your understanding of

3   their role?

4   A.    Yes.

5   Q.    How critical to the operations of Northwestern are the

6   services that Graves Law Offices provides?

7   A.    In my opinion, very substantial.  When Northwestern

8   acquired Montana Power Company, it was the last part of a

9   major divestiture involving the unwinding or the unbundling

10  of a vertically integrated utility out in Montana, and when

11  the generation assets were sold to PPL, a significant number

12  of environmental human resources went with that transaction.

13  So, Northwestern, when I came on board and was assigned the

14  responsibility to deal with the environmental issues, it was

15  pretty clear to me that internally we did not have the human

16  resource power to manage these situations going forward

17  efficiently and effectively because we didn't have the

18  manpower, the people-power to do it.  So, a decision was made

19  by senior management to go the route of using outside

20  consultants to manage the environmental affairs, working with

21  an in-house lawyer.

22  Q.    And I realize I'm getting into a sensitive area here, so

23  I want you to be limited of course to publicly disclosed

24  information, but is there a disclosed general order of

25  magnitude that you can describe either the alleged or

1    potential liability involved in the environmental matters

2    that Graves Law Office is involved in on Northwestern's

3    behalf?

4    A.    Sure.   Currently in our public filings, most recently

5    our 10(k), we list out an environmental reserve amount of I

6    believe approximately $43 million.   So that is the company's

7    assessment at this point of what it believes it is going to

8    be responsible for going forward with its environmental

9    matters, and in addition, obviously in this bankruptcy there

10   was a very public situation involving the Milltown Dam super-

11   fund site in which I believe claims were filed in the

12   neighborhood of $150 million against the company and the

13   estate for potential responsibility at the Milltown Dam and

14   through the efforts of Graves Law and the Paul Hastings firm

15   and ELM Consulting we were able to structure a very, very

16   favorable settlement to the benefit of the estate of roughly

17   $11 million.

18   Q.    Now, I realize that a lot of people contributed to the

19   confirmation and effectiveness of the plan of reorganization,

20   but in your mind could the company have done it without the

21   sort of assistance that Graves Law Office provided the

22   debtors?

23   A.    No, I think it would have taken significantly longer to

24   get this company through the bankruptcy process, in my

25   opinion, because we would have had to go out and hire the

1    necessary resources to go out and assess the environmental

2    situation, do an inventory of potential environmental

3    liabilities, and then do a quantification of those

4    liabilities, and Graves Law and ELM were extremely familiar

5    with all the company's environmental situations in all three

6    of its states and were able to work effectively and

7    efficiently with the Paul Hastings firm to develop a plan for

8    dealing with the environmental liabilities and to implement

9    or structure that plan within the filing documents.

10   Q.    Thank you, Mr. Young.

11         MR. ABBOTT:    I have no further questions, Your

12   Honor, and I would pass the witness.

13         THE COURT:    Thank you, Mr. Young.    Does that

14   conclude your testimony?

15         MR. ABBOTT:    That concludes the testimony, live

16   testimony, Your Honor.    I do wish to ask the Court to take

17   judicial notice of some of the entries on the docket and the

18   record in the bankruptcy case generally, and I'd be prepared

19   to address that in the beginning of my argument, if I might,

20   Your Honor.

21         THE COURT:    Go ahead.

22         MR. ABBOTT:    Your Honor -- Your Honor, this company

23   filed its petition on September 14th, 2003.    As Mr. Graves

24   testified, it sought the ability to use ordinary course

25   professionals in the ordinary course of its business.    On

1  September 17th, that was docket item 38, Your Honor.  Listed
2  on the exhibit there were both Graves Law Office and ELM
3  Consulting.  That motion, Your Honor, was approved at docket
4  item 200 on October 10th and contained what are fairly
5  customary monthly and aggregate caps for those professionals.
6  Your Honor, because it looked like the caps would likely be
7  exceeded with respect to these professionals, on December
8  22nd, 2003 at docket item 622, the debtors filed their
9  retention application of Graves Law Offices, and I would ask
10  the Court to take judicial notice of that.  Mr. Graves
11  identified it, and I note, Your Honor, that that application
12  disclosed the structure of the engagement, described in the
13  scope of their services under paragraph (9), Your Honor, that
14  Graves would retain and direct environmental consultants and
15  contractors and the management of environmental liabilities
16  and remediation of sites.  That's 9(c), Your Honor.  When
17  discussing the compensation and expenses at paragraph (11),
18  Your Honor, that that application stated that in addition to
19  the hourly rate set forth above, Graves customarily charges
20  its clients for all costs and expenses incurred including
21  environmental consulting services, telephone and tele-copier,
22  toll and other charges and a number of other fairly
23  traditional charges.  Your Honor, that's paragraph (11) on
24  page 4 of the application.  Your Honor, on January 14th,
25  2004, Judge Case then presiding over this proceeding entered

the order as far as we can tell without any objection, Your
Honor.   That's docket item number 696.   On page 2 of that
order, it states that the debtor's authorized pursuant to
327(a) and Bankruptcy Rule 2104 to retain and employ Graves
as special counsel in this Chapter 11 case, upon the terms
and conditions set forth in the application and the Graves
affidavit effective as of the petition date.   Your Honor,
that's the background of how Graves got into the case and
their efforts to -- or the debtors' efforts to have them
approved to provide services to the debtors.   Throughout the
course of the case, Graves submitted interim and quarterly
fee applications.   The Court in some previous hearings and
certainly Mr. Smith had noted some problems with those
applications that I think we have now corrected and resolved
in connection with our discussions with Mr. Smith and the
reductions that both the Court has imposed and Graves and ELM
have agreed.   The Court in some earlier hearings raised the
question of whether it was appropriate for Graves Law Office
to be able to pay its consultants directly, and I want to try
to respond to those, Your Honor.   As a result of those
comments, also on the docket at number 2622, which is still
pending is that nunc pro tunc retention application.   It was
supplemented on February 7th, Your Honor, with a request that
in the event that that application needed to be ruled on,
that ELM would request some modest relief to which I don't

1  think the fee auditor had an objection regarding its billing
2  practices and the customary sort of billing practices used
3  for environmental consultants of ELM's kind.  In addition,
4  based on some of their earlier comments at hearings, Graves
5  submitted a revised final fee application at docket item
6  2959.  That is the document, Your Honor, to which Mr. Smith
7  has noted some deficiencies and as to which recommendations
8  or deficiencies we agreed to concede.  Your Honor, I really
9  have three points that I'd like to make in legal argument.
10  The first is that we believe given the historical record in
11  this case, the disclosure of the engagements and the
12  retention order granted earlier in the case that there is a
13  law of the case argument that would suggest to us that ELM
14  need not be separately retained.  Additionally, and perhaps
15  alternatively, Your Honor, there is a case law extant in this
16  circuit that suggests that environmental consultants are not
17  professionals within the context of 327, they need to be
18  retained by the Court.  And my final point, Your Honor, and I
19  want to go through each of those a little more carefully, but
20  my final point, Your Honor, would be alternatively, if the
21  Court is more comfortable with such a nunc pro tunc
22  application, that on the, I think, relatively well settled
23  nunc pro tunc application law in this circuit, nunc pro tunc
24  retention in this case would be warranted.  And I'd like to
25  start with the idea of the law of the case, the two Third

1    Circuit cases I'd like to talk about first are <u>Hamilton v.</u>
2    <u>Leevy</u> (phonetical), which is 322 F.3d 776, and <u>Africa v. City</u>
3    <u>of Philadelphia</u>, which appears at 158 F.3d 711. Together,
4    Your Honor, those cases suggest the following about law of
5    the case: The doctrine of law of the case is intended to
6    limit the re-litigation of an issue once it's been decided
7    either explicitly or by necessary implication. The intent of
8    that doctrine is to promote finality, consistency, and
9    judicial economy. There's an exception for certain matters
10   including new evidence. It's clear, Your Honor, from those
11   cases that the application of the law, the case doctrine,
12   does not restrict this Court's power but informs the exercise
13   of the Court's discretion. The law, however, suggests that
14   the discretion to refrain from applying the doctrine should
15   only be used in extraordinary circumstances which I submit
16   are not present in this case. Those circumstances are things
17   like new evidence, supervening new law, or that the earlier
18   decision was clearly erroneous and would create manifest
19   injustice. Respectfully, Your Honor, we submit that there
20   are no such extraordinary circumstances to warrant a
21   departure from the law of the case doctrine in this case and
22   the previously approved retention application that adopted
23   the structure set forth in the application and the letter
24   agreement. Your Honor, as an aside to that, I note that
25   § 328 of the Code would otherwise allow the Court to change

1    the terms and condition of compensation after the conclusion

2    of services only if the terms and conditions proved to have

3    been improvident in light of circumstances not capable of

4    being anticipated at the time of the fixing of such terms and

5    conditions, and, Your Honor, here where they've been

6    disclosed in advance, we don't think we're in that bailiwick.

7    Your Honor, we do know from Mr. Graves' testimony that it's

8    frequent in his practice that this structure is used.  We

9    know that the ELM services were specifically contemplated by

10   the retention application in an order, and we think the law

11   of the case ought to govern, Your Honor.  The second prong of

12   my argument as I described is the reference to the line of

13   cases, the most, I think, well known of which is a case

14   called In Re:  Napoleon in this circuit.  It's at 233 BR 910.

15   That case cites another case In Re:  Sealing Associates

16   Limited, which is 128 BR 721.  They stand for the proposition

17   that environmental experts or consultants need not be

18   retained specifically under 327 as they're not necessarily a

19   professional as contemplated by § 327 of the Code.  The other

20   case that I would cite in that regard, Your Honor, is a 2001

21   case from Puerto Rico at 259 BR 484.  Again there the Court

22   found an environmental wet lands expert was not a

23   professional as contemplated by 327.  These cases are not

24   riding on a clean slate, Your Honor.  There is some

25   jurisprudence in this jurisdiction regarding those factors,

1    and as I'm sure you heard Mr. Graves run through a series of

2    questions that were designed to get at those factors, Your

3    Honor, and those factors are laid out I think most recently

4    in the AC&S case in this district, which appears at 297 BR

5    395.   That's a 2003 case that highlights the six factors that

6    Judge Farnan in the earlier First Merchants case established.

7    Those factors are whether the person to be employed controls,

8    manages, administers, invests, purchases, or sells assets

9    significant to the reorganization.   Whether that person would

10   be involved in negotiating the plan of the reorganization.

11   Whether that person's employment directly related to the type

12   of work carried out by the debtor or to the routine

13   maintenance of the debtor's operations.   Whether the person

14   to be employed is given discretion or autonomy to exercise

15   professional judgment in the administration of the estate,

16   and finally whether those persons are possessed of some

17   special skill or knowledge that would leave one to believe

18   they are professional within the ordinary meaning of that

19   term.   Your Honor, pursuant to Mr. Graves' testimony and I

20   think consistent with Mr. Young's testimony, the ELM

21   Consulting folks are certainly professionals within the

22   ordinary sense of the meaning, but that's the only one of

23   those six factors, Your Honor, that suggests that they are

24   professionals that would need to be retained.   We understand

25   from the earlier transcripts and record in the case that Your

Honor has a concern about that, and for that reason, Graves

did file a <u>nunc pro tunc</u> application to be employed and

retained in the case.  That alternative relief, Your Honor,

we would ask the Court to approve if in fact it is not

inclined to grant the application for fees including the ELM

expenses that's presently before Your Honor as amended,

pursuant to discussions with Mr. Smith.  Your Honor, there

are a couple of cases in this circuit that talk about the

propriety of <u>nunc pro tunc</u> application.  The two leading

cases are <u>In Re: Arkansas</u> at 798 F2d 645, and the most recent

case that I could find at the Third Circuit level that

addresses this issue and in fact clarifies to some extent the

<u>Arkansas</u> case was the <u>In Re:  FS Air Lease II, Inc.</u>, case at

844 F2d 99.  The <u>FS Air Lease</u> added a couple of questions to

the standard from <u>Arkansas</u> and they were (1) sort of at the

global level, could this applicant have been retained

initially, and (2) are circumstances extraordinary so as to

warrant approval on a <u>nunc pro tunc</u> basis.  The cases talk

about the reasons and the importance of prompt application by

a debtor for the retention of its professionals, and I think

those reasons have been met in this case where the debtor did

in fact seek approval of both GLO and ELM as ordinary course

and ultimately for Graves Law Offices as 327(e) counsel, but

the factors that the Court says are to be considered are

largely inapplicable in this case.  The first is, did the

applicant or someone else have the responsibility for applying? Well, Your Honor, in this case whether it was the applicant or someone else, and I would submit that it was perhaps a shared responsibility between debtor's bankruptcy counsel and Graves, but they met their burden. They did, in fact, make the application. It was granted without approval. The second factor, Your Honor, is was the applicant under any time pressure to begin work before approval. Again, not a factor that's particularly applicable to the facts of this case. Graves was working both before, during, and after the bankruptcy case. I think they were involved in important negotiations all through it, but given the fact that within three days of the filing of the case, there was an effort to get Court approval for the retention. I don't think that factor is particularly applicable. The third factor, again, not applicable, was their delay after learning that the approval was not granted. Well, in fact, Your Honor, approval was granted earlier in the case, so that factor, I think, at least is met here. The fourth factor is whether compensation to this party would prejudice innocent third parties, and nobody has suggested that, that I'm aware of, Your Honor, and we don't think that's the case. The last factor's a catchall and it asks the Court to consider other relevant factors. Here I think there are some other relevant factors, and they are principally the facts that we've heard

1    in testimony and I've discussed a little bit, the fact that

2    there was a multi-part effort to retain Graves Law Offices

3    and in acknowledgement in that retention of ELM Consulting's

4    role.    There was an effort to retain ELM Consulting as an

5    ordinary course professional, and then in the alternative in

6    the recent nunc pro tunc application to retain ELM

7    Consulting.    And the other factor, I think that's important

8    to consider, is that the purpose of the structure that was

9    developed and used by Graves Law Offices and other

10   environmental and other litigation firms was to retain the

11   expert directly in order to protect the company's important

12   confidential information, privileged information, and work

13   product protections.    I think, Your Honor, that on those

14   facts, and I hope the Court would view those facts to be the

15   extraordinary circumstances that would warrant nunc pro tunc

16   relief in this matter if the Court believes it needs to get

17   to that application before granting the Graves Law Office fee

18   application, including the ELM fees.    That said, Your Honor,

19   I'd be happy to try to respond to the Court's questions.    I

20   note that this engagement structure is one that did not

21   bother the U.S. Trustee.    I've been authorized to explain to

22   the Court that that was their position, and I would ask the

23   Court now to grant --

24          THE COURT:    Maybe you should go to the U.S. Trustee

25   and get him to sign the order.

1      MR. ABBOTT:  I understand, Your Honor.

2      THE COURT:  No, I don't have any problem.  Let me

3  clear up one thing with Mr. Smith here.  Mr. Smith --

4      MR. SMITH (TELEPHONIC):  Yes, Your Honor.

5      THE COURT:  -- what are your final numbers -- Are

6  you still there, Warren?

7      MR. SMITH (TELEPHONIC):  Yes, I am, Your Honor.

8      THE COURT:  What are your final numbers on this

9  revised fee application that was just filed in March?

10     MR. SMITH (TELEPHONIC):  Okay, Your Honor, if I

11  could come back to that question, if you don't mind? -- in a

12  roundabout way.  And that is, I'd like to clear up one

13  matter, and that is we did review the fee and expenses of

14  Graves.  We only reviewed the expenses of ELM.  We did not

15  review the fee detail or the fees of ELM because in our mind

16  the fee detail was inadequate for us to apply our regular

17  standard of review, and so we understand that the application

18  to employ ELM provides for them providing fee detail at a

19  lesser standard of review, and we're familiar with that, and

20  we can do that, but at this time, as of this time, we have

21  not reviewed the fees of ELM.  And, Your Honor, we did talk

22  to Mr. Abbott yesterday, and apparently they have agreed to

23  our reductions for Graves and those reductions included

24  travel time of $843.75, a reduction for conflicts of $337.50,

25  and accounting billing issue of $112 and $30.50 in reduction

1  for alcoholic beverages.

2         THE COURT:  So that comes out to what as far as the

3  expenses?

4         MR. SMITH (TELEPHONIC):  Your Honor, I've not added

5  those up.  I could just -- hang on, Your Honor.  Your Honor,

6  since ELM was listed in the Graves application as an expense,

7  I've not totaled up the other reductions because those are

8  fee and expense reductions.  Your Honor, if I could address

9  the agreement we had regarding reductions on ELM?

10        THE COURT:  Yes.

11        MR. SMITH (TELEPHONIC):  Again, we had only

12  reviewed the expenses of ELM not the fees.  There were

13  basically five issues on the ELM expenses.  One was the

14  communications fee.  That was in the amount of $16,492.25.

15  It was our understanding that that was basically a fee that

16  was based on a percentage of the time billed, and it's our

17  understanding that they've agreed to waive that fee.  We

18  asked a question, Your Honor, regarding travel time that was

19  imbedded in the ELM time records.  It was unclear to us what

20  that travel time was, and we've not gotten a response to that

21  question.  It's our understanding they will agree to reduce

22  that travel time by fifty percent, but again, we don't have

23  -- we are not able to quantify that number at this time.  And

24  also, Your Honor, the expenses were charged a 10 percent

25  surcharge.

1      THE COURT:  Yeah.

2      MR. SMITH (TELEPHONIC):  And they've agreed to

3  reduce that but we have not yet quantified that as well.  So

4  there are several items on the ELM expense side that have yet

5  been quantified.

6      MR. ABBOTT:  Your Honor, I can provide what I

7  believe are those numbers.

8      THE COURT:  Why don't you dictate them into the

9  record for me here.

10     MR. ABBOTT:  I'd be happy to, Your Honor.  The 10

11  percent expense surcharge that would be waived is $21,997.74.

12  The non-working travel adjustment is $8,047.50.  Mr. Smith

13  was correct about the communication charge of $16,492.  In

14  addition we've agreed to eliminate a $148.87 meal charge, and

15  a charge of $5 that apparently purchased beer.

16     MR. SMITH (TELEPHONIC):  Yes, Your Honor, that's

17  our understanding.

18     THE COURT:  Okay.  What is that total?

19     MR. ABBOTT:  For that, I'm going to have to borrow

20  --

21     THE COURT:  What I'm trying to get at is what's the

22  final figure you want to put in an order if I approve these

23  fees and expenses.  I'm not going to sit here and guess at it

24  --

25     MR. ABBOTT:  Your Honor, I've got that math done.

1    The total amount of fees would be $902,530.22, consisting of

2    as amended ELM expense and fees of $841,793.11 and non-ELM

3    Graves Law Office expenses of $60,737.11.

4            THE COURT:  What was the last number, 60 what?

5            MR. ABBOTT:  Sixty thousand seven hundred thirty-

6    seven dollars and eleven cents.

7            THE COURT:  And that totals the 902,530.22?

8            MR. ABBOTT:  Yes, sir.  And the fee component of

9    Graves after the reductions that we've agreed to and

10    discussed with Mr. Smith is $185,435.

11            THE COURT:  Okay.  Have you got that, Mr. Smith?

12            MR. SMITH (TELEPHONIC):  Yes, Your Honor.

13            THE COURT:  All right.  I'll take it under

14    advisement, we'll get out an order.

15            MR. ABBOTT:  I appreciate it, Your Honor.

16            THE COURT:  Right.  Let's take -- Have we got Law

17    Debenture; is that it?  How long is that going to take?  Can

18    we take a break?  How are you girls doing?  I've just been

19    ordered to take a break.

20            UNIDENTIFIED SPEAKER:  I think that would be a good

21    idea.

22            THE COURT:  Let me just say one thing.  We did an

23    order this morning on that arbitration case with Northwestern

24    and --

25            UNIDENTIFIED SPEAKER:  National Union.

THE COURT:  National Union Insurance Company, and the Court has appointed a former justice of the Montana Supreme Court, Jim Ragnier (phonetical) to be the umpire, and the order specifies that he will be given $450 per hour to split between the parties and then reasonable expenses.  And that concludes so that the arbitration now can proceed.

MR. ABBOTT:  Your Honor, if I might be excused from reappearing, I apologize.

THE COURT:  Yes.  How about 1:15.

MR. SMITH (TELEPHONIC):  Your Honor, if I could be excused we were not requested --

THE COURT:  Yeah, thanks, Warren.

MR. SMITH (TELEPHONIC):  Thank you very much, Your Honor.

(Whereupon at 12:56 p.m. a recess was taken in the hearing in this matter.)

(Whereupon at 1:16 p.m. the hearing in this matter reconvened and the following proceedings were had:)

THE CLERK:  Please rise.

THE COURT:  You may be seated.  Well, let's see. We've got some more money to look over here.  It's Law Debenture Trust Company of New York, request for fees of $958,075.87 and expenses of $21,994.49, unpaid annual administration fees of $45,000, total request $1,025,070.30. Now, you may proceed, counsel.

1    MR. SNELLINGS:  Thank you, Your Honor.  John

2 Snellings for Law Debenture Trust Company of New York as

3 indenture trustee to the Quips.  My notes say here, Good

4 morning, Your Honor.  I guess I'll have to modify that and

5 say --

6    THE COURT:  Well, it's still morning in Montana.

7    MR. SNELLINGS:  There you go.  We're here today on

8 Law Debenture's request for payment of fees and expenses that

9 was filed pursuant to a plan of reorganization back on

10 December 1st.  This is for fees and expenses pre-effective

11 date and does not cover those expenses and fees that we've

12 incurred since then.  It's a little outstanding here today.

13 Just eight weeks ago we were standing here presenting a

14 settlement agreement, a settlement agreement that included

15 payment of all of our fees, both pre- and post-effective date

16 in full.  Debtor admitted that that settlement was in the

17 best interest of the estate, and I would also remind the

18 Court that when the debtor reneged on the agreement it wasn't

19 due to the fact that our fees were excessive, but that's

20 water under the bridge pursuant to an appeal.  Now, we're

21 back to square one.  In reviewing the debtor's objection,

22 there seemed to be two major themes.  One is that there's not

23 enough information for them to make a determination regarding

24 our fees, and two, the issue of substantial contribution to

25 the reorganization effort.  There have been with regard to

1   inadequate information this dispute that's before you today
2   is not about inadequate information.  There have been over
3   220 interim and final fee applications filed in this case.
4   There have been in excess of $47 million in fees paid.  We
5   have provided sufficient information pursuant to the local
6   rules.  We have provided supplemental information, additional
7   information so that they could, the debtor could do a
8   reasonable and measured review of our fees and of our
9   expenses.  We have never obtained any such an analysis from
10  the debtor.  So this is not about inadequate information.  It
11  is not about substantial contribution either, Your Honor.  No
12  indenture trustee has been held to that standard in this
13  case, whether it be Wilmington or HSPC, they've been held to
14  a very lax standard.  This objection is about leverage.  The
15  debtor's angry, continues to be angry that Law Debenture and
16  Magten continue to prosecute the fraudulent conveyance
17  action.  Their objection seeks to use leverage -- our fees as
18  leverage so that they might push us to settle this matter
19  because the debtor equates substantial contribution to
20  reaching an agreement with the debtor as a prerequisite of
21  payment of any of our fees.  That is not now nor it should
22  ever be the standard to measure an indenture trustee's
23  actions within a case.  It puts an indenture trustee like Law
24  Debenture, a fiduciary to all of its holders, in an
25  impossible position where it is to serve the holders, but it

1    must submit to the demands of the debtor to settle.   Debtor's

2    objection is contrary to the plan.   It's contrary to

3    representations it's made to this Court between counsel and

4    to the public in general.   It is contrary to how it's treated

5    every other indenture trustee in this case, and it's contrary

6    to the order confirming their plan.   The plan provided quite

7    clearly in § 1518 that the debtor shall pay on the effective

8    date all the fees and expenses of an indenture trustee in

9    cash and in full.   That's a typical provision in a Chapter 11

10   case in which there are indenture trustees and that type of

11   indebtedness involved.   Basically, the holders get two

12   bundles of consideration for the plan, a distribution

13   directly to them and a payment of fees of their indenture

14   trustee so that it does not have to invoke the charging lien

15   and, therefore, reduce the recovery to those holders.   That

16   was the consideration that this debtor offered to and

17   solicited votes from the Quips and the Toppers and the senior

18   notes, and this Court should hold them to that promise.   The

19   fairness of the plan was built into the concept that the

20   Toppers and the Quips were going to be treated the same, that

21   their distribution would be a percentage recovery that was

22   equal.   That was critical to Judge Case's finding in the

23   confirmation that they would be treated alike.   Now, with

24   respect to that, the debtor at confirmation and also in the

25   confirmation order said that both the 8-A and 8-B parties

1  would be treated alike, that their distribution would be the
2  same.  However, by objecting to our fees and causing us to
3  rely on the charging lien, they have significantly reduced
4  the recovery of the Quips to far less than any recovery the
5  Toppers will receive.

6           THE COURT:  Is that because you'll have to go to
7  the Quip holders and recover under your charging lien?

8           MR. SNELLINGS:  Yes, Your Honor.  And for anything
9  that you do not allow here under this particular order.  So,
10  with respect to when we filed our request pursuant to the
11  plan, just before going effective, of what our fees were, the
12  response to the debtor was that they had never any intention
13  to paying our fees.  Once if you look at the correspondence
14  between debtor's counsel and my office, you will see that we
15  challenged that and said, Gee, that's not what  you said
16  during the confirmation process.  That is not what you said
17  in the plan, and it would have been good to disclose the fact
18  that you were never going to agree to our fees, challenge
19  them, and, therefore, reduce the ultimate recovery to the
20  Quips.  At that time, the attitude of the debtor changed and
21  said, No, we will comply with the plan, but you're still
22  going to have to file a fee application and go through that
23  process.  They also made representations to counsel, Your
24  Honor.  During the period just prior to going effective we
25  had the issue of determining an amount and estimating the

1    amount for the adversary proceeding in the Class 9 claims

2    dispute reserve.  We had numerous discussions about trying to

3    set that amount and at that time, we had discussions with

4    counsel from the debtor regarding our fees because that was

5    just prior to going effective, and we were preparing to make

6    our presentation to the fees as required under the plan.  And

7    as stated in the affidavits that we put forward to the Court,

8    is that we had conversations that the debtor did intend to

9    pay our fees and that we would not be nickeled and dimed.

10   However, once we actually made the application on November

11   1st, that changed and required us to invoke the charging

12   lien.  Also prior to going effective on November 1, the

13   debtor on its own website published a notice to all indenture

14   trustees, including Law Debenture, that is open to the public

15   and any Quips holders, any Toppers holder in which they

16   stated that on the effective date all of the fees and

17   expenses of all indenture trustees including law debenture

18   would be paid.  But contrary to that public representation,

19   it's never been paid.  This is completely inconsistent with

20   how they've treated all of the other indenture trustees in

21   the case.  Take for instance, Wilmington and its major holder

22   Harbert.  They struck a deal prior to confirmation and it's

23   in the plan that they were paid on the effective date $2.25

24   million in cash for their fees.  Wilmington also invoked

25   their charging lien and received another amount of stock

1    worth in the amount of around 55,000 shares which at current

2    prices is over another million dollars.  So they have

3    collected, Wilmington and Harbert, in excess of $3 million to

4    cover their fees.  Unlike Wilmington and Harbert, our fee

5    application is solely for the fees and expenses associated

6    with Law Debenture's role in this case.  We are not seeking

7    any fees of Magten's.  You can sort of parallel, Harbert was

8    the Topper's largest holder; Magten is ours.  Both have taken

9    very aggressive positions throughout this case.  However,

10   unlike Wilmington and Harbert, we're not seeking the payment

11   of any of Magten's fees here with this application.  It's

12   solely Law Debenture's.  But they struck their deal and

13   that's what they were paid.  There was absolutely no review

14   of Wilmington and Harbert's fees and expenses by the debtor

15   in the testimony provided to you when we took a 30(b)(6)

16   deposition of a representative from the debtor regarding

17   their fees and expenses and all fees and expenses of

18   indenture trustees.  The testimony was that the amount was

19   struck during the negotiations between Harbert and the

20   Committee but there was absolutely no oversight, no review of

21   any of the fees and expenses of the indenture trustee.

22   Second, there's HSBC.  They're the indenture trustee to the

23   senior note holders.  Your Honor, they've been paid over

24   $700,000 in fees and  expenses.  There again, there was no

25   oversight.  The representative of the debtor did indicate

1    that he had seen the invoices, but that he did not give them
2    anything but a quick review, and that they paid all of those
3    expenses of HSBC and their counsel, Pryor Cashman, a hundred
4    cents on the dollar, and this review can best be seen by
5    looking at Pryor Cashman's first invoice in which there is a
6    double entry for work done on the very first day of them
7    being hired. I asked the debtor, Did you pay for that double
8    entry? And they said, Most likely, yes, since we paid for
9    everything.  Finally, Your Honor, there was our predecessor
10   indenture trustee, Bank of New York.  They were the indenture
11   trustee for the Quips prior to our successor.  They had
12   submitted fees and expenses of $54,000 not only during the
13   time of their position on the Committee but also pre-petition
14   fees and expenses.  The debtor paid those expenses on the
15   effective date without any review, without any oversight.
16   Yet, now they're trying to hold us to a standard of
17   substantial contribution when here was a predecessor trustee
18   who was only on the case for a short time and was paid not
19   only their post-petition fees and expenses but also their
20   pre-petition.  With regard to that, with regard to the
21   representations made, with the findings of the Court in the
22   confirmation order, and with the acts of the debtor we
23   believe that they're judicially estopped from now just doing
24   a blanket objection to our fees and requiring us to come
25   forward to the Court with this fee application.  I think also

1  in their objection they minimize what we have done in this

2  case.  All that Law Debenture's done is attempted in good

3  faith to fulfill their fiduciary obligations to their

4  holders.  They have performed customary acts of indenture

5  trustees in Chapter 11s that are customarily paid by the

6  debtor.  We are the class representative.  We represent

7  hundreds of holders of Quips, and we perform that service

8  diligently and for the benefit of the debtor who does not

9  have to deal with these thousands of creditors and debt

10  holders.  We served on the Creditors Committee, a normal and

11  customary act.  We filed a proof of claim so that the debtor

12  could only have to deal with one proof of claim rather than

13  thousands.  We worked with regard to plan confirmation.  Now,

14  the plan isn't to our liking, yet it is better now as

15  confirmed than it was when we started.  The first plan had a

16  death trap provision, that if a class did not vote for the

17  plan the entire class got nothing.  We fought that.  It was

18  taken out.  We also believe that while they do not recognize

19  it to the full extent that we would want it, that the plan

20  now recognizes the fact of the litigation and the legitimacy

21  of that litigation and it continues as part of the plan.  We

22  also worked with the debtor with regard to solicitation and

23  the issues that were going to arise with regard to splitting

24  the class.  Now, with regard to Option 1 and Option 2.  While

25  they did not take our warnings and did not put in

1  solicitation practices to resolve the identity problems we've
2  worked with them since to help resolve that.  So we've
3  continued to work with the debtor on the litigation.  And
4  then we have the litigation itself, Your Honor.  We're in the
5  litigation for good.  The way the plan is devised so no Quips
6  holders have to be plaintiffs in this litigation so long as
7  we're a part of the litigation.  Section 12 of the
8  confirmation order is quite explicit.  While in other classes
9  the indenture is canceled and is not in full force and
10  effect, with regard to those who took Option 2, we are still
11  obligated to be representing them as a class and continue to
12  do so.  The litigation was an integral part of the plan
13  because it's the sole recovery of a substantial number of the
14  Quips who chose that, and it was the dividing of that choice
15  between Option 1 and Option 2 that Judge Case would allow
16  confirmation of the plan.  So, with regard to those who took
17  Option 2, the Quips notes and all the related documents
18  remain in full force and effect, and we continue to fulfill
19  that role as the indenture trustee, and that is worked into
20  the confirmation order.  And we will continue to fulfill
21  those responsibilities.  There are a number of methods that
22  we think we can be paid here.  We believe the clearest one is
23  the plan itself, and 518 that all indenture trustees are paid
24  their fees and expenses at or on the effective date in full
25  and in cash.  Now it states that if the debtor and the

1    indenture trustee do not agree, then it has to come before

2    the Court.   However, I believe and as we stated in our reply

3    that that type of objection should have the specificity with

4    regard to what items they truly reject, that a blanket

5    rejection without any specificity is one done in bad faith

6    and is arbitrary and is very difficult as counsel for an

7    indenture trustee to respond to.   To date, if you parse

8    together all their correspondence and pleadings, the debtor

9    has admitted or at least suggested that they're in agreement

10   with four of our categories and that they don't have a real

11   objection to it.   But yet, they hide behind the fact that

12   they will need a order to pay that.   They don't need an

13   order, Your Honor.   The order's in the confirmation.   If they

14   agree with our fees, they pay it, yet they haven't paid it.

15   They have strung this out to such an extent that we are still

16   accruing significant fees and expenses.   They raise an issue

17   with regard to our local counsel.   Our local counsel

18   submitted fifteen pages of invoices, a very small amount

19   given all the fee applications that have been filed here.

20   There's nothing unusual with regard to what our local counsel

21   did.   There's absolutely no grounds to object to their fees.

22   Everyone knows that here local counsel is Delaware's cottage

23   industry, and everyone knows what they perform and the

24   activities that they do, and there's absolutely no reason to

25   ask for more information about what they've done in this

1  case.  That's quite apparent.  With regard to the fees of Law

2  Debenture, the two officers that have been responsible for

3  this case, they ask for further information.  Yet, the detail

4  that is given, both in our application, is significant and

5  far greater than any information that they received from HSBC

6  and certainly far greater than anything they've received from

7  Wilmington since Wilmington never turned in a fee app.  And

8  yet they ask for more.  Your Honor, it's time to relieve us

9  of the burden of this leverage, to level the playing ground,

10 and allowing us to move forward in the litigation and any

11 settlement without using our fees as a ping-pong and without

12 using our fees as leverage to gain settlement.

13          THE COURT:  Is it your position that, and as I read

14 the fee request, they continue all the way through October

15 basically to the plan confirmation; correct?

16          MR. SNELLINGS:  Correct.

17          THE COURT:  And so from that point on when the

18 appeal was filed by Law Debenture and Magten trying to upset

19 the plan, you make no charges for those services.

20          MR. SNELLINGS:  Well, I'd have to check exactly

21 when we stopped.  I think that under the plan it was up to

22 the effective date, which was November 1.

23          THE COURT:  I want to separate something right

24 here.  It seems to me that what you do for your -- basically

25 your clients, the Quip holders, as I understand this thing,

1  the way it started out this 1996 debenture was originated to

2  raise some financing money for environmental matters and then

3  City Bank was the trustee, City Bank of New York, and was the

4  indenture trustee and you succeeded to their interest post-

5  petition.

6  MR. SNELLINGS:  That's correct.  Because Bank of

7  New York had a conflict.

8  THE COURT:  And during that pre-petition period

9  then City Bank would receive the funds from the old Montana

10  Power Company and then they make the distribution to the Quip

11  holders for the principal and interest that were paid, and

12  then they received an annual fee; right?

13  MR. SNELLINGS:  That's correct.

14  THE COURT:  Okay.  Now, did that debenture trustee

15  or your company as the successor trustee ever attempt to

16  protect those Quip bondholders when it learned back in '99

17  that the cash cow was going to be dismembered and that the

18  financial integrity of these Quip bonds were in jeopardy?

19  MR. SNELLINGS:  Well, Your Honor, I think you go to

20  some of the very essence of the fraudulent conveyance and the

21  fact that we believe that the entire going-flat transaction

22  was part of a fraudulent scheme that began --

23  THE COURT:  No, I'm talking about, counsel, much

24  more than that.  I'm talking about the dismemberment of a

25  generation facilities, which came first --

1    MR. SNELLINGS:  Uh-huh.

2    THE COURT:  -- the selling of all the generation

3    facilities to PP&L and then the dismemberment of the gas

4    supply company, and then came the transmission sale, each one

5    of these separate, and what I can't understand is how the

6    Quips bondholders were protected, weren't trying to be

7    protected at the beginning of this corporate scheme.

8    MR. SNELLINGS:  That I have no knowledge of.

9    THE COURT:  But you're a successor in interest.

10   MR. SNELLINGS:  That's correct.

11   THE COURT:  See, what bothers me about this whole

12   thing is these Quip holders and the indenture trustee is they

13   didn't step in any time when this thing was on the drawing

14   boards to be split out and all this cash was going to go into

15   this telecommunications network and put a lot of money in the

16   ground.  No one stepped forward on behalf of these Quip

17   bondholders to try to stop that.

18   MR. SNELLINGS:  You know, again, I'm not privy of

19   the history there pre-petition.  All I know is that once Law

20   Debenture, you know, became the successor, we did review the

21   going-flat transaction and had certainly tried to step in and

22   protect the rights of the Quip holders with regard to that

23   transaction.

24   THE COURT:  I'm probably holding you to the wrong

25   standard but it's just -- There's no question that the Quip

1   notes were unsecured.

2              MR. SNELLINGS:  Uh-huh.

3              THE COURT:  What they were relying upon was the

4   financial integrity of the Montana Power Company, which had a

5   history of performance for Montana.

6              MR. SNELLINGS:  That's correct, and --

7              THE COURT:  And that all changed when the company

8   decided to go into a dismemberment plan, and they did, and

9   nobody stepped forward on behalf of the Quip holders and

10   said, Hold it.  Nobody sought legal action at that time and

11   says, We relied upon the financial integrity of this company,

12   of the going concern, all the generations through

13   transmission.

14              MR. SNELLINGS:  Your Honor, I appreciate that

15   history.  All I can do is talk about when we got involved --

16              THE COURT:  Now, let's get involved with you.  You

17   say none of these fees are with regard to the Magten going-

18   flat transaction.

19              MR. SNELLINGS:  No, I'm not --

20              THE COURT:  Because that's not the way I read the

21   application.

22              MR. SNELLINGS:  No, we're not making any

23   application for any of Magten's fees that they've incurred in

24   this case.  For example the fees of Fried Frank or any other

25   counsel that they might.

1      THE COURT:  But your company parroted the Magten

2  and asserted the Magten objections to the plan and asserted

3  the fraud throughout the confirmation process; correct?

4      MR. SNELLINGS:  We -- Yes, but there are certain

5  things that we've never joined them.  We continued to

6  exercise independent judgment.  For example, we've never

7  challenged the MOU, and that's one appeal.  We did not join

8  in the Paul Hastings conflict motion.  We did not join there.

9  We do not join in the appeal of the confirmation order, Your

10  Honor.  That's just Magten.  So there were definite times

11  throughout that we did not join with them, and they went off

12  on their own way.

13      THE COURT:  So the only thing that you've got going

14  now adverse to the reorganized debtor is the Magten/Law

15  Debenture lawsuit trying to upset the Clark Fork transfer.

16      MR. SNELLINGS:  That's correct and also the more

17  recent one that was filed about Friday a week ago in which

18  we're seeking to revoke the confirmation order for their

19  failure to adequately fund their Class 9 reserves.

20      THE COURT:  Then this provision in the plan

21  relative to a dual test for your company's award of the fee,

22  503 --

23      MR. SNELLINGS:  Uh-huh.

24      THE COURT:  -- substantial contribution, and

25  something else; right?

1    MR. SNELLINGS:  Well, Your Honor, I think the way

2    the plan reads is that it's subject to 503 and the debenture,

3    and the language in the debenture states at 907 that we are

4    -- that the debtor's obligated to pay our reasonable fees and

5    not only is it a reasonable fees but it's also an

6    administrative expense.

7        THE COURT:  Well, doesn't that interpretation write

8    out, blank write out 503 language?

9        MR. SNELLINGS:  Write it out?

10       THE COURT:  You just argued that you don't have to

11   even get into this substantial contribution bogey-man

12   argument because it's irrelevant.

13       MR. SNELLINGS:  Well, I think it is by the fact

14   that they have not in any way applied that same standard to

15   any other indenture trustee, that they're only using that

16   standard and rejecting our fees outright as a punishment for

17   our actions in this case in which we were trying to protect

18   the interest of the Quips.

19       THE COURT:  Maybe they were satisfied with the

20   cooperation they received from those other indenture trustees

21   and they felt that it wasn't necessary to invoke 503(b).

22       MR. SNELLINGS:  Well, Your Honor, they have said

23   that, that the issue with regard to the Toppers was that they

24   settled and they now get $2.5 million in cash without any

25   oversight.  The problem there is that, Your Honor, with

1   regard to that settlement we were never invited to that

2   table.  We were never invited, you know, when they negotiated

3   with the Toppers they didn't invite the Quips to see if we

4   could come to some global settlement.  Instead, they

5   completed tried to isolate us.  There have been other

6   parties, Your Honor, throughout this case that have brought

7   up the fraudulent conveyance action.  The McGreevey's class

8   action that was mentioned earlier and the Comanche creditor

9   as well as Atlantic Richfield.  Creditors of Clark Fork and

10  Black Foot have been bringing up the fraudulent conveyance

11  action on a number of occasions, and in each case, even when

12  some of those have indicated an interest in joining our

13  action, the debtor has worked very, very diligently to settle

14  those cases and get those people not to join our action, and

15  consequently -- but that's not the standard that I believe

16  that, you know, we should be held to.  We have provided a

17  service to our Quips.  The indenture is clear that the debtor

18  is obligated, and you can either put it under an

19  administrative claim or you can look at the indenture as an

20  executory contract that has been assumed and continues to be

21  in effect today even.  It was in effect with the debtor in

22  possession.  It's in effect with this reorganized debtor, and

23  as an executory contract, they're obligated to pay for the

24  services that we have been providing.  So there's a number of

25  ways in which we should be paid.  This one in which they

1  promised under the plan to pay indenture trustees so that our

2  holders would not be significantly deluded by the charging

3  lien is the one that has brought us here today, and we

4  believe, based on their representations, based on the

5  confirmation order, and based on their public representations

6  that they're obligated to pay those fees, pay them in full,

7  and not apply this standard that they're only using more as a

8  club rather than anything else.

9  THE COURT:  My other question was regard to the

10  invoice that I have seen in here relative to the annual

11  administration fee of 45,000 is also included the

12  transactional or extraordinary fee of 129,000.

13  MR. SNELLINGS:  That's the hourly fees of the two

14  officers of Law Debenture that's been focused on this case,

15  and that's broken out, Your Honor, in pretty explicit detail

16  and in time records in our application.

17  THE COURT:  I agree that the time records are

18  there, but what is the basis, the legal basis for those

19  people to be paid through the reorganization?

20  MR. SNELLINGS:  It is pursuant to the indenture,

21  they're allowed to charge an hourly fee, just like --

22  THE COURT:  Reasonable expense?

23  MR. SNELLINGS:  -- HSBC did and HSBC's fees were in

24  excess of $400 an hour and Law Debenture's officials are, I

25  believe, 325.

1    THE COURT:  Okay, anything further?

2    MR. SNELLINGS:  No, Your Honor.

3    THE COURT:  All right.  Mr. Austin.

4    MR. AUSTIN:  For the record, Your Honor, I'm Jesse

5    Austin from Paul Hastings on behalf of Northwestern.  I want

6    to make a couple of summary points and try to address a

7    couple of the questions.  First off, I think the Court's

8    analysis or perspective is correct that whatever else may be

9    in the Quips indenture, 503(b) under the Bankruptcy Code

10   ultimately controls whether or not the debtor, in this case

11   Northwestern, actually has to pay cash with respect to the

12   indenture trustee's fees and costs incurred by Law Debenture.

13   What they're here asking you for today is to require

14   Northwestern to pay approximately a million dollars in cash

15   to them -- to it for the fees and expenses incurred in so-

16   called fulfilling its duties as indenture trustee which Mr.

17   Snellings readily admitted was primarily to benefit the

18   individual Quips holders.  We're not here arguing and in fact

19   that they don't have a claim.  We're here arguing whether or

20   not with respect to whatever claim is there, whether

21   Northwestern has to pay it in cash.  We submit in this

22   particular instance, 503(b) controls, it specifically

23   provides for in the plan.  To the extent ultimately, this

24   Court, for example, would say, Okay, you made a application

25   for a $1,100,000 effectively, I'm going to grant you a

1   hundred thousand.  That other million dollars of the claim

2   doesn't go away.  It becomes part of the indenture -- Law

3   Debenture's claim as the indenture trustee on behalf of the

4   Quips, and if they ultimately prevail in the litigation would

5   become part of that prevailing litigation claim.  It doesn't

6   go away.  It becomes a Class 9 claim ultimately paid from

7   distributions and Class 9 reserve.  So I want it to be clear.

8   It's not that the claim is going to go away.  The real

9   question is whether or not Northwestern has to bear the brunt

10  of a cash payment.  Here, Your Honor, the one thing I believe

11  we do agree with is that § 518 of the plan controls.  But

12  unfortunately Mr. Snellings only reads the first clause of

13  that first sentence of § 518 which says, On the effective

14  date the reorganized debtor will pay the indenture trustee's

15  fees and expenses in full and in cash.  What Mr. Snellings

16  does not go on to read is, In a amount to be agreed upon

17  among the debtor and each of the indenture trustees.  Each of

18  the indenture trustee means HSBC, Bank of New York,

19  Wilmington Trust, as well as Law Debenture.  In the event

20  that the trustee and the debtor can't agree, then the issue

21  comes before this Court to apply § 503, and 503 is very clear

22  that for an indenture trustee, which admittedly in this

23  particular instance, represents an unsecured claimant to

24  receive a cash payment on account of its fees, it has the

25  burden of establishing a substantial contribution.  And the

1    law in this case, which is controlled by the decision of

2    Lebraun (phonetical) vs. Mecom (phonetical) Financial at 27

3    F3d 937, clearly points out that a substantial contribution

4    shows that the efforts of the applicant, in this case Law

5    Debenture, resulted in a actual and demonstrable benefit to

6    the debtor's estate and the debtor's creditors.  Otherwise,

7    the creditors presume to be acting on it or its

8    representative's behalf.  And the Lebraun court further

9    stated that 503(b) is to encourage activities that will

10   benefit the estate as a whole and the substantial

11   contribution should be applied in a manner that excludes

12   reimbursement in connection with activities of creditors and

13   other interested parties which were designed primarily to

14   serve their own interest in which accordingly would have been

15   undertaken absent an expectation of reimbursement from the

16   estate.  Controlling law as well as 503(b) says here, Your

17   Honor, that the burden's on Law Debenture, and we submit that

18   it has not shown and cannot show that the fees and costs of

19   which it seeks payments were from efforts for Law Debenture

20   and its counsel provided an actual and demonstrative benefit

21   to Northwestern and its estate and its creditors.  Indeed, if

22   the Court reviews not only the application itself, but if it

23   reviews many pleadings that have been filed in this case, it

24   is very clear that Law Debenture acted almost exclusively to

25   protect the interests of the Quips holders and especially

1    Magten and not other creditors of Northwestern's estate.   Law
2    Debenture essentially became the official mouthpiece for
3    Magten and other distress funds for the Quips.  Magten held
4    in excess of 25 percent of the Quips, and under the terms of
5    the indenture could direct Law Debenture to take actions in
6    the bankruptcy case, and for the most part, while Mr.
7    Snellings in part begs to differ, Law Debenture appears to
8    follow Magten's lead rather than the interest of those Quips
9    holders which actually voted for the debtor's plan.   Law
10   Debenture objected to the confirmation.  Law Debenture filed
11   the adversary case.  It never engaged in negotiations to
12   result in a consensual plan.  It did not send out any type of
13   consent solicitation letter urging the Quips holders to vote
14   in favor of the plan.  There's nothing that Law Debenture
15   really did here as a practical matter which in any way
16   benefitted and enhanced this company getting the plan
17   confirmed, and in fact, all along the way, while we obviously
18   opposed what they were doing, they were throwing up
19   roadblocks and objections to the confirmation process.   When
20   you boil it down, Law Debenture's arguments essentially jell
21   around one point.  Northwestern paid the other trustees, it
22   should pay us too.  But as this Court itself recognized in
23   its comments, Northwestern clearly sees the other indenture
24   trustees significantly different than Law Debenture.
25   Throughout the Chapter 11 case, as we noted, Law Debenture

1   was fighting the process, and indeed, once it filed the

2   adversary case, it got booted off the Creditors Committee.

3   So, certainly after May 14th, anything Law Debenture was

4   doing May 14th, 2004 can't be said it on the benefit of the

5   estate but solely for the benefit of the Quips holders in

6   trying to block confirmation.  In contrast, HSBC, as a

7   trustee for the senior unsecured notes, worked throughout the

8   case as a member of the Creditors Committee to develop a

9   consensual plan.  And it had to defend itself against attacks

10  raised by Law Debenture as well as preliminarily Harbert and

11  Magten concerning -- Harbert and Wilmington Trust concerning

12  whether or not the claims of the Class 7 senior unsecured

13  notes were in fact a valid claim under some argument that the

14  Public Utility Holding Company Act may have voided those

15  securities.  Throughout there were negotiations and

16  discussion with HSBC, and the Creditors Committee would

17  ultimately reach an agreement to pay the claim presented by

18  HSBC because HSBC from the debtor's perspective, from the

19  perspective of the Creditors Committee did indeed make a

20  contribution, and to the extent that they were helpful, and

21  they were, they supported confirmation.  They urged their

22  holders upon call to support and vote for the plan.  From

23  that standpoint HSBC is clearly different, and I might add,

24  Your Honor, in contrast and I'll come to it in detail in a

25  second, the payment to HSBC was for -- and it represented

1   approximately almost $800 million of senior unsecured claims,
2   it's claim was for $745,000 roughly and that was for the
3   period from September 15th all the way through the
4   confirmation.  What you have to do is compare the claim of
5   Law Debenture, which is over a million dollars, representing
6   $65-plus million of claims, if you want to get some level of
7   comparison.  Additionally, the same can be said as far as the
8   assistance of Wilmington Trust, the trustee for the Toppers.
9   Yes, Wilmington Trust did engage in litigation with the
10  debtor in trying to oppose confirmation of the plan.  Yes, it
11  had Harbert beside it when that litigation was going on, but
12  that was at the time that we had a plan that distributed only
13  2 percent of the company's new equity to the Toppers and the
14  Quips to be shared pro rata.  As a result of the litigation,
15  as a result of negotiations within which Wilmington Trust
16  entered into with the debtor and with the Creditors
17  Committee, a modification to the plan was made that increased
18  the distribution to the Toppers and the Quips on a pro rata
19  basis from 2 percent to 8 percent with additional warrants
20  that could be exercised for an additional 5 percent of the
21  company.  So as a result of direct efforts by Wilmington
22  Trust and Harbert, there was a benefit to the debtor's estate
23  because these other creditors, which the Quips could have
24  taken, all they had to do was vote for the plan because they
25  went along for the ride, if you will.  Wilmington Trust made

1  from our perspective a substantial contribution, but it's not

2  completely substantial because we didn't pay all of the fees.

3  As a result of the negotiations, we only paid $2.25 million,

4  and we want to make it clear, based on that payment, that

5  every creditor thought that was okay.  It was actually

6  imbedded in § 5.18 that those payments were being made to

7  Wilmington Trust on account of its position and Harbert on

8  the settlement.  And, as Mr. Snellings stated, Wilmington

9  Trust didn't get paid a hundred percent because it did indeed

10  exercise its charging lien that reduced the distribution to

11  the Toppers by approximately a million dollars in value.  So

12  there was another million dollars of claims that Wilmington

13  Trust, through the provisions of the plan, got paid some cash

14  because we saw that made a contribution but on the balance of

15  it had to get paid through its charging lien, which

16  effectively then reduced the distribution to the holders of

17  the Toppers' claims.  With respect to Bank of New York,

18  similarly situated, that was done as a result of some of the

19  work done at the beginning of the case.  Plus, Your Honor,

20  with respect to the pre-petition amount, my recollection I

21  can state in my place, is I believe that was for payment on

22  account of unpaid trustee fees to the Bank of New York on

23  account of its position as the indenture trustee for one of

24  the senior secured bonds.  The reason Bank of New York had to

25  resign as indenture trustee on the Quips was because Bank of

1   New York also served as indenture trustee on one of the

2   issues of the senior secured bonds and under the Trust

3   Indenture Act of 1940, it couldn't serve in both capacities.

4   It resigned as a holder, as a trustee for the Quips and

5   that's where that, I think, most of that pre-petition amount

6   came from.  The point is, Your Honor, that here we did indeed

7   treat the Toppers and the Quips alike, and irrespective of

8   the fact that Law Debenture may attempt to invoke a charging

9   lien, it's ultimately provided for under the indenture just

10  as under the indenture there's obligations for

11  indemnification from those holders of Quips that are

12  directing Law Debenture to take such action that may

13  otherwise it has taken in this case.  Here, Your Honor, we

14  don't see any basis that Law Debenture can argue that it's

15  made a substantial contribution to confirming the debtor's

16  plan.  It totally failed to carry its burden and at all

17  points to this case it has attempted to oppose confirmation

18  and closing of this estate.  As we have gone through in an

19  attempt to review Law Debenture's fee applications, we do

20  note a number of things.  First, whatever else may be before

21  the Court, there certainly should be no consideration

22  whatsoever for fees and expenses incurred by Law Debenture

23  after May 14th because clearly that's a defining moment when

24  Law Debenture was removed from the Committee as a result of

25  the fact it actually joined in filing the adversary case to

1    remove assets from the debtor's estate which would have been

2    to the detriment of all the debtor's creditors.  So whatever

3    work was incurred after May 14th clearly doesn't fall into a

4    situation where this debtor would have even thought to have

5    paid in cash but one where Law Debenture can ask this Court

6    in good conscience to pay in cash.  If you then just look at

7    this fee statement up to that point, that otherwise reduces

8    that million one down to about $400,000, and the unfortunate

9    thing, Your Honor, in reviewing the application that's

10   presented, we the debtor can't really discern how much of

11   that should or should not be allowed as to things that may

12   well have helped the debtor.  For example, doing some

13   communications with the Quips holders and how much of it is

14   just stuff that otherwise would have been incurred by Law

15   Debenture under any circumstance.  The one thing I can tell

16   you that we've been able to discern was there's approximately

17   $67,000 incurred for participation on the Creditors Committee

18   and related matters.  To that point, I can advise the Court

19   the debtor would not object to those payments.  However,

20   you've got to then look at the rest of the claim they filed

21   in this context.  For example, a review and analysis of

22   general bankruptcy matters, they identify approximately

23   $88,000.  And there they specifically assert that these

24   tactics are attempted to facilitate efficient, quote,

25   "preservation and administration of the rights and claims

1    under the indenture."  Well, if that's what they incurred,

2    they have a Class 9 claim, but it's not one that we should

3    pay the cash for under 503(b) at this point.  They have

4    another $32,000 incurred for preparation of proofs of claim

5    although that section only includes approximately 2.1 hours

6    of time.  Again, that's something that may be reimbursable

7    under the indenture, but not a 503(b) type reimbursement.

8    The same for certain communications with Quips holders in the

9    amount of $65,000 of which when you look at some detail, they

10   put in time related from June 15th to September 3rd, 2004,

11   related to the adversary proceeding including 5.5 hours

12   related to research and the trustee's duties to prior

13   bondholders in the fraudulent conveyance claim.  And then

14   separately, Your Honor, they have included in that $114,511

15   of bankruptcy litigation fees and expenses related primarily

16   to the adversary proceeding and also another $452,000 roughly

17   for plan and disclosure statement matters, clearly places

18   where Northwestern cannot see that it gained any benefit for

19   the fees and expenses incurred.  One last point, Your Honor,

20   the argument that the indenture has been assumed is

21   incorrect.  The plan explicitly says and the indentures are

22   extinguished in counsel, but irrespective, indentures

23   themselves have survival language with respect to ultimate

24   payment of administrative costs and other claims.  These

25   payment provisions may well survive the ultimate cancellation

1   and termination of the indentures. They certainly may well

2   survive to the extent that we have ongoing litigation and if

3   the unlikely circumstance from Northwestern's perspective

4   that Law Debenture and Magten would prevail on the underlying

5   adversary complaint, that is the basis by which they may well

6   then be able to argue -- at least Law Debenture could argue

7   since it is the Quips' representative, that it is entitled to

8   its fees and expenses as a prevailing litigant under the

9   contractual provision. At this point, Your Honor, we ask

10  that this Court deny the request of Law Debenture to require

11  the debtor to make a cash payment on account of fees set

12  forth in the application. We do not believe that the plan

13  allows for such payment. The parties did not agree on the

14  amount. The plan specifically provides that as a result,

15  there has to be an application under 503(b), and in that

16  context, Your Honor, there's been no showing in this

17  particular instance of a substantial contribution for the

18  fees and expenses requested. Thank you.

19          THE COURT: Does the Committee have any position?

20  Let me hear from the Committee.

21          MS. PHILLIPS: We would support the debtor's

22  objection. For the record, Margaret Phillips of Paul Weiss

23  Rifkind Wharton & Garrison for the Plan Committee. The

24  language in the plan in 5.18 is very clear, and that to the

25  extent there's a dispute between an indenture trustee and the

1    debtor that the mechanism provided is that they file an

2    application in front of this Court subject to 503(b), and in

3    looking at their application, it just doesn't seem to satisfy

4    that standard which is a pretty stringent standard.  Thank

5    you.

6            THE COURT:  All right.

7            MR. SNELLINGS:  Your Honor, just to make sure that

8    we're all reading the same passage, I believe that 518 says

9    503 and not 503(b) as well as the indenture, and with regard

10    to, you know, administrative expenses, the indenture again

11    requires that the debtor be obligated to pay us all of our

12    reasonable fees and expenses as well as giving us an

13    administrative expense, but 518 does not make a reference to

14    503(b).  Again, with regard to the plain language of the

15    plan, it also states that if the parties cannot reach an

16    agreement.  Here we have again the debtor indicating certain

17    portions of the fee request being reasonable and such, yet

18    opposing the entire thing in toto.  I don't believe that

19    that's what's demanded of the plan and that those amounts

20    that they have admitted are reasonable and if they don't have

21    an objection, they should be required to pay.  And, with

22    regard to the remaining portion of the claim, while it gives

23    some comfort to the fact that it continues to be a Class 9

24    claim, with regard to that I guess it goes back to the

25    issuance of the fact that whether or not it has been properly

1  reserved under the disputed reserve amounts, and whether it

2  will be there to pay that claim should we prevail in the

3  litigation, and given the representations to the Court in

4  prior hearings, one has to wonder how much the debtor will be

5  able to rely on their dispute reserve in the future.  But, we

6  believe that our application is consistent with our duties

7  and responsibilities as an indenture trustee in this case and

8  consistent with what we are to be doing in the sense that we

9  are a fiduciary representing the Quips.  With regard to our

10  comparison to HSBC, let's be serious about that.  They were a

11  member of the Committee.  They had all the privileges of

12  Committee's counsel and such, and I would assume, since

13  they've gotten paid almost a hundred cents on the dollar,

14  that I am surprised that the Committee and the debtor paid

15  them $700,000 when in fact the senior notes had very little

16  risk in this bankruptcy, and yet, they have incurred that

17  type of fees when they were sitting on the Committee and

18  pretty much as was described going along with the bankruptcy.

19  With regard to Wilmington, we know that, again, out of that

20  $2.25 million, 1.9 was paid directly to Wilmington, 300,000

21  to Harbert, and we assume, although it's never been disclosed

22  that the additional stock also went to cover Harbert's fees

23  and expenses.  They were aggressive in this case, and just to

24  point that they had settled when we haven't even though we

25  have tried desperately, and this Court is well aware of us

1    attempting to bring a settlement of our litigation and all

2    the other resulting litigation before this Court that most of

3    those fees went to be paying Harbert's costs, we're not

4    seeking Magten's costs here which goes to the reasonableness

5    of what we're seeking here, and therefore, we believe that

6    our fee request should be allowed pursuant to the plan.

7         THE COURT:    What about the argument that's made

8    that under any circumstances you shouldn't be paid any fees

9    after May 14th when you were relieved from the Committee and

10   took an adversary position?

11        MR. SNELLINGS:    Well, Your Honor, you know, this is

12   an adversarial environment.    We're in a Chapter 11 in which

13   people are constantly trying to make positions and such.    The

14   Committee spent, what, $50,000 researching whether or not

15   there was a fraudulent conveyance before Magten was even on

16   the Committee.    This was a very serious issue, and to say

17   that once we have raised an objection or filed a complaint

18   that we have somehow forfeited all of our rights under the

19   indenture or under 503 or whatever standard, would be a

20   hammer that is contrary to the duties and responsibilities of

21   trust indentures and also it is, you know, contrary to the

22   fact that we are a representative fiduciary.    We have no

23   stake in this.    We do not hold Quips, but we do represent

24   Quip holders, and we are at all times acting in good faith.

25   That complaint has survived a motion to dismiss and once it's

1  properly teed up we'll move forward, and again, I remind the

2  Court that only eight weeks ago this debtor was willing to

3  pay us quite handsomely to settle that dispute and many

4  others, and we were willing to settle with that.

5  THE COURT:  We don't have an agreement today.

6  MR. SNELLINGS:  No, and remarkably while everybody

7  said how much they wanted to settle it, my phone hasn't been

8  ringing, so --

9  THE COURT:  It's too bad we can't get somebody to

10  take it off track or get it back on track.

11  MR. SNELLINGS:  Yes.

12  THE COURT:  Well, thank you very much.

13  MR. SNELLINGS:  Thank you.

14  MS. STEINGART:  Your Honor, may I?  There was a

15  point raised that I had not seen in the papers before that I

16  did want an opportunity to respond to since now we are --

17  THE COURT:  What are you talking about?  What

18  motion or what objection --

19  MS. STEINGART:  I'm talking about Law Debenture.

20  Since there has been talk now that it should be a Class 9

21  claim and being a Class 9 claimant and having a substantial

22  Class 9 claim by virtue of the plan, all of -- I wanted to

23  point out the technical fact that all of Law Debenture's

24  fees, Your Honor, are post-petition.  What Class 9 is for is

25  pre-petition, unsecured claims.  So, the idea that somehow

PENGAD · 1-800-631-6989

FORM FED-25

1   Law Debenture's fees should be lobbed into Class 9 is

2   completely contrary to what the Class 9 claims were set aside

3   for, which is disputed, pre-petition, unsecured claims, and

4   before we went further with that, I thought it might be

5   helpful for the Court to be aware of that issue.

6         THE COURT:  Mr. Austin, what -- Maybe you can

7   clarify your position with regard to not being -- you don't

8   want to pay any cash and does that mean that you want to pay

9   them in stock?

10        MR. AUSTIN:  To the extent they ultimately had a

11  claim that derived from the litigation, Your Honor, then it

12  would be a Class 9 claim.  I disagree with Ms. Steingart's

13  characterization that that is cost incurred on behalf of an

14  indenture that was entered into pre-petition and they're now

15  litigating that's what they were doing, so like any other

16  litigant that may have a contractual provision so that to the

17  extent they have a Class 9 claim, yes, they get paid in

18  stock.  That's where it would come from, but the real issue

19  we're here today for, Your Honor, is the fact that the

20  administrative claim, the question is do they get paid?  Do

21  we have to pay that claim in cash?  The answer is, we

22  believe, not this particular one in the amounts they've asked

23  for.  Thank you.

24        MS. DARWIN:  Your Honor --

25        MR. AUSTIN:  Your Honor, I object.  Mr. Snellings

1  has already spoken on behalf of the indenture trustee, and

2  Ms. Darwin's with his firm.  I think we only should have one

3  party to speak in connection.

4  MS. DARWIN:  Your Honor, if I may, Amanda Darwin

5  with Nixon Peabody.  I did actually want to agree with Mr.

6  Austin on this point.

7  MR. AUSTIN:  I withdraw my objection.

8  MS. DARWIN:  You will see that we have specifically

9  reserved our right to pursue an allowed unsecured claim for

10  that portion of the fees and expenses that aren't paid in

11  cash.  We have filed two proofs of claims, as a matter of

12  fact, one on behalf of the Quip holders for principal and

13  interest due under the Quips, and that is the proof of claim

14  that has all the focus in terms of the adversary proceeding.

15  We have also filed a second proof of claim, which is our

16  standard practice for the fees and expenses of the indenture

17  trustee, and to the extent that those are not paid under

18  whatever theory, whether it be pursuant to the plan or

19  whether it be a substantial contribution in cash by the

20  debtor on the effective date, there is solid case law which

21  is undisputed that those fees and expenses post-petition are

22  an unsecured claim and payable by the debtor as an unsecured

23  claim.  Thank you.

24  THE COURT:  All right.  Well, I'll take -- Is that

25  it?  Everybody's got their briefs in, now they've got all

1    their arguments in -- just be a matter now to get a simple

2    order out.

3            UNIDENTIFIED SPEAKER:  Simple?

4            THE COURT:  Up or down.  All right.  I don't think

5    there's anything further; is there?

6            MS. DENNISTON:  There's nothing further on the

7    agenda today, Your Honor.

8            THE COURT:  Okay, then, we'll be adjourned.

9            ALL:  Thank you, Your Honor.

10           (Whereupon at 2:20 p.m. the hearing in this matter

11   was concluded for this date.)

12

13

14

15

16

17

18           I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   _Elaine M. Ryan_                        5-09-05
     Elaine M. Ryan
24   2801 Faulkland Road
     Wilmington, DE 19808
25   (302) 683-0221